LAW OFFICES OF THOMAS M. MULLANEY
THOMAS M. MULLANEY
708 Third Avenue, Suite 2500
New York, New York, 10017
Tel. (212) 223-0800
Fax: (212) 661-9860
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

DOVER LIMITED,

            Plaintiff,

      v.

Alain Assemi, Hartsfield Capital Securities, Inc.,
Hartsfield Capital Group, Stephen J. Lovett,
John H. Banzhaf, Delbert D. Reichardt,
Mansell Capital Partners, LLC., Thomas O. Begley,
Thomas O. Begley & Associates, T. J. Morrow,
and TJ Morrow PC,

            Defendants.

-------------------------------------------------------X

**08 CV 1337**

Case No.

COMPLAINT

     Plaintiff Dover Limited (hereinafter "Plaintiff") file this Complaint against Defendants Alain Assemi, Hartsfield Capital Securities, Inc., Hartsfield Capital Group, Stephen J. Lovett, John H. Banzhaf, Delbert D. Reichardt, Mansell Capital Partners, LLC, Thomas O. Begley, Thomas O. Begley & Associates, T J Morrow, and TJ Morrow PC for engaging in a well scripted scheme to steal millions of dollars from it.  Left with no alternative, Plaintiff has filed this lawsuit and would respectfully show as follows:

## I.  THE PARTIES

1.      Plaintiff Dover Limited is a Hong Kong company with its principal place of business located at 1 Scotts Road, #16-03 Shaw Centre, Singapore 228208.

2.      Defendant Assemi is an individual residing at 15650 Vineyard Boulevard, Suite A131, Morgan Hill, California 95037.

3.      Defendant Hartsfield Capital Securities, Inc. is a Georgia corporation whose principal place of business is located at 3775 Mansell Road, Alpharetta, Georgia 30032.

4.      Defendant Hartsfield Capital Group is a Georgia corporation whose principal place of business is located at 3775 Mansell Road, Alpharetta, Georgia 30022.

5.      Stephen J. Lovett is an individual who is a Georgia citizen upon information and belief., who can be served at 3775 Mansell Road, Alpharetta, Georgia 30022.

6.      John H. Banzhaf is an individual who is a Georgia citizen upon information and belief who can be served at 3775 Mansell Road, Alpharetta, Georgia 30022.

7.      Delbert D. Reichardt is an individual who is a Georgia citizen upon information and belief who can be served at 3775 Mansell Road, Alpharetta, Georgia 30022.

8.      Thomas O Begley is an individual who is a Georgia citizen residing at 570 Clarinbridge Way, Alpharetta, Georgia 30022

9.      Thomas O Begley & Associates is, upon information and belief, a Georgia Corporation with its principal place of business located at 570 Clarinbridge Way, Alpharetta, Georgia 30022.

10.      Defendant T. J. Morrow ("Morrow") is an individual residing at 2501 Blue Ridge Road, Suite 150, Raleigh, North Carolina 27607.  Morrow can be served at his business office, TJ Morrow & Associates, now located at 110 Wall Street, New York, NY 10053.

11.     TJ Morrow PC is a New York professional corporation whose principal place of business is now located at 110 Wall Street, New York, NY 10053.

## II. JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1332 because there is complete diversity of citizenship between Plaintiff and Defendants.  Plaintiff Dover is a Hong Kong Corporation with its principal place of business located in Singapore.  None of the defendants is incorporated in, reside in or have their principal place of business in Hong Kong nor Singapore.  Thus, complete diversity of citizenship exists between the plaintiffs and defendants.  The amount in controversy also exceeds $75,000.  Based on the diversity of citizenship and the amount in controversy, this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332.

13.     Venue is proper in the Southern District of New York because all or part of the factual events that occurred in this case arose in the Borough of Manhattan, New York, New York.

## III.    BACKGROUND FACTS – DEFENDANTS' SCHEME

**A.    The Hartsfield Theft**

14.     Plaintiff's initial introduction to Hartsfield occurred in June of 2003, and it was made by an individual who has devoted himself, successfully, to a career of fraud and Ponzi schemes.  Dover and its Director, Ms. Wendy Sui Cheng Yap, had the profound misfortune of being ensnared by Defendant Assemi in 2003, when he referred Dover to a company called A.B. Watley, Inc ("Watley") to invest its funds.  Although Defendant Assemi held himself out as an investment professional, and provided investment advice to Dover, he holds no licenses as an investment professional.

15.     Only days after Dover entrusted $10,000,000 to Watley, Watley stole $3,000,000 from Dover to cover a bad "short" trade made by its chief proprietary trader Jay Amore, now a convict and

cooperating witness against other Watley employees in the so-called "Squawk Box" case in the Eastern District of New York.

16.    Knowing full well that Watley had stolen those funds from Dover, having actually approved it according to Jay Amore in trial testimony, Defendant Assemi told Dover's Ms. Yap a very different story, saying it was still available, and that records showing a loss were a computer glitch, and the like.

17.    Defendant Assemi then professed shock that Watley had treated Dover this way, and referred her to another trading firm called Hartsfield Capital Securities ("Hartsfield"), the broker-dealer of Defendant Hartsfield Capital Group ("Hartsfield Group"). Defendant Assemi claimed to know Hartsfield's Thomas O. Begley ("Begley"), and to know that he was a successful investor. Regrettably, Dover again took Defendant Assemi's advice, and invested the $6.75MM with Hartsfield that Watley had not stolen. In a litigation that Dover instituted in this Court, Defendants Watley and Assemi entered into Settlement Agreements with Dover, on which they both promptly defaulted. Dover is actively pursuing judgment collection efforts against Watley, and its parent A.B. Watley Group, Inc.

18.    To win Dover's business, Hartsfield claimed that it had substantial experience in foreign and domestic project financing ventures, and that these financing ventures had been highly financially profitable to its clients. One such business venture discussed with Plaintiff was investing with Mansell Capital Partners ("Mansell"), a project finance vehicle managed and directed by Hartsfield and incorporated by Hartsfield Group as a "single purpose investment vehicle." Assemi also falsely represented that his company, Elfort Company, S.A., was a subsidiary of Hartsfield and Mansell. Mansell in turn made its investments through secured short-term bank and corporate notes, or so Dover was told. These notes were purportedly purchased at substantial discounts and re-sold for a profitable

4

return.  These false claims were made by Defendants Assemi, Defendant Stephan Lovett, the President

of Hartsfield Group, and John H. Banzhaf ("Banzhaf") as President of Hartsfield.

19.     Hartsfield and Assemi also claimed that the investments were extremely secure, in fact

describing the investment as being in a "non-depletion account," because they were not only in short

term AA-rated notes, issued by AA-rated institutions, but that the account was backed by a $25MM

fidelity bond.  No such fidelity bond existed.

20.     .  Defendants Lovett, Banzhaf and Reichardt also tried to further legitimize the financing

deals to Plaintiff by claiming that Hartsfield and its employees invested in the same business ventures

where they would invest Plaintiff's money.  That claim of Hartsfield and its employees were false.

21.     According to Hartsfield, the length of time that Plaintiff participated in the investment

projects would remain Plaintiff's decision alone.  Plaintiff was not required to maintain any weekly,

monthly, or yearly balance.  In fact, Hartsfield agreed that Plaintiff could request the return of all or

some of her principal on a moment's notice.  That representation by Hartsfield and Defendant Begley

was false.

22.     After accepting Dover's funds on July 16, 2003, Hartsfield Group suddenly encountered

"delays" in finding investments, as obliquely claimed by Stephan Lovett, also described as Hartsfield

Group's President.  After negotiation, Hartsfield agreed to return $2.5MM of Dover's money, and then

introduced another investment program to entice Dover and keep the remaining $4.25MM.

23.     This time Dover's funds would be held in Hartsfield Capital Group's "attorneys insured

escrow account," pending deployment to the Mansell Capital Partners account when an appropriate

project finance opportunity becomes available, and only with Dover's approval.  That representation

was false.

24.    Plaintiff's director came to the United States in October 2003 to visit Hartsfield's office. During the visit, she met many of Hartsfield's employees and officers. They discussed investments, business opportunities and other related matters with Ms. Yap. Hartsfield again stressed that the safety of its investments, the experience of its people, and the principal guarantee were reasons why Plaintiff should stay invested with Hartsfield. Hartsfield officers Begley, Lovett, and Banzhaf also represented that they personally were managing Plaintiff's investment projects.

25.    In November 2003, Plaintiff notified Hartsfield that it needed a partial return of principal because of unforeseen business issues. Initially, Plaintiff requested that two million be transferred to its account, but it later reduced the amount to one million. That one million dollars was transferred in December 2003. Plaintiff's remaining balance with Hartsfield was then approximately $3,250,000.

26.    Hartsfield continued to promise it could generate significant profits with Plaintiff's remaining $3.25MM. According to Hartsfield, Plaintiff's money was now supposed to be invested in a $100 MM financing venture, and Plaintiff was to receive at least a 30% return on her investment.

27.    In early January 2004, Hartsfield sought to convince Plaintiff that it was generating significant profits on Plaintiff's money. At that time, Banzhaf sent approximately $97,000 to Plaintiffs -- representing that the funds were profits generated by the Hartsfield deals. Defendants Hartsfield/Mansell/Banzhaf also paid $1,498,387 to Plaintiff in "interest." Given the disposition of the funds, those payments were simply a return of Dover's principal, in classic Ponzi scheme fashion.

28.    In July 2004, Plaintiff met with Defendant Begley and other Hartsfield employees in New York, at the Tribeca Grand hotel. During the meeting, Hartsfield and Begley repeatedly stressed that Plaintiff's money was secure and substantial returns were being generated from her investments. Begley stressed that if Plaintiff continued investing with Hartsfield, additional profits would be distributed to plaintiff. Hartsfield also took this time in New York to pitch new business to Plaintiff. Hartsfield

wanted Plaintiff to not only invest in more funds, but Hartsfield also attempted to convince Plaintiff to

set up introductions with Plaintiff's Director's wealthy contacts and friends in Singapore. Hartsfield

again stressed that any new investments from those friends would have principal protection like

Plaintiff's prior investments.

29.    Not long after the July 2004 New York meeting, Plaintiff informed Hartsfield that she

needed $1.5MM of her money.    Begley responded the next day, telling Plaintiff "I will have it taken

care of." Two weeks later, Plaintiff contacted Begley again, telling him the $1.5MM was needed but not

yet received. This time, Begley claimed it was a minor technicality that had caused the problem.

Begley again promised that the money would be coming shortly.

30.    When the money had not arrived by the end of September, Plaintiff again stressed to

Hartsfield the necessity of having some of her invested funds returned. Begley and Hartsfield again

claimed the funds would be transferred to Plaintiff.   On October 18th, Begley went so far as to say

$1.5MM would be transferred the following day. This back and forth, with Plaintiff requesting that the

money be returned, and getting only excuses in return, continued for months. Plaintiff requested its

funds on: (i) November 16, 2004; (ii) December 13, 2004; (iii) February 18, 2005; (iv) March 1, 2005;

(v) April 21, 2005; (vi) June 7, 2005; (vii) August 19, 2005; (viii) September 19, 2005; (ix) September

29, 2005; and (x) October 11, 2005. Each time Plaintiff requested the funds, Hartsfield stated that the

funds would be coming shortly. Over the course of several months, the Hartsfield employees named as

defendants all repeated this claim, falsely.

31.    Eventually, Hartsfield began telling Plaintiff that the money under its trust and control

had been stolen by an unscrupulous lawyer in Canada. Defendant Begley had previously represented

that this attorney, William Kerr, was Hartsfield's attorney.  To attempt to show that Dover's funds were

insured, after Hartsfield had Dover's funds, Defendant Begley had previously provided an expired certificate of Kerr's malpractice insurance.

32.    Dover's Ms. Yap challenged Mr. Begley's proffer, noting that it was inconsistent with Defendant Lovett's promise that insurance on the fund was in place. No evidence of that insurance or a fidelity bond was provided however.

33.    Hartsfield still claimed Plaintiff would be repaid the money. In fact, on February 18, 2005 Defendant Banzhaf claimed that a Letter of Credit was in place which would secure repayment to Dover. This representation was false.

34.    Hartsfield further failed to explain to Dover how the funds earmarked for investment exclusively in AA-rated bank notes were instead entrusted to Mr. Kerr. Nor did Hartsfield reveal that the investment of Dover's funds was actually only on the basis of Hartsfield's close relationship with an individual apparently named Gordon Mascarenhas, an Ontario businessman who claimed that Kerr could pay an extraordinary rate of interest "against" funds held in his insured trust account.

35.    Mr. Kerr eventually claimed that this insured trust account was allegedly in an unnamed bank in Spain. The funds in this account have never resurfaced.

36.    Incredibly, on August 31, 2005 Defendant Begley wrote on Hartsfield Group letterhead that Mansell had Dover's $3.25MM in its custody, apparently reflecting Dover's remaining $1,751,613 in principal, and the due interest. That representation was false.

37.    In September 2005, Hartsfield Executive Vice President Del Reichardt wrote to Dover's Ms. Yap, carbon copying Defendant Lovett, stating that "[w]e are very mindful of our obligation to you" and that they were moving forward with a "new program" that would "reduce our outstanding obligation to you." Defendant Reichardt did not address Dover's queries about the alleged insurance for the

investment, nor its queries about whether he and Defendant Banzhaf had in fact personally "invested" with Kerr as Hartsfield previously claimed.

38.    Also in September 2005, Plaintiff requested from Defendant Lovett a copy of the insurance policy that Hartsfield had previously told Plaintiff protected its funds.  No evidence of such a policy or fidelity bond was ever provided.

39.    Ever audacious, on April 22, 2006 Defendant Begley again claimed on Hartsfield Group letterhead that Mansell was holding Dover funds in the amount of $3.25MM.  This claim was false.

40.    Concomitant with his false statements about Dover's funds, Begley began orchestrating another fraudulent scheme to steal even more money from Plaintiff.  To effectuate this fraudulent scheme, Defendant Begley enlisted the assistance of Hartsfield's New York lawyer and agent, Defendant Morrow.

A.    **The Begley-Morrow Theft**

41.    Defendant Begley, proclaiming his independence from Hartsfield and sorrow over the loss of Plaintiff's funds, proposed that a new business be formed which would purchase term-life insurance policies at less than face value and collect the distributions at a later date.  Begley also claimed that he and his new entity, Thomas O. Begley & Associates, would use this new business venture to pay back the $3.25 MM that Hartsfield had previously "borrowed" from Plaintiff.  Hartsfield also acknowledged its obligation to re-pay Plaintiff her $3.25MM as well, and that Begley's willingness to assume that debt did not extinguish Hartsfield's obligation.

42.    To start the business, Begley represented that a working capital loan of $900,000 was necessary.  He also introduced a new person into the scheme, T.J. Morrow.  Defendant Morrow is a New York attorney who is also General Counsel to Hartsfield, a fact that no defendant disclosed to Plaintiff.

43.    The working capital funds were supposedly to be used for drafting the necessary formation documents, coordinating the acquisition of insurance policies, and paying Mr. Morrow his legal fees.    According to Begley, Morrow was a licensed New York lawyer who had participated in a number of multi-million dollar deals.    Additionally, the fact that Plaintiff would send funds to Defendant Morrow's attorney escrow account was also designed to give Plaintiff peace of mind.

44.    Begley and Morrow flew from New York to Singapore in the summer of 2006.    While in Singapore, Morrow and Begley discussed the business venture and the alleged steps being taken to recover Plaintiff's funds from the Canadian lawyer and his insurance policy.    Both Morrow and Begley stressed that Plaintiff would recover the money Hartsfield had lost – whether through a collection process or through the new business venture.

45.    As a trained attorney, Defendant Morrow knew that his employment by Hartsfield would have had a material effect on Dover's willingness to loan funds to this new venture.    Defendant Morrow's failure to disclose that fact was fraudulent, and an abuse of his status as an attorney.

46.    Based on their oral representations in Singapore, and correspondence sent from New York and Georgia, Plaintiff agreed to enter into the new business venture.    In late October, Plaintiff wired $900,000 to the "Escrow & Clients Funds Mgt Account" of TJ Morrow, PC, "Attorneys-at-Law." Warning signs emerged swiftly.

47.    Beginning in November 2006, Plaintiff contacted Begley and Morrow about the status of both the business venture and the status of the funds.  Plaintiff complained that they had already missed an interest payment, due by the terms of the Agreement, and Dover wanted to know the status of its $900,000.  Responding to Plaintiff's inquires, Morrow began sending correspondence from New York to Singapore describing in a Byzantine fashion the new business venture, styled the Insuragift program.

10

48.     Morrow claimed that he and Begley were in the process of forming the Insuragift program, and he was certain that it would succeed. Morrow further represented that as a result of the business venture Plaintiff would be repaid her money in an efficient and timely manner. Finally, Morrow also attempted to explain the (deliberately) convoluted business structure that he and Begley were creating for Insuragift – a venture that turned out to be just another scheme to steal Plaintiff's money.

49.     Becoming suspicious about yet another excuse for why Dover had still not been repaid, Dover demanded: i) the return of its money, ii) a detailed description of where the $900,000 had been spent, and iii) supporting documents evidencing the distributions. From New York, Morrow sent Plaintiff a general e-mail purportedly listing where the money had been spent. No back-up documents or further explanations were provided. Not a single dime was returned, even though by Morrow's own account $313,360 of Plaintiff's money still remained.

50.     Plaintiff again demanded that Morrow and Begley send the back-up documents and return her money. When no documents were provided, Plaintiff contacted the law firm of Edwards Angell Palmer & Dodge, a vendor listed in Morrow's expense report, and discovered that Morrow had misrepresented the amount that had actually been paid.

51.     In December of 2006 a representative of Dover, Mr. Conrad Seah, and Dover's Ms. Yap traveled to New York and met with Defendant Begley to investigate the additional theft. Defendant Begley offered more excuses, and no explanation for what he did to "earn" $330,000 of his fees from the "escrow." Mr. Seah met with Defendant Morrow as well, and instructed him to return unused funds from the escrow account to Dover. Defendant Morrow refused, and also failed to produce one piece of independent evidence reflecting the remaining $570,000 of "expenses" he had generated and paid without Dover's authorization.

52.     In fact, Defendant Morrow actually claims to be owed $100,000, as he billed some $400,000 to the escrow for his own legal services. How this sizeable fee was earned is left a mystery, as the Insuragift program never did a nickel of business, and in fact was found to be likely forbidden under New York's insurance regulatory apparatus by the very attorneys Defendant Morrow retained to draft corporate documents.

53.     Based on Dover's discovery of this fraud and Morrow/Begley's failure to return her money, Plaintiff terminated her professional relationship with Morrow and Begley in late November 2006. Plaintiff again demanded the return of her money. No money has been returned.

54.     True to form, Defendant Begley blamed Defendant Morrow's "pernicious behavior" for the loss of $900,000, and claimed that he had hired an attorney to pursue Defendant Morrow. No record of such a litigation appears on Pacer for the Southern District of New York, nor on the eCourts electronic docket for New York State Supreme Court.

55.     What makes Defendant Morrow's conduct especially egregious is not just that he is an attorney (Defendant Lovett apparently trained as an attorney as well) but that he was Ms. Yap and Mr. Seah's attorney, having sent them both as clients a document he styled "Attorney Work Product", naming them as his clients, after he had accepted Dover's funds into his "Escrow & Clients Funds Mgt Account." Nothing disgraces the profession of law more than an attorney plundering his own client.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AGAINST ALL DEFENDANTS

#### Common Law Fraud

56.     Plaintiff re-alleges paragraphs 1 through 55.

57.     All Defendants fraudulently schemed to steal money from Plaintiff. The misrepresentations began in 2003 when Plaintiff was told by Defendant Assemi, and then the Hartsfield Defendants, that its investment at Hartsfield would be guaranteed and insured, and in fact would be invested at all. None of these representations was true. Instead, Plaintiff lost $4,150,000 because of the fraudulent scheme of Defendants.

58.     Once receiving Plaintiff's money, Defendants perpetuated the fraudulent scheme by convincing Plaintiff to keep its money with Defendants. Defendants even went so far as to transfer some of the principal back to Plaintiff, misrepresenting the payment as profit.

59.     Defendants defrauded Plaintiff by depositing Plaintiff's funds with an attorney located outside of the United States, as opposed to investing those funds in AA-rated bank notes as they had represented they would.

60.     Defendants further perpetuated the fraudulent scheme in the summer of 2006 when Defendants Begley and Morrow traveled to Singapore in an effort to convince Plaintiff they could recover her lost $3.25MM. They told Plaintiff that if Dover only transferred an additional $900,000 to them the lost funds could be recovered either through collection efforts or Insuragift.

61.     Defendants never intended to form any new business, to institute efforts to recover Plaintiff's funds or perform any other acts to obtain Plaintiff's lost money. Instead, Defendants simply pocketed Plaintiff's money, generated a bogus paper trail to attempt to justify their "fees," and never returned any lost principal.

62.     Plaintiff reasonably relied on Defendants' misrepresentations, and her reasonable reliance led to Plaintiffs loss of $4.15MM and other similar, related damages.

## SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Breach of Fiduciary Duty

63.    Plaintiff re-alleges paragraphs 1 through 62.

64.    Defendant Morrow represented himself to be Plaintiff's counsel.  He failed to disclose that he was actually Hartsfield's counsel.  As its lawyer and custodian of its funds, Morrow owed Plaintiff a fiduciary duty to care for its interest, to ensure that it was adequately protected, and to put its interest above his own.  Morrow, however, did the opposite.  He stole Plaintiff's money.

65.    The other Hartsfield defendants also owed Plaintiff a fiduciary duty.  As Plaintiff's investment advisor, Assemi and Hartsfield represented that it would take Plaintiff's money under their care, custody and control, and that Hartsfield had appropriate insurance to protect Plaintiffs funds, and that Plaintiffs funds would be invested in secure financial products.  Hartsfield breached this fiduciary duty by misappropriating Plaintiff's funds, failing to maintain insurance the investments, and misrepresenting the status of Plaintiff's investment on several occasions.

66.    Defendants Morrow and Hartsfield chose to abuse their positions of trust and misappropriate Plaintiff's money.  As a result, Plaintiff was damaged by their malfeasance, and they are liable for the damages caused by their breaches of fiduciary duty.

## THIRD CAUSE OF ACTION
## AGAINST HARTSFIELD AND HARTSFIELD GROUP

### Breach of Contract

67.    Plaintiff re-alleges paragraphs 1 through 66.

68.    Defendants agreed in the summer of 2003 that Plaintiff's money would be invested, be invested in AA-rated bank notes, and that its investment would be protected by insurance. Defendants expressly guaranteed to Plaintiff in conversations, telephone calls, and written correspondence that the

14

investments were insured and secured. Defendants' representations were subsequently documented in a written agreement.

69.     Plaintiff complied with all conditions precedent to her obligations under the agreement by transferring funds to Defendants. Rather than follow the terms of the contract, Defendants took the money and used it for their own purposes. By failing to comply with the terms of its obligations under the agreement, Defendants breached the contract. Plaintiff has been damaged as a result of Defendants conduct, and they are liable for those damages.

## FOURTH CAUSE OF ACTION
## AGAINST BEGLEY AND MORROW DEFENDANTS

### Breach of Contract

70.     Plaintiff re-alleges paragraphs 1 through 69.

71.     In the summer of 2006, Defendants Morrow and Begley agreed to form a business venture that would be used to re-pay Plaintiff's lost funds.   Plaintiff agreed to transfer $900,000 to these Defendants in order recover its funds, and also generate a profit. Rather than use the money for its intended purpose, Defendants Morrow and Begley used the money for their own purposes.

72.     By transferring the money to Defendants Morrow and Begley, Plaintiff complied with all conditions precedent to the contract. Defendants, however, did not comply with their obligations under the agreement. Their actions, therefore, constitute a breach of contract. Plaintiff was damaged as a result of Defendants breach of contract, and they are liable for the damages that they have caused.

## FIFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Unjust Enrichment

73.     Plaintiff re-alleges paragraphs 1 through 72.

74.     Defendants were enriched by Plaintiff's remittances of funds.

75.    Defendants' enrichment has been at Plaintiff's expense.

76.    The circumstances are such that equity and good conscience Defendants must return $4,150,000.00 in funds to Plaintiff.

77.    By reason of the foregoing, Plaintiff is entitled to judgment against Defendants in an amount equal to the value of all benefits wrongfully and unjustly received by them, together with interest, in an amount to be determined at trial, but not less than $4,150,000.00.

78.    Plaintiff has no adequate remedy at law.


## SIXTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Violation of Section 10(b) of the Securities Exchange Act of 1934
### and Rule 10b-5 of the Securities and Exchange Commission

79.    Plaintiff re-alleges paragraphs 1 through 78.

80.    At all relevant times, Defendant Assemi held himself out to Plaintiffs as an investment professional and requested that Plaintiffs place funds with Hartsfield for the purported purpose of investing in certain securities, namely a Non-Depletion Account allegedly offered by Hartsfield, an investment program purportedly designed by Hartsfield to obtain favorable rates of return and provide complete security for Plaintiffs' investment.

81.    At all relevant times, Defendant Assemi represented that (i) Hartsfield would invest Plaintiff's money in a Non-Depletion Account, and that (ii) Dover's principal would not depreciate or "deplete."

82.    Defendant Assemi's aforementioned representations to Plaintiff were false, and Defendant Assemi knew they were false at the time they were made.

83.    At all relevant times Defendant Assemi intentionally and/or recklessly omitted to inform Plaintiff of material information that would have effected its decision to invest with Hartsfield.

84.    The Hartsfield Defendants, and Defendants Lovett, Banzhaf, Reichardt and Begley also intentionally took steps to mislead and deceive Plaintiff by either hiding from them the true state of affairs of Dover's investment or by making affirmative misrepresentations or omissions as to, among other things, the existence of insurance and/or a fidelity bond securing Plaintiff's investment, and that Plaintiff's funds would be invested in AA-rated bank notes.

85.    Defendants' aforementioned representations to Plaintiff were false, and Defendants knew they were false at the time they were made.

86.    At all relevant times Defendants intentionally and/or recklessly omitted to inform Plaintiff of material information that would have effected its decision to invest with Hartsfield.

87.    The false and fraudulent misrepresentations and omissions alleged above were made and/or caused to be made by Defendants with the intent that Plaintiff would rely on those misrepresentations and omissions, which it did, and with the purpose and intent to deceive Plaintiff.

88.    In reasonable reliance upon the above misrepresentations and omissions, Plaintiffs deposited $6,750,000.00 with Hartsfield, $3,250,000.00 of which has never been returned according to its own admissions.

89.    Defendants' misrepresentations and omissions were made in connection with the sale and purchase of securities.

90.    But for Defendants' misrepresentations and omissions, Plaintiff would not have invested funds with Hartsfield at all.

17

91.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiff has suffered money damages in an amount to be determined at trial, but not less than $3,250,000.00, excluding interest.

92.    In light of the reckless and egregious conduct by Defendants, Plaintiff is entitled to punitive damages in an amount to be determined at trial, but which Plaintiff believes to be in excess of $5 million.

## SEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS (excluding Assemi)

### Conversion

93.    Plaintiff realleges paragraphs 1 through 92.

94.    Plaintiff placed its money with Hartsfield for the purported purpose of investing in a Hartsfield-managed Account.

95.    In July 2003, Plaintiff remitted $6.75 million to Hartsfield for the purpose of investing such monies.

96.    Hartsfield did not invest all of Plaintiff's money in an investment program or security.

97.    Instead, Hartsfield diverted at least $3,250,000 of Plaintiff's money for the purpose of wrongfully and unlawfully enriching itself.

98.    As a direct and proximate result of Hartsfield's conduct, Plaintiff has sustained damages in at least the amount of $3,250,000.00.

99.    Plaintiff subsequently placed its money with Defendants Begley and Morrow for the purported purpose of financing a investment program to securitize insurance policies.

100.    In October 2005, Plaintiff remitted $900,000 million to Defendants Begley and Morrow for the purpose of financing such a program.

101.    Defendants Begley and Morrow did not apply all of Plaintiff's remitted funds towards such an investment program.

102.    Instead, Defendants Begley and Morrow diverted some $880,000 of Plaintiff's money for the purpose of wrongfully and unlawfully enriching themselves.

103.    As a direct and proximate result of Defendants Begley and Morrow's conduct, Plaintiff has sustained damages in at least the amount of $880,000.00.

104.    In light of the reckless and egregious conduct by Defendants, Plaintiff is entitled to punitive damages in an amount to be determined at trial, but which Plaintiff believes to be in excess of $5 million.

## EIGTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Conspiracy

105.    Plaintiff re-alleges paragraphs 1 through 104.

106.    Throughout the course of their interaction with Plaintiff, Defendants have participated in a conspiracy to deprive Plaintiff of millions of dollars.  The conspiracy began in the summer of 2003 and continued through late 2006.  They used Plaintiff's money for their own benefit despite repeated promises that they would protect Plaintiffs funds, that no principal would be lost, and that the money invested was insured and would be invested in legitimate business operations.   Plaintiff has lost over four million dollars based on Defendants' misrepresentations.  Their actions were part of a conspiracy to deprive Plaintiff of its funds.

107.    As a member of the conspiracy, each of the defendants is liable for the ultimate damages caused to Plaintiff, which includes the over $4 million dollars in losses that occurred over the course of the conspiracy.  Plaintiff seeks to recover these damages from each and every Defendant.

**RELIEF REQUESTED**

WHEREFORE, plaintiff Dover Limited demands Judgment as follows:

A.     As to the First Cause of Action, awarding Plaintiff compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

B.     As to the Second Cause of Action, awarding Plaintiff compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

C.     As to the Third Cause of Action, awarding Plaintiff compensatory damages against Defendants Hartsfield Capital Group and Hartsfield Capital Securities, and Mansell Capital Partners, LLC, including interest thereon, in an amount to be determined at trial, but not less than $3,250,000.00;

D.     As to the Fourth Cause of Action, awarding Plaintiff compensatory damages against Defendants Begley and Morrow, including interest thereon, in an amount to be determined at trial, but not less than $880,000.00;

E.     As to the Fifth Cause of Action, awarding Plaintiff compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

F.     As to the Sixth Cause of Action, awarding Plaintiff compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

G.    As to the Seventh Cause of Action, awarding Plaintiff compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

H.    As to the Eighth Cause of Action, awarding Plaintiffs compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $4,130,000.00;

I.    As to all Causes of Action, Plaintiff seeks punitive damages against Defendants for the egregious fraudulent acts and breaches of fiduciary committed by Defendants, in an amount to be determined at trial, but no less than $5,000,000.00.

**WHEREFORE**, Plaintiff requests that a judgment be entered against Defendants as described above and for such other and further relief to which it may be justly entitled.

Dated: New York, New York
      February 11, 2008

Respectfully submitted,

LAW OFFICES OF THOMAS M. MULLANEY

By: _____
      Thomas M. Mullaney (TM 4274)

Attorneys for Plaintiff
Dover Limited
708 Third Avenue, Suite 2500
New York, NY 10017
(212) 223-0800
(212) 661-9860 (facsimile)