UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DOVER LIMITED,                                  :
                                                :
                            Plaintiff,          :        08-CV-1337 (LTS)(JCF)
                                                :
            vs.                                 :
                                                :        **DECLARATION IN SUPPORT**
ALAIN ASSEMI, et al.,                           :        **OF DEFAULT**
                                                :
                            Defendants.         :
                                                :
----------------------------------------------------------X
ALAIN ASSEMI,                                   :
                                                :
                                                :
                    Counter-Claim Plaintiff,    :
                                                :
            vs.                                 :
                                                :
DOVER LIMITED,                                  :
                                                :
                    Counter-Claim Defendant.    :
                                                :
----------------------------------------------------------X

I, Wendy Sui Cheng Yap, a Director of Plaintiff Dover Limited ("Dover"), make this

declaration pursuant to 28 U.S.C. § 1746 and state under the penalty of perjury of the laws of the

United States of America that the foregoing is true and correct.

    1.      In 2003, Dover began having discussions with Defendant Hartsfield Capital

Securities, Inc. and Hartsfield Capital Group ("Hartsfield") (they did not distinguish between the

two) about investing in foreign and domestic financing ventures.

    2.      Defendants Lovett, Begley, Banzhaf and Reichardt all made representations to

me about the investment strategy of Mansell Capital Partners ("Mansell"), orally and in writing,

all of which turned out to be false.

the Hartsfield Capital Securities "Project Finance Custodial Responsibilities" is attached as Ex A.

4.      According to Defendants Assemi, Lovett, Begley, Banzhaf and Reichardt, the risk associated with investing through Mansell was minimal.  The money was only to be used for purchasing short-term AA-rated notes, issued by AA-rated institutions.  Representations were also made that the invested funds would be backed by a $25MM fidelity bond.  Invested funds were supposed to be maintained in an attorney's escrow account, and released only for investment in the described securities.  Moreover, Dover was told that it could withdraw its money on demand, and the decision on whether or when to withdraw the money was Dover's alone.  A copy of a Mansell Capital Partners Board of Directors Resoultion, dated June 30, 2003, and signed by Defendants Lovett and Assemi, is attached as Exhibit B.  A copy of a letter from Defendant Begley, dated October 27, 2003, describing Mansell's function is attached as Ex. C

5.      Based on these representations, Dover wired money to Hartsfield's clearing firm, May Davis, for investing through Mansell.   In typical Ponzi-scheme fashion, Mansell did return some of my money to me as "interest," and so it, Hartsfield, Lovett, Begley, Banzhaf and Reichardt still have $1,498,387 of Dover's funds, exclusive of the promised interest.

6.      They never purchased the short-term notes with Dover's funds as they promised. Instead, they distributed these funds to themselves and their cronies, as well as sending funds to an attorney in Canada, William Kerr.  As it was belatedly revealed to me, he allegedly would invest the funds in an unspecified manner with an individual named Gordon Mascarenhas and obtain desirable returns.  Mr. Mascarenhas is a far cry from an AA-rated financial institution of course, and this alleged investment strategy is not what I had bargained for, nor does it seem to me to remotely approach handling Dover's funds with the standards charged to a fiduciary.

7.      Mr. Mascarenhas and/or Mr. Kerr, it was also later revealed to me, transferred Dover's funds to an unidentified bank in Marbella, Spain.  Throughout 2003-04, however, Dover was told only that unanticipated delays had been encountered, and it would take more time before Mansell's investment projects could begin.

8.      In July 2004, Dover met with Defendant Begley in New York at the Tribeca Grand Hotel.  During the meeting, Dover was told that its money was secure and substantial returns were being generated from its investment.  Dover was told that leaving its money in Mansell's hands would lead to continued distributions of profitable returns.  Dover relied on these representations.

9.      Not long after the July 2004 meeting, Dover requested that $1.5MM of its invested funds be returned.  Dover specifically contacted Defendant Begley about the return of these funds.  Defendant Begley responded that he would have it taken care of, and the money would be returned.

10.     Two weeks later, Dover again contacted Begley to determine why the money had not arrived. This time, Begley claimed that a minor technicality had caused a problem in transmitting the funds, but rest assured he would take care of the technical problem.

11.     When the money had still not arrived by September, Dover began demanding that the money be returned.  Despite repeated promises that the money was forthcoming, it was not.  Dover requested the return of its funds on multiple occasions, including on November 16th and December 13th in 2004, and February 18th, March 1st, April 21st, June 7th, August 19th, September 19th, September 29th, and October 11th in 2005.

12.    For example, on November 12, 2004 Defendant Banzhaf promised that he would be receiving Dover's funds for immediate remittance to Dover.  That promise turned out to be false.  A copy of Defendant Banzhaf's e-mail dated November 12, 2005 is attached as Exhibit D.

13.    Then, on February 18, 2005, Defendant Banzhaf informed me that "we" (he did not distinguish between Hartsfield and Mansell) anticipated receiving Dover's funds earlier that week, which never materialized.  A copy of Defendant Banzhaf's e-mail dated February 18, 2005 is attached as Exhibit E.

14.    As late as August 31, 2005, Defendant Begley wrote Dover on Hartsfield Capital Group letterhead and claimed that Mansell had Dover's $3.25MM in its Dover-dedicated account.  A copy of Defendant Begley's letter dated August 31, 2005 is attached as Exhibit F.

15. In the unlikely event that it is, Mansell and Lovett, Banzhai, Begley and Reichardt have refused to remit it. If it is not, Mansell and those defendants improperly converted my funds

I declare under the penalty of perjury that the foregoing was true and correct.

Executed on ~~June~~ July 3rd, 2008 in Singapore

_____
**WENDY SUI CHENG YAP**

**Exhibit A**

06/27/2003  01:11    0000000000                                                    PAGE  05

JUN-27-2003 15:49    HARTSFIELD CAPITAL            770 408 9100              F#511 P.004/005

# HARTSFIELD CAPITAL SECURITIES, INC.

### Project Finance Custodial Responsibilities

*Red*

There are two securities firms that work in concert to manage and maintain an ongoing safeguarding and monitoring of the client's principal investment and securities transactions. Hartsfield Capital Securities (HCS) introduces its client's trades to its affiliated broker for execution. Both of these firms, as registered members of the National Association of Securities Dealers, operate in a highly regulated business environment. The obligation and duty of the fiduciaries is to protect the clients invested funds and related securities investments at all times when such invested funds and securities are in the firms' fiduciary control.

HCS manages and directs the project finance vehicle which is Mansell Capital Partners (MCP) — under the stringent provisions of the agreements and instructions given to them by the client. The client funds are deposited in a bank account (J P Morgan Chase) in the client's name over which the client has complete control. The client is advised that the closing is ready to take place in the MCP account upon HCS's satisfaction that the issuer is ready to proceed and that the purchase can be effected resulting in a capital gain. Then, and only then, are the client funds transferred from the client account to the MCP account. *done 27/6/03*

Pursuant to a transfer of the client funds to MCP, the account is strictly governed in the following manner:

a. Funds in the account are under the sole control of HCS and its affiliated broker acting on the client's specific instructions as set forth in the Purchase Agreement and collateral documents between the client and HCS;

b. Only the client's funds and funds of no other client will reside in the designated MCP account;

c. Funds in the account may only be used to:

(i) acquire fully lendable, AA rated, cash-backed and registered bank-issued notes that are irrevocable and unconditional as to payment; and
(ii) acquire such securities where the available current market value of said securities is not less than the total amount of money paid for the securities;

d. Once the bank note has been acquired, a sell ticket is issued to convert the securities back into funds. Such sell ticket is executed by HCS and its affiliated broker. Upon completion of the sale transaction, funds in the MCP account are disbursed to the client pursuant to the client's prior instructions, the MCP project is funded, and the principal is positioned for the subsequent acquisition; and

e. Should the client issue a request to HCS at any time to transfer the client principal funds from the MCP account, such request would be honored by HCS and its affiliated broker without delay. Such instruction to transfer may occur prior or subsequent to a closing as is the client's wish to do so.

06/27/2003   01:11     0000000000                                           PAGE   06

27-2003 15:49     HARTSFIELD CAPITAL          770 408 9100          F#511 P.005/005

In summary, HCS and the the affiliated broker are operating as the client's fiduciaries under the strict governance of the securities regulations that bind them, and the client's specific instructions and agreements that also control them.  Thus the two firms act as the client's custodians to assure the preservation and integrity of the client invested funds.

John H. Banzhaf
President
Hartsfield Capital Securities, Inc.

**Exhibit B**

06/30/2003  00:11     0000000000

JUN-30-2003 13:38     HARTSFIELD CAPITAL          770 408 9100          F#524 P.002/009

## BOARD OF DIRECTORS' RESOLUTION

## FOR AUTHORIZATION FOR BANK ACCOUNT SIGNITURE

## FOR

## MANSELL CAPITAL PARTNERS, LLC

### A Georgia Limited Liability Company

We, the undersigned, representing all or a majority of Directors of MANSELL CAPITAL PARTNERS, LLC, having met and discussed the business herein set forth, have unanimously:

RESOLVED, that Ms. Wendy Yap, President of Dover Financial be and hereby is authorized to be the signatory on a bank account in the name of MANSELL CAPITAL PARTNERS, LLC with Mays Davis Group and its depository bank, PNC for the deposit of funds belonging to the LLC, such funds to be withdrawn only by check or wire transfer from the LLC and signed by Ms. Wendy Yap, Messer's Stephan Lovett and Alain Assemi of the LLC.

DATED this June 30, 2003

Stephan Lovett, Managing Director

Alain Assemi, Director

**Exhibit C**

*Hartsfld*

October 27, 2003


Dover Limited
Mrs. Wendy Yap & Mr. Kumar Krishna
56 Andrew Road
299968 Singapore


Via Fax (65-6520-2459)


Dear Wendy & Kumar:

SUBJECT:    PROJECT FINANCING ALTERNATIVE.

As I promised in our meeting in our office, I am forwarding a description of an alternative financing method that will achieve the same project finance goals but with greater comfort and transparency. This description is to clarify the structural features as well as the legal framework around the transaction. As you know, our current method provides protection against any and all risk of loss to the principal as a direct result of the securities acquired having a current market and value greater then the principal funds on deposit to acquire them. Nevertheless, to ask a client to move their capital to an unfamiliar institution requires faith. To that end, the following description affords the investor the rare opportunity to see the transaction as an insider rather then just a participant. As is inherent in our current methodology, the function of a secure transaction lies in providing both the issuer and exit market.

What differentiates this procedure from the current process is that the client maintains the account with their institution rather than moving the funds to a new location. In this way the transaction is completely transparent. Moreover, the client can relay on his own clearing and settlement institution for the efficacy of the securities.

### TRANSACTION OVERVIEW

The investment procedure is to establish a securities account with your registered broker dealer under the name of an entity contracted to acquire and borrow against the securities. In this case that would be Mansell Capital Partners, LLC. Hartsfield and its managers would provide explicit instructions for the acquisition of bank securities with a current market and current value.

The securities are identified by Hartsfield's recommendation, as the result of its own research. Where securities are to emanate from Hartsfield's identification, the broker dealer will be instructed to conduct due diligence to ascertain the efficacy of both the corporation and the nature of the security being offered.

The specific features of the transaction that mitigate risk to principal and insure return remain, namely:

- Your institution will act as custodian of all the funds and securities and be provided an Investment Policy statement outlining the Permitted Investments and activity that can occur in the account.

- Permitted Investments will be bank instruments issued by a major bank rated Aa/P-1 or better by Moodys, AA or better by S&P.

- The current market value of the security acquired shall be greater then the value of the deposit used to acquire the securities.

- Your institution will never permit purchase of securities before an exit market is identified, qualified, and simultaneously executed through a delivery versus payment account.

- Your institution will not permit withdrawal or transfer of the funds or the Permitted Investments from the account without your written consent other than profit withdrawals or transfers directed by the explicit trading instructions of the management group and approved by you.

STRUCTURE

Given the deep discount at which that the securities are offered, it is important to understand the restrictions that are imposed on these transactions. The actual mechanics of a secure transaction are essential to a successful, event free transaction. The discounted price of the instrument is determined by several factors such as type, term, maturity date and interest. The instruments can be purchased at two levels:

1. Fresh Cut (newly issued), or;

2. Seasoned (already issued).

Seasoned securities can be purchased in smaller denominations of $25-$50 million. However, because they are seasoned, you must be aware of all the restrictions that are associated with the original purchaser. If the securities were incorrectly purchased or have restrictions that were not disclosed, the issuing bank could contest payment.

Fresh Cut securities have fewer concerns, because the relationship between the issuer and the buyer is direct and primary. However, the minimum amount that must be purchased at one time is One Hundred Million US dollars to Five Hundred Million US Dollars. Hence the major buyers of the instruments are large insurance companies, pension funds, and large corporations in the private sector, Governments and in some cases high net worth individuals.

One of the drawbacks of such deeply discounted paper is that all these transactions are Private Placement, Non – Public Transactions. Therefore, they are restricted from being sold once purchased. As a result, Hartsfield arranges what is called a non-recourse loan. The term "non-recourse loan" is defined in this case as a loan arrangement under which the lender has no recourse against the borrower beyond the principal value of the security itself. In other words, the borrower is not personally at risk to repay the loan beyond the security that is pledged.

Thus, with this alternative investment method, the investor is able to achieve gains of two or three percent on their investment dollars in each completed transaction without exposure to risk of principal.

Currently, we have the ability to capture a contract for $5 billion USD directly from an AA rated bank for an AA rated security. The project finance trading transaction would be identical to the one that we previously proposed to you. However, this is fresh cut and the sizes of the trades are in increments of $100 million. The alternative structure that we have suggested will provide you the greater security and transparency. Through this structure, we have completely eliminated any possible risk to your principal.

STEPS TO CREATE A NON-DEPLETION SPECIAL PURPOSE TRADING ACCOUNT

(*Note*: Funds that are to be invested must be blocked and reserved in an account under the name of Mansell Capital Partners, LLC

1. Open an account at a brokerage firm of your choosing under the name of Mansell Capital Partners, LLC.
2. Reserve and block funds in the amount of $100 million in the name of Mansell Capital Partners, LLC.
3. The Mansell Capital Partners account will only acquire the permitted investments, which have been pre-identified and which have a current value and a current market sufficient to produce the required and agreed returns.
4. As part of the transaction, Hartsfield's responsibility will be to provide a securitized lender to provide a flexible secured revolving credit facility against the instrument in the form of a non-recourse loan and with no upside restriction on transaction size.
5. Preferably a Delivery verse Payment account (DvP) for the lender will be established at the institution that is purchasing the said securities on behalf of Mansell in order to speed the settlement time (typically same day). However, a

*[handwritten margin note: Mansell has control]*

DvP account can be set up at any institution with which the lender feels comfortable.

6. These assets are investment grade, with superior credit ratings, generally AA rated, and are cash backed. Mansell will provide these assets as security for the loan. These assets would otherwise remain on its balance sheet to maturity as a result of the restriction from selling.

7. Safety of principal is assured as a result of your institution qualifying the transaction. If both sides of the transaction are not identified and qualified, no transaction is possible.

Please call me after your review so that we can discuss the appropriateness of this revised structure for our group.


Sincerely,



Thomas O. Begley
Vice President Business Development


TB/no

**Exhibit D**

**From:** Yaputri Pte Ltd
**Date:** 11/16/04 12:29:05
**To:** John Banzhaf
**Cc:** Tom Begley(Hartsfield Capital)
**Subject:** Re: The Return of the Trust Funds

Dear John,

Today is Tuesday 16th Nov and we have not yet received interest (due on 10th Nov) and nor principal (d Monday 15th Nov).
What is status now?

Thanks and regards
Wendy


------Original Message------

**From:** John Banzhaf
**Date:** 11/12/04 04:55:46
**To:** yaputri@singnet.com.sg
**Subject:** The Return of the Trust Funds


Wendy,

Today, Thursday, is Veteran's Day in the U.S. and the banks are closed. That is all that has prevented n receiving the interest due on the 10th of the month. I will receive it tomorrow and wire it on to your bank. I will receive $1.5 million in principal on Monday with the balance of your $3.25 million to be received on Wednesday or Thursday. The attorney we have been working with to ensure the return of the funds is co that the funds will be transferred as promised.

Best regards,

John


John H. Banzhaf
President
Hartsfield Capital Securities
Telephone: (770) 408-6390
Facsimile:    (770) 408-9100

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is p

confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient

employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, d

or copying of this communication may be strictly prohibited. If you have received this communication in error, please notify th

immediately by telephone call and return the communication at the address above via the United States Postal Service. Thank y

**Exhibit E**

**From:** <u>Wendy Yap</u>
**Date:** 19-Feb-05 10:49:34 AM
**To:** <u>John Banzhaf</u>
**Subject:** RE:

Dear John,

If we receive the interest on 18th Feb 2005 when are we getting the principal ( both intere[s]
and principal were supposed to be received on Feb 16th)?

Thanks and regards
Wendy


------Original Message------

**From:** <u>John Banzhaf</u>
**Date:** 18-Feb-05 11:26:02 PM
**To:** '<u>Wendy Yap</u>'
**Subject:** RE:


Dear Wendy,

We had anticipated receiving the principal and interest on Feb.16[th], but the inability of the judge to be in cou[r]
until Feb. 23rd has delayed it.

We are in possession of the Trust Attorney's letter to the court accompanied by a copy of the Letter of Credit
which will be processed once the judge returns. However, we are still expecting the interest this afternoon a[nd]
have been assured of its arrival.

We anticipate no further delays and thank you for your patience and confidence.

Regards,

John

John H. Banzhaf
President
Hartsfield Capital Securities
Telephone: (770) 408-6390
Facsimile:   (770) 408-9100

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privile[ged]

confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient or th[e]

employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distrib[ution]

or copying of this communication may be strictly prohibited.  If you have received this communication in error, please notify the sen[der]

immediately by telephone call and return the communication at the address above via the United States Postal Service.  Thank you.

**Exhibit F**



Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax



F I L E

Hartsfield

# HARTSFIELD CAPITAL

August 31, 2005

Mrs. Wendy Yap
Dover Limited
56 Andrew Road
Singapore 299968

Dear Mrs. Yap:

SUBJECT: ACCOUNT STATEMENT

This is to advise and to confirm that Mansell Capital Partners, LLC, Atlanta Georgia, is
holding in your account, funds in the amount of $3,250,000 as of today, August 31, 2005.

Very truly yours,

Thomas Begley
V.P. Business Development

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DOVER LIMITED,
                                    :      08-CV-1337 (LTS)(JCF)

              Plaintiff,          :

    vs.                            :

ALAIN ASSEMI, et al.,            :      **DECLARATION IN SUPPORT**

                                 :      **OF DEFAULT**

           Defendants.        :

                                 :
------------------------------------------------------------X
ALAIN ASSEMI,                 :

                                 :

          Counter-Claim Plaintiff,  :

    vs.                            :

DOVER LIMITED,             :

          Counter-Claim Defendant.  :

                                 :
------------------------------------------------------------X

       I, Wendy Sui Cheng Yap, a Director of Plaintiff Dover Limited ("Dover"), make this declaration pursuant to 28 U.S.C. § 1746 and state under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

       1.      In 2003, Dover began having discussions with Defendant Hartsfield Capital Securities, Inc. and Hartsfield Capital Group ("Hartsfield") (they did not distinguish between the two) about investing in foreign and domestic financing ventures.

       2.      Defendants Lovett, Begley, Banzhaf and Reichardt all made representations to me about the investment strategy of Mansell Capital Partners ("Mansell"), orally and in writing, all of which turned out to be false.

the Hartsfield Capital Securities "Project Finance Custodial Responsibilities" is attached as Ex A.

4.    According to Defendants Assemi, Lovett, Begley, Banzhaf and Reichardt, the risk associated with investing through Mansell was minimal. The money was only to be used for purchasing short-term AA-rated notes, issued by AA-rated institutions. Representations were also made that the invested funds would be backed by a $25MM fidelity bond. Invested funds were supposed to be maintained in an attorney's escrow account, and released only for investment in the described securities. Moreover, Dover was told that it could withdraw its money on demand, and the decision on whether or when to withdraw the money was Dover's alone. A copy of a Mansell Capital Partners Board of Directors Resoultion, dated June 30, 2003, and signed by Defendants Lovett and Assemi, is attached as Exhibit B. A copy of a letter from Defendant Begley, dated October 27, 2003, describing Mansell's function is attached as Ex. C

5.    Based on these representations, Dover wired money to Hartsfield's clearing firm, May Davis, for investing through Mansell.  In typical Ponzi-scheme fashion, Mansell did return some of my money to me as "interest," and so it, Hartsfield, Lovett, Begley, Banzhaf and Reichardt still have $1,498,387 of Dover's funds, exclusive of the promised interest.

6.    They never purchased the short-term notes with Dover's funds as they promised. Instead, they distributed these funds to themselves and their cronies, as well as sending funds to an attorney in Canada, William Kerr. As it was belatedly revealed to me, he allegedly would invest the funds in an unspecified manner with an individual named Gordon Mascarenhas and obtain desirable returns. Mr. Mascarenhas is a far cry from an AA-rated financial institution of course, and this alleged investment strategy is not what I had bargained for, nor does it seem to me to remotely approach handling Dover's funds with the standards charged to a fiduciary.

7.     Mr. Mascarenhas and/or Mr. Kerr, it was also later revealed to me, transferred Dover's funds to an unidentified bank in Marbella, Spain.  Throughout 2003-04, however, Dover was told only that unanticipated delays had been encountered, and it would take more time before Mansell's investment projects could begin.

8.     In July 2004, Dover met with Defendant Begley in New York at the Tribeca Grand Hotel.  During the meeting, Dover was told that its money was secure and substantial returns were being generated from its investment.  Dover was told that leaving its money in Mansell's hands would lead to continued distributions of profitable returns.  Dover relied on these representations.

9.     Not long after the July 2004 meeting, Dover requested that $1.5MM of its invested funds be returned.  Dover specifically contacted Defendant Begley about the return of these funds.  Defendant Begley responded that he would have it taken care of, and the money would be returned.

10.     Two weeks later, Dover again contacted Begley to determine why the money had not arrived. This time, Begley claimed that a minor technicality had caused a problem in transmitting the funds, but rest assured he would take care of the technical problem.

11.     When the money had still not arrived by September, Dover began demanding that the money be returned.  Despite repeated promises that the money was forthcoming, it was not. Dover requested the return of its funds on multiple occasions, including on November 16th and December 13th in 2004, and February 18th, March 1st, April 21st, June 7th, August 19th, September 19th, September 29th, and October 11th in 2005.

3

12.     For example, on November 12, 2004 Defendant Banzhaf promised that he would be receiving Dover's funds for immediate remittance to Dover.  That promise turned out to be false.  A copy of Defendant Banzhaf's e-mail dated November 12, 2005 is attached as Exhibit D.

13.     Then, on February 18, 2005, Defendant Banzhaf informed me that "we" (he did not distinguish between Hartsfield and Mansell) anticipated receiving Dover's funds earlier that week, which never materialized.  A copy of Defendant Banzhaf's e-mail dated February 18, 2005 is attached as Exhibit E.

14.     As late as August 31, 2005, Defendant Begley wrote Dover on Hartsfield Capital Group letterhead and claimed that Mansell had Dover's $3.25MM in its Dover-dedicated account.  A copy of Defendant Begley's letter dated August 31, 2005 is attached as Exhibit F.

15.   In the unlikely event that it is, Mansell and Lovett, Banzhaf, Begley and Reichardt have refused to remit it.  If it is not, Mansell and those defendants improperly converted my funds

I declare under the penalty of perjury that the foregoing was true and correct.

Executed on July 3rd, 2008 in Singapore

WENDY SUI CHENG YAP

**Exhibit A**

06/27/2003  01:11    0000000000                                        PAGE  05

JUN-27-2003 15:49    HARTSFIELD CAPITAL        770 408 9100        F#511 P.004/005

# HARTSFIELD CAPITAL SECURITIES, INC.

### Project Finance Custodial Responsibilities

There are two securities firms that work in concert to manage and maintain an ongoing safeguarding and monitoring of the client's principal investment and securities transactions. Hartsfield Capital Securities (HCS) introduces its client's trades to its affiliated broker for execution. Both of these firms, as registered members of the National Association of Securities Dealers, operate in a highly regulated business environment. The obligation and duty of the fiduciaries is to protect the clients invested funds and related securities investments at all times when such invested funds and securities are in the firms' fiduciary control.

HCS manages and directs the project finance vehicle which is Mansell Capital Partners (MCP) under the stringent provisions of the agreements and instructions given to them by the client. The client funds are deposited in a bank account (J P Morgan Chase) in the client's name over which the client has complete control. The client is advised that the closing is ready to take place in the MCP account upon HCS's satisfaction that the issuer is ready to proceed and that the purchase can be effected resulting in a capital gain. Then, and only then, are the client funds transferred from the client account to the MCP account.

Pursuant to a transfer of the client funds to MCP, the account is strictly governed in the following manner:

    a. Funds in the account are under the sole control of HCS and its affiliated broker acting on the client's specific instructions as set forth in the Purchase Agreement and collateral documents between the client and HCS;

    b. Only the client's funds and funds of no other client will reside in the designated MCP account;

    c. Funds in the account may only be used to:

        (i) acquire fully lendable, AA rated, cash-backed and registered bank-issued notes that are irrevocable and unconditional as to payment; and
        (ii) acquire such securities where the available current market value of said securities is not less than the total amount of money paid for the securities;

    d. Once the bank note has been acquired, a sell ticket is issued to convert the securities back into funds. Such sell ticket is executed by HCS and its affiliated broker. Upon completion of the sale transaction, funds in the MCP account are disbursed to the client pursuant to the client's prior instructions, the MCP project is funded, and the principal is positioned for the subsequent acquisition; and

    e. Should the client issue a request to HCS at any time to transfer the client principal funds from the MCP account, such request would be honored by HCS and its affiliated broker without delay. Such instruction to transfer may occur prior or subsequent to a closing as is the client's wish to do so.

06/27/2003  01:11    0000000000                                    PAGE  06

27-2003 15:49    HARTSFIELD CAPITAL       770 408 9100           F#511 P.005/005

In summary, HCS and the the affiliated broker are operating as the client's fiduciaries under the strict governance of the securities regulations that bind them, and the client's specific instructions and agreements that also control them. Thus the two firms act as the client's custodians to assure the preservation and integrity of the client invested funds.


John H. Banzhaf
President
Hartsfield Capital Securities, Inc.

Exhibit B

06/30/2003  00:11    0000000000

JUN-30-2003 13:38    HARTSFIELD CAPITAL          770 408 9100          F#524 P.002/009

# BOARD OF DIRECTORS' RESOLUTION

## FOR AUTHORIZATION FOR BANK ACCOUNT SIGNITURE

### FOR

## MANSELL CAPITAL PARTNERS, LLC

A Georgia Limited Liability Company


We, the undersigned, representing all or a majority of Directors of MANSELL CAPITAL PARTNERS, LLC, having met and discussed the business herein set forth, have unanimously:

RESOLVED, that Ms. Wendy Yap, President of Dover Financial be and hereby is authorized to be the signatory on a bank account in the name of MANSELL CAPITAL PARTNERS, LLC with Mays Davis Group and its depository bank, PNC for the deposit of funds belonging to the LLC, such funds to be withdrawn only by check or wire transfer from the LLC and signed by Ms. Wendy Yap, Messer's Stephan Lovett and Alain Assemi of the LLC.


DATED this June 30, 2003


Stephan Lovett, Managing Director


Alain Assemi, Director

**Exhibit C**

*Hartsfield*

October 27, 2003

Dover Limited
Mrs. Wendy Yap & Mr. Kumar Krishna
56 Andrew Road
299968 Singapore

Via Fax (65-6520-2459)

Dear Wendy & Kumar:

SUBJECT:    PROJECT FINANCING ALTERNATIVE.

As I promised in our meeting in our office, I am forwarding a description of an alternative financing method that will achieve the same project finance goals but with greater comfort and transparency. This description is to clarify the structural features as well as the legal framework around the transaction. As you know, our current method provides protection against any and all risk of loss to the principal as a direct result of the securities acquired having a current market and value greater then the principal funds on deposit to acquire them. Nevertheless, to ask a client to move their capital to an unfamiliar institution requires faith. To that end, the following description affords the investor the rare opportunity to see the transaction as an insider rather then just a participant. As is inherent in our current methodology, the function of a secure transaction lies in providing both the issuer and exit market.

What differentiates this procedure from the current process is that the client maintains the account with their institution rather than moving the funds to a new location. In this way the transaction is completely transparent. Moreover, the client can relay on his own clearing and settlement institution for the efficacy of the securities.

### TRANSACTION OVERVIEW

The investment procedure is to establish a securities account with your registered broker dealer under the name of an entity contracted to acquire and borrow against the securities. In this case that would be Mansell Capital Partners, LLC. Hartsfield and its managers would provide explicit instructions for the acquisition of bank securities with a current market and current value.

The securities are identified by Hartsfield's recommendation, as the result of its own research. Where securities are to emanate from Hartsfield's identification, the broker dealer will be instructed to conduct due diligence to ascertain the efficacy of both the corporation and the nature of the security being offered.

The specific features of the transaction that mitigate risk to principal and insure return remain, namely:

- Your institution will act as custodian of all the funds and securities and be provided an Investment Policy statement outlining the Permitted Investments and activity that can occur in the account.

- Permitted Investments will be bank instruments issued by a major bank rated Aa/P-1 or better by Moodys, AA or better by S&P.

- The current market value of the security acquired shall be greater then the value of the deposit used to acquire the securities.

- Your institution will never permit purchase of securities before an exit market is identified, qualified, and simultaneously executed through a delivery versus payment account.

- Your institution will not permit withdrawal or transfer of the funds or the Permitted Investments from the account without your written consent other than profit withdrawals or transfers directed by the explicit trading instructions of the management group and approved by you.

## STRUCTURE

Given the deep discount at which that the securities are offered, it is important to understand the restrictions that are imposed on these transactions. The actual mechanics of a secure transaction are essential to a successful, event free transaction. The discounted price of the instrument is determined by several factors such as type, term, maturity date and interest. The instruments can be purchased at two levels:

1. Fresh Cut (newly issued), or;

2. Seasoned (already issued).

Seasoned securities can be purchased in smaller denominations of $25-$50 million. However, because they are seasoned, you must be aware of all the restrictions that are associated with the original purchaser. If the securities were incorrectly purchased or have restrictions that were not disclosed, the issuing bank could contest payment.

Fresh Cut securities have fewer concerns, because the relationship between the issuer and the buyer is direct and primary. However, the minimum amount that must be purchased at one time is One Hundred Million US dollars to Five Hundred Million US Dollars. Hence the major buyers of the instruments are large insurance companies, pension funds, and large corporations in the private sector, Governments and in some cases high net worth individuals.

One of the drawbacks of such deeply discounted paper is that all these transactions are Private Placement, Non – Public Transactions. Therefore, they are restricted from being sold once purchased. As a result, Hartsfield arranges what is called a non-recourse loan. The term "non-recourse loan" is defined in this case as a loan arrangement under which the lender has no recourse against the borrower beyond the principal value of the security itself. In other words, the borrower is not personally at risk to repay the loan beyond the security that is pledged.

Thus, with this alternative investment method, the investor is able to achieve gains of two or three percent on their investment dollars in each completed transaction without exposure to risk of principal.

Currently, we have the ability to capture a contract for $5 billion USD directly from an AA rated bank for an AA rated security. The project finance trading transaction would be identical to the one that we previously proposed to you. However, this is fresh cut and the sizes of the trades are in increments of $100 million. The alternative structure that we have suggested will provide you the greater security and transparency. Through this structure, we have completely eliminated any possible risk to your principal.

STEPS TO CREATE A NON-DEPLETION SPECIAL PURPOSE TRADING ACCOUNT

(*Note*: Funds that are to be invested must be blocked and reserved in an account under the name of Mansell Capital Partners, LLC

1. Open an account at a brokerage firm of your choosing under the name of Mansell Capital Partners, LLC.
2. Reserve and block funds in the amount of $100 million in the name of Mansell Capital Partners, LLC.
3. The Mansell Capital Partners account will only acquire the permitted investments, which have been pre-identified and which have a current value and a current market sufficient to produce the required and agreed returns.
4. As part of the transaction, Hartsfield's responsibility will be to provide a securitized lender to provide a flexible secured revolving credit facility against the instrument in the form of a non-recourse loan and with no upside restriction on transaction size.
5. Preferably a Delivery verse Payment account (DvP) for the lender will be established at the institution that is purchasing the said securities on behalf of Mansell in order to speed the settlement time (typically same day). However, a

*[handwritten margin note: Mansell has control]*

    DvP account can be set up at any institution with which the lender feels comfortable.

6. These assets are investment grade, with superior credit ratings, generally AA rated, and are cash backed. Mansell will provide these assets as security for the loan. These assets would otherwise remain on its balance sheet to maturity as a result of the restriction from selling.

7. Safety of principal is assured as a result of your institution qualifying the transaction. If both sides of the transaction are not identified and qualified, no transaction is possible.

Please call me after your review so that we can discuss the appropriateness of this revised structure for our group.

Sincerely,

Thomas O. Begley
Vice President Business Development

TB/no

**Exhibit D**

**From:** Yaputri Pte Ltd
**Date:** 11/16/04 12:29:05
**To:** John Banzhaf
**Cc:** Tom Begley(Hartsfield Capital)
**Subject:** Re: The Return of the Trust Funds

Dear John,

Today is Tuesday 16th Nov and we have not yet received interest (due on 10th Nov) and nor principal (c Monday 15th Nov).
What is status now?

Thanks and regards
Wendy


--------Original Message--------

**From:** John Banzhaf
**Date:** 11/12/04 04:55:46
**To:** yaputri@singnet.com.sg
**Subject:** The Return of the Trust Funds


Wendy,

Today, Thursday, is Veteran's Day in the U.S. and the banks are closed. That is all that has prevented n receiving the interest due on the 10th of the month. I will receive it tomorrow and wire it on to your bank. I will receive $1.5 million in principal on Monday with the balance of your $3.25 million to be received on Wednesday or Thursday. The attorney we have been working with to ensure the return of the funds is co that the funds will be transferred as promised.

Best regards,

John


John H. Banzhaf
President
Hartsfield Capital Securities
Telephone: (770) 408-6390
Facsimile:   (770) 408-9100

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is p

confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient

employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, d

or copying of this communication may be strictly prohibited.  If you have received this communication in error, please notify th

immediately by telephone call and return the communication at the address above via the United States Postal Service.  Thank y

**Exhibit E**

**From:** Wendy Yap
**Date:** 19-Feb-05 10:49:34 AM
**To:** John Banzhaf
**Subject:** RE:


Dear John,

If we receive the interest on 18th Feb 2005 when are we getting the principal ( both interes
and principal were supposed to be received on Feb 16th)?

Thanks and regards
Wendy



------Original Message------

**From:** John Banzhaf
**Date:** 18-Feb-05 11:26:02 PM
**To:** 'Wendy Yap'
**Subject:** RE:


Dear Wendy,

We had anticipated receiving the principal and interest on Feb.16th, but the inability of the judge to be in cou
until Feb. 23rd has delayed it.

We are in possession of the Trust Attorney's letter to the court accompanied by a copy of the Letter of Credit
which will be processed once the judge returns. However, we are still expecting the interest this afternoon ar
have been assured of its arrival.

We anticipate no further delays and thank you for your patience and confidence.

Regards,

John

John H. Banzhaf
President
Hartsfield Capital Securities
Telephone: (770) 408-6390
Facsimile:   (770) 408-9100

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privile
confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient or th
employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distrib
or copying of this communication may be strictly prohibited.  If you have received this communication in error, please notify the sen
immediately by telephone call and return the communication at the address above via the United States Postal Service.  Thank you.

**Exhibit F**



Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax



# HARTSFIELD CAPITAL

August 31, 2005

Mrs. Wendy Yap
Dover Limited
56 Andrew Road
Singapore 299968

Dear Mrs. Yap:

SUBJECT: ACCOUNT STATEMENT

This is to advise and to confirm that Mansell Capital Partners, LLC, Atlanta Georgia, is holding in your account, funds in the amount of $3,250,000 as of today, August 31, 2005.

Very truly yours,

Thomas Begley
V.P. Business Development