LAW OFFICES OF THOMAS M. MULLANEY
THOMAS M. MULLANEY
708 Third Avenue, Suite 2500
New York, New York, 10017
Tel. (212) 223-0800
Fax: (212) 661-9860
Attorneys for Plaintiff
Dover Limited

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DOVER LIMITED,                                  :
                                                :
                                                :    08-CV-1337 (LTS)(JCF)
                    Plaintiff,                  :
                                                :
        vs.                                     :
                                                :    **DECLARATION OF THOMAS**
ALAIN ASSEMI, et al.,                           :    **M. MULLANEY**
                                                :
                    Defendants.                 :
                                                :
------------------------------------------------------------X
ALAIN ASSEMI,                                   :
                                                :
                                                :
                    Counter-Claim Plaintiff,    :
                                                :
        vs.                                     :
                                                :
DOVER LIMITED,                                  :
                                                :
                    Counter-Claim Defendant.    :
                                                :
------------------------------------------------------------X

        THOMAS M. MULLANEY declares the following under penalty of perjury:

        1.      I am a member of the Bar of this Court, and am the attorney for Plaintiff in the

above-entitled action.  I am familiar with all the facts and circumstances in this action.

2.    I make this declaration in support of Dover's Memorandum of Law in Opposition to Defendants Alain Assemi, Hartsfield Capital Group ("Group"), Stephen J. Lovett, Thomas O. Begley, and Thomas O. Begley & Associates' ("Group Defendants", less Defendant Assemi) Motion(s) to Dismiss and/or Transfer Venue and the Joinder in said Motion filed by Defendants Argosy Capital Securities, Inc. (f/k/a Hartsfield Capital Securities, Inc.) Delbert D. Reichardt and John Banzhaf ("Argosy").

3.    Attached as Exhibit A is a copy of an agreement between Dover and Group, HCS, and Alain Assemi.

4.    Attached as Exhibit B is copy of TB-0001 -0005, produced by Defendant Begley on July 30, 2008.

5.    Attached as Exhibit C are relevant portions of the Transcript of Deposition of Thomas O. Begley, Jr., (Begley Tr."), at p.13-14, et seq.

6.    Attached as Exhibit D is a letter drafted by Defendant Begley to Dover's Wendy Yap.

7.    Attached as Exhibit E are relevant portions of the Transcript of Stephan J. Lovett, ("Lovett Tr."), dated Friday, August 1, 2008, at p.55, li. 17 – p. 56, li. 1, et seq.

8.    Attached as Exhibit F is an SEC filing for "AdZone"

9.    Attached as Exhibit G are relevant portions of the Transcript of Deposition John H. Banzhaf, ("Banzhaf Tr.").

10.    Attached as Exhibit H is the Hartsfield Capital Group marketing brochure.

11.    Attached as Exhibit I is the FINRA BrokerCheck Report on John H. Banzhaf as of December 6, 2007.

12.     Attached as Exhibit J is a draft of it Mr. Begley of an Affidavit apparently submitted in a Canadian litigation.

13.     Attached as Exhibit K the Reasons for Judgment of the Ontario, Canada Superior Court also describes Mr. Begley as Mansell's Vice President.

14.     Attached as Exhibit L is a letter where Mr. Begley held himself out as "VP of Business Development" for "Hartsfield Capital Group."

15.     Attached as Exhibit M is a Mansell "Unanimous Resolution" bearing the page numbers 79-80, that were applied by the lawyers who produced them, who represent Argosy.

16.     Attached as Exhibit N is a letter of Group seeking an advance for the rent for its entire office suite from Mansell.

17.     Attached as Exhibit O is a Mansell Board of Directors Resolution

18.     The attorney taking the deposition recalls Mr. Banzhaf saying just before this text "We've got a huge problem", although this was not captured by the court reporter.

19.     Attached as Exhibit P is a letter from John H. Banzhaf to David G. Serena of the May, Davis Group, dated March 13, 2003

20.     Attached as Exhibit Q are relevant portions of the Transcript of Deposition of Delbert D. Reichardt, Dated July 31, 2008.

Dated: New York, New York
         August 18, 2008

                                   _____
                                   Thomas M. Mullaney (TM 4274)

**Exhibit A**

Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax

# HARTSFIELD CAPITAL

October 8, 2003

Dover Limited
Mrs. Wendy Yap
56 Andrew Road
299968 Singapore

Dear Mrs. Yap,

SUBJECT:     THREE ENDORSED ORIGINALS OF THE TERMS& CONDITIONS

Please find attached three endorsed Terms and Conditions agreements that were approved September 22, 2003 between both our firms. Please keep a copy for your files and send the two others to Hartsfield. We thought of sending the agreements to Alain first, however, as a result of his role to the agreement as ancillary, we would prefer that he endorse it when you visit next week. We still have the facsimiles of all the signatures.

I look forward to meeting you next week.

Regards,

Thomas O. Begley
V.P. Business Development
Hartsfield Capital

TOB/trg

Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax

# HARTSFIELD CAPITAL

September 22, 2003

Dover Limited
Mrs. Wendy Yap
56 Andrew Road
299968 Singapore

Via Fax (65-6520-2459)

Dear Mrs. Yap:

SUBJECT:     USE OF FUNDS-INTEREST GUARNTEE

Like everything in life, patience has its limits and we recognize this boundary. When we make a warranty or representation, we do so with the knowledge that we have a clear understanding of all the elements involved in a transaction. However, occasionally we are presented with circumstances that we have to adjust to. This adjustment does not prevent a transaction, but can delay it, such as the new regulatory post 9-11environment that we must work in.

We have been in the Investment Banking Business for more then thirty years and have worked extensively with some of the largest companies on the planet. In addition we have managed billions of dollar and have a pristine reputation. Recognizing that the circumstances surrounding this delay should not be a concern of your, and that the personal and professional credibility and reputation of Mr. Alain Assemi, as well as our own, based on no small part of the warranty and representation we have made, we would like you to consider the following opportunity.

We are prepared to guarantee your principal and an annual percentage rate of 30% retroactive sixty days (which reflects the time in which we received the principal) payable monthly. In addition, we will preserve your place in the project finance program with the following conditions.

## CONDITIONS

- Your funds will be held in an our attorney insured escrow account at all times.
- We will pay you APR of thirty percent every month retroactive sixty days from the date of this letter on the current balance ($4,250,000.00).
  - $127,000.00 per/month
- First payment will begin ten days once this agreement is endorsed.
- You will have the right to have your principal returned to you at the end of each month.
- Similarly, we have the right to return your principal at the end of each month with no further obligation.
- When the project finance opportunity becomes available we will make a formal request to you to transfer the funds from the escrow account to the Mansell Capital Partners account. This will prevent the concern of the funds being utilized in a Project Finance program without your knowledge and assure your participation.

- Once the program begins, we will pay a one percent participation fee on each and every trade. Proof of each trade will be independently audited, and statement of activity sent to you or the Elfot Company.

Hartsfield Capital would like to thank you for you're past patience and we hope this offer in some way compensates you for your past considerations. We anticipate that by the time this letter reaches you we will have started the Project Finance program, however, this offer is our way of offering an olive branch to reflect our apologies and our confidence in the completion of the transaction.

As we mentioned before, although you can withdraw your monies at any time, we are absolutely certain that this transaction will be completed shortly and therefore implore you to stay the course. Moreover, we understand that no one stumbles into wealth, you have to earn it, and this offer being made to you is as a result of our core business acumen, and reflects no risk to you. Hartsfield's guarantee of interest and principal on a monthly basis, we believe, offers you a win-win opportunity at our expense.

If this proposal is acceptable to you, please endorse this letter were indicated and return both a fax and hardcopy.

Sincerely,

Thomas O. Begley
V.P. Business Development
HARTSFIELD CAPITAL SECURITIES

TOB/trg

_____
Wendy Yapp                        Date
President
Dover Limited

Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-406-9000
770-406-9100 fax

# HARTSFIELD CAPITAL

September 22, 2003

Dover Limited
Mrs. Wendy Yap
56 Andrew Road
299968 Singapore

Via Fax (65-6250-2459)

Dear Mrs. Yap:

SUBJECT:     USE OF FUNDS-INTEREST GUARNTEE

We are prepared to guarantee your $4,250,000.00 principal investment on deposit with our fiduciary at an annual percentage rate of 30%. Additionally, in an effort to compensate you for the period of time that your funds were waiting deployment in our project finance program, which subsequently experienced repeated delays, we wish to compensate you by making our interest offer sixty days retroactive which reflects the time which we received and did not employ your capital. In addition, we will preserve your place in the project finance program with the following conditions.

## CONDITIONS

- Your funds will be held in our attorneys insured escrow account.
- We will pay you an APR of thirty percent every month retroactive sixty days from the date of this letter on your current balance of $4,250,000.00
- The account would normally receive $106,250 monthly interest, however, we have increased it to $127,000.00 per month in order to compensate you for the delays we experienced
- First payment will begin ten days after the date this agreement is endorsed.
- You will have the right to have your principal returned to you at the end of each month.
- Similarly, we have the right to return your principal at the end of each month with no further obligation.
- When the project finance opportunity becomes available we will make a formal request to you to transfer the funds from this escrow account into the Mansell Capital Partners account. This will prevent the potential concern of the funds being utilized in a Project Finance program without your knowledge and further assure your participation.
- That your position be maintained in the pool of investors for the next available Project Finance opportunity.
- That once the Project Financing begins your current balance of $4,250,000.00 USD will yield you $100,000 or an effective yield of 2.35% on your current balance for each trade and we anticipate to trade at a minimum two times per week.

Hartsfield Capital would like to thank you for your patience and we hope this offer demonstrates our commitment to making you a valued client and compensates you for your past consideration.

Sept 26 2003

Sept-30th-2003

09/30/2003  02:37   0000000000                                                    PAGE  02

09-30-03  11:44                              ID-            September 24, 2003        P.04

                                             -2-

If this proposal is acceptable to you, please endorse this letter were indorsed and return both a fax and hardcopy.



Sincerely,

Thomas O. Bagley
V.P. Business Development
HARTSFIELD CAPITAL GROUP

TOB/cg

Wendy Yap                Sept 26 2003          Alain Assemi                  Date
President                Date                  President
Dovre Limited                                  Effort Company S.A.

※ Addendum :- I understand from our telephone
              Conversation this morning between Mr. Thomas
              Bagley, Mr. Alain Assemi and myself (Wendy Yap)
              on Sept 26 2003, 9.00am (Singapore time)
              that once project financing begins (and the
              trading on the contract starts, estimated to be
              in next 10 days), I will receive a total
              profit of USD 20 million 6 weeks from date
              of commencement of trading assuming that
              I do not withdraw profits during the 6 weeks
              of trading contract. This profit of USD 20 million
              is based on 2.35% per trade minimum 2 per
              week on a compounded basis.

                                                    Wendy Yap.

CC: Alain Assemi

                         TOTAL P.006

**From:** Alain Assemi
**Date:** Wednesday, October 01, 2003 7:46:35 AM
**To:** yaputri@singnet.com.sg
**Cc:** tbegley@hartsfieldcapital.com
**Subject:** Fwd: Signed documents

Dear Wendy,
Attached is the signed documents.
Regards,
Alain


----Original Message Follows----
From: "efax.com" <message@mail.efax.com>
To: alain_assemi@hotmail.com
Subject: eFax from 0000000000 - 2 page(s)
Date: Tue, 30 Sep 2003 21:47:41 +0000


You have received a 2 page fax at 30/09/2003 14:47:41 PDT.

* The reference number for this fax is ord1_did1-1064958348-6308391758-47.

This message can be opened with eFax Messenger Plus. If you have not already
installed eFax Messenger Plus on your computer, please download a free copy
at http://www.eFax.com/need.

With Messenger Plus you can...

* Add your signature to outbound documents - easily.
* Combine, re-order or delete pages in the thumbnail view.
* Add custom rubber stamp images to each document.
* Highlight segments of a document.
* Embed voice & text annotations for personal notes & data.

Please visit http://www.eFax.com/help if you have any questions regarding
this message or your service.

Thank you for using the eFax service!

_____

Get MSN 8 Dial-up Internet Service FREE for one month. Limited time offer--
sign up now! http://join.msn.com/?page=dept/dialup

**Exhibit B**

# CHASE ○

TJ Morrow, PC., Account ending in 2365 (Specified Activity)  Wires # 1, 2 & 3

| Date | Action | Debit |
|------|--------|-------|
| 08/29/2006 | FUNDS TRANSFER (DOMESTIC) A/C: T.O. BEGLEY & ASSOCIATES I | $140,000.00 |

# JPMorganChase ⬡

**WIRE PAYMENT**                    **ATTN: T J MORROW**
We Debited Your Account Per Outbound Fedwire

```
Amount:              $ 3,000.00
Account:              00995005992365
Account Name:         T J MORROW PC
Date:                 10/04/2006    Time:  09:21 EASTERN TIME
Bank Seq #:                0109400277ES
SWIFT/Fed/CHIP Ref #: B1QGC04C001163
```

**Foreign Exchange & Charges Information**
```
Foreign Exchange Amount:
Foreign Currency:
Currency Exchange Rate:
```

**Address Information**
```
T J MORROW PC
67 WALL ST 22ND FL 0119
NEW YORK NY 10005-3111
```

**Other Transfer Information**
```
Sender Bank and ID#:       JPMORGAN CHASE BANK, NA 021000021
Related Ref#:              DCD OF 06/10/04
Account with Bank and ID#: ABA/061113415
                           BB&T GEORGIA
                           BYRON GA


Intermediary Bank and ID#:




Beneficiary Account:       /5147444224
Beneficiary Name:          THOMAS BEGLEY
Beneficiary Address:


Other Payment Info:






Order Bank:
```

TB 0002

**JPMorganChase**

**WIRE PAYMENT**                **ATTN: T J MORROW**

```
We Debited Your Account Per Outbound Fedwire

Amount:              $ 20,000.00
Account:             00995005992365
Account Name:        T J MORROW PC
Date:                10/10/2006    Time:   13:04 EASTERN TIME
Bank Seq #:                   0748400283ES
SWIFT/Fed/CHIP Ref #: B1QGC08C006004
```

**Foreign Exchange & Charges Information**
```
Foreign Exchange Amount:
Foreign Currency:
Currency Exchange Rate:
```

**Address Information**
```
T J MORROW PC
67 WALL ST 22ND FL 0119
NEW YORK NY 10005-3111
```

**Other Transfer Information**
```
Sender Bank and ID#:      JPMORGAN CHASE BANK, NA 021000021
Related Ref#:             DCD OF 06/10/10
Account with Bank and ID#: ABA/061113415
                          BB&T GEORGIA
                          BYRON GA


Intermediary Bank and ID#:




Beneficiary Account:      /5147444224
Beneficiary Name:         T. O. BEGLEY & ASSOCIATES
Beneficiary Address:


Other Payment Info:






Order Bank:
```

TB 0003

# JPMorganChase ⬡

**WIRE PAYMENT**                    **ATTN: T J MORROW**

We Debited Your Account Per Outbound Fedwire

```
Amount:              $ 10,000.00
Account:             0099S005992365
Account Name:        T J MORROW PC
Date:                10/26/2006    Time:  10:58 EASTERN TIME
Bank Seq #:                   0222100299ES
SWIFT/Fed/CHIP Ref #: B1QGC01C002434
```

**Foreign Exchange & Charges Information**

```
Foreign Exchange Amount:
Foreign Currency:
Currency Exchange Rate:
```

**Address Information**

```
T J MORROW PC
67 WALL ST 22ND FL 0119
NEW YORK NY 10005-3111
```

**Other Transfer Information**

```
Sender Bank and ID#:        JPMORGAN CHASE BANK, NA 021000021
Related Ref#:               DCD OF 06/10/26
Account with Bank and ID#: ABA/061113415
                            BB&T GEORGIA
                            BYRON GA


Intermediary Bank and ID#:




Beneficiary Account:        /5147444224
Beneficiary Name:           T O BEGLEY & ASSOCIATES
Beneficiary Address:


Other Payment Info:






Order Bank:
```

TB 0004

# JPMorganChase ⬡

**WIRE PAYMENT**                    **ATTN: T J MORROW**

**We Debited Your Account Per Outbound Fedwire**

```
Amount:            $ 30,000.00
Account:           00995005992365
Account Name:      T J MORROW PC
Date:              11/20/2006    Time:  11:25 EASTERN TIME
Bank Seq #:                  0005900324BN
SWIFT/Fed/CHIP Ref #: B1QGC02C002851
```

**Foreign Exchange & Charges Information**

```
Foreign Exchange Amount:
Foreign Currency:
Currency Exchange Rate:
```

**Address Information**

```
T J MORROW PC
67 WALL ST 22ND FL 0119
NEW YORK NY 10005-3111
```

**Other Transfer Information**

```
Sender Bank and ID#:       JPMORGAN CHASE BANK, NA 021000021
Related Ref#:              PES OF 06/11/20
Account with Bank and ID#: ABA/061113415
                           BB&T GEORGIA
                           BYRON GA


Intermediary Bank and ID#:




Beneficiary Account:       /5147444224
Beneficiary Name:          THOMAS BEGLEY
Beneficiary Address:


Other Payment Info:






Order Bank:
```

TB 0005

**Exhibit C**

Page 1

1          IN THE U.S. DISTRICT COURT

       SOUTHERN DISTRICT OF NEW JERSEY COUNTY

2           CA NO.:08-CV-1337LTS

3 DOVER, LTD.,

4         Plaintiff,

5 -VS-

6 ALAIN ASSEMI, HARTSFIELD CAPITAL GROUP, STEPHAN J. LOVETT,
   THOMAS O. BEGLEY, JR., DELBERT D. REICHARDT, MANSELL CAPITAL

7 PARTNERS, LLC, THOMAS O. BEGLEY, THOMAS O. BEGLEY &
   ASSOCIATES, T.J MORROW, and T.J. MORROW, P.C.,

8

9         Defendant.

   --------------------------------------/

10

      DEPOSITION OF THOMAS O. BEGLEY, JR.

11        Friday, August 1, 2008

        11:40 AM - 1:35 PM

12       181 Peachtree Street

         Atlanta, GA

13

14

15

16

17

18

19

20 Reported by:

21 Catherine Jarman Rouzer, CVR-CCR

22 Esquire Deposition Services

23 Job NO. 204575b

24

25

Thomas O. Begley, Jr.

**Page 10**

1    Q.  Is it true for all dates in between, 2003 and
2 today?
3    A.  Yes.
4    Q.  Okay.  What's your wife's name?
5    A.  Tracy.
6    Q.  Where does she live?
7    A.  570 Clairidge Way.
8    Q.  All right.  With you?
9    A.  Yes.
10    Q.  What's your father's name?
11    A.  Thomas O. Begley.
12    Q.  And you're Thomas O. Begley, Jr.?
13    A.  Yes.
14    Q.  Where does he live?
15    A.  He lives in New York City.
16    Q.  Where in New York City?
17    A.  Long Island.  They no longer live there.  They
18 once lived there.  They've moved to Atlanta in the last two
19 years.
20    Q.  Okay.  And what's your mother's name?
21    A.  Nancy.
22    Q.  Cleared something up.  Let's turn to Paragraph 10
23 of your affidavit, if we could.  The last sentence of your
24 paragraph -- last sentence of that paragraph you testify,
25 in fact, nearly every relevant event that I'm aware of took

**Page 11**

1 place in Georgia, or at least did not occur in New York.
2 Let's make that two parts.
3        What relevant events are you aware of that took
4 place in Georgia?
5    A.  In Georgia?
6    Q.  Yeah.
7    A.  All communication with Ms. Yap.
8    Q.  Between whom?
9    A.  Ms. Yap and myself and Mr. Morrow.
10    Q.  By that answer did you mean conversations between
11 you and Mr. Morrow or conversations between Ms. Yap and Mr.
12 Morrow?
13    A.  All three.
14    Q.  How do you know that conversations -- all
15 conversations between Ms. Yap and Mr. Morrow occurred in
16 Georgia?
17    A.  Well, I live here, I'm a resident.  I assume she
18 called me or I called her.
19        MR. DIAMOND:  Don't assume.  You're not
20        required to.
21 BY MR. MULLANEY:
22    Q.  And you misunderstood my question, I think.
23    A.  Okay.  Yes.
24    Q.  How do you know that all conversations between
25 Ms. Yap and Mr. Morrow occurred in Georgia?

**Page 12**

1    A.  I don't know.
2    Q.  They could have occurred anywhere?
3    A.  It's possible.
4    Q.  Even in New York?
5    A.  It's possible.
6    Q.  In 2003 where did Mr. Morrow live?
7    A.  My --
8        MR. DIAMOND:  If you know.
9        THE DEPONENT:  I don't really know.
10 BY MR. MULLANEY:
11    Q.  Okay.  In 2004 where did Mr. Morrow live?
12    A.  I don't know.
13    Q.  In 2005?
14    A.  I don't know.
15    Q.  Do you know where Mr. Morrow worked in any of
16 those years?
17    A.  I communicated with him in North Carolina.
18    Q.  Did you ever communicate with him in New York in
19 2003?
20    A.  No.
21    Q.  In 2004?
22    A.  No.
23    Q.  2005?
24    A.  Not that I know of.
25    Q.  Are you aware that Mr. Morrow maintained an

**Page 13**

1 office in New York in 2003?
2    A.  Yes.
3    Q.  2004?
4    A.  Yes.
5    Q.  2005?
6    A.  I believe so, yes.
7    Q.  Did you ever send Mr. Morrow anything in New
8 York?
9    A.  No, I received.
10    Q.  What did you receive?
11    A.  Correspondence.  Actually one letter that I can
12 think of.
13    Q.  Okay.  From Mr. Morrow?
14    A.  Yes.
15    Q.  From New York?
16    A.  Yes.
17    Q.  What was that letter about?
18    A.  I'm not certain.  Something to the extent that I
19 was in breach of some function that he was claiming that I
20 was supposed to perform that I didn't perform.
21    Q.  Did those relate in any way to Dover, Ltd. or
22 Wendy Yap?
23    A.  Yes.
24    Q.  Did Mr. Morrow ever send you any funds?
25    A.  Yes.

4 (Pages 10 to 13)

Page 14

1    Q. From where did he send you those funds?
2    A. From his account.
3    Q. Do you know where his account was located?
4    A. I believe it was JP Morgan Chase.
5    Q. Do you know where that JP Morgan Chase bank was?
6    A. Not in particular, no.
7    Q. Okay. Who is John Moran, if you know?
8    A. John Moran was a client, I guess, of Mansell --
9 He was just a client of the firm of Mansell's back years
10 ago.
11    Q. How many years ago?
12    A. I'm not certain, but a couple. Three, four,
13 maybe five years.
14    Q. How do you know that Mr. Moran was a client of
15 Mansell?
16    A. He participated in a program that Mansell was
17 offering at the time.
18    Q. How do you know he participated in that program?
19    A. His monies were associated with that.
20    Q. How do you know that?
21    A. I had seen his agreements.
22    Q. Did you hold a position with Mansell Capital
23 Partners, LLC?
24    A. No.
25    Q. Ever?

Page 15

1    A. No.
2    Q. Did you have any ownership interest in Mansell
3 Capital Partners?
4    A. No.
5    Q. If it's all right with you, for the rest of the
6 deposition I'm just going to call that Mansell Capital
7 Partners?
8    A. Okay.
9    Q. I know there might be others out there with other
10 Roman -- with Roman numerals attached.
11    A. Right.
12    Q. We're not discussing those today. How would you
13 have seen Mr. Moran's agreements with Mansell if you had no
14 role with Mansell?
15    A. Well, because he communicated with the firm and
16 he would send documentation by fax typically, sometimes
17 Federal Express.
18    Q. But if you had nothing to do with Mansell, how
19 would you see those?
20    A. Well, I work at the firm. At the time I was
21 there, so I personally communicated with Mr. Moran from
22 time to time.
23    Q. Well, when you say the firm, what do you mean?
24    A. I'm saying I worked as a consultant at
25 Hartsfield. Mansell was providing a product, the one that

Page 16

1 Wendy Yap was participating in. Mr. Moran participated in
2 that, as well.
3    Q. Well, I'm a little confused.
4    A. Okay.
5    Q. As a consultant to Hartsfield did you have a
6 connection to Mansell?
7        MR. DIAMOND: Let me object on vagueness.
8        Can you better describe connection? He's already
9        said he was involved in some business deals.
10        That's a connection. Do you mean something more
11        specific?
12 BY MR. MULLANEY:
13    Q. Did you understand my question, Mr. Begley?
14    A. I'm trying to answer it correctly. I'm not
15 really sure what you're suggesting.
16    Q. Well, I'm curious to know why if you had no
17 position at Mansell --
18    A. Right.
19    Q. -- you would be familiar with products that
20 Mansell sold and contracts that Mansell entered into, so
21 explain that to me any way you would like.
22        MR. DIAMOND: And before you do, can
23        you explain to me how this deals with
24        jurisdiction?
25        MR. MULLANEY: Sure. Mr. Moran lived

Page 17

1 in New York and Mansell dealt with him in
2 New York repeatedly and others.
3        MR. DIAMOND: And what does that have
4        to do with --
5        MR. MULLANEY: Mr. Begley --
6        MR. DIAMOND: -- Mr. Begley's
7        jurisdiction with the state of New York?
8        MR. MULLANEY: If Mr. Begley was
9        working at Mansell, he would be dealing with
10        the state of New York.
11        MR. DIAMOND: I believe he answered he
12        was not working at Mansell.
13        MR. MULLANEY: I'm not sure that his
14        answers to that point are crystal clear to
15        me.
16        MR. DIAMOND: Okay. I'll let you
17        inquire into it. I thought I heard him say
18        he did not have a position at Mansell, but
19        --
20        MR. MULLANEY: Sure.
21        MR. DIAMOND: Go ahead.
22 BY MR. MULLANEY:
23    Q. If you didn't work at Mansell --
24    A. Right.
25    Q. -- how would you be so familiar with Mansell's

5 (Pages 14 to 17)

Page 18

1 dealings?

2     A. Primary, because I had associates of mine who
3 were participating outside of Mr. Moran and Mrs. Yap and
4 Mansell -- had people working in Mansell, as well, people
5 who were participating in the Mansell program, as well,
6 friends of mine, personal friends.

7     Q. Who were they?

8     A. People in Georgia.

9     Q. But who are they?

10       MR. DIAMOND: Again, I'm going to object to
11 that. I don't see how that pertains to whether
12 or not there --

13       MR. MULLANEY: It does.

14       MR. DIAMOND: -- is personal jurisdiction,

15 BY MR. MULLANEY:

16     Q. What if all those people live in New York?

17     A. None of them do.

18     Q. I'm not required to take your word for it. I'm
19 entitled to their names so I can check that out for myself.

20     A. The -- I mean, I don't have the records right in
21 front of me, but there were other people who participated
22 who received their funds, the principal returned and their
23 interest, and they are lower in the program when what
24 occurred with Ms. Yap occurred.

25     Q. Can you remember any of their names?

Page 19

1     A. Not at the moment.

2     Q. None?

3     A. Not at this moment.

4     Q. But they were personal friends?

5     A. Well, they were associates.

6     Q. They were associates? They were associates of
7 yours in some other business?

8     A. Just relationships, I met.

9     Q. Okay. Now did you have a business relationship
10 with Mr. Moran?

11     A. No.

12     Q. Did you -- Do you know who the company Belsize
13 is?

14     A. I do.

15     Q. And what is that?

16     A. It's Mr. Moran's company.

17     Q. Did you have any business relationship with
18 Belsize?

19     A. I mean, I communicated with them.

20     Q. Okay.

21     A. And outside of the relationship he had with
22 Mansell, no.

23     Q. So you communicated with Mr. Moran concerning his
24 relationship with Mansell? Is that correct?

25     A. Yes. Like I said, I've spoken to him.

Page 20

1     Q. What makes you believe that Alain Assemi lived in
2 Switzerland, if anywhere?

3     A. I mean, it's pretty common knowledge that he's
4 not at the address where he was when we were associated
5 with him.

6     Q. And he could live in Finland, or he could live in
7 New York, or he could live in --

8     A. Agree.

9     Q. So for all you know he lives in New York? Is
10 that correct?

11     A. Mr. Assemi?

12     Q. Yeah.

13       MR. DIAMOND: Do you know where he lives?

14       THE DEPONENT: No.

15 BY MR. MULLANEY:

16     Q. No idea?

17     A. No.

18     Q. Okay. When's the last time you talked to him?

19     A. A month ago, maybe two months ago.

20     Q. Did he call you?

21     A. Yes.

22     Q. Did his phone number show up on whatever phone
23 you were using?

24     A. No.

25     Q. Okay. What did you discuss?

Page 21

1     A. Just other things, other business.

2     Q. Any business involving Mr. Moran?

3     A. No, not at all.

4     Q. Well, what other business, if you can tell me?

5       MR. DIAMOND: Again, let me object. I don't
6 see where that has anything to do with the
7 jurisdictional issues we're here to discover.

8       MR. MULLANEY: Might have something -- Their
9 business might touch upon New York State or New
10 York City.

11       THE DEPONENT: Really nothing. I mean, Alain
12 is an associate, somewhat of a friend, so I know
13 him. That's about it really.

14 BY MR. MULLANEY:

15     Q. I mean --

16     A. We never talk about business. We don't talk
17 about Mansell. We never talk about Ms. Yap.

18     Q. Never?

19     A. No.

20     Q. Do you know where he lives?

21     A. I know he's overseas, that's all. Not specific.

22     Q. You testified that your earnings in 2007 were
23 less than forty thousand dollars. Is that correct?

24     A. Yes.

25     Q. Were you a W-2 employee of anybody in 2007?

6 (Pages 18 to 21)

Page 22

1    A.  No, no.
2    Q.  1099 employee of anybody?
3    A.  No.
4    Q.  How did you earn your forty thousand dollars?
5    A.  Basically just consulting, minor consulting fees.
6  It wasn't reported, that's all.
7    Q.  It wasn't reported?
8    A.  No.
9    Q.  With whom or what did you consult in 2007 to earn
10 these fees?
11   A.  Various -- Nothing in particular.  Associates of
12 mine who -- They pay me for services I provide them, kind
13 of like consulting.
14   Q.  I understand.  Who were these associates?
15   A.  Friends of mine in my community where I live.
16   Q.  Can you remember any names?
17   A.  Greg Counts, Anthony Reed.
18   Q.  These are individuals?
19   A.  Yes, they are.
20   Q.  The first one was an Anthony Counts?
21   A.  No.  Greg --
22   Q.  Greg Counts.
23   A.  -- Counts, Anthony Reed.
24   Q.  Okay.  What town do they live in?
25   A.  They live in Alpharetta.

Page 23

1    Q.  All right.  Anybody else?
2    A.  I can't think of any.
3    Q.  Okay.  What was the May Davis Group?  Do you
4  know?
5    A.  May Davis?  That was a broker's firm.
6    Q.  Did you have any business dealings with May
7  Davis?
8    A.  Never.
9    Q.  Never?  Okay.  For any reason?  I mean, for any
10 client, any customer?
11   A.  I mean, I know people who work for May Davis.  I
12 mean, I know the principal of May Davis.
13   Q.  What's his name or her name?
14   A.  I can't recall, but he was introduced to me by
15 Henry Thomas.
16   Q.  Who?
17   A.  He was introduced to me by Henry Thomas, an
18 associate of his.  That's how I met him.
19   Q.  Henry Thomas is not president of May Davis?
20   A.  No.  He's just an associate.
21   Q.  Okay.  And do you know where Henry Thomas lives?
22   A.  He lives New Rochelle.
23   Q.  In New York?
24   A.  Yes.
25   Q.  Were you introduced in person by Mr. Thomas to

Page 24

1  May Davis?
2    A.  No.  Phone.
3    Q.  By phone.  Okay.  Do you know where May Davis is
4  located?
5    A.  The last thing I remember they were at the World
6  Trade Center.
7    Q.  In New York City?
8    A.  Yes.
9    Q.  Did you know them to have moved to Wall Street in
10 New York City?  Does that ring a bell?
11   A.  No.
12   Q.  Okay.  So you would not have talked to anyone
13 from May Davis after September 11th, 2001?  Is that
14 correct?
15   A.  Correct.
16   Q.  Okey-doke.  How long have you lived in
17 Alpharetta?
18   A.  Thirteen years.
19   Q.  Okay.  Where did you live before Georgia?
20   A.  Well, I've been in Georgia for about 15, 16
21 years, but prior to that I lived in New York City.
22   Q.  Yeah, I going to say I thought I detected the
23 sound of New York.
24   A.  Oh, yeah.  Also I'd like to make a correction --
25   Q.  Sure.

Page 25

1    A.  -- on my affidavit.
2    Q.  Sure.
3    A.  I didn't prepare it, but I just noted that it
4  says in Paragraph 4 that I've never maintained residence in
5  New York City.
6    Q.  Right.
7    A.  I was born and raised in New York City.
8    Q.  Okay.
9    A.  So.
10   Q.  Now, you read that affidavit carefully before you
11 signed it, right?
12   A.  I thought I did.
13   Q.  You thought you did?  You signed it under oath,
14 right?
15   A.  Yes, I did.
16   Q.  And in front of Ms. Simon, a notary public?
17   A.  Yes, I did.
18   Q.  And you swore to tell the truth under penalties
19 of perjury?
20   A.  Yes, I did.
21   Q.  And yet, there's an inaccuracy about where you
22 lived in that affidavit?
23       MR. DIAMOND:  Which he has voluntarily
24       pointed out today upon reading it more carefully
25       this morning.

7 (Pages 22 to 25)

Page 26

1    MR. MULLANEY: Well, the voluntariness of
2    that --
3        MR. DIAMOND: These things happen.
4        MR. MULLANEY: -- I suppose are up for
5    debate, but I appreciate your candor, Mr. Begley.
6    BY MR. MULLANEY:
7    Q. I'm going to show you a document that was marked
8    as Plaintiff's 2 in a previous deposition. Tell me if that
9    looks familiar to you (Presenting)?
10       MR. DIAMOND: The question is, does it look
11   familiar.
12       THE DEPONENT: No, it doesn't.
13   BY MR. MULLANEY:
14   Q. Plaintiff's 2 is the Unanimous Resolution --
15   purports to be the Unanimous Resolution of the
16   Shareholders, Directors, and Officers of Mansell Capital
17   Partners, LLC. Did I read that correctly?
18       MR. DIAMOND: Let me -- I'm looking at
19   Plaintiff's Exhibit 2 and it has something like
20   that in the title line of it, however, the
21   version that we have here is unsigned. But with
22   that --
23       MR. MULLANEY: Caveat?
24       MR. DIAMOND: -- caveat, I suppose if you
25   have a question.

Page 27

1    BY MR. MULLANEY:
2    Q. I do. Does this refresh your recollection, Mr.
3    Begley, that you were the secretary of Mansell Capital
4    Partners?
5    A. No, it doesn't.
6    Q. Okay. Now is your legal name Thomas O. Begley or
7    Thomas O. Begley, Jr.?
8    A. I guess I'm a junior; my father's a senior.
9    Q. What does it say on your driver's license?
10   A. I never really paid attention to it. I think
11   it's probably junior.
12       MR. DIAMOND: Don't guess. If you have it
13   on you, you may look.
14       THE DEPONENT: Junior.
15   BY MR. MULLANEY:
16   Q. Okay. To your knowledge, was your father the
17   secretary of Mansell Capital Partners?
18   A. No.
19   Q. Do you know if he had anything to do with
20   Mansell?
21   A. Nothing at all.
22   Q. Nothing at all? Does Plaintiff's 2 refresh your
23   recollection that you attended a meeting of shareholders,
24   directors, and officers of Mansell on July 29th, 2003?
25   A. I did not attend a meeting.

Page 28

1    Q. Did not? Okay.
2    A. No.
3    Q. Mr. Begley, do you know what Hartsfield Capital
4    Securities is?
5    A. Yes, I do.
6    Q. What is it or was it?
7    A. Securities firm.
8    Q. Do you know where it was located?
9    A. Originally at 3775 Mansell Road.
10   Q. And now?
11   A. I don't think there is a Hartsfield Capital
12   Securities anymore.
13   Q. Did it change its name?
14   A. I believe so.
15   Q. Do you know what it changed its name to?
16   A. Argosy Securities, I think.
17   Q. Do you know where Argosy is located?
18   A. I believe it's 1105 Lakewood.
19   Q. In the same suite you share?
20   A. Yes.
21   Q. And Hartsfield Capital Securities was in the same
22   suite you shared at 3775?
23   A. Yes.
24   Q. Did you have any role with Hartsfield Capital
25   Securities?

Page 29

1    A. No.
2    Q. None at all?
3    A. No.
4    Q. Do you what a company called Hartsfield Capital
5    Group is?
6    A. Yes.
7    Q. What was that?
8    A. I guess -- I mean, I'm not certain of a title or
9    description, but investment banking firm or provided
10   consulting services, things of that nature.
11   Q. Did you play any role at Hartsfield Capital
12   Group?
13   A. I was a consultant.
14   Q. Just a consultant?
15   A. Yes.
16   Q. Okay. Not an officer?
17   A. No.
18   Q. Not an owner?
19   A. No.
20   Q. Did you rent space from Hartsfield Capital Group?
21   A. Yes, I did.
22   Q. You were a tenant?
23   A. Yes.
24   Q. Did you have a lease agreement?
25   A. No formal one, no.

8 (Pages 26 to 29)

Page 30

1    Q.  Oral?
2    A.  Yes.
3    Q.  You pay monthly rent to the Hartsfield Capital
4  Group?
5    A.  That was the intent, yes.
6    Q.  Was it you or Thomas O. Begley and Associates?  I
7  want to say it precisely.
8    A.  T.O. Begley and Associates.
9    Q.  Oh, T.O. Begley and Associates.  Was it an LLC or
10  --
11    A.  LLC.
12    Q.  -- which paid rent to Hartsfield Capital Group,
13  if any?
14    A.  Repeat that.
15    Q.  Which group paid to Hartsfield Capital Group, if
16  any?
17    A.  Probably both over the course.  I mean, at some
18  point I probably paid it and at some point I probably used
19  T.O. Begley and Associates.
20    Q.  Did you ever have a meeting with Ms. Yap in New
21  York City?
22    A.  Yes.
23    Q.  When?
24    A.  I'm not certain of the date, but it was during
25  the incident with T.J. Morrow.

Page 31

1    Q.  Where did you meet?
2    A.  She requested I come meet her at a law firm.
3    Q.  What was the name of the law firm?
4    A.  I'm not pronouncing -- I'm not sure I got --
5    Q.  Hunt & Williams (sic)?
6    A.  Dover, Palmer --
7    Q.  Edwards and Angel?
8    A.  Edwards, right, that is the nature.
9    Q.  Something, something, Palmer, Dodge?
10    A.  Right.  That's it.  Exactly.
11    Q.  I know I'm leading.  Forgive me.
12        MR. DIAMOND:  That's all right.
13  BY MR. MULLANEY:
14    Q.  Did you meet with Ms. Yap anywhere else and
15  discuss -- in New York City anywhere else?
16    A.  On the same trip, went to Hunt and Williams.
17    Q.  Okay.  That same day?
18    A.  I'm not sure if it was the same day.  It was only
19  two days, so it was either that day or the following day.
20    Q.  Did you ever meet anyone else from Dover in New
21  York City?
22    A.  Wendy has a consultant -- I mean, a confidant she
23  has with her constantly, Conrad, so he was there, as well.
24    Q.  Did you ever meet with Conrad separately in New
25  York City?

Page 32

1    A.  Well, he was there with Wendy.
2    Q.  Okay.  During the two day trip?
3    A.  Yeah.
4        MR. DIAMOND:  I think he meant any other
5        occasions, other than then.
6        THE DEPONENT:  That was it.
7  BY MR. MULLANEY:
8    Q.  Did you meet Ms. Yap at her hotel on the same
9  two-day trip?
10    A.  Yeah.  We were in the same hotel.
11    Q.  Where were you staying?  Do you recall?
12    A.  I can't recall.  It was in Manhattan.
13    Q.  Okay.  Do you recall having a dinner at a fancy
14  restaurant during this trip?
15    A.  I'm sure we did.
16    Q.  Okay.  Do you recall where you went?
17    A.  I can't recall.
18    Q.  Okay.  Do you know an attorney named Thomas
19  Lansio or Lansia?
20    A.  I can't say I do.  No, I don't -- I don't recall.
21    Q.  Would it refresh your recollection if I told you
22  that at one point I believe you had retained Mr. Lansia to
23  pursue a claim on behalf of Dover?
24    A.  Okay.  Repeat the question again.
25    Q.  Would it refresh your recollection if I told you

Page 33

1  that at one point you had told Ms. Yap that you would hire
2  Ms. Lansia to pursue a claim on Dover's behalf?
3        MR. DIAMOND:  The question is, does that
4        refresh your recollection.
5        THE DEPONENT:  It's possible, yes.
6  BY MR. MULLANEY:
7    Q.  Does any of that refresh your recollection as to
8  where Mr. Lansia may have worked?
9    A.  Only group that it could be would be Hutton and
10  Williams, if it was a group.
11    Q.  And in New York City?
12    A.  Yes.
13    Q.  Okay.  Do you recall sending Mr. Lansia any
14  money?
15    A.  No.
16    Q.  Did you execute a retainer agreement or
17  engagement letter with Mr. Lansia?
18    A.  No.
19    Q.  No?
20    A.  I don't believe so.
21    Q.  I'm going to show you a document previously
22  marked as Plaintiff 9 and we will be marking some documents
23  in there as exhibits, Plaintiff's 9-A through F.  Take a
24  look at that and as much as you like, tell me if you're
25  familiar with it.  I'm going to ask you about the exhibits,

9 (Pages 30 to 33)

**Thomas O. Begley, Jr.**

Page 34

1 obviously, or not obviously.
2      I'll turn your attention to Exhibit C -- 9-C
3 whenever you're ready. Do you recognize Plaintiff's 9-C,
4 Mr. Begley?
5    A. Yes, I do.
6    Q. Were you the author of Plaintiff's 9-C?
7    A. No. I'm not the author, but --
8    Q. Who is the author?
9    A. Mr. Morrow.
10   Q. Let me ask you how did he -- Why did it come into
11 your possession?
12   A. Well, basically he is the architect of the
13 program we were offering to Wendy.
14   Q. Who is we?
15   A. Myself, Mr. Morrow, and Wendy. It was a
16 partnership.
17   Q. Okay. And this is October 27th, 2003, you and
18 Mr. Morrow were offering Ms. Yap some sort of partnership?
19 If you look at the top left corner, you'll see the date is
20 October 27th, 2003.
21      MR. DIAMOND: Again, let me interpose an
22      objection and ask the jurisdictional issue of
23      this .
24      MR. MULLANEY: Mr. Morrow worked in New
25      York.

Page 35

1      MR. DIAMOND: Well, I believe he testified
2      that he never dealt with Mr. Morrow.
3      MR. MULLANEY: We're perhaps uncovering an
4      inconsistency in his testimony.
5      THE DEPONENT: Mr. Morrow has never. Has
6      Mr. Morrow ever resided in New York. I mean, the
7      only place we've communicated with him was in
8      North Carolina.
9 BY MR. MULLANEY:
10   Q. So you say.
11   A. Okay.
12   Q. He told me you lived in New York in 2004, so who
13 should I believe?
14   A. He said I lived in New York until 2004?
15   Q. That's what he told me.
16   A. I mean, clearly if you look at my -- I mean, it's
17 clearly straightforward. You can look at my driver's
18 license, a thousand things to determine --
19   Q. Who am I to believe, Mr. Begley?
20   A. Okay. I understand.
21      MR. DIAMOND: Is there a question on the
22      table?
23      MR. MULLANEY: Yes.
24 BY MR. MULLANEY:
25   Q. The question is, are you sure that you and Mr.

Page 36

1 Morrow were --
2    A. Can I make a correction here --
3    Q. Sure.
4    A. -- because I'm looking at the document now?
5    Q. Sure.
6    A. And this is with Wendy and Mr. Van Kumar.
7    Q. Yes.
8    A. Kumar has passed away since then, so this is a
9 completely -- I'm thinking this is -- When I saw the
10 securities structures I thought it was Mr. Morrow, but --
11 I'm familiar with the document vaguely, but to be honest
12 with you, I don't recall it that well.
13   Q. Okay.
14   A. But I do know Kumar. When I saw Kumar's name, so
15 then I noticed it because I --
16   Q. Sure.
17   A. -- I communicated with him quite often.
18   Q. Well, let me ask you this question again then or
19 rephrase it.
20   A. Uh-huh (affirmative).
21   Q. Do you know after reviewing it a little more
22 carefully --
23   A. Yes.
24   Q. -- whether Mr. Morrow was the author of this
25 document, was not the author of this document --

Page 37

1    A. No.
2    Q. -- or you don't know?
3    A. He wasn't because --
4    Q. Was not?
5    A. He was not.
6    Q. Okay. Who was?
7    A. To be honest with you, I don't know, I guess.
8 I'm certainly not.
9    Q. You are not, you know that?
10   A. Yes.
11   Q. Okay. And do you recall if you saw this on or
12 around October 27th, 2003?
13      MR. DIAMOND: Let me object again. If he's
14      not the author of the document, if he's not a
15      part of the preparation of the document, I don't
16      see what value it is for any jurisdictional
17      issue.
18      MR. MULLANEY: I think I'm inquiring into
19      the accuracy of whether he was or was not the
20      author of this document and maybe we'll find that
21      Mr. Begley's recollection will get refreshed as
22      to whether Mr. Morrow participated in it or not
23      upon further inquiry.
24      MR. DIAMOND: I'm comfortable with you
25      asking him again if he was the author of the

10 (Pages 34 to 37)

Page 38

1    document.
2 BY MR. MULLANEY:
3    Q.  Okay.
4    A.  I'm not the author of the document.
5    Q.  Now if you look on the last page of this Exhibit
6 9-C --
7    A.  Yes.
8    Q.  -- you see that down in the bottom left-hand
9 corner there's some initials there, TB/NO.
10    A.  Uh-huh (affirmative).
11    Q.  Does that refresh your recollection?
12    A.  TB --
13        MR. DIAMOND:  The question is, does it
14    refresh your recollection.
15        THE DEPONENT:  It doesn't.
16 BY MR. MULLANEY:
17    Q.  No, does not?  TB --
18    A.  I know who TB is.  That's me.
19    Q.  Okay.
20        MR. DIAMOND:  Well, it's your initials.
21        THE DEPONENT:  Right, exactly.  I mean,
22    that's my initials.
23        MR. MULLANEY:  All right.
24        MR. DIAMOND:  The document speaks for
25    itself.

Page 39

1        MR. MULLANEY:  I'm not sure about that.
2        MR. DIAMOND:  No, it is not a signed
3    document.  It's a typed document and it has not
4    refreshed his recollection.  Let's move on.
5        MR. MULLANEY:  I understand.
6        MR. DIAMOND:  Let's move on.
7        MR. MULLANEY:  I don't think I was pressing
8    a question at that moment.
9 BY MR. MULLANEY:
10    Q.  Now does this document, sir, 9-C refresh your
11 recollection that you had some business with Mansell
12 Capital Partners?  If you look at the last paragraph of the
13 first page you'll see right in the middle refers to Mansell
14 Capital Partners, LLC.
15    A.  I mean, since I'm not the author, I can't tell
16 you --
17        MR. DIAMOND:  The question is, does it
18    refresh your recollection --
19        THE DEPONENT:  No.
20        MR. DIAMOND:  -- that you had some business
21    with Mansell?
22        THE DEPONENT:  No, it doesn't.
23 BY MR. MULLANEY:
24    Q.  Okay.  Why don't you turn to the last exhibit,
25 which would be Plaintiff's 9-F and tell me if you recognize

Page 40

1 Plaintiff's 9-F?
2    A.  Yes.
3    Q.  You do?
4    A.  Uh-huh (affirmative).
5    Q.  How do you recognize it?
6    A.  That's my signature.
7    Q.  Do you recall writing it?
8    A.  No.
9    Q.  Any reason to think you didn't write it?
10    A.  No.
11    Q.  Does Plaintiff's 9-F refresh your recollection
12 that you had some business dealings with Mansell?
13    A.  No, it doesn't.
14    Q.  Okay.
15    A.  It doesn't.
16    Q.  Now does -- Right under your signature and your
17 title there it says, VP of Business Development.  Does that
18 refresh your recollection that you held a position at the
19 Hartsfield Capital Group?
20    A.  Yeah.  I was business development, yes.
21    Q.  Well, VP, what does that stand for generally?
22    A.  Vice president.
23    Q.  Does that imply that you were an officer of
24 Hartsfield Capital Group?
25    A.  It was more of a title than anything.

Page 41

1    Q.  So perhaps an imprecise description of your
2 consultancy status?  Is that accurate?
3    A.  That's pretty accurate.
4    Q.  We're all done with that document, and if I may
5 take those back from you.
6    A.  Yes.
7        MR. KOLBER:  Can I see that document that he
8    signed?
9        MR. MULLANEY:  Sure.
10        MR. DIAMOND:  These will be attached to the
11    transcript?
12        MR. MULLANEY:  correct.
13        (Whereupon, an off-the-record discussion
14    ensued.)
15 BY MR. MULLANEY:
16    Q.  Mr. Begley, did you ever direct Mr. Banzhaf to
17 send any funds to anyone in New York City?
18    A.  No.
19    Q.  Did you ever ask Mr. Reichardt to send anyone any
20 funds in New York City?
21    A.  No.
22    Q.  Do you have any reason -- Do you have any idea
23 why Mansell would have sent funds to your parents in New
24 York?
25    A.  It's possible if I was earning any kind of

11 (Pages 38 to 41)

**Thomas O. Begley, Jr.**

Page 42

1  income, I would send it to my dad.
2      Q.  If you were --
3      A.  If I was generating -- Whatever I was earning
4  from Mansell, I would dictate where it would go. I would
5  tell them where to send it.
6      Q.  Tell me how you could be earning income from
7  Mansell given your earlier testimony.
8      A.  Well, I mean, we're talking about -- I'm not
9  certain I understand what the question is.
10     Q.  The question is, I believe you testified you had
11  nothing -- effectively nothing to do with Mansell?
12     A.  Correct.
13     Q.  Correct me if I'm wrong.
14     A.  Correct.
15     Q.  But now you seem to be testifying that you earned
16  money from Mansell.
17     A.  Well, no. I mean, there was -- Let me clarify
18  this so you understand. There was earnings generated from
19  those that participated in the Mansell account. Any of my
20  associates that I had who put money into that, I would be
21  entitled to whatever percentage I can get.
22     Q.  So you directed participants into the Mansell
23  account? Is that correct?
24     A.  Yeah, I did.
25     Q.  And you might get a referral or a commission?

Page 43

1      A.  Correct.
2      Q.  Okay. So you did have a relationship with
3  Mansell?
4      A.  Tenuous, yes.
5      Q.  Was it documented?
6      A.  No.
7      Q.  Was it verbal?
8      A.  I suspect it was. I mean --
9      Q.  Don't suspect. Either you know or you don't.
10  It's your relationship.
11     A.  It was definitely verbal.
12     Q.  With whom?
13     A.  The principals of Mansell.
14     Q.  Who are they?
15     A.  Actually, I -- I wasn't a principal. I'm really
16  not sure who the principals were.
17     Q.  Well, you were -- Your oral contract for referral
18  fees were with principals of Mansell and you're not sure
19  who the principals of Mansell were. Is that your
20  testimony?
21     A.  It's a special purpose vehicle. That's all I
22  knew, that it was a vehicle specifically set up for this,
23  that was it.
24     Q.  With whom did you make your oral contract? Is
25  there a vehicle downstairs in the parking lot?

Page 44

1      A.  No, no, nothing like that.
2      Q.  Okay. So another person, right? Another human?
3      A.  Yeah.
4      Q.  Who was it?
5      A.  It would probably have to be --
6          MR. DIAMOND: Don't say probably. If you
7      can recall who it was, you should tell him, but
8      if you don't recall, you shouldn't guess.
9          THE DEPONENT: I would think that the people
10     who wrote -- sent the checks would be Del or John
11     Banzhaf, Del Reichardt or John Banzhaf.
12  BY MR. MULLANEY:
13     Q.  I'm going to adopt your lawyer's instruction.
14  Don't say the people who would, don't use any conditions.
15  With whom was your oral contract made concerning Mansell?
16  Mr. Banzhaf, Mr. Reichardt, Mr. Diamond, me?
17     A.  It would be Del Reichardt or John Banzhaf.
18     Q.  Would be or was?
19     A.  Was.
20     Q.  Okay. Both?
21     A.  I don't know -- I don't -- I didn't see a
22  distinction between the two. I mean, if I was with one, I
23  was with both.
24     Q.  Well, they're two different humans, right? I
25  mean, one looks -- One is sitting right there and the other

Page 45

1  is not.
2      A.  Sure.
3      Q.  I mean, they are two different people, right?
4      A.  Well, you're saying that. If I communicated with
5  John or I communicated with Del, I thought I was
6  communicating with both. They were the same organization.
7      Q.  Okay. And that was Mansell?
8      A.  No, because I -- I guess -- I mean, I --
9      Q.  I mean, this is a long pause, Mr. Begley. You
10  made a lot of money from Mansell, right? That's something
11  you would remember?
12     A.  Yeah, it is, but it was -- There's several -- I
13  mean, I'm -- There's several entities involved here, so --
14     Q.  I'm only asking about one.
15         MR. DIAMOND: I've forgotten what the
16     question exactly is. Could you repeat it?
17         MR. MULLANEY: Do you mind reading back the
18     question?
19         (Whereupon, a portion of the previous
20     testimony was read back.)
21         MR. DIAMOND: Is it something you would
22     remember? I don't know what the it is.
23         MR. MULLANEY: I'll just rephrase the
24     question.
25         MR. DIAMOND: Please.

12 (Pages 42 to 45)

Thomas O. Begley, Jr.

Page 46

1 BY MR. MULLANEY:
2    Q.  You had an oral agreement with somebody to
3 receive referral fees or commissions for people you
4 referred to Mansell. Is that correct?
5    A.  Correct.
6    Q.  With whom did you make that oral agreement?
7    A.  It would have to be between Del Reichardt and
8 John Banzhaf.
9    Q.  That's not - It would have to be between them?
10 With whom did you make it?
11   A.  It's oral, so therefore, I don't have a written
12 document, so I would -- I mean, I'm just --
13   Q.  Now, I don't know is an answer, as an old boss of
14 mine used to say. That's an answer. We'll just -- I guess
15 we'll just move on. I mean, you can't answer the question.
16 Is that fair to say?
17   A.  I can't. I know it's very simple, but the fact
18 is that I don't have a written agreement. You're saying --
19 You're asking me, who did I have the agreement with. I
20 assume that Mansell was -- I don't want to use the word
21 assume. Mansell was an entity that Del Reichardt and John
22 Banzhaf maintained and controlled, and, therefore, my
23 relationship was with the two of them.
24   Q.  But you don't know with who your oral contract
25 was, correct?

Page 47

1    A.  Correct.
2    Q.  Okay. Was there a Mr. Mansell?
3    A.  No, there wasn't.
4    Q.  Mansell was either Mr. Reichardt or Mr. Banzhaf?
5 Is that your testimony? And no one else?
6    A.  Either, yes.
7    Q.  Okay. Did Mr. Lovett have anything to do with
8 Mansell?
9    A.  I'm not sure.
10   Q.  You're not sure?
11   A.  I'm not sure.
12   Q.  You are all in the same office, you and Mr.
13 Lovett and --
14   A.  Yes.
15   Q.  -- Mr. Banzhaf and Mr. Reichardt? Okay. Now if
16 you had any earnings from Mansell, and I'll represent that
17 you did, and they were directed to your parents, how would
18 that direction get communicated to Mansell?
19   A.  I would ask Del or John to transfer some funds.
20   Q.  To your parents in New York?
21   A.  Yes.
22   Q.  Okay. Did you ever ask Del or John to transfer
23 funds to Belsize?
24   A.  No.
25   Q.  Never?

Page 48

1    A.  I mean, if -- If John Moran was participating in
2 the Mansell entity that would be something that that would
3 be understood already between John, Del and Belsize.
4    Q.  Well, did you -- When did you first meet Mr.
5 Moran?
6    A.  Can't recall.
7    Q.  Okay. Did you direct -- Is Mr. Moran one of
8 those people you directed to Mansell?
9    A.  I can't recall.
10   Q.  Well, I mean, it would be a big coincidence,
11 right, if you just happen to have a relationship with Mr.
12 Moran that was totally separate from Mr. Moran's
13 participation in Mansell and you and Mansell happen to be
14 in the same office suite in Alpharetta, Georgia?
15       MR. DIAMOND: Object to the form of the
16    question.
17 BY MR. MULLANEY:
18   Q.  Okay. Did you understand the question?
19   A.  Yes, I did.
20   Q.  Okay. Can you answer?
21       MR. DIAMOND: Let me state my objection.
22    It's speculative. It's hypothetical. It's
23    argumentative. And I think you should rephrase
24    the question.
25 BY MR. MULLANEY:

Page 49

1    Q.  Okay. Does it -- Does it refresh your
2 recollection as to whether you referred Mr. Moran to
3 Mansell to note that you are an individual in Alpharetta,
4 Georgia; Mansell is a two-person in Alpharetta, Georgia?
5    A.  I may have directed John Moran to Mansell.
6    Q.  Okay.
7       MR. KOLBER: I would like to object to the
8    characterization of what Mansell was or was not.
9    You made a statement, but I don't think it's
10    accurate.
11       MR. MULLANEY: I may have. Do you want to
12    clarify it now?
13       MR. KOLBER: Mansell Capital Partners, LLC,
14    is a limited liability company, and could be
15    either a member organization, member managed, and
16    so I don't know what you meant by referring to
17    two-person LLC. I don't know what you meant by
18    that.
19       MR. MULLANEY: Okay.
20       MR. KOLBER: All I know is --
21       MR. MULLANEY: Whatever I said, why don't we
22    just call it Mansell and --
23       MR. KOLBER: That would be fine, thank you.
24       MR. MULLANEY: I don't think the
25    characterization was important for my question,

13 (Pages 46 to 49)

**Thomas O. Begley, Jr.**

Page 50

1    anyway.
2  BY MR. MULLANEY:
3    Q.  Now, forgive me if I asked this already.  Did Mr.
4  Moran have any connection to Belsize, a company called
5  Belsize?
6    A.  John Moran?
7    Q.  Yeah.
8    A.  That was his company, I believe.
9    Q.  Okay.  Did you refer Mr. Moran personally or
10  Belsize to Mansell?
11    A.  I wouldn't really know the difference.  I can't
12  make the distinction.  I just spoke to John.
13    Q.  Okay.  Do you know where Belsize was located?
14    A.  I believe they were in New York.
15    Q.  Do you know if anyone else works at Belsize
16  besides Mr. Moran?
17    A.  No.
18    Q.  Do you know what Leather World is?
19    A.  A leather shop.
20    Q.  A leather shop?
21    A.  Yeah.
22    Q.  Do you know where it's located?
23    A.  Nope.
24    Q.  No?  Did you ever direct any funds be sent by
25  Mansell to Leather World?

Page 51

1    A.  I can't recall.
2    Q.  Can't recall?  Did you ever direct that Mansell
3  send any funds to a company called Leather Creation?
4    A.  It's possible.
5    Q.  All right.
6    A.  Yes.
7    Q.  Where was Leather Creation?
8    A.  Georgia.
9    Q.  Georgia?  Did you ever direct that Mansell send
10  any funds to a company called Sound Design?
11    A.  Yes.
12    Q.  And where was Sound Design located?
13    A.  Georgia.
14    Q.  Now was this -- these directions part of your
15  commissions you would earn or for some other services you
16  provided to Mansell?
17    A.  No, for the commissions.
18    Q.  Okay.  And the commission -- How is the -- What
19  was the structure of the commission payments?  You asked
20  John or Del to send money to whoever you want whenever want
21  and --
22    A.  No.
23    Q.  There's a fixed amount?
24       MR. DIAMOND:  Let me object.  I fail to see
25    how that relates to jurisdictional issues to get

Page 52

1    into how the commissions were designated or what
2    they consisted of or getting into that detail I
3    don't think --
4       MR. MULLANEY:  Okay.
5       MR. DIAMOND:  -- relates to jurisdictional
6    issues.
7  BY MR. MULLANEY:
8    Q.  Do you know -- Are you familiar with a company
9  called Argyle International?
10    A.  I can't recall.
11    Q.  Can't recall?  Do you know --
12       MR. KOLBER:  Can I ask a question at this
13    point consistent with that?
14       MR. MULLANEY:  Sure.
15       MR. KOLBER:  Counselor, this may or may not
16    have to do with jurisdiction, but it goes to the
17    reputation of my client, who was the person who
18    had the authority to transmit funds out of
19    Mansell.  And in the prior depositions this
20    morning, there's a question as to the legitimacy
21    of certain documents instructing Mr. Banzhaf here
22    to send funds, and so I would like to ask Mr.
23    Begley, with your consent, as to how he did
24    determine asking Mr. Banzhaf to send funds from
25    Mansell's account to family members of Mr. Begley

Page 53

1    or other accounts for the account of Mr. Begley.
2    It goes to whether or not Mr. Banzhaf is telling
3    the truth, because his credibility has been
4    called into question by Mr. Lovett earlier this
5    morning.
6       MR. DIAMOND:  Well, if you can phrase that
7    question a little bit more succinctly perhaps
8    I'll grab hold of it a little bit more.
9       MR. KOLBER:  Okay.  The issue is --
10       MR. DIAMOND:  We are limited to
11    jurisdictional issues.
12       MR. KOLBER:  Okay.
13       MR. DIAMOND:  Maybe if you asked it another
14    way that might pertain to this.
15       MR. KOLBER:  Well, as you probably know, Mr.
16    Banzhaf and Mr. Reichardt's position is that they
17    were simply acting in administerial, clerical
18    function with respect to the funds of Mansell,
19    and Mr. Begley's testimony is key to that.  If
20    Mr. Begley could enlighten us as to the amount of
21    discretion that Mr. Banzhaf has or had with
22    respect to Mansell Capital Partners, LLC, that
23    would be relevant.  And I happen to think it
24    might be relevant on the jurisdictional point, as
25    well, going to the piercing the corporate veil.

14 (Pages 50 to 53)

**Thomas O. Begley, Jr.**

Page 54

1  So the question would be of Mr. Begley is, how
2  did Mr. Begley support the request to Mr. Banzhaf
3  regarding sending the money. Would he just pick
4  an amount out of the air or would he have some
5  support for it? That's as simple a question as
6  I can make it.
7      MR. DIAMOND: I just don't see how that
8  relates to jurisdictional issues.
9      MR. KOLBER: Well, that's my point. I'm
10  asking for you to allow the question to be
11  answered, even though it may not be related to
12  jurisdiction because my client's reputation is
13  involved here.
14      MR. DIAMOND: I certainly have no knowledge
15  of anything that would impugn your clients'
16  reputations, but my understanding and
17  instructions here today are restricted to
18  jurisdictional issues, so I would have to object
19  to that and instruct him not to answer.
20      MR. KOLBER: Unless I were to find some
21  nexus to the jurisdiction issue.
22      MR. DIAMOND: Again, I have to refresh
23  myself on who is the person that's supposed to be
24  asking the questions here, but I just don't think
25  that's a proper format to get into today.

Page 55

1      MR. KOLBER: Okay. Fair enough.
2      MR. DIAMOND: All right.
3      MR. MULLANEY: I think anyone can ask
4  questions. Is that not true --
5      MR. DIAMOND: In their turns, I suppose so.
6      MR. MULLANEY: Okay. Yeah.
7      MR. DIAMOND: I'm not trying to hold things
8  up, but it is a jurisdictional deposition, so
9  let's stick with that.
10  BY MR. MULLANEY:
11      Q. Mr. Begley, do you know who Travis Correl is?
12      A. Travis Correl? It sounds familiar, but I can't
13  recall.
14      Q. Have you ever heard of a company called Flexifit
15  International?
16      A. No.
17      Q. Have you ever heard of a company called Seaforth
18  Meridian?
19      A. Yes.
20      Q. What is Seaforth Meridian or where is it?
21      A. I don't know where it is. I just know -- I just
22  know that it was something associated with Mr. Assemi.
23      Q. Okay. Do you know when it was associated with
24  Mr. Assemi?
25      A. I have no idea.

Page 56

1      Q. Do you know where Mr. Assemi lived in 2003?
2      A. I'm not certain. I'm not certain.
3      Q. Do you know where he lived in 2004?
4      A. I'm not certain.
5      Q. Do you know where Mr. Assemi kept a bank account
6  in 2003?
7      A. No, I don't.
8      Q. Do you know where he kept a bank account in 2004?
9      A. No, I don't.
10      Q. Did you direct either Mr. Reichardt or Mr.
11  Banzhaf to send Mr. Assemi money from the Mansell account?
12      A. No.
13      Q. Never?
14      A. Mansell was its own entity, so --
15      Q. Maybe or may not be, but that's not my question.
16  My question was, did you ever direct either of those people
17  to send money to Mr. Assemi?
18      A. No, I can't recall. I'll say that.
19      Q. Okay.
20      A. I can't recall.
21      Q. Okay. Was Mr. Assemi one of the people you
22  referred to Mansell?
23      A. It's a possibility.
24      Q. Why do you say it's a possibility?
25      A. I tried to refer everybody I could. I mean, I

Page 57

1  was talking to quite a few people. I mean, I'm business
2  development. That's my function.
3      Q. Okay. Well, as a consultant, right --
4      A. Yes.
5      Q. -- in a business -- You were in business
6  development for Mansell or for somebody else?
7      A. Well, I was a consultant at Hartsfield Capital
8  Group. I guess Mansell just happened to be a vehicle that
9  I was transferring -- having people participate through.
10      Q. Okay. Well, were you -- Did you have a business
11  development role for Mansell?
12      A. No.
13      Q. Business development was for Hartsfield Capital
14  Group?
15      A. Correct.
16      Q. And in that capacity you sent funds -- referred
17  people to --
18      A. To Mansell. That's pretty much it.
19      Q. And Mr. Assemi may or may not have been one of
20  those people?
21      A. Correct.
22      Q. Did you get written contracts with the people you
23  referred to Mansell?
24      A. In most cases we did.
25      Q. Okay. Did you have one with Mr. Assemi?

15 (Pages 54 to 57)

Page 58

1    A.  I can't recall.

2    Q.  Have one with Mr. Moran?

3    A.  I'm sure there was.

4    Q.  Okay.  Do you have it in your possession still?

5    A.  I don't because -- I mean, it wasn't mine to

6  hold, but I don't have it, no.

7    Q.  You were -- You signed one part and Mr. Moran

8  signed the other, right?

9    A.  Correct, but I don't have it, no.

10    Q.  If you executed contracts with anyone in New

11  York, for example, as part of their being referred to

12  Mansell, would you have copies of those contracts or the

13  original?

14    A.  No.

15    Q.  You would have sent that back to them?

16    A.  You know, they get filed away with whatever

17  Mansell -- wherever they file it.

18    Q.  You would give it to someone at Mansell?

19    A.  I suspect, yes.

20    Q.  Either Mr. Reichardt or Mr. Banzhaf?

21        MR. DIAMOND:  This was a question that

22    started with if, as I recall.  Not to say that

23    there were any --

24        MR. MULLANEY:  That's right.  It started

25    with if.

Page 59

1  BY MR. MULLANEY:

2    Q.  Now, would you hand Mr. Reichardt or Mr. Banzhaf

3  hard copies of these contracts?

4        MR. DIAMOND:  Again, I think you have to ask

5    questions of fact, not would you have done this

6    or is this --

7        MR. MULLANEY:  I'm trying to follow up on

8    the witness' testimony, which tends to be a

9    little bit in the conditional tense.

10        MR. DIAMOND:  I've noticed that, as well,

11    but I think your questions --

12        MR. MULLANEY:  I'd like to follow --

13        MR. DIAMOND:  -- your questions have to be

14    better than his answers, I think.

15        MR. MULLANEY:  Well, how can I do that?  He

16    says, there might have been contracts.

17        MR. DIAMOND:  I think you come back and say,

18    was there such a contract.

19        MR. MULLANEY:  And the answer is --

20        MR. DIAMOND:  And if he says, I don't

21    recall, then that's your answer.  Don't say --

22    You can't say, if there was such a contract what

23    would you have done.  I mean, that doesn't take

24    us anywhere.

25        MR. MULLANEY:  Okay.

Page 60

1  BY MR. MULLANEY:

2    Q.  Was there a contract between you and Mr. Moran?

3    A.  No.

4    Q.  Was there a contract between you and Belsize?

5    A.  No.

6    Q.  Are you sure that's consistent with your earlier

7  testimony?

8    A.  If you're referring to a contract between me and

9  any of the clients, there's never me and another client

10  with a contract ever.  If there was a contract between a

11  client and maybe Mansell, so --

12    Q.  I must be confused.  Did you testify earlier that

13  you had a written contract with people you referred into

14  Mansell?

15    A.  No.  My -- Let me re -- I misunderstood the

16  question then because --

17    Q.  Go ahead.

18    A.  The question -- My -- I didn't have a contract

19  with the client.  My agreement was basically I referred

20  clients to Mansell and that's all I did.  I didn't have a

21  position at Mansell; I didn't sit on the board, nothing of

22  that nature.

23    Q.  All right.  Well, my question was -- I'll ask it

24  again to maybe refresh your recollection.

25        Did you have a contract with the people you

Page 61

1  referred to Mansell?

2        MR. DIAMOND:  Let me again object.  I think

3    there's a problem with the semantics of did you

4    have a contract.  You mean was he a party to a

5    contract or --

6  BY MR. MULLANEY:

7    Q.  Well, let's do it that way.  Were you a party of

8  a contract?

9        MR. DIAMOND:  I object to your question

10    because it's vague.  You're misunderstanding how

11    you --

12        MR. MULLANEY:  Why don't we let me finish a

13    question and then Mr. Begley seems to be able to

14    answer.  Whether the answers are consistent or

15    not is a different issue.  I'll ask it again.

16  BY MR. MULLANEY:

17    Q.  Did you in any capacity, Mr. Begley, enter into a

18  contract with people you referred to Mansell?

19    A.  No.

20    Q.  Written or oral?

21    A.  No.

22    Q.  Now, did the people you referred to Mansell, were

23  they aware you would be getting a commission or referral

24  fee for your sending them to Mansell?

25    A.  Of course.

16 (Pages 58 to 61)

Thomas O. Begley, Jr.

Page 62

1 Q. And you told them that?

2 A. They knew there was a percentage being generated

3 of which they were getting a percentage, and then the

4 remaining percentage stayed with Mansell.

5 Q. How did -- But you didn't have a position with

6 Mansell, so how did they know you were getting paid?

7     MR. DIAMOND: Let me object. We're getting

8     far a field from any jurisdictional --

9     MR. MULLANEY: Well, I'm not sure that's

10     right, because Mansell indisputably did business

11     in New York. And whether or not Mr. Begley's

12     relationship with Mansell would then, I think,

13     directly implicate whether he really was doing

14     business in New York.

15     MR. DIAMOND: Well, counselor, I would

16     object to that. That's a conclusion of law. You

17     make a statement that Mansell was indisputably

18     doing business in --

19     MR. MULLANEY: We're sending into New York

20     with some regularity. It was. In any event, the

21     fact that it's a question means it's -- even if

22     it's a question means my inquiry is proper.

23     MR. DIAMOND: I think there's a point where,

24     as you get into the substance of these deals it

25     ceases to be jurisdictionally related, but again,

Page 63

1 I've forgotten the substance of the question you

2 were just asking. If you want to try it again, I

3 mean, I'm not trying to put you off of this, but

4 just keep you on jurisdictional questions.

5     MR. MULLANEY: Fair point. Why don't we

6     focus it this way?

7 BY MR. MULLANEY:

8 Q. Did you have any communications with anyone in

9 New York where you indicated that you would be getting a

10 commission or referral fee for sending them to Mansell?

11 A. No, no.

12 Q. So let's take a concrete example. Did Mr. Moran

13 know that you were getting a commission or referral fee for

14 directing him to Mansell?

15     MR. DIAMOND: Let me object. He can't

16     possibly know what someone else knew.

17     MR. MULLANEY: They might have told him.

18     They might have written it.

19     THE DEPONENT: No.

20 BY MR. MULLANEY:

21 Q. Okay. Same question for Mr. Assemi.

22 A. No.

23 Q. Okay. Do you know a gentleman named John Mialo?

24 A. Mialo? Spell it, please.

25 Q. M-i-a-l -- it appears to be in this --

Page 64

1 A. Yes, I do.

2 Q. How do you pronounce his last name?

3 A. Mialo.

4 Q. Okay. Where does he live?

5 A. In Atlanta.

6 Q. And a Maurice Thomas?

7 A. Can't say I do.

8 Q. Do you know where Mr. Mialo lived in 2003?

9 A. Yes.

10 Q. Where?

11 A. Atlanta.

12 Q. Do you know where he lived in 2004?

13 A. Atlanta.

14 Q. All right. Do you know a Frank Nadal?

15 A. Yes.

16 Q. Who is he?

17 A. Our lawn keeper.

18 Q. Your lawn keeper?

19 A. He obviously lives here in Atlanta.

20 Q. Does he still work for you?

21 A. Yeah.

22 Q. Do you know what the company 26-2 is?

23 A. No.

24 Q. Do you know a person named Gerralyn or Gerralyn

25 Wood?

Page 65

1 A. I know the name, yes.

2 Q. Who is she?

3 A. She was someone who did some consulting.

4 Q. For whom or what?

5 A. I can't recall what it was.

6 Q. Do you know where she lives or worked?

7 A. She was in Atlanta.

8 Q. I'm going to put in front of you Plaintiff's 10

9 and direct your attention to Tab C, Exhibit 10-C, and the

10 second page of that. Is that your signature, sir?

11 A. It looks like my signature.

12 Q. Well, does it look a lot like your signature?

13 A. It looks like my signature, yes.

14 Q. Okay. Any reason to think it's not your

15 signature?

16 A. Yes.

17 Q. What's that?

18 A. Because of what it's signed against, a

19 resolution.

20 Q. Okay. So it's the text of the document, it's not

21 the signature itself that makes you think it's not yours?

22 A. Correct.

23 Q. Have there been any incidents that you're aware

24 of, sir, where your signature's been forged successfully?

25 A. I've had some incidents.

17 (Pages 62 to 65)

**Thomas O. Begley, Jr.**

Page 66

1   Q.  Is that right?
2   A.  Yeah.
3   Q.  And did you make out police reports?
4   A.  No.
5   Q.  Okay.
6   A.  They didn't really --
7   Q.  Amount to much?
8   A.  -- amount to much, right.  Exactly.
9       MR. KOLBER:  Mr. Mullaney, I would like to
10  inquire of the witness whether or not he can
11  testify to whether or not he serves as a
12  secretary to any other company or corporation.
13      MR. MULLANEY:  That's okay with me.
14      MR. KOLBER:  Is that okay with you?
15      MR. DIAMOND:  Is that a jurisdictional
16  question?  With any other -- with any --
17      MR. KOLBER:  With any company.
18      MR. DIAMOND:  With any company?
19      THE DEPONENT:  Did I serve as a secretary or
20  --
21      MR. KOLBER:  In other words, your signature,
22  this signature that you just testified appears as
23  if it's your own is a double line that says
24  Thomas O. Begley, Secretary, and above that it
25  says certified by the corporate secretary.  My

Page 67

1   question to you is, to your knowledge, have you
2   ever been or are you currently the corporate
3   secretary of any legal entity?
4       THE DEPONENT:  No.
5       MR. KOLBER:  Thank you.
6   BY MR. MULLANEY:
7   Q.  I'm going to show you a document that was
8   previously marked as Plaintiff's 14.  Tell me if you
9   recognize that.
10      MR. DIAMOND:  The question is, do you
11  recognize it.  Counsel, can I ask what it was
12  Exhibit 14 to?  To the deposition this morning?
13      MR. MULLANEY:  Yes.
14      MR. DIAMOND:  Thank you.
15      MR. MULLANEY:  Not this morning.  It was --
16      MR. DIAMOND:  Yesterday?
17      MR. MULLANEY:  Yes, sir.
18      MR. DIAMOND:  And do I understand that
19  that's going to be marked in this exhibit as P-14
20  also?
21      MR. MULLANEY:  Yes, if that's all right with
22  you.
23      MR. DIAMOND:  It's okay with me.  We'll have
24  gaps for the numbers that don't exist.  I'm okay
25  with that.  I just want it to be clear.

Page 68

1       MR. MULLANEY:  I guess that's right.  What I
2   anticipate will happen is if there's any -- there
3   is motion practice.  I will just say in my papers
4   it was Plaintiff's Exhibit 14 that was introduced
5   at the --
6       MR. DIAMOND:  And I guess the transcript
7   will have an exhibit list that will identify,
8   these were the exhibits that were proffered and
9   they may say, Exhibit 7, 14, 20 --
10      MR. MULLANEY:  Yes.
11      MR. DIAMOND:  -- 142 and that these -- you
12  would certify that those were the only exhibits
13  that were offered.  That's acceptable.
14      MR. MULLANEY:  Okay.  Thanks.  And we're
15  only going to go up to 20, I think.
16  BY MR. MULLANEY:
17  Q.  Do you recognize Plaintiff's Exhibit 14?
18  A.  I don't recognize it, per se.  It's been awhile,
19  so I can't say I recognize the document, but I'm not
20  surprised.
21  Q.  You said it's been awhile.  It's been awhile
22  since when, you authored it?
23  A.  I can't recall that I authored this.
24  Q.  Okay.
25  A.  But I'm not denying it, as well.

Page 69

1   Q.  Maybe you did, maybe you didn't.  Do you know who
2   Bill is or was?
3   A.  Bill Kerr was the gentleman that we sued in
4   Canada for the misappropriation of the funds.
5   Q.  And you're sure that's the same Bill?
6   A.  Absolutely.
7   Q.  When you say we sued, who is we?
8   A.  Basically the entire -- The Mansell.  When I say
9   Mansell, Mansell sued.
10  Q.  And you were authorized to write a letter to Bill
11  on behalf of Mansell?
12  A.  Well, I mean, because I -- I had my -- I -- I
13  marketed this to my associates and friends.  I mean, Wendy
14  was a friend, you know, so to market it to these people and
15  then to find out this guy stole the money, I wanted to make
16  sure that he understood that it was a collective effort to
17  get these funds.
18  Q.  That wasn't exactly my question.
19  A.  Okay.
20  Q.  My question was narrower.  Well, that reminds me
21  of another question.  When you say it was a collective
22  effort to get the funds, who was in the collective effort?
23  A.  Just everybody who had something to lose here.
24  Q.  Including people in New York?
25  A.  Well, Wendy -- You know, the only person I recall

18 (Pages 66 to 69)

Page 70

1 besides Wendy was John Moran in New York.
2    Q.  Right, okay.  So you were writing on his behalf
3 here in this letter?
4    A.  No, I wasn't.
5    Q.  So you were saying it was going to be a
6 collective effort.
7    A.  I'm talking about Mansell group.
8    Q.  Okay.
9    A.  Mansell.  I was -- When I say -- When I speak in
10 collective effort, I'm not referring to the company as per
11 se, but I mean, you know, I personally went out and asked
12 people to participate in Mansell, so I was actually -- I
13 had a little credibility issue, as well, me personally, and
14 so I mean, I'm speaking in general terms.  Nothing
15 specific.  I'm not saying that it was Mansell, but --
16    Q.  Okay.  So generally either you were speaking on
17 behalf of Mansell, the LLC, or Mansell, the LLC, and its
18 participants or both, you're not sure?
19    A.  First and foremost, I don't recall even writing a
20 letter, but I'm saying that there was correspondence sent
21 to Mr. Kerr on a regular basis in an attempt to get this
22 money.
23    Q.  So you seem very clear that the Bill at the top
24 of this letter is Bill Kerr.
25    A.  Oh, yeah, I do know it's Bill Kerr.  I mean, he's

Page 71

1 the only person we talked to --
2    Q.  So you have a clear recollection of this letter?
3    A.  Not necessarily, but --
4    Q.  You have a clear recollection of the two words at
5 the top of this letter, Dear Bill, and the rest of it is
6 foggy?
7    A.  No.
8    Q.  I'll just get right back to the initiating
9 question.  Were you authorized by anyone at Mansell to
10 write this letter on its behalf?
11    A.  No.
12    Q.  Just took it upon yourself to do it.
13    A.  I don't recall that I did it.
14    Q.  Did you submit some affidavits to a court in
15 Canada on behalf of Mansell?
16    A.  Yes, I did.
17    Q.  How did you describe yourself in those
18 affidavits?
19    A.  I'm not really sure.
20    Q.  How -- forgive me -- how could you submit an
21 affidavit on behalf of Mansell in a court in Canada if you
22 had no --
23       MR. DIAMOND:  Do you have copies of these
24    affidavits that you're speaking of?
25       MR. MULLANEY:  No, but I'll look through my

Page 72

1    file in a minute.
2       THE DEPONENT:  If it was affidavit, it was
3    probably as Thomas Begley, if it was.  I'm not
4    sure.  I'm not certain.
5 BY MR. MULLANEY:
6    Q.  Can't recall?
7    A.  Can't.
8    Q.  Do you recall whether you were sworn to tell the
9 truth when you submitted that affidavit?
10    A.  Of course.
11    Q.  Okay.  But the -- You're not sure what you may
12 have said in it?
13    A.  Correct.
14    Q.  Okay.  At the bottom of the second paragraph you
15 write, our broker/dealer, Hartsfield Capital Securities, is
16 likewise adversely affected by the curtailed business.
17 Hartsfield Capital Securities was the broker/dealer for
18 who, Mansell?
19    A.  I don't know in this case, because, I mean, I
20 can't say that I'm the author of this document.  The fact
21 that my name is at the bottom doesn't suggest that I wrote
22 this, but --
23    Q.  It doesn't?
24    A.  No.
25    Q.  Okay.  Have there been incidents of lots of

Page 73

1 people out there circulating correspondence with your name
2 on it falsely that you're aware of?
3    A.  I can't say there is.
4    Q.  Could be the same person who is forging your
5 signature out there?
6       MR. DIAMOND:  This document, your P-14, has
7    no signature on it.
8       MR. MULLANEY:  That's correct.  That's
9    right.  That's right.
10       MR. KOLBER:  Mr. Mullaney, you made a
11    statement regarding forging the signatures.
12       MR. MULLANEY:  Uh-huh (affirmative).
13       MR. KOLBER:  I'm not sure what sort of
14    premise has been established that the signature
15    was forged.  Is that what you meant to say?
16       MR. MULLANEY:  It is.  I believe Mr. Begley
17    testified earlier that he was aware that there
18    are incidents where people had forged his
19    signature, that he did not report those incidents
20    to the police.
21       MR. KOLBER:  In his testimony with respect
22    to any of the signatures that you produced in
23    today's deposition, is it his testimony that
24    those signatures have been forged?
25       MR. MULLANEY:  I don't think so.

19 (Pages 70 to 73)

**Thomas O. Begley, Jr.**

Page 74

1　　　MR. KOLBER: I think -- I just want to
2　clarify that.
3　　　THE DEPONENT: No, I didn't say it was
4　forged. I'm just saying that my signature on
5　that document is in question because I never was
6　at a board meeting; I never signed.
7　　　MR. KOLBER: This is important. The
8　signature that was presented to you today --
9　　　THE DEPONENT: Correct.
10　　　MR. KOLBER: -- you cannot confirm what your
11　signature -- Is it your position that someone
12　forged that signature?
13　　　THE DEPONENT: I'm not saying that it wasn't
14　my signature. I'm saying that the document that
15　the signature is connected to is the issue. I'm
16　not suggesting that that's not my signature. I'm
17　just saying that the document that the
18　signature's connected to is something that I
19　don't recall ever signing. I've never been to a
20　board meeting.
21　　　MR. KOLBER: So Mr. Mullaney, is it correct
22　that when you refer to a forged signature, you're
23　referring to the possibility that in the past
24　when Mr. Begley says that in the past he's had an
25　experience where someone might have forged his

Page 75

1　signature, that's the --
2　　　MR. MULLANEY: That's correct.
3　　　MR. KOLBER: -- reference you were making?
4　Thank you.
5　　(Whereupon, an off-the-record discussion ensued.)
6　BY MR. MULLANEY:
7　　Q. I'm going to show you a document, Mr. Begley,
8　that's previously marked as Plaintiff's Exhibit 15.
9　　A. Okay.
10　　Q. Tell me if you recognize it.
11　　　MR. DIAMOND: The question is, do you
12　recognize it.
13　　　THE DEPONENT: I don't really recognize
14　this, but I -- No, I don't recognize it.
15　BY MR. MULLANEY:
16　　Q. Okay. If you look on the second page you see
17　towards the bottom your initials, TOB, and then a back
18　slash, TRG. Does that refresh your recollection as to this
19　document?
20　　A. Well, I'm not saying that it wasn't something
21　that was prepared. I'm just saying that I don't recognize
22　the document. That's all.
23　　Q. All right. Let me put it this way, do you know
24　who TRG is or was?
25　　A. Oh, yeah.

Page 76

1　　Q. Who?
2　　A. My wife.
3　　Q. Okay. What's her --
4　　A. Tracy Renee Gravely. That was her maiden name.
5　　Q. Okay.
6　　A. She's a typist.
7　　Q. I'm sorry?
8　　A. She's just a typist.
9　　Q. She's just a typist?
10　　A. Just a typist.
11　　Q. So you think she typed this document?
12　　A. No, she didn't.
13　　Q. Do you have dyslexia?
14　　A. Pardon me?
15　　Q. Do you have dyslexia?
16　　A. No.
17　　Q. Okay. If you look at the bottom of Paragraph 2,
18　right there on the first page, you see a phrase that
19　starts, this is a reoccurring problem. Does this refresh
20　your recollection as to this document?
21　　A. No, not necessarily.
22　　Q. Not necessarily?
23　　A. No. I mean, my -- She wasn't my secretary. She
24　was the secretary for the entire company, so she --
25　　Q. What was the entire company?

Page 77

1　　A. Hartsfield Capital Group.
2　　Q. Okay. So your wife may have typed this?
3　　A. Right.
4　　Q. And may have done so on the Hartsfield Capital
5　Group computer?
6　　A. I suspect.
7　　Q. Okay. And you don't recall reading this last
8　phrase where it calls you a dyslexic a-hole, if I may say,
9　on the transcript?
10　　　MR. DIAMOND: Again, I ask, what does this
11　have to do with jurisdictional issues?
12　　　MR. MULLANEY: Well, it may have been sent
13　to Mr. Assemi who maintained a bank account in
14　New York.
15　　　THE DEPONENT: Actually, I don't --
16　　　MR. DIAMOND: I don't think there's a
17　question on the table.
18　　　THE DEPONENT: To be honest, now that I'm
19　reading line two here, I'm almost certain I
20　wouldn't have sent this to Wendy, because I don't
21　speak to her that way. I don't have that kind of
22　language with her.
23　　　MR. MULLANEY: Okay.
24　　　THE DEPONENT: She would know that.
25　　　MR. MULLANEY: I'll take that back.

20 (Pages 74 to 77)

Page 78

```
1        MR. DIAMOND:  That was Exhibit 15?
2        MR. MULLANEY:  15.
3        MR. DIAMOND:  All right.
4  BY MR. MULLANEY:
5     Q.  I'm going to do the same thing with Plaintiff's
6  16.  Tell me if you recognize that document, and I'll say,
7  if so, tell me if you sent it to Mr. Assemi or anyone
8  (Presenting)?
9     A.  I can't recall this document at all.
10    Q.  Not at all?
11    A.  Not at all.
12    Q.  Okay.
13    A.  In fact, and it was strange here, and that's why
14 I'm questioning this document, and the one you submitted
15 earlier, is because some of the language in here, I mean,
16 it wouldn't be something I would be communicating to Wendy.
17 There's just no way.
18    Q.  You don't think so?  You want to read me the
19 language that --
20    A.  Tom is boss bag of all -- What is that?  I don't
21 get that.  Without my signature.  I mean, I would never
22 submit something like this.
23    Q.  Okay.
24    A.  I'm kind of curious where a document like this
25 came from, that one as well, because --
```

Page 79

```
1        (Whereupon, plaintiff's exhibit number
2        twenty-one was marked for the purpose of
3        identification).
4  BY MR. MULLANEY:
5     Q.  I will confess to having lied earlier.  We're
6  going to go to Plaintiff's 21.
7     A.  Okay.
8     Q.  Do you recognize this document, sir?
9     A.  I know John, I see my signature.
10       MR. DIAMOND:  Well, he asked if you
11 recognize the document.
12       THE DEPONENT:  I can't say I recognize it.
13 BY MR. MULLANEY:
14    Q.  Okay.  Any reason to think it's not a true and
15 accurate document?
16    A.  No.
17    Q.  Okay.  Do you recall sending it?
18    A.  No.
19    Q.  Do you recall signing it?
20    A.  No.
21       MR. DIAMOND:  It's not signed.
22 BY MR. MULLANEY:
23    Q.  Do you recall signing an iteration of it?
24    A.  No, I don't.
25    Q.  Do you recall giving it to anybody in any form?
```

Page 80

```
1     A.  You say giving it to anyone in any form?
2        MR. DIAMOND:  Do you recall giving it to
3  anyone?
4        THE DEPONENT:  No.
5        (Whereupon, plaintiff's exhibit number
6        twenty-two was marked for the purpose of
7        identification).
8  BY MR. MULLANEY:
9     Q.  Okay.  We're close to the end, and forgive me,
10 I'm just tidying up my own thinking here.  Plaintiff's 22.
11 Do you recognize Plaintiff's 22, sir?
12    A.  Yes, I do.
13    Q.  Is that your signature on it?
14    A.  Yes, it is.
15    Q.  Do you recall sending it?
16    A.  No, but chances are I did.
17    Q.  No reason to think you didn't?
18    A.  No.
19    Q.  Is anything in that letter inaccurate as you sit
20 here today?
21    A.  No.
22    Q.  Okay.  Does it refresh your recollection as to
23 where May Davis was operating on July 16th of 2003?
24    A.  No, but my understanding when I was communicating
25 with May Davis was always when they were in the World Trade
```

Page 81

```
1  Center.  That's part of my recollection.
2        And now that you brought that up, I do realize
3  that there was -- somebody had an account -- either we had
4  an account at May Davis or Wendy had an account at May
5  Davis, something to that affect.
6     Q.  Who is we?
7     A.  When I say we I'm talking about the Hartsfield
8  Group entity.  I don't know if it was Hartsfield or if it
9  was Mansell.  It says Mansell, so I assume it was Mansell
10 that had the account there.
11    Q.  You also wrote Plaintiff's 22 on Hartsfield
12 Capital Group letterhead, correct?
13    A.  Yes.
14    Q.  Okay.  I have nothing further.  Dan?
15       MR. KOLBER:  Can I confer with Mr. Banzhaf
16 for a moment.
17       MR. MULLANEY:  Sure.  This would be a good
18 time for a break.
19       (Brief recess).
20       EXAMINATION
21 BY MR. KOLBER:
22    Q.  Mr. Begley, did you ever ask Mr. Banzhaf to
23 remit, either by check or by wire transfers, certain funds
24 of Mansell to certain of your creditors?
25    A.  Yes.
```

21 (Pages 78 to 81)

**Exhibit D**



Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax

# HARTSFIELD CAPITAL

July 16, 2003

Dover Limited
Wendy Yap
56 Andrew Road
299968 Singapore
c/o: Alain Assemi of the Elfort Company S.A.

Dear Mrs. Yap.

RE: ACKNOWLEDGEMENT OF RECEIPT OF FUNDS

This letter will acknowledge receipt of your funds in the amount of $6,750,000.00 transferred from your account at May Davis/Fiserv to the Mansell Capital Partners trading account at May Davis/Fiserv. Those funds were transferred to Mansell Capital Partners May Davis/Fiserv trading account July 16, 2003.

We will make every effort to respond to your questions and concerns in a timely and thorough fashion.

Sincerely,

Thomas Begley
Executive Vice President

TOB/trg

TOTAL P.003



**Exhibit E**

Page 1

```
1                    IN THE U.S. DISTRICT COURT

               SOUTHERN DISTRICT OF NEW JERSEY COUNTY

2                      CA NO.:08-CV-1337LTS

3 DOVER, LTD.,

4                 Plaintiff,

5 -VS-

6 ALAIN ASSEMI, HARTSFIELD CAPITAL GROUP, STEPHAN J. LOVETT,

  STEPHAN J. LOVETT, DELBERT D. REICHARDT, MANSELL CAPITAL

7 PARTNERS, LLC, THOMAS O. BEGLEY, THOMAS O. BEGLEY &

  ASSOCIATES, T.J MORROW, and T.J. MORROW, P.C.,

8

                   Defendant.

9 --------------------------------------/

10              DEPOSITION OF STEPHAN J. LOVETT

                  Friday, August 1, 2008

11                 8:35 AM - 11:05 AM

                  181 Peachtree Street

12                    Atlanta, GA

13

14

15

16

17

18

19

20 Reported by:

21 Catherine Jarman Rouzer, CVR-CCR

22 Esquire Deposition Services

23 Job NO. 204575a

24

25
```

**Stephan J. Lovett**

Page 10

1    Q.  All right.  Let's turn to Paragraph 7 of your
2  affidavit, and the last sentence reads, neither I nor HC
3  Group was involved in either of these transactions.  Did I
4  read that accurately?
5    A.  Correct.
6    Q.  And is the text accurate?
7    A.  Yes.
8    Q.  Did you have any business with Dover, Ltd. at all
9  in any capacity ever?
10    A.  Yes.
11    Q.  And could you describe that, please?
12    A.  Dover contracted with Hartsfield Capital Group to
13 look at the potential acquisition of Bogasari flour mill in
14 Jakarta.
15    Q.  Nothing else?
16    A.  That's it.
17    Q.  Okay.  Was there a contract between you and Dover
18 relating to this acquisition?
19    A.  I'm not sure that Dover was the contracting
20 party.  I believe it may have been another entity.
21    Q.  Do you recall which one it is?
22    A.  No, not offhand.
23    Q.  You had no other relationship with Dover?
24    A.  None.
25    Q.  Did you have any business relationship with Wendy

Page 11

1  Yap?
2    A.  Yes, I did.
3    Q.  And what was that?
4    A.  Wendy Yap was a principal in a bakery company
5  located in Jakarta and we were looking at strategic
6  alternatives for that bakery company.
7    Q.  When you say we, who was that?
8    A.  Hartsfield Capital Group.
9    Q.  Did you or HC Group have any other business with
10 Wendy Yap?
11    A.  No.
12    Q.  Turn to Page 3 of your affidavit, Paragraph 9,
13 the last sentence says, you testified, in fact, every event
14 that I am personally aware of took place in Georgia.
15    A.  Correct.
16    Q.  What events are those?
17    A.  I met with Wendy Yap in Georgia and we discussed
18 various things that Hartsfield Capital Group could do to
19 support her interests in her various companies.
20    Q.  Meaning just the -- called the bakery project and
21 the Bogasari project?
22    A.  Correct.
23    Q.  Nothing else?
24    A.  We talked about structured project finance.
25    Q.  Okay.  So there's a third -- a third piece of

Page 12

1  business you discussed with Ms. Yap?
2    A.  Discussed but not contracted.
3    Q.  Okay.  What did you discuss with Ms. Yap about --
4  you said structured finance?
5    A.  Structured project finance.
6    Q.  Structured project finance.
7    A.  The concept.
8    Q.  Okay.  Well, as much as you can tell me, what did
9  you discuss with her about the concept?
10    A.  The concept was that funds could be used and have
11 the interest income from those funds for the project.
12    Q.  Was there a project in mind?
13    A.  Yes.
14    Q.  What was that?
15    A.  The expansion of her bakery operation, the
16 expansion of our wheat trading operation.
17    Q.  Did you ever have any written communication with
18 Ms. Yap about that?
19    A.  I believe so.
20    Q.  Did you discuss with her where funds would be
21 invested from which the interest would be generated to
22 finance the project?
23    A.  Yes.
24    Q.  And where would the funds have been invested?
25    A.  They would have been invested in a special

Page 13

1  purpose vehicle.
2    Q.  What was that called?
3    A.  I believe that she selected Mansell Capital
4  Partners.
5    Q.  She selected it?
6    A.  Yes.
7    Q.  Oh.  Had you ever heard of Mansell Capital
8  Partners before?
9    A.  Yes.
10    Q.  How had you heard of Mansell Capital Partners?
11    A.  It was a company that was put together as a
12 special purpose vehicle for Ms. Yap's transaction.
13    Q.  Who put it together?
14    A.  Mr. Banzhaf put it together.
15    Q.  Do you know why Mr. -- Let me take that back.
16 Did anyone ask Mr. Banzhaf to put it together?
17    A.  I believe it was Ms. Yap.
18    Q.  You had nothing to do with that?
19    A.  I'm not sure that I understand the word nothing.
20    Q.  Okay.  Did you have anything to do with the
21 formation of Mansell Capital Partners?
22    A.  No, I did not.
23    Q.  Were you an officer of Mansell Capital Partners?
24    A.  No.
25    Q.  A director?

4 (Pages 10 to 13)

**Stephan J. Lovett**

Page 14

1    A.  No.
2    Q.  Did you have any control over the funds that were
3 deposited with Mansell Capital Partners?
4    A.  No.
5    Q.  Were you personally paid any money from the
6 Mansell Capital Partners bank account?
7    A.  I never received any funds personally from the
8 Mansell Capital account.
9    Q.  Did HC Group receive any funds from Mansell
10 Capital account?
11    A.  Yes, it did.
12    Q.  Okay.  And what was that for?
13    A.  Administrative services.
14    Q.  What were those administrative services?
15    A.  Housing, location, et cetera, office.
16    Q.  Housing of what?
17    A.  The company.
18    Q.  Which company?
19    A.  Mansell Capital Partners.
20    Q.  It was rent effectively?
21    A.  It wasn't delineated.
22    Q.  Was there a contract between Mansell and HC
23 Group?
24    A.  No, there wasn't.
25    Q.  Was there --

Page 15

1           MR. KOLBER:  I'm sorry to interrupt, but it
2       was the same point I made yesterday.  Let's be
3       clear as to which Mansell we're talking about.
4       Is this Mansell Capital Partners, LLC, Georgia --
5           MR. MULLANEY:  Yes.
6           MR. KOLBER:  -- limited --
7           MR. Mullaney:  Yeah.
8           MR. KOLBER:  -- liability company?
9           MR. Mullaney:  If we can, Mr. Lovett, if
10      it's okay with you, we'll stipulate that any time
11      I say Mansell I mean Mansell Capital Partners,
12      LLC, and this is to distinguish it from other
13      entities that may be named Mansell Capital
14      Partners II and Mansell Capital Partners III.  Is
15      that okay?
16           THE DEPONENT:  All right.
17           MR. Mullaney:  Is that okay, Mr. Kolber?
18           MR. KOLBER:  Yeah.
19 BY MR. MULLANEY:
20    Q.  Was Ms. Yap aware that HC Group would be paid
21 funds by Mansell for administrative services?
22    A.  I have no actual knowledge.
23    Q.  Let's turn to Paragraph 11 of your affidavit.
24 And you testify there that HC Group is unrelated to
25 Defendant, Hartsfield Capital Securities, Inc.  Did I read

Page 16

1 that correctly?
2    A.  Correct.
3    Q.  And is that correct?
4    A.  It is.
5    Q.  If you know, where is Hartsfield Capital
6 Securities located, now Argosy Capital Securities?
7    A.  1105 Sanctuary Parkway, Suite 425, Alpharetta,
8 Georgia.
9    Q.  Is it Sanctuary Parkway or Lakewood Parkway?
10    A.  I think it's actually Lakewood Parkway.
11    Q.  All right.  So is it Hartsfield Capital
12 Securities now Argosy Capital Securities in the same office
13 suite as HC Group?
14    A.  Yes.
15    Q.  Okay.  Does HC Group receive rent from Argosy
16 Capital Securities?
17    A.  Yes, it does.
18    Q.  So it's not totally unrelated, is it?
19    A.  The only relationship between Hartsfield Capital
20 Group and Hartsfield Capital Securities or Argosy is the
21 fact that one is the landlord and the other is the tenant.
22    Q.  Are there any other shared services between HC
23 Group and Argosy, if we can call it Argosy?
24    A.  Hartsfield Capital Group provides certain
25 administrative services as part of the rent to Argosy.

Page 17

1    Q.  What are those services?
2    A.  Secretarial and computer.
3    Q.  If you -- As much as you can, describe the
4 computer services that HC Group provides to Argosy.
5    A.  They provide hardware and software services.
6    Q.  If you can describe the hardware and software
7 services that HC Group provides to Argosy, and if it's
8 okay, when I say Argosy I mean Argosy Capital Securities
9 and the company in its previous incarnation, Hartsfield
10 Capital Securities?
11    A.  Hartsfield Capital Group provides monitors, a
12 computer, a mouse and various hardware and printers for
13 Argosy.  Similarly it provides it with certain
14 administrative operative software and it maintains that
15 software.
16    Q.  Does HC Group provide telephone services to
17 Argosy?
18    A.  Yes, it does.
19    Q.  Does -- Describe those services, if you can.
20    A.  It provides Argosy with a handset, voicemail, and
21 occasionally operator support.
22    Q.  Okay.  Does HC Group separately bill Argosy for
23 the telephone services it provides?
24    A.  It is included in the rent.
25    Q.  All right.  Are there any other connections

5 (Pages 14 to 17)

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

**Stephan J. Lovett**

Page 22

1    A.  Yes, I did.
2    Q.  And it showed a negative income?
3    A.  Yes, it did.
4    Q.  Did HC Group file an income tax return for 2007?
5    A.  I believe so.
6    Q.  And it would show a net operating loss of
7  $73,000?
8    A.  Correct.
9    Q.  Does HC Group have any other owners?
10   A.  No.
11   Q.  Do you own any part of Argosy?
12   A.  No.
13   Q.  And I ask you this -- forgive me if you would --
14 but you testified that you're a person of limited means. I
15 notice you're wearing a solid gold Rolex and gold
16 cufflinks.  May I ask when those were purchased?
17   A.  Neither were purchased.
18   Q.  Were they given to you?
19   A.  My cufflinks are a gift from my father for my
20 20th birthday.
21   Q.  Okay.
22   A.  And the Rolex was a gift from my ex-wife for my
23 40th birthday.
24   Q.  All right.  Fair enough.  Where does your ex-wife
25 live?

Page 23

1    A.  Illinois.
2    Q.  Chicago?
3    A.  No.
4    Q.  Does she still carry the last name Lovett?
5    A.  Yes.
6    Q.  What town in Illinois does she live in?
7    A.  I believe Barrington.
8    Q.  Okay.  Who is Nadia Simon?
9    A.  The office manager for Hartsfield Capital Group.
10   Q.  How many other employees does Hartsfield Capital
11 Group have?
12   A.  None.
13   Q.  Just Ms. Simon?
14   A.  Yes.
15   Q.  All right.  Do you know a gentleman named Solomon
16 Weider or Weider?
17   A.  Yes, I do.
18   Q.  And who is he?
19   A.  He is a principal in a company, I believe, called
20 Success Realty.
21   Q.  Do you know where Success Realty is located?
22   A.  New York.
23   Q.  Do you know where Mr. Weider or Weider lives?
24   A.  No.
25   Q.  What makes you think Success Realty is located in

Page 24

1 New York?
2    A.  Historical reference.
3    Q.  What does that mean?
4    A.  It means I believe I've seen a document that says
5 that they are a New York corporation.
6    Q.  Have you heard of a company called Hartsfield
7 Capital Inc.?
8    A.  I've seen lots of iterations of Hartsfield
9 Capital, and they are sometimes referred to
10 inappropriately, as counsel well knows, having committed
11 the error himself.
12   Q.  Well, whether or not it's inappropriate or not
13 is, as they say, a legal conclusion.  But my question was,
14 have you heard of a company called Hartsfield Capital Inc.?
15 That's a yes or no.
16   A.  Yes.
17   Q.  And how have you heard it?
18   A.  I think it was referenced incorrectly in a
19 document.
20   Q.  Do you recall the document?
21   A.  I believe it was a Complaint that was
22 subsequently withdrawn by Mr. Weider.
23   Q.  A legal Complaint?
24   A.  Yes.
25   Q.  Do you know where that was filed?

Page 25

1    A.  I think it was filed in New York.
2    Q.  Do you have any connection to Hartsfield Capital
3 Inc.?
4    A.  Well, given that Hartsfield Capital Inc. doesn't
5 exist and given that it perhaps was mistakenly referred to
6 in lieu of its correct name, which is Hartsfield Capital
7 Group, Inc., then the answer is yes.
8    Q.  Okay.  Well, did HC Group do any business with
9 Success Realty?
10   A.  No, it did not.
11   Q.  Did you in any capacity transact any business
12 with Success Realty?
13   A.  No, we did not.
14   Q.  Well, what was the basis of the Complaint that
15 Success Realty or Mr. Weider filed against Hartsfield
16 Capital, whether it was named appropriately or not?
17   A.  Obviously it was baseless.
18   Q.  Well, did they -- If you know, did Success Realty
19 just pick your name out of a hat and sue you or was there
20 some communication between you and Success Realty before
21 the Complaint was filed?
22   A.  There was communication between Success Realty
23 and Hartsfield Capital Group, and we endeavored to advise
24 them that there was no basis for their Complaint.
25   Q.  Before the Complaint was filed, was there any

7 (Pages 22 to 25)

Page 26

1 communication between you and HC Group and Success Realty?
2    A.   Yes.
3    Q.   Describe that communication for me, if you would,
4 please.
5    A.   We advised them that their client, which I
6 believe was a company called HMI, and that HMI had an
7 obligation to Success Realty and that in the event that
8 Hartsfield Capital Group became aware of any profits to be
9 derived from the HMI activity that Hartsfield Capital Group
10 would pay Success Realty.
11   Q.   Was there -- Was this all done orally?
12   A.   No.
13   Q.   There were writings between Hartsfield Capital
14 Group and Success Realty?
15   A.   I'm not sure if it was with Success Realty or
16 whether it was with some other entity.
17   Q.   Was it -- Were those writings with Mr. Weider?
18   A.   Quite possibly.  I would need to look at the
19 documents to be sure.
20   Q.   I'll probably send a document request to your
21 attorney, Mr. Richardson, and we'll have our chance.  Has
22 that litigation between Mr. Weider and Hartsfield Capital
23 been resolved?
24   A.   My understanding is that it was dismissed with
25 prejudice.

Page 27

1    Q.   How did you gain that understanding?
2    A.   From counsel.
3    Q.   Hartsfield Capital had counsel in New York in
4 that action?
5    A.   Yes.
6    Q.   Who was it?
7    A.   I don't recall her name.
8    Q.   Don't recall her name?
9    A.   No, I don't.
10   Q.   Do you know where she was located?
11   A.   New York.
12   Q.   Okay.  Did Hartsfield Capital pay that attorney,
13 whatever her name is, money?
14   A.   Yes.
15   Q.   Okay.  Do you know a gentleman named John Moran?
16   A.   Yes, I do.
17   Q.   And how do you know him?
18   A.   I've talked with him on the phone.
19   Q.   Have you talked about business matters with him
20 on the phone?
21   A.   Yes.
22   Q.   How many times would you say you've spoken with
23 Mr. Moran about business matters?
24   A.   A number.
25   Q.   Do you know where Mr. Moran lives?

Page 28

1    A.   No.
2    Q.   Did you call him or did he call you?
3    A.   I'm sure both occurred.
4    Q.   Do you know what the telephone exchange is for
5 New York City?
6    A.   I know some of them.
7    Q.   Okay.  There are some new ones.  Do you recall if
8 you ever dialed a 212 area code before you got in touch
9 with Mr. Moran?
10   A.   I believe so.
11   Q.   Okay.  When did your telephone communications
12 with Mr. Moran begin, if you recall?
13   A.   I don't.
14   Q.   Roughly have they been going on a year, five
15 years, ten years?
16   A.   I do not know when they first occurred.
17   Q.   Have you ever sent Mr. Moran any written
18 communications?
19   A.   Quite possibly.
20   Q.   Would you have a record of those written
21 communications in your office?
22   A.   I'm not sure if I still do.
23   Q.   Do you recall where you may have sent those
24 written communications?
25   A.   They would have been sent by e-mail.

Page 29

1    Q.   Okay.  Does HC Group have an e-mail retention
2 policy?
3    A.   Yes.
4    Q.   And what is it?
5    A.   Any files that have not been accessed for more
6 than three years are usually deleted.
7    Q.   Okay.  Who does the deleting?
8    A.   The individuals responsible for those e-mails
9 should do it, and then should they not and the system
10 crashes, then the office manager will go back and clean up
11 the files.
12   Q.   And currently the employees of HC Group are you
13 and Ms. Simon, right?
14   A.   Yes.
15   Q.   So you and Ms. Simon are responsible for deleting
16 your own e-mails and that's how the policy is carried out?
17   A.   Yes.
18   Q.   Have you ever met Mr. Moran?
19   A.   Yes.
20   Q.   Where did you meet?
21   A.   At Harry's Bar in New York City.
22   Q.   The Harry's Bar downtown?
23   A.   Yes.
24   Q.   And you're familiar enough to know -- with New
25 York City to know where downtown is when I say Harry's Bar

8 (Pages 26 to 29)

**Stephan J. Lovett**

Page 30

1 downtown?
2    A.  Yes.
3    Q.  Hanover Street?
4    A.  I don't know the street.
5    Q.  How many times have you met Mr. Moran in New
6 York?
7    A.  Once.
8    Q.  Once?  What did you discuss with him at Harry's
9 Bar?
10    A.  His pending marriage.
11    Q.  Anything else?
12    A.  I don't recall.
13    Q.  You have a social relationship with Mr. Moran?
14    A.  No, I don't.
15    Q.  So you met a person with whom you do not have a
16 social relationship in New York City, discussed his pending
17 marriage, and that's it?
18    A.  No.  We had other matters to discuss, one of
19 which just happened to be his pending marriage.
20    Q.  Okay.  But you don't recall the others?
21    A.  Not offhand, no.  They were of a business nature.
22    Q.  And so you had more than one business matter to
23 discuss with Mr. Moran?
24    A.  We had a lot of potential things, most of which
25 did not materialize.

Page 31

1    Q.  Some of which did?
2    A.  Yes.
3    Q.  What were those?
4    A.  I believe that he was responsible for Mr. Alain
5 Assemi.
6    Q.  How do you mean he was responsible for Mr. Alain
7 Assemi?
8    A.  I think that Mr. Moran was responsible for
9 introducing Alain Assemi.
10    Q.  To whom?
11    A.  I believe to Mr. Begley.
12    Q.  Any other business matters?
13    A.  Yes.
14    Q.  What were those?
15    A.  None that brought fruit.
16    Q.  Have you ever met Mr. Assemi?
17    A.  No.
18    Q.  Have you heard of a company called Belsize?
19    A.  Yes.
20    Q.  And what is that?
21    A.  I believe that's the entity that Mr. Moran is
22 associated with.
23    Q.  And did I mispronounce his name?  Is it Moran,
24 Moran?
25    A.  I'm not sure.

Page 32

1    Q.  Okay.  Do you know where Belsize is located?
2    A.  No.
3    Q.  Are there any contracts between you or HC Group
4 and Belsize that were executed?
5    A.  Not that I recall.
6    Q.  Are there any contracts between you or HC Group
7 and Mr. Moran that were executed?
8    A.  Again, not that I recall.
9    Q.  Are there any in draft?
10    A.  I don't know.
11    Q.  Who would know if not you?  Ms. Simon, perhaps?
12    A.  I would make a check and see if we have any of
13 those documents.  And if we do, we'll certainly produce
14 them.
15    Q.  Thank you, kindly.  I probably should have said
16 this at the beginning of the deposition.  The ice cracking
17 behind me reminded me.  Any time you want water, coffee,
18 food, you haven't eaten any of your food, need to take a
19 break to go to the restroom or for any other reason, please
20 let me know.
21    A.  Thank you.
22    Q.  The court reporter will tell us when she needs to
23 take a break, I guess.  I'm going to show you a document,
24 Mr. Lovett, that was previously marked Plaintiff's Exhibit
25 1.  And I'll ask you if you recognize that document

Page 33

1 (Presenting)?
2    A.  Yes, I do.
3    Q.  And did you, in fact, author this document?
4    A.  I'm not sure.
5    Q.  Do you have any reason to think you did not
6 author it?
7    A.  Oh, I'm sorry.  I misunderstood you.  I
8 apologize.
9    Q.  That's okay.
10    A.  I thought you said offer, as opposed to author.
11 Yes, I believe I am the author of this document.
12    Q.  Okay.  And then do you have any reason to think
13 you did not offer that document to Mansell Capital
14 Partners?
15    A.  I'm not sure.
16    Q.  All right.
17    A.  Oh, to Mansell Capital Partners?
18    Q.  Correct.
19    A.  I have every reason to think that I did offer and
20 author this document to Mansell Capital Partners.
21    Q.  And I'll apologize in advance.  I occasionally
22 mumble, and if I'm not enunciating, let me know and I'll
23 speak up.  What is K and K Holdings?
24    A.  K and K Holdings was the landlord for Hartsfield
25 Capital Group, and Hartsfield Capital Group had

9 (Pages 30 to 33)

**Stephan J. Lovett**

Page 34

1 insufficient funds to pay its rent and so it took an
2 advance from Mansell Capital Partners for the
3 administrative services that it provided to it and this is
4 a memorialization of that advance.
5    Q.  Did Hartsfield Capital Group repay that money?
6    A.  I believe so.
7    Q.  Okay.  Does Hartsfield Capital Group keep
8 financial records in the ordinary course of its business?
9    A.  Yes, it does.
10    Q.  So it would have a record of whether it repaid
11 Mansell?
12    A.  It should.
13    Q.  How do I want to do this?  I'm going to ask you,
14 Mr. Lovett, to give me that document back.  Is that other
15 document you've turned face down, does that also have a
16 sticker on it?
17    A.  Yes, it does.
18    Q.  Yes.  I will ask you, and you're doing it right
19 then, to keep all of those documents that I give you that
20 have a sticker on them, if you would just give them to the
21 court reporter when we're done with it, that would be
22 handy.
23    A.  If you will, in fact, give me a copy of them, as
24 well.
25    Q.  Sure.  The way this works is --

Page 35

1    A.  Typically they're proffered at the time of the
2 deposition.
3    Q.  Typically they are.  The way this is going to
4 work, because I, unfortunately, came down here in a little
5 bit of short notice and could only carry one copy, is the
6 way I have to send you a copy of your transcript anyway, so
7 we'll do what's called a read and sign, and you'll have an
8 opportunity to correct any typographic errors or what have
9 you in the transcript.  The transcript will contain, I will
10 be happy to attach, the exhibits and that's how you'll get
11 them.
12    A.  That's fine.
13    Q.  Okay.  If I were a big time swimmer, I would be
14 able to carry three copies of these documents around with
15 me.  I'm going to show you a document that was previously
16 marked Plaintiff's Exhibit 2 that's unfortunately lost its
17 staple.  Plaintiff's 2 purports to be a Unanimous
18 Resolution of the Shareholders, Directors, and Officers of
19 Mansell Capital Partners, LLC.  Have you ever seen this
20 document before, Mr. Lovett (Presenting)?
21    A.  Only as a result of this litigation.
22    Q.  And without revealing any conversations you may
23 have had with your attorneys, what were the circumstances
24 during this litigation where you read this document or saw
25 it?

Page 36

1    A.  I believe that this was a document that was
2 produced by the co-defendants in this matter.
3    Q.  What makes you think that?
4    A.  Because it was not produced by me and it was not
5 produced by Mr. Begley.
6    Q.  How do you know that, that it was not produced by
7 Mr. Begley?
8    A.  Because I asked Mr. Begley.
9    Q.  Were you present at a special meeting of the
10 shareholders, directors, and officers of Mansell Capital
11 Partners on July 29th, 2003?
12    A.  There was never any such meeting on July 29th,
13 2003.
14    Q.  How do you know that?
15    A.  Because I know that there was never a meeting of
16 the members of Mansell Capital Partners.
17    Q.  How do you know that?
18    A.  I know -- Not that I ever attended.
19    Q.  So is it more accurate to say that there may have
20 been a meeting, but that you weren't there?
21    A.  This document says that the following were
22 present.
23    Q.  Uh-huh (affirmative).
24    A.  And I think if you review the books and records
25 of Mansell and the minute book, you'll find that this was

Page 37

1 never recorded because the meeting never took place.  And
2 that this is a draft memo, unexecuted that was resident in
3 somebody's file.
4    Q.  How would you know all of that if you had so
5 little to do with Mansell, as you earlier testified?
6    A.  Because how could there be a meeting with me
7 present if I never attended it?
8    Q.  Maybe we're splitting hairs.  My point was that
9 there may have been a meeting with other people there and
10 it may be an error that you were listed as being present.
11 Is that a possibility?  Or do you know that is totally
12 impossible?
13    A.  What I know is that I never attended a meeting of
14 the officers and directors of Mansell Capital Partners
15 ever.
16    Q.  All right.  That is unambiguous, as the lawyers
17 say.  Were you the president of Mansell Capital Partners?
18    A.  No.  A review of the Secretary of State and a
19 review of the income taxes filed by Mansell Capital
20 Partners and a review of all available documentation will
21 demonstrate that I was never an officer or director of
22 Mansell.
23    Q.  Do you have that documentation available to you?
24    A.  No.
25    Q.  How do you know what it will reveal?

10 (Pages 34 to 37)

**Stephan J. Lovett**

Page 38

1    A.   Because I checked with the Secretary of State,
2 and I looked at the annual filings, and I was never listed.
3    Q.   Did you check the income tax returns filed by
4 Mansell Capital Partners?
5    A.   I have seen them as a result of this litigation.
6    Q.   Really?  Where have you seen them?
7    A.   I've seen them in the review of the documentation
8 filed and drafted by the Defendants.
9    Q.   No other place?
10   A.   No.
11   Q.   Do you have access to Mansell Capital Partners'
12 documents today?
13   A.   No.
14   Q.   Did you ever have access to Mansell Capital
15 Partners before -- outside of what may have been produced
16 in this litigation?
17   A.   No.
18        (Whereupon, plaintiff's exhibit number
19        nineteen was marked for the purpose of
20        identification).
21 BY MR. MULLANEY:
22   Q.   All right.  I'm going to mark a document as
23 Plaintiff's 19 and show that to Mr. Lovett.  Take a moment
24 to review that, if you would.  I will take a moment.  Can I
25 get anybody anything while I'm up?  Have you had a moment

Page 39

1 to review the document that I've marked as Plaintiff's 19?
2    A.   Yes.
3    Q.   Have you ever seen that document before?
4    A.   I believe so.
5    Q.   Were you the author of this document?
6    A.   I believe so.
7    Q.   And when you write in it, Hartsfield, to what
8 entity are you referring?
9    A.   Hartsfield Capital.
10   Q.   And when you discuss Hartsfield Capital, what
11 entity are you referring to, Hartsfield Capital Group --
12   A.   Yes.
13   Q.   -- Hartsfield Capital Securities, Hartsfield --
14   A.   Hartsfield --
15   Q.   -- Capital Inc.?
16   A.   I only have capacity and standing for Hartsfield
17 Capital Group.
18   Q.   Oh.  What was the clearing firms to which you
19 refer in this letter on the first sentence?
20   A.   I don't recall which clearing firm it was.
21   Q.   Who was the -- What was the depository to which
22 you refer?
23   A.   I'm not sure about which depository it was
24 either.
25   Q.   Did Hartsfield Capital Group ever receive any

Page 40

1 rating agency letters?
2    A.   I'm not sure that I understand the question.
3    Q.   The last sentence in the first paragraph reads,
4 we have been advised that this rating in the form of a
5 letter to the issuing counsel from the rating agency would
6 take no longer than two days.  And I believe that -- You
7 tell me, but I believe that I'm reading it correctly.
8    A.   I'm not sure that we ever really received that
9 rating.
10   Q.   Okay.  Who is TRG?  If you look at the last --
11 the last writing, it appears to be your initials and then a
12 backslash and then TRG.
13   A.   That would have been the secretary.
14   Q.   Do you know what his or her name was?
15   A.   I don't recall.  I'm not sure.
16   Q.   Would Hartsfield Capital Group or you have
17 records that would show the name of that person?  Was it a
18 him or her?  Do you recall that?
19   A.   It would have been a her.  I can certainly look
20 at that.
21   Q.   Thank you.  Is there anything inaccurate as we
22 sit here today that is in the letter marked as Plaintiff's
23 19?
24   A.   I think it was accurate at the time that it was
25 drafted.  I think this is a matter that never came to

Page 41

1 fruition.  This was something that Hartsfield Capital Group
2 was researching and never came forward.
3    Q.   When you say researching, did Hartsfield Capital
4 Group have any communications with any rating agencies?
5    A.   Yes.
6    Q.   What rating agencies were those?
7    A.   Standard and Poor's, Moody's, et cetera.
8    Q.   Okay.  Do you know where Standard and Poor's is
9 located?
10   A.   No.
11   Q.   Do you know where Moody is located?
12   A.   No.  I don't know what office we would have been
13 dealing with.
14   Q.   Okay.
15   A.   I suspect it would have been an office outside of
16 the country.
17   Q.   Why do you suspect that?
18   A.   Because the nature of this security would not
19 have been a U.S. security.
20   Q.   Would Hartsfield Capital Group have records to
21 show what rating agencies it communicated with?
22   A.   Historically yes.  The question is whether it has
23 one going back five years to August 8th, 2003.
24   Q.   That is the question.  Now, did you send this
25 letter?  Do you recall?

11 (Pages 38 to 41)

**Stephan J. Lovett**

Page 42

```
 1    A.  I think so.
 2    Q.  Did you send it to Mr. Assemi?
 3    A.  I believe so.
 4    Q.  If Mr. Moran was at the time -- if he was --
 5 responsible for Mr. Assemi, would Mr. Moran get a copy of
 6 this letter, as well?
 7    A.  I'm not sure.
 8    Q.  Do you recall if you sent Mr. Moran a copy of
 9 this letter?
10    A.  I'm not sure.
11    Q.  Did you know Mr. Roger Kipfer?
12    A.  I have spoken with Mr. Kipfer.
13    Q.  In person?
14    A.  No.
15    Q.  On the phone?
16    A.  Yes.
17    Q.  Ever send him an e-mail?
18    A.  Quite possibly.
19    Q.  Do you know where Mr. Kipfer lives?
20    A.  No.
21    Q.  So he could live in New York for all you know?
22    A.  I don't know where he resides.  I do know that
23 when I have talked with him that he was either in
24 Switzerland or Germany.
25    Q.  And how do you know that?
```

Page 43

```
 1    A.  Because I remember the time difference.
 2    Q.  I'm going to show you a document, Mr.
 3 Lovett, that was previously marked as Plaintiff's
 4 Exhibit 3.  This may take a moment to review.  Tell me
 5 if you've seen that before.
 6        (Brief recess.)
 7    Q.  Mr. Lovett, have you had a chance to review
 8 Plaintiff's Exhibit 3?
 9    A.  Yes, sir, I have.
10    Q.  Do you recognize this document?
11    A.  Yes, I do.
12    Q.  And what is it?
13    A.  It is an electronic brochure.
14    Q.  Who owned this electronic brochure?
15    A.  It is the property of Hartsfield Capital Group.
16    Q.  Okay.  Did Hartsfield Capital Group ever
17 disseminate this brochure?
18    A.  Yes.
19    Q.  Did it disseminate one to Wendy Yap, if you
20 recall?
21    A.  It's entirely possible.
22    Q.  All right.  Does Hartsfield Capital Group still
23 use this electronic brochure?
24    A.  No.
25    Q.  Why not?
```

Page 44

```
 1    A.  It is dated, and incorrect, and not reflective of
 2 the current company.
 3    Q.  Was this electronic brochure to your knowledge --
 4 When did Hartsfield Capital Group change this brochure?
 5    A.  This was in a constant state of change.
 6    Q.  All right.  If you would turn about 12 pages into
 7 the document where it begins to discuss the acquisition and
 8 divestiture experience of Hartsfield Capital Group, that's
 9 the header, and a number of companies are listed there, a
10 great number of companies.  Are any of these companies
11 located in New York to your recollection?  I'll give you a
12 minute to read through it.
13    A.  Actually I do not believe that any of these
14 companies are located in New York.
15    Q.  Okay.  Have you heard of a company called Ad Zone
16 Research?
17    A.  No.
18    Q.  You're sure?
19    A.  It doesn't sound familiar to me.
20    Q.  Is there another -- Is there another investment
21 banking firm out there in the world called Hartsfield
22 Capital?
23    A.  I'm not sure.
24    Q.  Okay.  Not that you're aware of?
25    A.  I'm just not sure.
```

Page 45

```
 1    Q.  All right.  Do you know a gentleman named David
 2 Fromer or Fromer?
 3    A.  I think so.
 4    Q.  Who is he?
 5    A.  I think there's a fellow in Atlanta named David
 6 Fromer.
 7    Q.  Have you ever met him?
 8    A.  No.
 9    Q.  Let's turn to management and senior staff
10 section, and you are the first person referred to.  Is this
11 description of you accurate?
12    A.  Yes.
13    Q.  When you had the senior planning and development
14 position at the Bank of New York, Irving Bank, were you
15 living in New York City?
16    A.  No.
17    Q.  Where were you living?
18    A.  New Jersey.
19    Q.  Were you working in New York City?
20    A.  Yes.
21    Q.  What years did you have the senior planning and
22 development position at the Bank of New York?
23    A.  1987, 1988.
24    Q.  Okay.  And did you have the senior planning and
25 development position at Bell Atlantic?
```

12 (Pages 42 to 45)

**Stephan J. Lovett**

| Page 46 |
|---|

1    A.  Yes.
2    Q.  Where was Bell Atlantic located?
3    A.  Philadelphia, Pennsylvania.
4    Q.  Did you live in New Jersey at the -- Where was
5 the office -- Where was the Bell Atlantic office where you
6 worked located?
7    A.  1600 Market Street.
8    Q.  Philadelphia?
9    A.  Philadelphia.
10   Q.  Did you live in New Jersey at that time?
11   A.  No.
12   Q.  Did you live in Philadelphia?
13   A.  Yes.
14   Q.  Same question for Rockwell International.
15   A.  I lived in Wilton, Connecticut, Bloomfield Hills,
16 Michigan, Oakbrook, Illinois, West Lake Village,
17 California, Pittsburgh, Pennsylvania, Ogdensburg, New York,
18 and I think that's it.
19   Q.  How long were you with Rockwell International?
20   A.  Fifteen years.
21   Q.  And how many times in your 15 years for Rockwell
22 did you work in New York City?
23   A.  Never.
24   Q.  Anytime in New York state?
25   A.  Yes.

| Page 47 |
|---|

1    Q.  Where in New York state?
2    A.  Ogdensburg, New York.
3    Q.  What years did you work for Rockwell
4 International?
5    A.  In Ogdensburg?
6    Q.  Yeah, that's fine.
7    A.  1975.
8    Q.  All right.  And when did you leave Rockwell
9 International?
10   A.  1985.
11   Q.  And the same questions for the Continental Group
12 if you can remember all the questions.
13   A.  19 -- Well, Rhoyattan, Connecticut, Darien,
14 Connecticut, Olympia, Washington.
15   Q.  Were those towns where you lived during the time
16 you worked for the Continental Group?
17   A.  No.
18   Q.  Were those towns where you worked?
19   A.  Yes.
20   Q.  What is the Continental Group?
21   A.  Continental Group is a -- was a packaging and
22 financial services conglomerate and oil and gas
23 exploration.
24   Q.  Where was its headquarters?
25   A.  Rhoyattan, Connecticut.

| Page 48 |
|---|

1    Q.  Did it have an office in New York City?
2    A.  I assume it did.
3    Q.  But you don't know?
4    A.  At the time it did business in over 100
5 countries.  It had operations in every state of the United
6 States.  I would assume that it had some type of facility
7 in New York.
8    Q.  In New York City -- Did you ever go to the New
9 York City office or plant?
10   A.  No.
11   Q.  Okay.  What years did you work for the
12 Continental Group?
13   A.  1971 through 1973.
14   Q.  Okay.  What years were you in the Navy?
15   A.  1963 through 1970.
16   Q.  And what years were you at Columbia University?
17   A.  1963 through 1970.
18   Q.  Okay.  Were you in the Naval Reserves while you
19 were in -- at Columbia?
20   A.  Yes.
21   Q.  Did you serve actively in the Navy?
22   A.  Yes.
23   Q.  What years were those?
24   A.  1970 to 1970.
25   Q.  Okay.  Did John Banzhaf ever have duties as an

| Page 49 |
|---|

1 officer at Hartsfield Capital Group?
2    A.  Yes.
3    Q.  When?
4    A.  I would imagine 1994 or 5, and he continued for
5 three or four years.
6    Q.  Okay.  If you would turn a couple of pages in
7 Plaintiff's Exhibit 3, you'll see the entry for Mr.
8 Banzhaf, the second paragraph.  This -- After 1998 or so,
9 this would be inaccurate, where it states that Mr. Banzhaf
10 is a senior officer with Hartsfield Capital Group?
11   A.  At some point in time I understand that Mr.
12 Banzhaf was advised by the NASD that he could not hold
13 positions in both Hartsfield Capital Securities and
14 Hartsfield Capital Group, and his officer responsibilities
15 at Group were terminated at his request.
16   Q.  Do you know what year that was?
17   A.  No, I don't.
18   Q.  But anytime after that termination this
19 Plaintiff's 3 would be inaccurate, to the extent it listed
20 Mr. Banzhaf as a senior officer of Hartsfield Capital
21 Group, correct?
22   A.  Correct.  And Mr. Banzhaf asked me on several
23 occasions to have this stricken from the electronic
24 brochure and the website, and it took an inordinate amount
25 of time to get that done.

13 (Pages 46 to 49)

Page 50

1    Q.   How much time?
2    A.   More than a year.
3    Q.   Okay.  Why?
4    A.   Because the contractor for the website that had
5    control over the brochure and the website went out of
6    business, and it turns out that Hartsfield Capital did not
7    own the website, that it was owned by the developer.
8    Q.   Okay.  When did this developer go out of
9    business?
10   A.   I'm not sure.
11   Q.   What was the name of the developer?
12   A.   I don't recall.
13   Q.   Wouldn't the brochure be easier to change than
14   the website?
15   A.   No.
16   Q.   Why not?
17   A.   The brochure is a locked document.  And so --
18   Q.   Locked by whom?
19   A.   By the developer.
20   Q.   Oh, okay.  How long do you think it would have
21   taken to retype Plaintiff's Exhibit 3 to make it accurate?
22   A.   Significant amount of time.
23   Q.   A day?
24   A.   Much more.
25   Q.   Two days?

Page 51

1    A.   Much more.
2    Q.   Okay.  Three?
3    A.   Much more.
4    Q.   How many words a minute do you type?
5    A.   40 to 50.
6    Q.   Okay.  Is your e-mail address still Stephan -- I
7    apologize if I'm mispronouncing that -- at
8    Hartsfieldcapital.com?
9    A.   Yes, it is.
10   Q.   When did your e-mail address first become
11   Stephan@hartsfieldcapital.com?
12   A.   I can't recall exactly, but it has been that for
13   some quite time.
14   Q.   All right.  Enough with Plaintiff's 3.  I will
15   show you what has been previously marked as Plaintiff's
16   Exhibit 8 and just tell me if you've ever seen that
17   document before, Mr. Lovett (Presenting)?
18   A.   I'm not sure.
19   Q.   Were you the author of that document?
20   A.   No.
21   Q.   Did you transmit that document?  Do you recall?
22   A.   I have no knowledge of that.
23   Q.   Enough with that document.  I'll show you what
24   was previously marked as Plaintiff's Exhibit 13.  Take a
25   moment to review that (Presenting).

Page 52

1    Q.   Have you had a moment to review Plaintiff's
2    Exhibit -- I forget the number --
3    A.   13.
4    Q.   -- 13?
5    A.   Yes.
6    Q.   Do you recognize this document?
7    A.   No.
8    Q.   Any idea who Ed might be?
9    A.   No, I don't, particularly not June 20th, 2008.
10   Q.   Is that your handwriting at the top left corner?
11   A.   No.
12   Q.   That is your name at the bottom left corner,
13   correct?
14   A.   Yes.
15   Q.   But you did not author this document?
16   A.   I have no recollection whatsoever of authoring
17   this document.  I don't know who Ed is.
18   Q.   Okay.  Do you know who William Kerr is?
19   A.   Yes, I do.
20   Q.   And who is he?
21   A.   Mr. Kerr is a attorney, which I subsequently just
22   found out is still practicing, to my surprise, in Canada
23   and he is the individual with whom Mansell Capital Partners
24   deposited in his trust in an escrow account.  And he is the
25   person who embezzled those funds.

Page 53

1    Q.   How do you know that?
2    A.   Because I'm aware of litigation that Mansell
3    Capital Partners initiated against Mr. Kerr.
4    Q.   And the result?  You're aware of the result?
5    A.   I'm aware that a judgment was entered into
6    against Mr. Kerr.
7    Q.   Okay.
8    A.   And his law firm.
9    Q.   Did you have anything to do with the transmittal
10   of funds from Mansell to Mr. Kerr?
11   A.   No.  I'm not a signatory nor was I ever a
12   signatory on that account.  I had no capacity or standing
13   to effect such an activity.
14   Q.   Did you ever instruct anyone who did have such
15   capacity to transfer funds to Mr. Kerr?
16   A.   I don't instruct anybody.
17   Q.   You don't instruct anybody?
18   A.   No.
19   Q.   You don't instruct Ms. Simon?
20   A.   If you knew Ms. Simon you would know that that
21   was impossible.
22   Q.   Okay.  I hear Mr. Banzhaf, I believe, concurring
23   with you.  Did you ever ask anybody with -- Strike that.
24        Did you ever as a signatory of the Mansell bank
25   account to send money to Mr. Kerr?

14 (Pages 50 to 53)

**Stephan J. Lovett**

Page 54

1    A.   I have no knowledge of doing so.
2    Q.   How do you know that money was sent by Mansell to
3 Mr. Kerr?
4    A.   Res ipsa loquitor.
5    Q.   Well, does that mean you know it because you read
6 about it in pleadings from the Canada litigation or
7 something else?
8    A.   The former.
9    Q.   Oh.  That's the sole basis of your knowledge —
10   A.   No.
11   Q.   -- about —
12   A.   No.
13   Q.   Okay.  What are the other basis of your knowledge
14 for Mansell sending funds to Mr. Kerr?
15   A.   We have a coffee room at Hartsfield Capital.  We
16 -- The members of the tenancy congregate in that coffee
17 room.  One does not experience the embezzlement of $10
18 million without that becoming a topic of conversation.
19   Q.   And I presume you either participated or heard
20 some conversation about this massive embezzlement?
21   A.   Correct.
22   Q.   Who are the other participants in that
23 conversation or conversations about the embezzlement?
24   A.   It would have been Messieurs Banzhaf, Reichardt,
25 Begley, Simon — Oh, no.  Maybe she wasn't there then.  I

Page 55

1 cannot imagine that there was anybody that was officed with
2 us that was not aware of that.
3    Q.   Was there anyone else who was officed with you?
4    A.   Then?
5    Q.   Uh-huh (affirmative).
6    A.   Yes.
7    Q.   Who?
8    A.   We had approximately 20 other tenants.
9    Q.   This was on Mansell Road?
10   A.   Correct.
11   Q.   All of whom you think knew about the embezzlement
12 from Mansell?
13   A.   I cannot imagine that there was anybody in the
14 building that was not aware.
15   Q.   Okay.  Was TJ Morrow officed with you then?
16   A.   Never.
17   Q.   Never?  Do you know Mr. Morrow?
18   A.   Yes.
19   Q.   How do you know him?
20   A.   I was introduced to him by Mr. Begley.
21   Q.   When?
22   A.   I'm not sure, but it was some time ago.
23   Q.   What was his relationship to Hartsfield Capital
24 Group?
25   A.   He was a individual that I spoke with on a number

Page 56

1 of occasions regarding potential funding of transactions.
2    Q.   Do you know when he first started discussing the
3 potential funding of transactions?
4    A.   It may have been in 1998 or 1999.
5    Q.   All right.  Do you know where Mr. Morrow lived in
6 1998 or 1999?
7    A.   Someplace in North Carolina.
8    Q.   Do you know where Mr. Morrow worked in 1998 or
9 1999?
10   A.   Someplace in North Carolina.
11   Q.   Did you ever know Mr. Morrow to live in New York
12 City?
13   A.   He had mentioned to me that he was from the New
14 York City area, but I thought he was from New Jersey.
15   Q.   Did you ever know Mr. Morrow to work in New York
16 City?
17   A.   I have no actual knowledge of where he worked.
18   Q.   Did you ever send Mr. Morrow anything?
19   A.   Yes.
20   Q.   Did you ever send him anything in New York City?
21   A.   I would have sent him something by e-mail, so I
22 would not have knowledge of where the e-mail found its
23 home.
24   Q.   Did you ever receive any e-mails from Mr. Morrow?
25   A.   I believe so.

Page 57

1    Q.   Mr. Morrow put a signature block at the bottom of
2 his e-mails?
3    A.   I don't recall.
4    Q.   Does it refresh your recollection if I ask if Mr.
5 Morrow's signature block states that his office is in New
6 York City?
7    A.   No, it wouldn't because I don't recall.
8    Q.   Okay.
9    A.   I would need to look at a document to refresh my
10 memory.
11   Q.   Okay.  Well, you have the documents, I guess, in
12 your possession.
13   A.   I don't know.  I've not seen anything nor do I
14 have any recollection of the signature block.
15   Q.   Did you -- Have you ever searched your e-mail
16 files for communications from Mr. Morrow?
17   A.   Regarding this litigation, yes.
18   Q.   Did you ever search it for e-mails regarding any
19 matter between you and Mr. Morrow?
20   A.   Not recently.
21   Q.   Okay.  Do you recall when you did?
22   A.   Not offhand.
23   Q.   All right.  Did you ever meet Mr. Morrow?
24   A.   I met him on one occasion.
25   Q.   Where?

15 (Pages 54 to 57)

Page 58

1   A.  In Atlanta.
2   Q.  When?
3   A.  I think in 1998 or 1999.
4   Q.  Did you insert Mr. Morrow's name in Plaintiff's
5 Exhibit 3?
6   A.  Yes.
7   Q.  Okay.  I'm going to take a break now and call Mr.
8 Begley's attorney.  I'll probably be ready for him in an
9 hour or so.  Is that -- Unless -- Do you think you'll have
10 a lot of questions for Mr. Lovett?
11       MR. KOLBER:  No.
12       MR. Mullaney:  Is that okay with you, Mr. Lovett?
13       THE DEPONENT:  That's fine.
14       (Brief recess).
15 BY MR. MULLANEY:
16   Q.  Mr. Lovett, I'm going to put in front of you
17 what's already been marked as Plaintiff's Exhibit 9 and
18 turn your attention to Exhibit A.  The exhibit tab -- Take
19 a minute to look at that if you would.
20   A.  I'm sorry.  Where are you directing me to?
21   Q.  Exhibit A.  I'll just ask you if you've seen that
22 document before?
23   A.  I don't recall.
24   Q.  I'll turn your attention to Exhibit B, then, if
25 you don't recall Exhibit A, what I'll call Plaintiff's 9.

Page 59

1   A.  No.
2   Q.  Is that your signature on Plaintiff's Exhibit 9-
3 B?
4   A.  And the question is?
5   Q.  Is that your signature?
6   A.  I believe it to be my electronic signature.
7   Q.  What makes you think it's your electronic
8 signature?
9   A.  Because it looks like my electronic signature as
10 opposed to my manual signature.
11   Q.  What's the difference?
12   A.  The formation of the letters, truncation of my
13 first name, the shape of the letter J.  It looks like my
14 electronic signature.
15   Q.  Who has the ability, other than yourself, to
16 apply your electronic signature to a document?
17   A.  Anybody with access to the computer.
18   Q.  Who's that?  Let me take that back.  Who was that
19 on June 30th, 2003?
20   A.  I'm not sure.
21   Q.  Do you recall if you applied your electronic
22 signature to this document in --
23   A.  I don't --
24   Q.  -- 2003?
25   A.  I don't recall.

Page 60

1   Q.  Do you have any reason to think you did not apply
2 your electronic signature --
3   A.  This transaction doesn't make sense to me, so I'm
4 looking at it, and I'm saying, why would I do this.
5   Q.  Was it ever done?
6   A.  I don't believe it was ever done.
7   Q.  My question is a little narrower than that.  It
8 was just whether --
9   A.  You asked me why I don't believe I may have, and
10 I'm answering you.
11   Q.  Okay.
12   A.  Telling you that the transaction in and unto
13 itself does not make any sense to me, nor do I have any
14 knowledge that any such transaction ever occurred.  And so,
15 therefore, I wouldn't understand why this memo exists, much
16 less why I would have executed it.
17       MR. KOLBER:  This is Plaintiff's Exhibit 19?
18       MR. MULLANEY:  9-B.
19       MR. KOLBER:  9-B, which was introduced yesterday?
20       MR. MULLANEY:  Uh-huh (affirmative).
21 BY MR. MULLANEY:
22   Q.  What does the -- Let me take that back.  What was
23 the fax number for Hartsfield Capital Group on June 30th,
24 2003?
25   A.  It was and is 770-408-9100.

Page 61

1   Q.  All right.  Do you recall faxing this document to
2 anybody?
3   A.  No, I don't.  But again, I look at this and I say
4 that it's inconceivable to me that any of this ever
5 occurred.
6   Q.  Anything else wrong with this -- Anything else
7 make you think that you did not sign this document,
8 Plaintiff's 9-B?
9   A.  All of the things that are tangential to this did
10 not occur.  There was never an account at PNC.  I was never
11 a co-signator on any account with Ms. Yap.
12   Q.  Anything else?  I'm ready to move on if you are.
13   A.  Okay.
14   Q.  If you would make sure you place that document in
15 the pile when you're done with all the stickered exhibits.
16   A.  All Bates stamped.
17   Q.  I'm sorry?
18   A.  All Bates stamped.
19   Q.  They're not all Bates stamped.  That's not a
20 Bates stamp.
21   A.  Okay.
22   Q.  Well, I should say lawyers frequently speak of
23 Bates stamping as the numbers that are applied to the
24 bottom of documents that are produced in discovery.
25   A.  Let's move on.

16 (Pages 58 to 61)

**Stephan J. Lovett**

Page 66

1 funds.

2    Q.    What makes you think it involves the same funds?

3    A.    Because these were the funds that Mansell Capital

4 Partners had deposited with Mr. Kerr?

5    Q.    Seaforth -- All of Seaforth Meridian's funds were

6 deposited by Mansell Capital Partners with Mr. Kerr?

7    A.    I don't know about the word all.

8    Q.    Some Seaforth Meridian funds were --

9    A.    I believe that funds belonging to Seaforth

10 Meridian were deposited with Mansell Capital Partners.

11    Q.    Okay.  And then those were subsequently deposited

12 with Mr. Kerr?

13    A.    Yes.

14    Q.    Okay.  What makes you think that?

15    A.    As a result of the Seaforth litigation, which

16 they had alleged that the funds were sent to Hartsfield and

17 that the proof was that Hartsfield never received any funds

18 whatsoever from Seaforth or from any other of the

19 individuals involved in that litigation.  And that as a

20 result of that, the receiver had misled the Court and

21 therefore, it was overturned and the funds returned to

22 Hartsfield.

23    Q.    What amount was returned to Hartsfield?

24    A.    I believe that $39,000 was taken out of

25 Hartsfield's operating account.

Page 67

1    Q.    Okay.

2    A.    And after payment of legal fees, I believe

3 somewhere around $17,000 were returned, which was the

4 corpus to Hartsfield, not quite a Pyrrhic victory, but an

5 expensive one, nonetheless.

6    Q.    Yes.  Do you know who a company called MCP-2 is?

7    A.    That's Mansell Capital Partners 2.

8    Q.    And what is that?

9    A.    It's another single purpose vehicle.

10    Q.    Who started that single purpose vehicle, MCP-2?

11    A.    I'm not sure.

12    Q.    How do you know it's a single purpose vehicle?

13    A.    They all are, 1, 2, 3, 4, 5, 6, 7 and 8.

14    Q.    And how do you know that?

15    A.    Because each entity was set up for a specific

16 purpose.

17    Q.    Who set up each up?

18    A.    I'm not sure which entities were set up by whom,

19 other than the fact that Mansell Capital Partners, no Roman

20 numeral, was set up, I believe, by Mr. Banzhaf, as the

21 registered agent and the incorporator.

22    Q.    You spoke of Mansell Capital Partners 2 through 8

23 with some knowledge or confidence.  What's the basis of

24 that knowledge?

25    A.    I understand that all of the MCPs were all single

Page 68

1 purpose vehicles.

2    Q.    What's the basis of your understanding?  Where

3 did you glean that understanding?

4    A.    I'm not sure specifically, but I know that that

5 was the intent of them.

6    Q.    How do you know it was the intent of them?

7    A.    Because I've now been involved in litigation on a

8 few of them.

9    Q.    Which ones?

10    A.    I believe two or three of them.

11    Q.    Which ones?

12    A.    I think certainly Mansell Capital Partners and

13 either 2 or 3 and I think 8.

14    Q.    Okay.  Where is the litigation versus Mansell

15 Capital Partners 8 pending?

16    A.    I am not sure that anything is pending.  I think

17 that there was -- And I'm not sure whether 8 or 2 was

18 purchased by Codum (sic), but I think one of them was.

19    Q.    Well, then, with regards to Mansell Capital

20 Partners 8, what litigation-like events were surrounding

21 that fund -- that vehicle?

22    A.    I don't know as we sit here whether 2, 3, 4, 5,

23 6, 7, or 8 is involved in any litigation.  I believe that

24 one of them, but I'm not sure whether it's 2 or 8, was sold

25 to another capital company and I know that all of them are

Page 69

1 resident with other entities.  I'm just not sure as we sit

2 here which belongs to which.

3    Q.    Okay.  And you still don't know the basis of your

4 knowledge of the status of 2 through 8?

5    A.    In some cases it would have been as a witness.

6 In some cases it would have been as an advisor.  I need to

7 look at the particular company before I can opine.

8    Q.    Okay.  Were you an advisor to Mansell Capital

9 Partners, LLC, Mansell relevant to this case?  Mansell

10 that's a party in this case.

11    A.    In some loose sense, yes.

12    Q.    Explain the loose sense, if you would.

13    A.    I provided advice to -- or at least my opinion to

14 members of the company.

15    Q.    What was your advice or opinion?

16    A.    From time to time various topics.

17    Q.    Like what?

18    A.    Whether it should have a website, those types of

19 things.

20    Q.    Purely clerical, or administerial, or

21 administrative things?

22    A.    Primarily.

23    Q.    Secondarily anything else?

24    A.    I'm not specifically aware.

25    Q.    Okay.  Who's Melanie Myer or Mayer?

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

**Stephan J. Lovett**

Page 70

1    A.  She's an attorney in Atlanta.
2    Q.  Does she practice anywhere else?
3    A.  I don't believe so.
4    Q.  Where does she keep her office, if you know?
5    A.  I believe it's North Pointe Parkway.
6    Q.  Did she ever maintain an office in the same
7 building as Hartsfield Capital Group?
8    A.  Yes.
9    Q.  Does she still?
10    A.  No.
11    Q.  Were you ever married to Ms. Myer?
12    A.  No.
13    Q.  Did you ever have a personal relationship with
14 her?
15    A.  Yes.
16    Q.  Did she ever live with you?
17    A.  I don't understand the relevancy of that
18 question.
19    Q.  Fair point.  Turn to, if you would, I guess,
20 Plaintiff's 10-C.  We looked at this document earlier in an
21 unsigned form.  If you could take another look at this, and
22 this one appears to be signed by you.  It appears to be a
23 signed version of Plaintiff's 2.  Let me know if this
24 refreshes your recollection about this document
25 (Presenting)?

Page 71

1    A.  Absolutely not.
2    Q.  Does that appear to be your signature on the left
3 side of the page of 10-C?
4    A.  It's impossible to tell.
5    Q.  Are you familiar with Mr. Begley's signature?
6    A.  I can't speak to it.
7    Q.  Okay.  In any event, you are absolutely certain
8 you did not sign this by hand or electronically?  Is that
9 correct?
10    A.  As I've mentioned already, asked and answered.
11    Q.  Well, humor me and answer again with a yes or no
12 would be fine.
13    A.  I have no knowledge of this.
14    Q.  All right.  Dan, do you have any questions for
15 the witness?
16    MR. KOLBER:  Yes.  I'd like to just take a minute and
17 confer with my client --
18    MR. MULLANEY:  That's fine.
19        (Brief recess).
20        EXAMINATION
21 BY MR. KOLBER:
22    Q.  Mr. Lovett, I'm Dan Kolber.  I represent Mr.
23 Banzhaf, Argosy Capital Securities Incorporated, and Mr.
24 Del Reichardt.
25    A.  Yes, sir.

Page 72

1    Q.  Do you know what a limited liability company is?
2    A.  I believe so.
3    Q.  And do you understand how a limited liability
4 company is formed in the state of Georgia?
5    A.  Superficially.
6    Q.  Well, if one were to set up a limited liability
7 company in the state of Georgia, are you aware of the
8 initial steps that would be taken to bring it into
9 existence?
10    A.  I believe that it would be a filing of the
11 Secretary of State for the officers and registered agent.
12    Q.  Okay.  And at any time did you ever cause such a
13 filing to be made with respect to the organization of
14 Mansell Capital Partners, LLC?
15    A.  I have no knowledge whatsoever of that ever
16 occurring.
17    Q.  Okay.  How long have you known Mr. Banzhaf?
18    A.  Oh, I guess 15 years.
19    Q.  In February 2003 did you share an office with Mr.
20 Banzhaf?
21    A.  We were both officed in the same building.
22    Q.  And was that located at 3775 Mansell Road?
23    A.  Yes, sir.
24    Q.  Okay.  Did you, during February, 2003, ask Mr.
25 Banzhaf to act as the organizer for Mansell Capital

Page 73

1 Partners, LLC?
2    A.  I'm not sure.
3    Q.  Have you ever asked Mr. Banzhaf to take any
4 action with respect to Mansell Capital Partners, LLC?
5    A.  I'm sure I could have.
6    Q.  Could you give me an example?
7    A.  I asked him to be attentive to this Kerr
8 litigation.
9    Q.  What do you mean by that?
10    A.  I was most concerned about Mr. Kerr's
11 embezzlement.
12    Q.  Perhaps you didn't hear my question.  Did you ask
13 Mr. Banzhaf to take any action with respect to Mansell
14 Capital Partners, LLC, at any time?
15    A.  And my answer is as it was, which is I could
16 have.
17    Q.  Okay.  When you say you could have, I'm asking
18 you to give me an example.
19    A.  And I did, and the example that I proffered was
20 that I was most concerned over the Kerr defalcation and so
21 I could have, and most likely did ask Mr. Banzhaf to be
22 attentive to that.
23    Q.  And when you asked him to be attentive, what was
24 your intent at the time?  Did you expect him to read
25 documents, to attend certain court proceedings?  What did

19 (Pages 70 to 73)

**Exhibit F**

**SEC Info**    Home    Search    My Interests    Help    Sign In    *Please Sign In*

# Adzone Research Inc · 8-K · For 5/20/04 · EX-99.1

**Filed On 5/27/04 12:12pm ET · SEC File 0-28717 · Accession Number 1144204-4-7695**

Find    in this entire Filing.    Show  Docs searched  and  every "hit".
Help...    *Wildcards:* ? (any letter), * (many). *Logic:* for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs |
|---|---|---|---|---|
| 5/27/04 | Adzone Research Inc | 8-K{5,7} | 5/20/04 | 5:32 |

## Current Report · Form 8-K
## Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 8-K | Current Report | 3 | 16K |
| 2: EX-4.1 | Instrument Defining the Rights of Security Holders | 8 | 40K |
| 3: EX-4.2 | Instrument Defining the Rights of Security Holders | 12 | 64K |
| 4: EX-4.3 | Instrument Defining the Rights of Security Holders | 7 | 27K |
| 5: EX-99.1 | **Miscellaneous Exhibit** | 2 | **11K** |

## EX-99.1 · Miscellaneous Exhibit

| **EX-99.1** | **1st Page of 2** | TOC | Top | Previous | Next | Bottom | Just 1st |

SOURCE: ADZONE RESEARCH, INC.

### ADZONE RESEARCH EXECUTES AGREEMENT FOR UP TO $1,750,000 IN INSTITUTIONAL FINANCING

CALVERTON, N.Y.- May 21, 2004 -- AdZone Research, Inc. (OTCBB: ADZR), a pioneering Internet surveillance technology solutions provider, today announced that it has entered into an agreement with an institutional investor for a private placement of common stock. The initial closing was for $400,000, and resulted in the issuance of 3,457,217 shares of common stock. In addition, the investor received warrants to purchase an aggregate of 1,728,608 shares. The second closing will occur no later than June 4, 2004, for $600,000, and the last closing for $750,000, which is at the option of AdZone, shall occur within five days of the effective date of a registration statement covering this transaction. The net proceeds are to be used for acquisitions and to fund the company's ongoing growth.

The New York-based law firm of Sichenzia Ross Friedman Ference LLP represented AdZone in this transaction. "We are proud to be working with AdZone Research in helping provide access to capital needed both to effectively market its Internet surveillance technology, as well as to grow through acquisition," said David Frommer of Hartsfield Capital, a full service investment banking firm headquartered in Atlanta, which advised AdZone Research on the financing. "It's critical that the company be effectively financed to meet current and emerging opportunities to showcase its advanced technology. While timelines for defense contract awards are inevitably getting longer," Frommer continued, "our assessment is that major opportunities for the company are near at hand. Development of its commercial division will offer similar growth opportunities going forward, and we anticipate additional fundings going forward."

"Engaging Hartsfield Capital is a major turning point in our company's operating history," said Charles A. Cardona III, AdZone's Chairman & CEO. "We are privileged to announce partnering with a premier investment banker that has provided financial support and strategic guidance that has helped to drive the growth of many companies."

More details of the private placement are contained in a Form 8-K filed with the Securities and Exchange Commission.

AdZone Research is headquartered in Calverton, N. Y., in a facility that formerly housed major defense contractor Northrop Grumman Corporation. The facility was earlier used for top-secret defense research and development, and was part of the United States Navy's Naval Defense Technology Center.

Through monitoring of more than 500,000 Web sites worldwide, AdZone provides tracking and monitoring of targeted information on the Internet, with an expanded focus on global Internet analysis of security-related data transmissions. For additional information, please visit the company's Web site at www.adzoneresearch.com .

31

| **EX-99.1** | **Last Page of 2** | TOC | 1st | Previous | Next | Bottom | Just 2nd |

Certain statements contained herein are *"forward-looking"* statements (as such term is defined in the Private Securities Reform Act of 1995). Because such statements include risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements.

Contact:

AdZone Research
Charles A. Cardona III
631-369-1100

32

## Dates Referenced Herein  *and*  Documents Incorporated By Reference

| *This 8-K Filing* | *Date* | *Referenced-On Page* *First* | *Last* | *Other Filings* |
|---|---|---|---|---|
| For The Period Ended | 5/20/04 | | | |
| | 5/21/04 | 1 | | |
| Filed On / Filed As Of | 5/27/04 | | | DEF 14C |
| | 6/4/04 | 1 | | DEF 14C |
| Top | | | | List All Filings |

Filing Submission  -   Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Copyright © 2008 **Fran Finnegan & Company**  All Rights Reserved.
www.secinfo.com - Thu, 12 Jun 2008 14:48:56.2 GMT - Privacy - Help

**Exhibit G**

Page 1

IN THE U.S. DISTRICT COURT

SOUTHERN DISTRICT OF NEW JERSEY COUNTY

CA NO.:08-CV-1337LTS

DOVER, LTD.,

        Plaintiff,

-VS-

ALAIN ASSEMI, HARTSFIELD CAPITAL GROUP, STEPHAN J.
LOVETT, JOHN H. BANZHAF, DELBERT D. REICHARDT, MANSELL
CAPITAL PARTNERS, LLC, THOMAS O. BEGLEY, THOMAS O.
BEGLEY & ASSOCIATES, T.J MORROW, and T.J. MORROW,
P.C.,


        Defendant.

-------------------------------------/

DEPOSITION OF JOHN H. BANZHAF

Thursday, July 31st, 2008

8:49 AM - 3:40 PM

181 Peachtree Street

Atlanta, GA


Reported by:

Catherine Jarman Rouzer, CVR-CCR

State of Georgia

Esquire Deposition Services

Atlanta Office Job #427626/204574

404-872-7890

**John H. Banzhaf**

Page 6

1        PROCEEDINGS
2 (Whereupon,
3        JOHN H. BANZHAF,
4 having been first duly sworn, was examined and
5 testified as follows.)
6        EXAMINATION
7 BY MR. MULLANEY:
8    Q   Good morning, Mr. Banzhaf. My name is Tom
9 Mullaney. I'm an attorney for the Plaintiff, Dover
10 Limited. Have you ever been deposed before?
11   A   Yes.
12   Q   How many times?
13   A   Once.
14   Q   All right. A while ago, recently?
15   A   A couple of years.
16   Q   Okay. Well, I'll, I guess refresh your memory
17 as to the ground rules. Anytime you'd like to take a
18 break, please let me know, if you need some water or
19 need to use the restroom.
20        Have you taken any medication today that would
21 affect your ability to answer questions clearly?
22   A   No, no.
23   Q   All right. I tend to talk a little slowly,
24 but make sure you wait for me to finish my question
25 before you start answering, otherwise the court

Page 7

1 reporter will be irate with us. I will presume if you
2 answer my questions that you understood the question
3 that I asked, and it will be presumed that way. So if
4 -- if something I say is unclear, ask me to rephrase
5 or clarify it, and I'll try to do so.
6        MR. MULLANEY: Dan, anything else?
7        MR. KOLBER: No.
8 BY MR. MULLANEY:
9    Q   And, Mr. Banzhaf, if I understand correctly,
10 you're testifying on behalf of Argosy?
11        MR. KOLBER: Argosy.
12 BY MR. MULLANEY:
13   Q   Argosy Securities?
14   A   Argosy Capital Securities, Inc.
15   Q   Okay. And you are its designee as its Rule
16 30(b)(6) witness, is that correct?
17   A   Yes.
18   Q   And Argosy used to be known as Hartsfield
19 Capital Securities, Inc.?
20   A   Yes.
21   Q   For shorthand, would it be all right if we
22 called both entities Argosy?
23   A   Absolutely.
24   Q   Okay. Am I pronouncing that right, Argosy?
25   A   Yes, sir.

Page 8

1    Q   And I will ask you questions today both in
2 your individual capacity and as the representative of
3 Argosy. If you need the question to be separated,
4 please let me know, and, as we go forward, I will make
5 every effort to separate as appropriate.
6        Let me ask you, what was your personal
7 relationship to Mansell Capital Partners?
8    A   I was the initiating agent, and I was a --
9        MR. KOLBER: Objection. Tom, in light of
10        the fact that there's been a number of
11        Mansells floating around, I think you've got
12        to be specific as to which Mansell partners.
13        MR. MULLANEY: Okay. Fair enough.
14 BY MR. MULLANEY:
15   Q   What was your personal relationship to Mansell
16 Capital Partners, LLC?
17   A   I was its initiating agent, and I was early,
18 for the first month or so, an officer of the firm, and
19 thereafter I was removed in that function.
20   Q   Who removed you?
21   A   The individuals who asked me to form the
22 Mansell Capital Partners, LLC in the first place,
23 Stephan Lovett and Thomas Begley.
24   Q   Do you remember the date that those two
25 individuals asked you to resign?

Page 9

1    A   We were removed as signators, I'm saying in
2 March of '03. I don't know the specific date or don't
3 recall the specific date, March of 2003.
4    Q   What does an initiating agent do?
5    A   He forms the firm with, in this case, the
6 State of Georgia.
7    Q   Okay.
8    A   It is a clerical function.
9    Q   Was Mansell actually formed in the state of
10 Georgia?
11   A   Yes, sir.
12   Q   And there are formation papers out there
13 somewhere in the world?
14   A   Yes, sir.
15   Q   And it was an LLC?
16   A   It was an LLC.
17   Q   So there's an operating agreement?
18   A   There was an organizing agreement.
19   Q   Anything else you can recall?
20   A   No, sir.
21   Q   Who owned Mansell?
22   A   The individuals who asked me to form the firm
23 owned it. My initial investment in Mansell Capital
24 Partners, LLC was twenty dollars to open a bank
25 account at the Bank of America. It was refunded to

3 (Pages 6 to 9)

## John H. Banzhaf

Page 10

1 me.
2    Q  After March of 2003, did you perform any tasks
3 for Mansell?
4    A  I performed -- I think the technical
5 expression that you would use is ministerial
6 functions. I would call them clerical functions.
7        MR. KOLBER: Tom, excuse me for
8    interrupting, but he used the word investment,
9    and I think that's imprecise.
10       THE WITNESS: You're right.
11       MR. KOLBER: Was it an investment? Did
12   you get an ownership interest?
13       THE WITNESS: No, I got no ownership
14   interest. It was needed. Somebody had to pay
15   to open the bank account. I invested -- wrong
16   word.
17       MR. KOLBER: You got to -- you've got to
18   be very precise on this.
19       THE WITNESS: Okay. I paid it. I paid
20   twenty dollars and it was repaid to me.
21 BY MR. MULLANEY:
22   Q  I personally didn't take that as an actual
23 investment, but that would probably not get me very
24 far any ways. It's not a very big investment.
25       To your knowledge, how much did Mr. Begley or

Page 11

1 Lovett invest in the company to start it up, the
2 company being Mansell?
3    A  I have no knowledge that they did so.
4    Q  Was it -- was there any capital in Mansell,
5 when you started it?
6    A  No, sir.
7    Q  Was there any capital in it when you were
8 removed as an officer?
9    A  I don't think so.
10   Q  Okay. Were there any -- Did Mansell have
11 control over any funds when you were removed as an
12 officer?
13   A  Not that I'm aware of.
14   Q  What was the function of Mansell?
15   A  It was a single entity operation designed
16 simply to have a bank account that would receive and
17 disburse funds.
18   Q  Why?
19   A  It was required by Mr. Lovett and Mr. Begley
20 for purposes that they -- they had that they needed
21 such an account.
22   Q  What were those purposes?
23   A  I don't know that I know them originally.
24   Q  Do you know them now?
25   A  There were functions that Mr. Lovett and Mr.

Page 12

1 Begley subsequently were involved with that did use
2 Mansell Capital Partners' bank account for their both
3 potential receipt of funds and the actual receipt of
4 funds.
5    Q  How did they use the bank account for the
6 potential receipt of funds?
7        MR. KOLBER: Wait a second. Just ask him
8    in terms of what he participated or knows.
9        Don't speculate or conjecture. If you were
10   involved, speak as to your involvement.
11 BY MR. MULLANEY:
12   Q  Yeah. As an old boss of mine said, I don't
13 know is an answer.
14   A  Well then the answer is I don't know.
15   Q  Okay. Now, I would get in trouble if I gave
16 that answer, but it's still an answer.
17       Did you ever ask Mr. Lovett why he required
18 Mansell to be effectively a bank account to distribute
19 and take in funds?
20   A  No.
21   Q  Did you ever ask Mr. Begley why he wanted
22 Mansell to be an entity to take in and distribute
23 funds?
24   A  No.
25   Q  To your knowledge, did Mansell ever have

Page 13

1 another function other than to take in and distribute
2 funds?
3    A  Not to my knowledge.
4    Q  Okay. When Mansell was distributing funds who
5 caused, physically caused, the distribution?
6    A  I need clarification of that.
7        MR. KOLBER: Yeah, during what time
8    period?
9 BY MR. MULLANEY:
10   Q  In 2003?
11   A  Well --
12   Q  For example --
13   A  I need further clarification.
14   Q  Sure. If Mansell were to wire funds to
15 somebody, who did it in 2003?
16   A  I personally wired the funds.
17   Q  Okay.
18   A  But the reason I asked for clarification is
19 that I did not initiate the request to wire the funds.
20 I was asked to wire the funds by Mr. Begley and Mr.
21 Lovett.
22   Q  Always both?
23   A  No.
24   Q  Could either one request you to wire funds?
25   A  Yes.

4 (Pages 10 to 13)

John H. Banzhaf

Page 14

1    Q   Did you have to check with the other before
2 you wired funds?
3    A   No.
4    Q   And by -- when I said physically distribute,
5 that's what I meant.  You would have -- you would call
6 the bank and effect the transfer, fill out the
7 transfer form?
8    A   Yes, sir.
9    Q   Wire transfer form?
10   A   Yes, sir.
11   Q   Were you also the check writer for Mansell in
12 2003?
13   A   Yes, sir.
14   Q   Were you the check writer for Mansell in 2004?
15   A   Yes, sir.
16   Q   2005?
17   A   Yes, sir.
18   Q   2006?
19   A   Yes, sir.
20   Q   When did Mansell stop distributing funds?
21   A   I believe it was March of 2007.  In 19 --
22 following 2005, the funds that were distributed were
23 minor administrative requirements, such as the thirty
24 dollars renewal to the State of Georgia.
25        MR. MULLANEY:  Okay.  Thank you.  Dan,

Page 15

1        you wanted to know how long generally it was
2        before we took a break?  Your answer is once
3        again?
4        (Off the record.)
5 BY MR. MULLANEY:
6    Q   Why did Mansell stop distributing funds?
7    A   It had no money in the account.
8        MR. KOLBER:  And, again, while -- you're
9        asking while he was --
10       MR. MULLANEY:  Sure.
11       MR. KOLBER:  -- acting.
12       MR. MULLANEY:  Sure.
13       MR. KOLBER:  Remember only while you were
14       participating.
15 BY MR. MULLANEY:
16   Q   And this is Mansell, LLC.  Do you know why
17 Mansell had no money in the account?
18   A   Yes.
19   Q   Why?
20   A   Funds -- the -- the purpose of the transfer in
21 and out of funds ceased to operate.
22   Q   What was the purpose?
23   A   To transfer investor's funds to the Kerr Trust
24 in Toronto.
25   Q   That wasn't the sole purpose to which the

Page 16

1 Mansell account was put, was it?
2    A   From the standpoint of my involvement it was.
3    Q   Okay.  Why did the purpose stop?
4    A   The Kerr Trust stopped sending funds.
5    Q   Do you know why it stopped doing that?
6    A   Funds it had apparently were dissipated.
7    Q   Properly or improperly, or do you know?
8    A   I'm not sure.
9    Q   All right.  Were you involved in any
10 litigation of Mansell against Mr. Kerr or the Kerr
11 Trust in Canada?
12   A   Yes.
13   Q   To what extent?
14   A   I would write the check for the legal fees to
15 the attorney.
16   Q   Any other extent?
17   A   No.
18   Q   Okay.  Are there other Mansell Capital
19 partnerships in existence today, to your knowledge?
20   A   Yes.
21   Q   What are they?
22   A   There is a Mansell Capital Partners II, LLC,
23 and I have just discovered there is a Mansell Capital
24 Partners III, LLC.
25        MR. MULLANEY:  Off the record for a

Page 17

1        second.
2        (Discussion off the record.)
3 BY MR. MULLANEY:
4    Q   Sir, how do you know about Mansell III, we'll
5 call it for shorthand?
6    A   I received an email from my attorney, Mr.
7 Kolber, with background on it.
8    Q   And that was recently, I think?
9    A   It was recently.
10   Q   Had you heard of Mansell Capital Partners III
11 before that?
12   A   No, sir.
13   Q   Okay.  What is Mansell Capital Partners II, to
14 your knowledge?
15   A   It is an LLC that was formed.  To the best of
16 my knowledge, it has no operating function.
17   Q   Do you know who formed Mansell Capital
18 Partners II?
19   A   I was the agent who formed Mansell Capital
20 Partners II at the request of Mr. Lovett.
21   Q   On what date, if you recall, did Mr. Lovett
22 ask you to form Mansell II?
23   A   I do not recall.
24   Q   Was paperwork filed with the State of Georgia
25 to form Mansell II?

5 (Pages 14 to 17)

Page 46

1    Q   What is a correspondent bank?
2    A   I -- my understanding of a correspondent bank
3  is a bank that has a relationship with another bank.
4  I'm not really a banker.  I don't know.
5    Q   Okay.  Would Mr. Reichardt be a better person
6  to ask about that?
7    A   Possibly.
8    Q   Would it refresh your recollection -- Let me
9  take that back.  Did Dover's bank in Singapore have a
10  correspondent banking relationship with a bank in the
11  United States, to your knowledge?
12    A   I have no knowledge of that.
13    Q   Okay.  Do you -- Is it possible, if you know,
14  to send -- to wire,-- strike that.
15        Is it possible, do you know, to wire funds
16  directly to a non-United States bank?
17    A   Yes.
18    Q   It is?
19    A   Yes.
20    Q   Those wires don't have to go through a United
21  States bank as a correspondent bank?
22    A   Well, sir, the bank that is initiating the
23  wire transfer is in the United States.
24    Q   Okay.  But I understand.  Mansell -- and
25  forgive me, I don't know too much about banking.

Page 47

1    A   Nor do I.
2    Q   To your knowledge, Mansell has a bank in the
3  United States?
4    A   Yes, sir.
5    Q   It's in Atlanta?
6    A   Yes, sir.
7    Q   Okay.  It wants to send money to Singapore?
8    A   Yes, sir.
9    Q   Do you know -- maybe you don't -- but do you
10  know if the money can go directly to Singapore, or it
11  has to pass through another bank in the United States,
12  a correspondent bank?
13    A   I don't know that.
14    Q   All right.  Is it possible that Dover's --
15  strike that.
16        Does it refresh your recollection that Dover's
17  bank in Singapore was the ING bank?
18    A   That's my understanding.
19    Q   Okay.  Do you understand that wires to the ING
20  bank had to go through J. P. Morgan Chase Bank as a
21  correspondent bank?
22    A   I have no knowledge of that.
23    Q   All right.  Forgive me in advance if this
24  question sounds obnoxious, but have you ever heard of
25  a company called Leather World?

Page 48

1    A   Yes.
2    Q   What is Leather World?
3    A   It is the recipient of a check received from
4  Mansell at the request of Thomas Begley.
5    Q   How much was the check?
6    A   Something in excess of two thousand dollars, I
7  think.  I'm not sure.  I don't recall.
8    Q   Did Mansell ever distribute money to Leather
9  World?
10    A   I need a definition of what that means.
11    Q   Which part?
12    A   I wrote a check to Leather World at the
13  request of Thomas Begley.
14    Q   Okay.  Do you know what the check was for?
15    A   I have an understanding of what the check was
16  for, but it's hearsay.
17    Q   What's your understanding?
18    A   My understanding is that it's for furniture
19  for Mr. Begley's home.
20    Q   How did you get that understanding?
21    A   From Mr. Begley.
22        MR. MULLANEY:  Okay.  Off the record for
23     a second.
24        (Discussion off the record.)
25  BY MR. MULLANEY:

Page 49

1    Q   Have you heard of a company called Sound
2  Design?
3    A   Yes, sir.
4    Q   What is it?
5    A   It is, I believe, a firm that sells audio --
6    Q   Audio visual?
7    A   Audio equipment, correct.  Visual, I don't
8  know.  I've never seen their product and never seen
9  their firm.
10    Q   Did Mansell ever distribute money to Sound
11  Design?
12    A   I wrote a check to Sound Design at the request
13  of Mr. Begley.
14    Q   Okay.  How much was that check, if you recall?
15    A   Once again, probably in excess of two thousand
16  dollars.
17    Q   A lot more in excess of two thousand dollars.
18    A   Okay.
19    Q   Does that refresh your recollection?
20    A   No, sir, because I don't recall, but I know
21  that I wrote one.
22    Q   Okay.  Did Mr. Begley direct you to write that
23  check?
24    A   Yes, sir.
25    Q   Did he tell you why he was directing you to

13 (Pages 46 to 49)

Page 50

1 write that check?
2    A  Yes.  He wanted to pay for sound equipment for
3 his home.
4    Q  Okay.  Was Mr. Begley an investor in the Kerr
5 Trust?
6    A  No, sir.
7    Q  Was Mr. Lovett an investor in the Kerr Trust?
8    A  No, sir.
9        MR. KOLBER:  Objection.  How do you --
10 how do you know that?
11       THE WITNESS:  Because I would receive the
12 funds, and I didn't receive any funds from Mr.
13 Lovett.
14       MR. KOLBER:  Well, that's what you know
15 then.
16       THE WITNESS:  That's all I know, yes.
17 BY MR. MULLANEY:
18    Q  Fair enough.  I'll take your counsel's fine
19 point.  Did Mr. Lovett ever tell you that he was an
20 investor in the Kerr Trust?
21    A  No, he never did.
22    Q  Did he ever tell you that he was not an
23 investor in the Kerr Trust?
24    A  No, he never did.
25    Q  Did you and he ever have a conversation about

Page 51

1 the Kerr Trust?
2    A  I was requested to distribute funds monthly
3 that would include funds to Mr. Lovett.
4    Q  What did that have to do with the Kerr Trust?
5    A  It utilized funds received from the Kerr
6 Trust.
7    Q  Who instructed you to make those distributions
8 to Mr. Lovett?
9    A  Mr. Lovett did.
10    Q  Did he say why he was entitled to
11 distributions from the Kerr Trust through Mansell?
12    A  He did not.  He just told me how much to send.
13    Q  All right.  Okay.  Forgive me.  Because of my
14 physical infirmities, I only brought one copy set with
15 me.  We're going to go through some documents, and
16 what I'll do is show them to you for identification,
17 and your attorney may look them over with you for a
18 moment.  Then I'll ask you questions about those.  If
19 you recognize the document and answer those questions,
20 please give the document to the court reporter, and
21 the court reporter --
22    A  We're going to go from here, to here, to here.
23    Q  That's right.
24    A  Okay.
25    Q  The court reporter has some stickers, and she

Page 52

1 will mark the document as an exhibit to your and
2 Argosy's deposition.  That's how that will work.
3        And sometimes I'll just look at the document
4 and ask you a question from it without showing you the
5 document --
6    A  Okay.
7    Q  -- because it refreshes my recollection.  Does
8 Argosy pay a phone bill?
9    A  No, sir.
10    Q  Has it ever paid a phone bill?
11    A  No, sir.
12    Q  Phone charges are -- for Argosy are
13 encompassed within its sub tenancy from Hartsfield
14 Capital Group?
15    A  The monthly rent covers that, yes.
16    Q  So every phone call Argosy makes is actually
17 charged to Hartsfield Capital Group?
18    A  Yes.
19    Q  And every phone call that Mansell made was
20 charged to Hartsfield Capital Group?
21    A  Yes.
22    Q  Same is true of facsimiles?
23    A  Yes.
24    Q  Okay.
25        MR. KOLBER:  Tom, to be fair, and then

Page 53

1        reimbursed by the tenant.
2        THE WITNESS:  That's part of the rent.
3 BY MR. MULLANEY:
4    Q  Is that all accurate?  I'm talking about the
5 initial charge and then you --
6    A  No, no.  We were never charged individually
7 for any of those functions.
8    Q  Okay.  That's what I'm getting at.
9    A  Yeah.
10    Q  Is that fair?
11       MR. KOLBER:  If you made a long-distance
12       phone call, would you pay more because you
13       made that long-distance phone call?
14       THE WITNESS:  No.
15 BY MR. MULLANEY:
16    Q  If you made four million photocopies, would
17 you pay more?
18    A  No.
19    Q  Okay.
20    A  I'd have run out of paper, but.
21    Q  You might have to bring your own paper.
22 There's a big building next door called Georgia Paper.
23       MR. KOLBER:  Georgia Pacific.
24       MR. MULLANEY:  Perfect time to take a
25       break.

14 (Pages 50 to 53)

Page 58

```
 1    A  Yes, sir.
 2    Q  What was it?
 3    A  It was the landlord for Mr. Lovett's building.
 4    Q  Ah-ha.  Do you know who owns K&K Holdings?
 5    A  No, sir.
 6    Q  Do you have any knowledge of the corporate
 7 structure of K&K Holdings?
 8    A  No, sir.
 9    Q  Was this -- was the thirty-four thousand four
10 hundred and forty-nine dollars and seventy-seven cents
11 ever repaid?
12    A  I don't recall.
13    Q  All right.  Does Hartsfield Capital Group
14 operate only -- Let me take that back.
15       Does Hartsfield Capital Group lease only one
16 suite within the building?
17       MR. KOLBER:  To your knowledge.
18       THE WITNESS:  Off the record?
19       MR. KOLBER:  No, you're on the record.
20       MR. MULLANEY:  No.
21       THE WITNESS:  Here's the problem.  He's
22       asking a question related to 3775 Mansell Road
23       and the terms of the letter, but the question
24       was asked in relation to the one suite.  Two
25       different buildings.
```

Page 59

```
 1 BY MR. MULLANEY:
 2    Q  Good point.  In 2003 -- I'll take this back.
 3       Did Hartsfield Capital Group move in between
 4 2003 and today?
 5    A  And today?  Yes.
 6    Q  Okay.  When did it move?
 7    A  December of 2007.
 8    Q  All right.  And did Argosy move with it?
 9    A  Yes, sir.
10    Q  In 2003, was Hartsfield Capital Group at 3775
11 Mansell Road?
12    A  Yes, sir.
13    Q  In 2003, did Argosy share a suite with
14 Hartsfield Capital Group?
15    A  Its offices were, yes, yes.
16    Q  Okay.  And today Argosy sublets space within a
17 suite from Hartsfield Capital Group?
18    A  Yes, sir.
19    Q  Were the terms of the lease, the sublease
20 today any different than they were in 2003?
21    A  No, sir.
22    Q  Even the rent?  Even the amount of rent?
23    A  Yes, sir.
24    Q  Okay.  What is the amount of rent?
25    A  Seven hundred and fifty dollars a month.
```

Page 60

```
 1    Q  I'm sorry for laughing.  I'm moving to Atlanta
 2 at the end of the day today.  I have space in an old
 3 dilapidated suite for you.
 4       MR. KOLBER:  Per square foot up there.
 5 BY MR. MULLANEY:
 6    Q  Oh, my God, I've --
 7       And in December of 2007, Hartsfield Capital
 8 Group moved to Lakewood Road?
 9    A  Yes, sir.
10    Q  1105 Lakewood Road?
11    A  1105 Lakewood Road.
12       MR. KOLBER:  Parkway.
13 BY MR. MULLANEY:
14    Q  Lakewood Parkway?  Sorry.
15    A  Lakewood Parkway, correct.
16    Q  Do you know who the landlord is -- strike
17 that.
18       Do you know who owns the building at 1105
19 Lakewood Parkway?
20    A  No, sir.
21    Q  That does it for that document.
22    A  Do I just put it here?
23    Q  Put it there, if you would, and we'll sort out
24 who custodies the originals later.
25       Look at the next two pages of this document,
```

Page 61

```
 1 if you would, please?
 2    A  Next two pages?
 3    Q  Next two pages, and tell me if you recognize
 4 those two?  As a matter of fact, I take that back.
 5 Just the top page.
 6    A  I do not recognize it.
 7    Q  Okay.  Second page?  Do you recognize this
 8 document?
 9    A  I do not recognize it.
10    Q  Third page?
11    A  I do not recognize it.
12    Q  The fourth and the fifth page?
13    A  I do not recognize it or them.
14    Q  Okay.  Do you know whose initials -- take that
15 back.
16       Do you know who TRG is?  If you look at the --
17    A  Yeah, I see.
18    Q  -- second page of that?
19       MR. KOLBER:  It calls for speculation.
20 BY MR. MULLANEY:
21    Q  Do you know?
22    A  I don't know.
23    Q  Just if you know.
24    A  I don't know.
25    Q  Turn to the very next page is a two-page
```

16 (Pages 58 to 61)

Page 74

```
 1        MR. KOLBER: Wait, I object to that. I
 2   mean to the extent that he has any knowledge
 3   about the document, can you direct the
 4   question with respect to a time period and his
 5   involvement.
 6        MR. MULLANEY: Okay.
 7        MR. KOLBER: And ask him has he -- has he
 8   distributed? Has --
 9        MR. MULLANEY: Fair enough.
10        MR. KOLBER: Rather than some general --
11   BY MR. MULLANEY:
12    Q   Have you, Mr. Banzhaf, ever distributed
13   Plaintiff's Exhibit Three, or a copy of it, to anyone
14   for any reason?
15    A   No, sir.
16    Q   Do you know if Plaintiff's Exhibit Three was
17   ever distributed to anyone for any reason?
18    A   I don't know that. No, I don't know.
19    Q   Why did you testify earlier that it was a
20   marketing document?
21    A   Because that's my interpretation of what it
22   was.
23    Q   You said you had seen it before, correct?
24    A   That is correct.
25    Q   Where --
```

Page 75

```
 1    A   I saw it on -- it's -- it's in the -- the
 2   folder as a separate folder in the shared file,
 3   computer shared files.
 4    Q   What's the title of this separate folder?
 5    A   Hartsfield brochure, I believe.
 6    Q   Did you participate in the drafting of the
 7   Hartsfield brochure?
 8    A   No, sir.
 9    Q   When was the first time you had seen the
10   Hartsfield brochure?
11    A   In '96 or seven, 1996 or seven.
12    Q   So Plaintiff's Exhibit Three has been in
13   existence in its current form since 1997? Is that
14   what you --
15        MR. KOLBER: Objection.
16   BY MR. MULLANEY:
17    Q   If you know?
18    A   It no longer exists in this form.
19    Q   Okay.
20        MR. KOLBER: It exists. We're looking at
21   it.
22        THE WITNESS: He asked the question does
23   it -- has it existed since then in this form,
24   and the answer is no.
25        MR. KOLBER: You don't know.
```

Page 76

```
 1        THE WITNESS: I know it has not -- does
 2   not exist in this form as the present point,
 3   as of the time.
 4   BY MR. MULLANEY:
 5    Q   Was the marketing -- was the Hartsfield
 6   brochure file deleted?
 7    A   It was extensively amended.
 8    Q   How do you know it was extensively amended?
 9    A   Because I requested it be amended, and I was
10   assured that it was and followed up to ensure that it
11   was.
12    Q   When did you request it be amended?
13    A   Probably in 2006, five or six.
14    Q   What prompted you to ask that it be amended?
15    A   It included in its management group
16   individuals that had no knowledge of their being
17   included in this brochure, and individuals including
18   myself and Mr. Reichardt who had strong objections
19   initially and thereafter to be included in this group.
20    Q   When you say initially and thereafter, when
21   did you first lodge your objections to be in
22   Plaintiff's Exhibit Three?
23    A   '03 or four.
24    Q   Okay. So you knew as of 2003 that Plaintiff's
25   Exhibit Three existed in this form?
```

Page 77

```
 1    A   I knew that it had, when I would check it,
 2   yes.
 3    Q   Were you aware that Plaintiff's Exhibit Three
 4   was available on the Internet?
 5    A   I was not aware of it.
 6    Q   To whom did you lodge your objections to the
 7   form of Plaintiff's Exhibit Three?
 8    A   To Mr. Lovett.
 9    Q   And what made you think Mr. Lovett had control
10   over the contents of Plaintiff's Exhibit Three?
11    A   Because Mr. Lovett is the CEO of Hartsfield
12   Capital Group.
13    Q   Well, why didn't you lodge your objections to
14   the contents with Mr. Begley?
15    A   I'm not aware that Mr. Begley was a decision
16   maker on that.
17    Q   Did Mr. Lovett acknowledge he was the -- the
18   decider on --
19    A   Yes, he has.
20    Q   -- on the contents of Plaintiff's Exhibit
21   Three?
22    A   Yes.
23    Q   Did Mr. Lovett acknowledge that he has sole
24   decision-making authority for all -- for everything
25   related to Hartsfield Capital Group?
```

20 (Pages 74 to 77)

**John H. Banzhaf**

Page 82

1 that even though you have no knowledge that
2 any person listed here, at some time, maybe
3 they were, depending on the time period. Is
4 that -- is that what you mean to say?
5       THE WITNESS: No.
6       MR. KOLBER: I don't want to put words in
7 your mouth.
8       THE WITNESS: What I mean to say is when
9 we found these names in there --
10      MR. KOLBER: What date are you talking
11 about?
12      THE WITNESS: I'm talking about, you
13 know, from 2003, four, five, six. I objected
14 to Mr. Lovett that they were included here.
15      MR. KOLBER: Okay. Fair enough.
16      THE WITNESS: That's all I'm saying.
17      MR. KOLBER: Let's go from there.
18 BY MR. MULLANEY:
19   Q   Did Mr. Lovett have any operating function at
20 Hartsfield Capital Securities, the predecessor to
21 Argosy?
22   A   None.
23   Q   So is it fair to say that Plaintiff's Capital
24 Three was a Hartsfield Capital Group document?
25   A   Absolutely.

Page 83

1   Q   And does Plaintiff's Exhibit Three ever make a
2 distinction between Hartsfield Capital, Hartsfield
3 Capital Group, and Hartsfield Capital Securities, to
4 your knowledge?
5       MR. KOLBER: Objection. He would have to
6 read this.
7 BY MR. MULLANEY:
8   Q   Okay. Well, on the first page -- Well, look
9 at the bottom left corner of every page on the
10 document reads only Hartsfield Capital, correct?
11   A   (Nods )
12   Q   No. You have to say yes or no, I'm sorry.
13   A   Yes.
14   Q   Or say some words.
15   A   Yes.
16   Q   And the bottom left footer makes no
17 distinction between Hartsfield Capital Group and
18 Hartsfield Capital Securities, correct?
19   A   Yes.
20   Q   Okay. And is that part of the confusion you
21 -- possible confusion you referenced earlier in your
22 testimony?
23   A   Yes.
24   Q   Okay. The top, first two words of the text of
25 this document are, in all caps, Hartsfield Capital,

Page 84

1 correct?
2   A   Yes.
3   Q   There is no mention of a Hartsfield Capital
4 Group, is there --
5   A   No.
6   Q   -- in this paragraph?
7   A   Yes, you're correct.
8   Q   Nor is there -- nor is there a mention of
9 Hartsfield Capital Securities, is there?
10   A   Correct.
11   Q   Okay. I have to ask you, have you ever heard
12 of a woman named Crystal Wisdom?
13   A   No.
14   Q   She is a -- if you forgive my good humor --
15 She appears right after, on the page after Mr.
16 Begley's page, under the senior staff under Mr.
17 Krizenowski, if I'm pronouncing that correctly.
18   A   I have no idea who that is.
19   Q   Okay. Let's go to your entry in the
20 management and senior staff.
21   A   All right. My personal entry?
22   Q   Correct.
23   A   Okay. All right.
24   Q   Is the first sentence describing you accurate?
25   A   Extensive, broad operating experience for

Page 85

1 Hartsfield Capital credit in corporate finance advise
2 -- yes.
3       MR. KOLBER: Wait a second. Were you
4 involved with Hartsfield Capital? Not the
5 securities, but this group?
6       THE WITNESS: When I originally joined
7 Mr. Lovett's firm, I was.
8       MR. KOLBER: Okay.
9       THE WITNESS: That's where that title
10 executive vice president comes from.
11 BY MR. MULLANEY:
12   Q   Okay. At one point in time, you were an
13 executive vice president at Hartsfield Capital Group?
14   A   Yes.
15   Q   Okay. When did you resign your position at
16 Hartsfield Capital Group?
17   A   Upon the creation of Hartsfield Capital
18 Securities in February of '98.
19   Q   Okay. So this -- that sentence would be
20 inaccurate at anytime after February of 1998?
21   A   Yes.
22   Q   And it was not corrected until 2007?
23   A   Until we made a -- Well, probably earlier than
24 that, but until we made a big fuss. We kept asking
25 for this -- these things to be eliminated, and we

22 (Pages 82 to 85)

**John H. Banzhaf**

Page 106

```
1    Q  Do you recognize this document, sir,
2  Plaintiff's Exhibit Six?
3    A  No.
4    Q  Why don't you take a moment to flip through
5  it, and tell me if you have any reason to think this
6  broker check report is inaccurate?
7    A  Do I have to read all this?
8       MR. KOLBER:  Wait, wait.
9  BY MR. MULLANEY:
10   Q  It's dated as of Thursday, December 6, 2007.
11   A  Essentially I'm guessing.  Yeah, same day.
12      MR. KOLBER:  We will stipulate that if
13   FINRA runs a service called broker check that
14   will provide information to the public
15   regarding registered broker dealers and their
16   reps.
17      MR. MULLANEY:  Okay.
18 BY MR. MULLANEY:
19   Q  Let us skip forward, in that case, to page
20 four.
21   A  And how is it headed?
22   Q  Employment history.
23   A  All right.  Okay.
24   Q  Could you read, to yourself, your employment
25 history and tell me if that's accurate?
```

Page 107

```
1       MR. KOLBER:  No, down here.
2       THE WITNESS:  No, no, but --
3       MR. KOLBER:  No, that's previously
4    registered.  This is what we're looking at,
5    employment history.
6       THE WITNESS:  It is not at all accurate.
7  BY MR. MULLANEY:
8    Q  What is inaccurate about it?
9    A  Under employment history, the two -- the third
10 one is accurate.  The second one, Hartsfield Capital
11 Group, 12/1/97 to present is inaccurate.
12   Q  Do you know how FINRA gets its information on
13 its brokers?
14      Let me take that back.  Do you know how FINRA
15 got its employment history information about you?
16   A  I can make an assumption, but the answer is
17 no.
18   Q  All right.  Are brokers not requested to
19 submit their own employment history information?
20   A  We are requested, and it is done, and it is
21 accurate on Form BD.  But since I've never seen this
22 form, I can't speak to that.
23   Q  Okay.  So your form -- your personal Form BD
24 is --
25   A  Well, actually, my personal -- you're talking
```

Page 108

```
1  my personal U4.  That's what that is.
2    Q  Okay.
3    A  Now my personal U4 is accurate.
4    Q  Okay.
5       MR. KOLBER:  Let's slow down.  Well,
6    you're making the statement.  We don't have
7    the Form U4 in front of you.
8       MR. MULLANEY:  Right.
9       MR. KOLBER:  So you don't --
10      THE WITNESS:  I'm making the statement
11   that that statement in this line two --
12      MR. KOLBER:  No, I understand that, but
13   unless you had Form U4 right in front of you
14   at this point --
15      THE WITNESS:  Then I -- then what is the
16   answer to my question?
17      MR. KOLBER:  I don't know.
18      THE WITNESS:  Well, let's rephrase the
19   question then.
20      MR. KOLBER:  Okay.  Why don't -- he
21   didn't ask you about your Form U4.  So why
22   don't you strike --
23      MR. MULLANEY:  Well, why don't we do it
24   this way.  When you get a chance, or your
25   attorney gets a chance, why don't you send me
```

Page 109

```
1  your last Form U4?
2       THE WITNESS:  Okay.
3       MR. KOLBER:  Well -- well, wait.  Your U4
4    -- I don't want to do an undertaking here,
5    okay.
6       MR. MULLANEY:  Okay.
7       MR. KOLBER:  All -- my only point is that
8    he's telling on the record that a form that is
9    on file with a government agency is
10   inaccurate, and we're looking at an example of
11   a government form that is inaccurate according
12   to his testimony.  Therefore, Mr. Banzhaf, you
13   don't know unless you have the form in front
14   of.
15      THE WITNESS:  That is -- that's correct.
16      MR. KOLBER:  That's all I'm saying.
17   Okay.
18 BY MR. MULLANEY:
19   Q  So, if I could ask the question, are -- do
20 you know whether or not your current U4 as on file
21 with FINRA is accurate?
22   A  I believe it to be accurate.
23      MR. KOLBER:  But you don't know for sure
24   unless it was in front of you, correct?
25      THE WITNESS:  That is correct.
```

28 (Pages 106 to 109)

Page 110

```
 1        MR. KOLBER: Fine.
 2 BY MR. MULLANEY:
 3    Q  Do you know if the government seeks employment
 4 history information about brokers from any source
 5 other than the broker?
 6    A  I don't know.
 7        MR. KOLBER: I might interject that I've
 8    got these same forms, and I can tell you right
 9    now that my form is inaccurate, and it's very
10    difficult to get it completed. It's got to be
11    registered with NEVA securities and a number,
12    and I've even taken steps to get them to
13    correct it.
14        MR. MULLANEY: Okay.
15        MR. KOLBER: And you have to get a court
16    order. It's very difficult. It's an
17    expungement process.
18 BY MR. MULLANEY:
19    Q  Well, my question is not really about the
20 difficulty of getting it changed, which no doubt is
21 enormous, but how they got this idea in the first
22 place.
23        Under affiliations?
24    A  Yes.
25    Q  Is that accurate?
```

Page 111

```
 1    A  I believe it to be accurate.
 2    Q  And it begins I am the president of John
 3 Banzhaf & Associates, correct?
 4    A  That is correct.
 5    Q  Does it -- do you recall submitting a writing
 6 where you gave your affiliation's information?
 7    A  I can tell you where this document came from.
 8    Q  Okay. Where did it come from?
 9    A  It comes from my personal U4.
10    Q  Do you recall drafting that?
11    A  I was required to draft it, yes.
12    Q  My question was just do you recall?
13    A  Yes. Yes, I do.
14    Q  Okay. Second paragraph, Begley, BANZHAF, and
15 Reichardt, LLC was formed in December 2004. Is that
16 accurate?
17    A  Yes, sir.
18    Q  I'll read the -- I'll read the whole
19 paragraph, and tell me if it's accurate. Begley,
20 Banzhaf, and Reichardt, LLC, was formed in December
21 2004 solely as a bank account to receive and
22 distribute funds to its partners from any potential
23 project. With such a limited function, it takes
24 virtually no time in its management. Is that
25 accurate?
```

Page 112

```
 1    A  Yes, sir.
 2        MR. KOLBER: By the meaning of the words
 3    it's not accurate. By plain common sense
 4    language it's not accurate.
 5        MR. MULLANEY: Okay.
 6        MR. KOLBER: Not because he's
 7    mischaracterizing. A company cannot be a bank
 8    account.
 9        MR. MULLANEY: I understand that there's
10    a grammatical issue.
11        MR. KOLBER: Well, it's more than a --
12    it's more than a grammatical.
13        MR. MULLANEY: Well, I didn't write it.
14    Do you want to talk to Mr. Banzhaf for a
15    minute?
16        MR. KOLBER: So you cannot say it's
17    accurate. It's not accurate.
18        THE WITNESS: All right.
19        MR. KOLBER: We can get into why it's not
20    accurate.
21        THE WITNESS: It's not accurate.
22        MR. KOLBER: You're under oath, John.
23    Okay. That's why I'm being very, very
24    precise. It's not accurate. And anybody can
25    see that.
```

Page 113

```
 1 BY MR. MULLANEY:
 2    Q  I mean, if I get in trouble for grammatical
 3 mistakes, I want to be the one -- I had nuns in
 4 Chicago.
 5        MR. KOLBER: No, no --
 6        MR. MULLANEY: Sacred Heart School, my
 7    hands would be chopped into ribbons with a
 8    ruler.
 9        MR. KOLBER: It's not just a typo.
10    There's more to it than that.
11        MR. MULLANEY: I understand there's more
12    to it.
13 BY MR. MULLANEY:
14    Q  Okay. Who formed Begley, Banzhaf and
15 Reichardt?
16    A  The three parties listed.
17    Q  All together all signed an operating agreement
18 or whatever it's called?
19    A  There was an organization agreement to create
20 the LLC.
21    Q  Okay. And was there, what's it called, an
22 initiating agent?
23    A  I was the agent that formed the LLC.
24    Q  Where was the LLC formed?
25    A  In the state of Georgia.
```

29 (Pages 110 to 113)

John H. Banzhaf

Page 122

1 Group wasn't involved with May Davis in the sale of --
2 or purchase of AA-rated notes?
3     A   Only because I understood that Mr. Lovett was
4 involved in that transaction, and Hartsfield Capital
5 Securities was never allowed -- involved in those
6 transactions.
7     Q   So, do you recall signing this letter or are
8 you just acknowledging that's your signature?
9     A   I'm acknowledging that's my signature.
10    Q   Did you sign this letter?
11    A   I'm acknowledging that's my signature,
12 therefore I must have.
13    Q   Okay.  Well --
14    A   I don't recall signing it.
15    Q   Do you have any reason to think you didn't
16 sign it?
17    A   No.
18        MR. MULLANEY:  Okay.  Why don't we mark
19    this as -- what are we up to, Plaintiff's
20    Seven?
21        THE WITNESS:  Seven.
22        (Whereupon, Plaintiff's Exhibit Number
23    Seven was marked for identification purposes.)
24 BY MR. MULLANEY:
25    Q   Well, is the text of this letter accurate?

Page 123

1        MR. KOLBER:  Read it first.
2        THE WITNESS:  Which letter are you
3    looking at?
4 BY MR. MULLANEY:
5    Q   Plaintiff's Seven.
6    A   Seven, okay.
7        MR. KOLBER:  I make note that it's
8    referencing an attachment, and we don't have
9    the attachment here.
10       MR. MULLANEY:  We do.  I'll get to that
11   in a second.
12       THE WITNESS:  And I'm saying that I do
13   not recall this letter, therefore, I don't
14   know that it's accurate or inaccurate.
15 BY MR. MULLANEY:
16   Q   Well, did Hartsfield Capital Securities -- did
17 it ever conduct any business with the May Davis Group?
18   A   It did not.
19   Q   What was the contemplated transaction, if you
20 know, as referred to in the third line down in the
21 text?
22   A   The sale of AA-rated bank notes.
23   Q   To whom?
24   A   I have no idea.
25   Q   Who told you about the contemplated

Page 124

1 transaction?
2    A   Mr. Lovett.
3    Q   Okay.  Well, just tell me what he told you
4 about the contemplated transaction?
5    A   I can only recall that Mr. Lovett was involved
6 in the sale of -- or contemplated sale.  I don't know
7 that he ever completed any sales.  Contemplated sales
8 of AA bank notes.  And that the project finance
9 custodial responsibility form alluded to those bank
10 notes.  Therefore, I'm assuming since this meant --
11 referenced the custodial responsibilities, then this
12 refers to the same thing.
13   Q   Okay.  So then if -- was it contemplated then
14 that Hartsfield Capital Securities --
15   A   No, it was complicated -- contemplated that
16 Mr. Serena's firm would do that.
17   Q   Well, let me ask you this.  Why is your name -
18 - why are you involved in this at all?
19   A   I really can't recall.
20   Q   Can't recall, okay.  But Mr. Lovett -- that's
21 your signature.  This is Mr. Lovett's transaction?
22   A   I believe so.
23   Q   Okay.  And you didn't -- Did you ever talk to
24 Mr. Serena?
25   A   I have talked to Mr. Serena.

Page 125

1    Q   Well, what did you talk to him about?
2    A   Setting up a relationship between the two
3 firms, which never happened.
4    Q   What two firms?
5    A   The Hartsfield Capital Securities and May
6 Davis Group, Inc. contemplated a relationship that
7 never occurred.
8    Q   Okay.  And what was that relationship?
9    A   The sale of securities.
10   Q   What securities?
11   A   I don't believe they were defined, other than
12 the AA bank notes.
13   Q   Okay.  Well, let me get this straight.
14 Hartsfield Capital Group and Mr. Lovett contemplated
15 trading AA-rated bank notes through May Davis
16 Securities, correct?
17   A   I believe that to be true.
18   Q   And they contemplated doing that without
19 involving Hartsfield Capital Securities, correct?
20   A   I don't know.
21       MR. KOLBER:  Objection.  Yeah, okay.  If
22   you don't know.
23       THE WITNESS:  I don't know that.
24 BY MR. MULLANEY:
25   Q   Okay.  Independently, Hartsfield Capital

32 (Pages 122 to 125)

Page 138

1 account with Hartsfield Capital Securities?
2         MR. KOLBER: Discussion by who?
3 BY MR. MULLANEY:
4    Q  Anybody?
5    A  No. Well --
6         MR. KOLBER: Don't answer.
7 BY MR. MULLANEY:
8    Q  Well, I'm going to ask it again. Was it --
9 did anyone ever discuss with John Banzhaf that Dover
10 might open an account with Hartsfield Capital
11 Securities?
12   A  No.
13   Q  Did anyone ever discuss with you that Ms. Yap
14 might open an account with Hartsfield Capital
15 Securities?
16   A  No.
17   Q  Did Hartsfield Capital Securities have any
18 account that was insured for twenty-five million
19 dollars with a Fidelity bond?
20   A  No.
21   Q  Did Hartsfield Capital Securities ever enter
22 into a relationship with May Davis Group?
23   A  No.
24   Q  Did you ever see the handwritten agreement to
25 the above written out by Ms. Wendy Yap?

Page 139

1         MR. KOLBER: Your question assumes
2      something that hasn't been established.
3 BY MR. MULLANEY:
4    Q  I guess that's right. You've never seen
5 Plaintiff's -- what are we up to?
6    A  This?
7         MR. KOLBER: Let him ask the question.
8      If you want him to testify as to whether or
9      not he's seen a particular document, define
10      the document, and he'll answer it.
11         MR. MULLANEY: Yeah, I guess that's
12      right. I probably asked and answered this
13      before.
14 BY MR. MULLANEY:
15   Q  Have you ever seen -- is it Plaintiff's Eight?
16 Have you ever seen Plaintiff's Eight before?
17   A  No, sir.
18   Q  Okay.
19   A  Should I put this in the pile?
20   Q  Yeah, please. Let me ask you if you have ever
21 seen the declaration in support of default by Ms.
22 Wendy Yap, in that form?
23   A  Yes.
24         MR. MULLANEY: Let me mark that as
25      Plaintiff's Nine, please.

Page 140

1         (Whereupon, Plaintiff's Exhibit Number
2      Nine was marked for identification purposes.)
3 BY MR. MULLANEY:
4    Q  Okay. Did you, John Banzhaf, ever make any
5 representations to Wendy Yap about the investment
6 strategy of Mansell Capital Partners?
7    A  No.
8    Q  Let's turn to what you have there as Exhibit
9 A. Have you ever seen Exhibit A to Plaintiff's
10 Exhibit Nine before?
11   A  Yes.
12   Q  When, and let me say if you've seen it as a
13 result of this litigation, don't tell me anything
14 you've discussed with your lawyers about it, just say
15 yes or no.
16   A  Yes.
17   Q  Have you seen it before this -- the onset of
18 this litigation?
19   A  No. Can I amend that?
20   Q  Yes, of course.
21   A  By definition, if I created this document, I
22 must have seen it.
23   Q  Right.
24   A  So the answer is yes, I did see it.
25   Q  So you, in fact, created Exhibit A to

Page 141

1 Plaintiff's Exhibit Nine?
2    A  I believe I did.
3    Q  Did you send, let me call it Exhibit 9-A. Did
4 you send Plaintiff's Exhibit 9-A to Wendy Yap?
5    A  I did not.
6    Q  Did you send it to anyone in Singapore?
7    A  I did not.
8    Q  Are you aware it was sent to Wendy Yap?
9    A  By definition I was aware, because I received
10 it from Wendy Yap in this document that is support,
11 and I went back through the files of Mansell Capital
12 Partners. I originally assumed it was done by
13 Hartsfield Capital Securities. It was found in the
14 file of Mansell Capital Partners. It was created on
15 March 28th, but you see by the fax number it was faxed
16 to Ms. Yap on June 27th of '03.
17         MR. KOLBER: How do you know it was faxed
18      to Ms. Yap?
19         THE WITNESS: Because I got it from Ms.
20      Yap. That's where this came from.
21         MR. KOLBER: In other words, you're
22      making certain assumptions.
23         THE WITNESS: Yes, I am. Right.
24         MR. KOLBER: Okay. So don't make
25      assumptions. On the upper left-hand corner --

36 (Pages 138 to 141)

Page 142

1  We've been through this before. It's dated
2  and because it's dated and you're making
3  certain assumptions. So only testify as to
4  what you know.
5      THE WITNESS: What I know is I received a
6  fax that -- a document that I created on March
7  28th, something of that, in '03 that has a fax
8  date on it of June 27th, '03, and the document
9  was received from Ms. Yap.
10      MR. KOLBER: Because it's attached to her
11  declaration, and that's why you're saying it
12  was received from Ms. Yap?
13      THE WITNESS: Sure. It's listed as
14  Exhibit A.
15      MR. KOLBER: Okay. Thank you.
16 BY MR. MULLANEY:
17  Q  Do you have any other reason to think Exhibit
18 9-A was sent to Ms. Yap?
19  A  The character of what is being described here
20 are the --
21      MR. KOLBER: Just answer his question.
22  Don't talk about the character.
23      THE WITNESS: Then he'll have to rephrase
24  it so I'll remember what it was.
25      MR. KOLBER: Okay.

Page 143

1 BY MR. MULLANEY:
2  Q  Is there any other reason?
3  A  Yes.
4  Q  Okay.
5  A  The document contains subjects related to AA
6  cash back and registered bank issued notes, which I
7  know to have been a project of Mr. Lovett.
8  Q  How do you know --
9      MR. KOLBER: You're assuming Mr. Lovett
10  sent it. Is that what you're saying?
11      THE WITNESS: Yes.
12      MR. KOLBER: But you don't know -- but
13  you don't know for sure.
14      THE WITNESS: Can I talk to him?
15      MR. MULLANEY: You can.
16      THE WITNESS: Off the record?
17      MR. MULLANEY: Why not.
18      (Discussion off the record.)
19 BY MR. MULLANEY:
20  Q  Do you know from personal knowledge that Mr.
21 Lovett sent Exhibit 9-A to Ms. Yap?
22  A  No, sir.
23  Q  Do you have reason to believe that Mr. Lovett
24 sent the Plaintiff's Exhibit 9-A to Ms. Yap?
25  A  I have reason to believe he did.

Page 144

1  Q  And why don't you tell me what the reason to
2 believe is.
3  A  The content of the letter or document, Project
4 Finance Custodial Responsibilities, refers to a -- the
5 AA rated bonds and bank notes that was a project that
6 Mr. Lovett was undertaking with Ms. Yap, to the best
7 of my knowledge.
8  Q  When you say with Ms. Yap to the best of my
9 knowledge, what is the basis of that knowledge?
10  A  The fact that this document came to me for my
11 possession and perusal as Exhibit A from Ms. Yap.
12  Q  Okay. You didn't see Mr. Lovett hunched over
13 the fax machine?
14  A  I did not.
15  Q  Okay. On June 27th?
16  A  Correct.
17  Q  Okay. He didn't tell you, oh, I just sent Ms.
18 Yap --
19  A  No, he did not.
20  Q  Okay. Now, I believe you testified that you
21 had found Plaintiff's 9-A in the Mansell file, is that
22 correct, recently?
23  A  Yes. Yes, I did.
24  Q  Okay. Was there a fax confirmation sheet
25 attached to Plaintiff's 9-A?

Page 145

1  A  No.
2  Q  So there is a file, a physical file of Mansell
3 documents?
4  A  No, sir. There is an electronic folder.
5  Q  Ah-ha. Okay. And Plaintiff's 9-A, in
6 electronic form, is in the Mansell folder?
7  A  Correct.
8  Q  Did you put it there?
9  A  I probably did, yes, on March -- I drafted it,
10 I believe on March 28 -- 27 or 28th of '03.
11  Q  Was there a time when -- I take that back. Do
12 you recall if you sent Plaintiff's 9-A to David
13 Serena?
14  A  I don't recall I sent Plaintiff's 9-A to David
15 Serena.
16  Q  Turn, if you would, to Exhibit C of
17 Plaintiff's Nine. Have you ever seen Exhibit C
18 before?
19  A  No, sir. No, sir.
20      MR. KOLBER: Within the contents of the
21  litigation?
22      THE WITNESS: No, I never saw it until
23  this morning.
24      MR. KOLBER: Okay.
25      THE WITNESS: Wasn't this one of the

37 (Pages 142 to 145)

Page 158

1  Q  Did you ever ask for one?
2  A  No.
3  Q  Why not?
4  A  Because that wasn't my role. I was
5 ministerial, slash, clerical in nature. I had not
6 management and authority function.
7  Q  Okay. Why don't you turn to Exhibit F, 9-F.
8 Have you ever seen Exhibit 9-F before?
9  A  Not prior to the involvement of the suit.
10  Q  Okay. Within the last two months, have you
11 searched the Mansell folder on the computer?
12  A  Yes.
13  Q  Exhibit 9-F was not in that?
14  A  No, it was not.
15  Q  Does Mr. Begley keep his own folder within the
16 Hartsfield Capital Group computer?
17  A  I have not seen it, if he has.
18  Q  Does Mr. Lovett?
19  A  He has the Hartsfield Capital Group folders,
20 yes.
21  Q  Okay. Do you have access to the Hartsfield
22 Capital Group folders?
23  A  Yes.
24  Q  Have you ever looked through those?
25  A  Only once to try to determine where that

Page 159

1 custodial responsibilities memo was.
2  Q  Project Finance Custodial Responsibilities?
3  A  Yes, yes.
4  Q  And you found it in the Mansell folder?
5  A  I found it in the Mansell folder, but I looked
6 in the other -- Hartsfield folders, which is what you
7 had asked.
8  Q  All right. We are up to -- I'll mark the
9 whole thing as Plaintiff's Ten.
10     (Whereupon, Plaintiff's Exhibit Number Ten was
11  marked for identification purposes.)
12 BY MR. MULLANEY:
13  Q  Take a minute to look at it, if you like.
14  A  May we unwrap it is what --
15  Q  Oh, yes. Yeah. Clip that, if you would. I
16 don't want to get those pages out of order, please.
17  A  May I keep it unclipped while we're --
18  Q  Sure. Turn to -- don't turn to it yet. Have
19 you heard of a company called Argyle?
20  A  Yes.
21  Q  What is it?
22  A  I don't know what it is, sir. I know I've
23 heard of it in relation to Gordon Mascarenhas.
24  Q  That's his company, as far as you know?
25  A  As far as I know.

Page 160

1  Q  What's your source of that knowledge?
2  A  Mr. Kerr in his affidavit said he had sent
3 funds to Argyle.
4  Q  When did the -- forgive me for asking this --
5 when did you open the Mansell Capital Partners' bank
6 account?
7  A  March of '03.
8  Q  Do you know where Argyle International was
9 located?
10  A  No, sir.
11  Q  Did you ever send Argyle International any
12 money?
13  A  No, sir.
14  Q  Did you ever accept any -- strike that.
15     Did Mansell ever accept any money from Argyle
16 International?
17  A  I don't know.
18  Q  Okay. I turn your attention to Exhibit 10-A.
19  A  Oh, 10-A?
20  Q  Yeah. Tab them for your convenience. Turn a
21 couple pages in to what, on the bottom right-hand
22 corner has been stamped page two, I believe, by Mr.
23 Levy.
24  A  Okay. All right.
25  Q  If you look at the top --

Page 161

1  A  I see it.
2  Q  Two deposits.
3  A  Yes, I see them.
4  Q  Okay. Does this refresh your recollection of
5 where Argyle International is located?
6  A  No, because it only reflects that I previously
7 said I didn't know, and now I know that they did
8 transfer money into Mansell. Now, let me read this.
9 Does this tell me where they're located? I still
10 don't know where they're located, but this
11 acknowledges that the funds were received.
12  Q  Okay. And the sending bank could be a JP
13 Morgan Chase Bank anywhere?
14  A  I don't know enough about that to say that one
15 way or another.
16  Q  All right. The first debit.
17  A  Okay.
18  Q  10/01/03, here on this page --
19  A  Yeah.
20  Q  Is to Alain Assemi?
21  A  Yes.
22  Q  At the Sterling National Bank.
23  A  Right. That's the one at 512 7th Avenue.
24  Q  Okay. And you directed that wire?
25  A  Yes, sir.

41 (Pages 158 to 161)

John H. Banzhaf

Page 162

1   Q   All right.  And you knew you were sending that
2   wire to New York, didn't you?
3   A   Yes, sir.
4   Q   Turn to the second page of this document
5   stamped 03 at the bottom, and we're still in 10-A.
6   A   All right.
7   Q   What is Omnibus, LLC, if you know?
8   A   Where is that, sir?
9   Q   That is the fourth debit down.
10   A   Oh, I see it.  I don't know.
11   Q   And that -- Look up to the second debit,
12   Belsize, LLC.  That company is in New York, do you
13   know?
14   A   I don't know where it is.  I don't know where
15   it is.
16   Q   Okay.  Do you know where the Commerce Bank is?
17   A   I don't know.  It could be in New York.  I
18   don't know.
19   Q   I'll spare you the suspense.  It's Belsize,
20   John Moran put in a pleading that admits it's in New
21   York, so.
22   A   Okay.
23   Q   I'm sure you were at the edge of your seat.
24   Turn to the seventh page of this document stamped 07
25   down at the bottom, right-hand corner.

Page 163

1   A   Okay.
2   Q   The first debit there on December --
3   A   Okay, debit.
4   Q   -- December 5th is from William Kerr.  It says
5   the sender is from JP Morgan Chase Bank.  Do you see
6   that?
7   A   No.  The first debit --
8   Q   First deposit, I'm sorry.
9   A   Oh, fine.  I'm looking in the wrong place.
10   Okay.  That says -- yes, that says sender JP Morgan
11   Chase Bank.  Okay.
12   Q   Did you notice that at the time that William
13   Kerr had --
14   A   No.
15   Q   Let me finish my question, if you would.
16       Did you notice that at the time that William
17   Kerr had sent money from a place apparently other than
18   Canada?
19   A   I don't even acknowledge that.
20   Q   Okay.  Had you -- did you notice at the time
21   that William Kerr sent money from a place other than -
22   -
23       MR. KOLBER:  I object to the form of the
24       question because it's a compound question.
25       MR. MULLANEY:  I'm finishing it.

Page 164

1       MR. KOLBER:  Well, ask the question, but
2   don't answer until you hear the whole
3   question.
4       THE WITNESS:  All right.
5   BY MR. MULLANEY:
6   Q   Did you notice at the time that William Kerr
7   had sent Mansell money from a place other than the
8   Royal Bank of Canada?
9       MR. KOLBER:  And we don't know that.  How
10       do you know that?
11       THE WITNESS:  That was my point.
12   BY MR. MULLANEY:
13   Q   Let's go back to page two.
14   A   Two?
15   Q   Uh-huh.  And look at the debit at 10 -- of
16   10/3.
17   A   Yep.
18   Q   Is three million five hundred thousand dollars
19   to the William Kerr Trust account.
20       MR. KOLBER:  Where is this?
21       THE WITNESS:  These two he's referring
22       to.
23   BY MR. MULLANEY:
24   Q   Did you read -- Am I correct in reading it's
25   the beneficiary bank was the Royal Bank of Canada?

Page 165

1   A   Yes, sir.
2   Q   Okay.  Same for the three-million-dollar wire
3   you directed to the William Kerr Trust --
4   A   Yes, sir.
5   Q   -- the same day?
6   A   Yes, sir.
7   Q   Okay.  And then three days later, you directed
8   three hundred thousand dollars to the William Kerr
9   Trust and the Royal Bank of Canada, do you see that?
10   A   Yes, sir.
11   Q   Okay.  Now, would it be fair for me to ask if
12   on 12/5 of that year you notice that one-point-seven-
13   eight-eight-nine-eight-eight million dollars came from
14   William B. Kerr, but from a different bank?
15   A   Are we --
16       MR. KOLBER:  What page are you on?
17       THE WITNESS:  I don't know what we're on.
18   BY MR. MULLANEY:
19   Q   We're on page seven now.
20   A   Oh, all right.
21       MR. KOLBER:  Now go to page seven.
22       THE WITNESS:  Now you're talking about
23       these one-seven-eight-eight and so forth?
24   BY MR. MULLANEY:
25   Q   Correct.

42 (Pages 162 to 165)

John H. Banzhaf

Page 178

1  Q  Who asked you to write that check?
2  A  Steve Lovett.
3  Q  Did he tell you why he wanted you to write --
4  A  He wanted to have another bank account, and
5 I'm not conscious that that bank account was ever used
6 -- not another bank account, another LLC.
7  Q  Do you know why that LLC was formed?
8  A  Only at his request.  I have no idea.
9  Q  Next page, page seventy, very top.  MCP3, do
10 you see that?
11  A  Yes, I do.
12  Q  And that was for check number ten-fifty-six?
13  A  Yes.
14  Q  And you wrote that check, is that correct?
15  A  I wrote a check, yes.
16  Q  Not a check, did you write that check?
17  A  Probably.
18  Q  Do you have any reason to think you didn't
19 write it?
20  A  Yes.
21  Q  What is it?
22  A  Let me -- let me define what I mean.  I have
23 no reason to believe I didn't write the check, but
24 these checks were written, the hundred-dollar checks
25 for the establishment of an LLC with the State of

Page 179

1 Georgia.  I was not the agent who established that.
2      MR. KOLBER:  That's not what he's asking.
3 BY MR. MULLANEY:
4  Q  In fact, I can't remember what my last
5 question was, but I think it was --
6      MR. KOLBER:  Did you write the check?
7      THE WITNESS:  I wrote the check.
8 BY MR. MULLANEY:
9  Q  Okay.  And I take it from the -- Did you write
10 it at Mr. Lovett's request?
11  A  Yes.
12  Q  Did he tell you why he wanted you to write
13 that check?
14  A  No.
15  Q  Can you remember who the payee was?
16  A  Secretary of the State of Georgia -- Georgia
17 Secretary of State, technically.
18  Q  What was the Baseline Securities Corp?
19  A  That was the S-Corp, I believe, owned by
20 Delbert Reichardt.
21  Q  I want to ask you about Gambrell and Stolz.  I
22 think I figured out who that is.  If you keep turning,
23 you'll actually see the pages change and are slightly
24 out of order.
25  A  Yeah.

Page 180

1  Q  And I'm going to ask you to turn to page
2 forty-nine now at the bottom.
3  A  Got it.
4  Q  And about the middle of the page, there's a
5 company called 262 it appears?
6  A  Yes.
7  Q  Do you know what that was or is?
8  A  Yes.
9  Q  What is it?
10  A  It's a marketing firm that creates websites.
11  Q  Did Mansell have a website?
12  A  No.
13  Q  Who asked you to write that check?
14  A  It was suggested by Tom Begley that we write
15 it for the website for Hartsfield Capital Securities.
16      MR. KOLBER:  Securities?
17      THE WITNESS:  Hartsfield Capital
18      Securities.
19 BY MR. MULLANEY:
20  Q  What was Dewey Robbins?
21  A  A creditor of Tom Begley's.
22  Q  Was it a person or a company?
23  A  Best of my knowledge, it was a person.
24  Q  Okay.  Do you know where Mr. or Mrs. -- do you
25 know where Dewey Robbins lives?

Page 181

1  A  Someplace in Pennsylvania.  That's from
2 memory.
3  Q  Okay.  Mr. --
4  A  That's the only check I actually mailed.
5  Q  You anticipated.  And I'm up to page fifty-
6 two.  The checks numbered eleven-nineteen and eleven-
7 twenty are Gerralyn Wood, it appears.  Do you know who
8 that person or company is or was?
9  A  I believe a provider of technical services to
10 Mr. Begley, software, I think.
11  Q  Person or company, or do you know?
12  A  I don't know.
13  Q  Did Mr. Begley ask you to write those two
14 checks?
15  A  Yes, sir.
16  Q  Did he mail them?
17  A  I believe so.
18  Q  And check eleven-twenty-one to Dewey Robbins,
19 that's the check --
20  A  That I mailed.
21  Q  It may be the only one you mailed.
22  A  The only -- the only individual to whom which
23 I mailed, yes.
24  Q  And there's another -- if you turn the page --
25 there's another check to Gambrell and Stolz.

46 (Pages 178 to 181)

Page 182

```
 1    A   Yes.
 2    Q   This is for legal services, I take it?
 3    A   I could be funny, but the answer is yes.
 4    Q   For Hartsfield Capital Securities?
 5    A   No.
 6    Q   For whom or what?
 7        MR. KOLBER:  Don't answer that.
 8        THE WITNESS:  Okay.
 9        MR. MULLANEY:  Insert the attorney/client
10    privilege?
11        MR. KOLBER:  Can I go off the record and
12    find out what it was?
13        MR. MULLANEY:  Yeah.
14        (Off the record.)
15 BY MR. MULLANEY:
16    Q   Let's go back on the record.  Do you remember
17 what that check was for, Mr. Banzhaf?
18    A   The Gambrell and Stolz check?
19    Q   Yes.
20    A   It was to Gambrell and Stolz for a PPM.
21    Q   That stands for private placement memorandum?
22    A   Yes, sir.
23    Q   And for whom or what was the private
24 placement?
25    A   That's the part I couldn't remember.
```

Page 183

```
 1    Q   Did anyone ask you to write that check?
 2    A   Yes.
 3    Q   Who?
 4    A   Well, the -- the clients of Gambrell and Stolz
 5 acknowledged the check should be written.
 6    Q   Who are the clients of Gambrell and Stolz?
 7    A   Mr. Begley, Mr. Reichardt, and Mr. Banzhaf.
 8    Q   And was this part of Begley, Banzhaf and
 9 Reichardt, LLC?
10    A   No.
11    Q   Okay.  Did this PP -- private placement ever
12 come to fruition?
13    A   No.
14    Q   Turn to page fifty-six, if you would.  There's
15 another Gambrell and Stolz check there, eleven-forty-
16 nine for ten thousand dollars.  Do you see that, sir?
17    A   Oh, all right.  Yes, thank you.  Yeah, I see
18 it.
19    Q   Do you recall what that check was for?
20    A   I am sure it is for the same --
21        MR. KOLBER:  Either you know or you don't
22    know.  If you know, you can tell him.
23        THE WITNESS:  It was for the same PPM.
24 BY MR. MULLANEY:
25    Q   Are you at liberty to give the name of the
```

Page 184

```
 1 entity that was going to issue the PPM?
 2    A   I'd be at liberty, if I could remember it.
 3    Q   That's fine.
 4        MR. KOLBER:  Off the record.
 5        (Discussion off the record.)
 6 BY MR. MULLANEY:
 7    Q   We'll go back on the record.  I appreciate it.
 8 Thank you, Mr. Banzhaf.
 9    A   You're welcome.
10    Q   A little further down the page you'll see MCP2
11 and MCP3.  Do you recall what those checks were for?
12    A   No, because they appear to have already taken
13 place earlier.
14    Q   Next page, page fifty-seven, eleven-seventy-
15 two.
16    A   Eleven-seventy-two, okay.
17    Q   A check to T-Mobile, and there are the
18 initials SJL there.
19    A   Uh-huh.  (Affirmative)
20    Q   Do you see that?
21    A   Yes.
22    Q   Do you know why you wrote that check to T-
23 Mobile?
24    A   Yes.
25    Q   Why?
```

Page 185

```
 1    A   I wrote it at the request of Tom Begley for
 2 the T-Mobile account for SJL, who stands for Stephan
 3 J. Lovett.  I paid the check.  I gave T-Mobile a check
 4 for that.
 5    Q   Did you send T-Mobile the check?
 6    A   I took it.  They have an office in a shopping
 7 center near our office, when our office was there.
 8    Q   Let's turn to Exhibit C, first page.
 9    A   Okay.
10    Q   Page seventy-nine, that's Exhibit 10-C, if I
11 may call it that.
12    A   D?
13    Q   Are we on D?  I have we're on C.
14        MR. KOLBER:  We're on C.  Okay.
15        THE WITNESS:  Seventy-nine, okay.
16 BY MR. MULLANEY:
17    Q   Have you ever seen this document?
18    A   Yes, sir.
19    Q   Before today?
20    A   Yes, sir.
21    Q   Have you seen it before the initiation of this
22 litigation?
23    A   Yes, sir.
24    Q   When have you seen it?
25    A   In 19 -- in 2003, probably in essentially the
```

47 (Pages 182 to 185)

Page 186

1 same time frame as it is dated.
2    Q   What were the -- why did you see it?
3    A   I wished to establish something that it had
4 established.
5    Q   And which was what?
6    A   That Stephan Lovett and Thomas Begley were the
7 officers of the firm.
8    Q   Okay. Is it also accurate in establishing
9 that Mansell Capital Partners' funds were, at the
10 time, on deposit with Hartsfield Capital Securities?
11    A   Mansell Capital Partners' funds have never
12 been on deposit with Hartsfield Capital Securities.
13    Q   Okay. So that -- do you see where that reads?
14    A   Currently on deposit with a clearing firm.
15    Q   Not a clearing firm.
16    A   With the clearing firm of Hartsfield Capital
17 Securities. That makes an assumption that's not
18 accurate. It is not an accurate statement.
19    Q   Okay. What is an accurate statement?
20        MR. KOLBER: I object.
21 BY MR. MULLANEY:
22    Q   If you know.
23        MR. KOLBER: No, what is an accurate
24        statement.
25 BY MR. MULLANEY:

Page 187

1    Q   Oh, okay. Well, you say that -- you say that
2 phrase is inaccurate, currently on deposit with the
3 clearing firm of Hartsfield Capital Securities, Inc.
4    A   I am --
5        MR. KOLBER: Wait, there's no question
6        yet. What's your question?
7 BY MR. MULLANEY:
8    Q   What about that is inaccurate?
9    A   That Hartsfield Capital Securities never had
10 Mansell funds on deposit with its clearing firm.
11    Q   Okay. Did you notice that discrepancy at the
12 time you first saw this document?
13    A   I did not.
14    Q   Okay. If you look down, one, two, three, the
15 fourth paragraph of text, which has further misspelled
16 with an E at the end.
17    A   Oh, here, okay.
18    Q   Were you aware of that paragraph, when you
19 reviewed the document in 2003?
20    A   I was not aware of that.
21    Q   And when you saw this document in 2003 were
22 you aware of the paragraph right below it?
23    A   No.
24    Q   And if you look down at the very bottom of the
25 document, the final it was further resolved, were you

Page 188

1 aware of that paragraph?
2    A   No.
3    Q   Did you ever tell anyone that pages seventy-
4 nine and eighty of Plaintiff's 10-C were inaccurate in
5 any way?
6    A   No.
7    Q   Okay.
8    A   Do you want me to put this back?
9    Q   No, give me a moment, if you would.
10    A   Oh, you want me to keep this out?
11    Q   Yes, yes. Okay. With Plaintiff's Exhibit Ten
12 still, go to 10-A, if you would.
13    A   I don't know where we are.
14        MR. KOLBER: When you say 10-A --
15        THE WITNESS: Under D or what are we
16        under?
17        MR. KOLBER: Okay. Which tab?
18        MR. MULLANEY: A.
19        MR. KOLBER: Tab A.
20        THE WITNESS: Oh, tab A, I'm sorry.
21        MR. KOLBER: All right. We're at tab A.
22        MR. MULLANEY: Now you know why nobody --
23        no lawyers can keep track of everything at a
24        deposition.
25        MR. KOLBER: Put that down. Here's tab

Page 189

1        A.
2        THE WITNESS: Tab A, okay.
3 BY MR. MULLANEY:
4    Q   Turn to the -- it's page two.
5    A   All right.
6    Q   And check number one thousand six.
7    A   Check.
8    Q   Do you know who that check was written to?
9    A   Are we looking at the same thing?
10        MR. KOLBER: Yeah.
11        THE WITNESS: This is -- this is a date,
12        not a check number. Oh, oh, up here. I'm
13        sorry. Five thousand dollars. I do not know,
14        but isn't it --
15        MR. KOLBER: Okay. You don't know. You
16        answered.
17        THE WITNESS: I don't know.
18 BY MR. MULLANEY:
19    Q   All right. I'm going to -- let's make this
20 Plaintiff's Eleven.
21    A   So this is now going to be --
22    Q   Close that up.
23    A   And you're going to put that together. All
24 right.
25        (Whereupon, Plaintiff's Exhibit Number

48 (Pages 186 to 189)

**Page 190**

```
1        Eleven was marked for identification
2    purposes.)
3        THE WITNESS:  Yes.  Well, you've already
4    answered a question.
5        MR. MULLANEY:  No, I have not.
6 BY MR. MULLANEY:
7    Q   Have you ever seen Plaintiff's Eleven before,
8 with the handwriting and the checkmarks on it?
9    A   Yes.
10    Q   And do the checkmarks indicate checks?  What
11 do the checkmarks indicate?
12    A   Checks written to the individuals -- the
13 individual whose name is across the top, answering the
14 question that it was queried by the Dover counsel.
15    Q   To make it a little cleaner, do the checkmarks
16 -- are they next to checks that were written by
17 yourself to yourself, sending money from Mansell
18 Capital Partners to you?
19    A   Yes.
20    Q   Okay.  All of them?
21    A   All of --
22    Q   All the checked ones?
23    A   All the ones in this group?
24    Q   Yes.
25    A   Yes.
```

**Page 191**

```
1    Q   All the checked ones in that --
2    A   Yes.
3    Q   -- Plaintiff's Eleven?
4    A   Right.
5    Q   If we can do them all at once, that would be
6 fine.  If we can't, we can't.  Why did you write those
7 checks to yourself?
8    A   These were the checks that were told to both
9 Mr. Reichardt and Mr. Banzhaf to write for their
10 clerical services to Mansell and he would tell us at
11 the beginning of each month what he would like to have
12 us write.
13    Q   Who is he?
14    A   Thomas Begley, I'm sorry.  I thought I said
15 that.
16    Q   So Mr. Begley instructed you to write each one
17 of those checks to yourself?
18    A   That is correct.
19    Q   For your clerical services?
20    A   Correct.
21    Q   Your personal clerical services to Mansell and
22 to him?
23    A   All the activities involving the inbound and
24 outbound transfer of funds to and from the Kerr Trust
25 to the investors.
```

**Page 192**

```
1    Q   Meaning writing checks to other people at Mr.
2 Begley's behalf, correct?
3    A   Checks and wire transfers.
4    Q   Meaning sending wires and writing checks for
5 Mr. Begley?
6    A   That's correct.
7    Q   So Mansell was effectively Mr. Begley's
8 personal bank account?
9    A   Mr. Begley's --
10        MR. KOLBER:  Wait, don't answer that.
11        THE WITNESS:  Okay.
12        MR. KOLBER:  That's a characterization
13    and conclusion.
14        MR. MULLANEY:  You're going to object on
15    those grounds?
16        MR. KOLBER:  Yes.
17 BY MR. MULLANEY:
18    Q   Okay.  Would you term Mansell bank account as
19 Mr. Lovett's personal bank account?
20        MR. KOLBER:  I object to that too.
21        THE WITNESS:  Same answer.
22        MR. MULLANEY:  You're instructing him not
23    to answer?
24        MR. KOLBER:  Yes.  I mean, we've
25    established --
```

**Page 193**

```
1        MR. MULLANEY:  I know what we've
2    established.
3        MR. KOLBER:  If you want to ask were
4    certain checks given to a certain person,
5    which you've done, the answer is yes.  You
6    don't have to characterize it in such a way.
7 BY MR. MULLANEY:
8    Q   I understand.  Did anyone, other than Mr.
9 Lovett or Mr. Begley, have any discretion over the
10 Mansell bank account?
11    A   None other than those two.
12    Q   Do you know how much you were paid in 2003 for
13 your ministerial functions?
14    A   If I were to -- Well, 2003, I don't know.
15    Q   Do you know how much you were paid in 2004 for
16 your ministerial --
17    A   Well, I can add them all up by year, which
18 I've never done.
19    Q   Don't bother.  I'll do that.
20    A   I just know how much -- approximately how much
21 it was for the entire sixteen-month period.
22    Q   Okay.  And how much was that?
23    A   Approximately eighty thousand dollars.
24    Q   How many hours a day did you spend --
25        MR. KOLBER:  Wait, wait, wait, hold on.
```

49 (Pages 190 to 193)

John H. Banzhaf

Page 194

1    Eighty thousand to you or you and Mr.
2 Reichardt?
3       THE WITNESS:  To me personally.
4       MR. KOLBER:  Personally.
5 BY MR. MULLANEY:
6    Q  How many hours a day did you spend on Mansell
7 business?
8    A  If I worked ten hours a day, which I do, at
9 least five.
10    Q  Five hours a day on Mansell business?
11    A  Four or five.
12    Q  Okay.  Other than -- what page -- let's take
13 10/3/03, for an example.
14    A  Are we looking at page three of this is what
15 you're after?
16    Q  Whatever page of the Bank of America account
17 statements reflects the activity of October 3rd, 2003?
18    A  Oh, October?
19    Q  Yeah, 10/3/03.
20    A  Three million dollars, is that?
21    Q  Just the day.  I'm looking at the date.
22    A  The day.
23    Q  10/3, three million came in, three million
24 came in, three forty-five wire transfer fee, forty-
25 five --

Page 195

1    A  That's right.
2    Q  Okay.  So in the five hours a day you may have
3 spent on October 3rd, how much of that time was
4 consumed by noting that six million five hundred
5 dollars had appeared --
6    A  It's entirely possible that most of that day
7 was spent that day.
8    Q  Okay.  And what do you have to do, when the
9 money comes in to the account?
10    A  The money comes in --
11    Q  Let me take that back.  What did you do, if
12 you remember, when the money came into the account?
13    A  I would get an indication from the Bank of
14 America that "X" dollars had come in.  I would then
15 look up where it came from and to -- how much it was,
16 and then if there was to be a dissemination of
17 interest, which there would be, I then had to figure
18 out who got how much that month.
19    Q  Well, you didn't figure that out, did you?
20 Didn't Mr. Begley tell you who got?
21    A  He told us how much that they should get each
22 month.
23    Q  Right.  You didn't have anything to --
24    A  Well, the word figure out is a
25 mischaracterization.  You're right.

Page 196

1    Q  Well, give me a --
2    A  I had to -- I had to write the --
3 differentiate between the investors and write the wire
4 transfers and then take them to the bank and make --
5 ensure that those transfers took place by following up
6 thereafter.
7    Q  Well, when you say -- you used the word
8 differentiate in your testimony.  What --
9 differentiate between who?  I mean didn't --
10    A  How --
11    Q  Didn't Mr. Begley just tell you who to send
12 checks to?
13    A  Yes, but not each month.
14    Q  Some months you decided who to send checks?
15    A  No.
16       MR. KOLBER:  You're putting words in his
17    mouth.
18       THE WITNESS:  That's not true.
19 BY MR. MULLANEY:
20    Q  Okay.
21    A  What happened is that if we got "X" dollars in
22 from Mr. Kerr in firm of interest, the amount -- the
23 percentage of interest that each investor was to
24 receive that month was predetermined.  Mr. Begley
25 predetermined that.  I then did the calculation of

Page 197

1 what had come in and sent out a check to Singapore to
2 the -- essentially, to the four or five investors.
3    Q  Okay.
4    A  One, two, three, four.
5    Q  Was that written down anywhere, that
6 percentage breakdown?
7    A  Not to me.  I was just told it.
8    Q  You were told it once?
9    A  I was told it the first time by Mr. Begley.
10    Q  Okay.  What was the percentage?
11    A  It was in the neighborhood of three-and-a-half
12 to four percent.
13    Q  For whom?
14    A  For each one of them.
15    Q  Well, when you say in the neighborhood, how
16 did you write a check based on that?
17    A  Because I can't remember right now what that
18 percentage was.  I know that I knew what the
19 percentage to Ms. Yap was, for example, on a monthly
20 basis.  I can probably even remember it now.
21    Q  Go ahead.
22    A  A hundred and nine thousand dollars and
23 change.
24    Q  Well, that's not percentage.  That's a flat
25 fee.  That's a fixed amount.

50 (Pages 194 to 197)

Page 198

1    A   But it's a percentage of what her investment
2 was.
3    Q   Okay. Well, did Mr. Begley tell you to give
4 her -- to send Dover a percentage of what came in or
5 did he tell you to send her a hundred and nine
6 thousand dollars a month?
7    A   The first time he told me to send a hundred
8 and nine thousand dollars a month.
9    Q   Okay.
10   A   Thereafter, I simply duplicated it.
11   Q   Okay. And there were four investors?
12   A   Yes.
13   Q   So it would take twenty hours a week, four
14 weeks a month to send four checks. Is that your
15 testimony?
16   A   I said -- you didn't ask me how much time it
17 takes to send the checks. You asked me how much time
18 I spent on Mansell Capital Partners.
19   Q   That's right.
20   A   That was my recollection, yes.
21   Q   Okay. Well, other than distributing fixed
22 amounts of money to four people every month by wire or
23 by check, what did you do for Mansell?
24   A   I kept the checkbook. I did the bank -- did
25 the bank records and that sort of thing.

Page 199

1    Q   Right. And keeping the checkbook involved
2 keeping track of four payees a month, right?
3    A   Plus all the other checks that I had to write.
4    Q   Which you wrote at Mr. Begley's direction?
5    A   Correct, and Mr. Lovett's direction.
6    Q   And what else was involved?
7    A   That's about it.
8    Q   Okay. Do you think you wrote thirty checks a
9 month for Mr. Begley or Mr. Lovett?
10   A   I can't recall how many it was. I didn't keep
11 track.
12   Q   Well --
13   A   Our records here would show that.
14   Q   That's right. You would give each check to
15 Mr. Begley or Mr. Lovett to mail but one?
16   A   It depends on who the check was for and to
17 what some of them -- Taking Mr. Lovett, for example.
18 If he wanted the money wire transferred to his bank
19 account in Las Vegas, I would do that.
20   Q   Uh-huh.
21   A   And those are on the list.
22   Q   Yeah. Let's talk about the checks.
23   A   And the checks I would write to -- for
24 example, his request, to his landlord. That's the
25 thirty-four thousand. I did that at least twice.

Page 200

1    Q   Let me cut you off, if I may, because my
2 question was a little different.
3        It was physically someone else who mailed
4 those checks except for one check to Dewey Robbins,
5 correct?
6    A   I mailed -- if the -- the check went to the
7 landlord, I mailed it.
8    Q   Okay. And the landlord was K&K Holdings?
9    A   Yes, sir.
10   Q   So other than K&K Holdings and Dewey Robbins,
11 someone else would mail any check that was written?
12   A   That is correct.
13   Q   Okay. And would you physically go to a bank
14 branch to cause a wire transfer?
15   A   Yes, sir.
16   Q   And you would balance the Mansell checkbook?
17   A   Yes, sir.
18   Q   And that took eighty hours a month?
19   A   It's what I was doing for Mansell.
20   Q   That's not what I asked. I asked if it still
21 --
22   A   I can't tell you if it took eighty hours a
23 month. That's my estimate. You asked the question
24 how much time did I spend for Mansell, and I was
25 giving you an estimate.

Page 201

1    Q   Yes. My questions indicate I think the
2 estimate's a little -- Was there anything else you did
3 for Mansell?
4    A   I don't remember that I did.
5    Q   Do you have a securities license?
6    A   Yes, sir.
7    Q   Series 7?
8    A   No, sir.
9    Q   What series?
10   A   Series 62, 63 and 24.
11   Q   Do you have a law degree?
12   A   No, sir.
13       MR. MULLANEY: Do you have any questions,
14   Dan?
15       MR. KOLBER: Let us have a couple
16   minutes.
17       MR. MULLANEY: Okay.
18       MR. KOLBER: And I have just a couple of
19   questions, but I want to see.
20       THE WITNESS: Do you want me to join you?
21       MR. KOLBER: Yeah.
22       (Off the record.)
23       EXAMINATION
24 BY MR. KOLBER:
25   Q   Mr. Banzhaf, early in your deposition this

51 (Pages 198 to 201)

**ESQUIRE DEPOSITION SERVICES, LLC**
**1-800-944-9454**

**Exhibit H**



# Mission Statement

HARTSFIELD CAPITAL strongly believes that the Firm should maintain a long-term relationship with its clients, similar in nature to that of an accounting or law firm.

In order to accomplish this objective, we have chosen to remain a small firm, of substantial scope and depth, dependent upon fewer clients who require a consistent level of high quality results. To meet these criteria, we, in turn, employ only senior level consultants to personally deliver our services. Since we do not require a large staff of junior consultants, we are not distracted by the requirements to manage or support them. This form of organization allows us to be highly client and market focused as opposed to *fee driven*.

From our very beginning, we have viewed our role as being either an extension to the CEO, to accomplish a specific task or as a client team member, applying strategic or tactical concepts to solve business or organizational issues. As part of our commitment to a client with whom we have an ongoing relationship, we will not consult on similar issues with any of the client's direct competitors.

Our primary objective is to help our clients develop and maintain a decided competitive advantage. To do that, it is impossible to provide counsel to two or more competing clients with impartiality. HARTSFIELD CAPITAL believes in maintaining the confidentiality of client's identities and the exact nature of the work undertaken.

HARTSFIELD CAPITAL





# Table of Contents

I.      ACQUISITION & DIVESTITURE SERVICE

II.     TRANSACTION HISTORY

III.    FINANCIAL ADVISORY SERVICES

IV.     MANAGEMENT & SENIOR STAFF

HARTSFIELD CAPITAL



# Acquisition & Divestiture Services

HARTSFIELD CAPITAL GROUP is dedicated to providing fully integrated advisory services to buyers, sellers and managers of medium-sized companies. HARTSFIELD CAPITAL has recognized that medium-sized companies receive little support or attention from the traditional investment banking firms on Wall Street or the major consulting companies. At HARTSFIELD CAPITAL we have completed over 200 corporate development transactions ranging in size from $3 million to $1.6 billion and our target market is between $25 million and $300 million. Additionally, Hartsfield has completed over $10 billion dollars in project finance funding. Our reputation has been built upon representing our clients from initial contact through the closing of a transaction and post transaction integration. We understand that the selling or buying of a business can be a complex transaction as well as an emotionally involved experience for owners and employees alike.

With offices in Atlanta, Knoxville, Reno and San Diego, HARTSFIELD CAPITAL offers expertise in six basic areas:

➢ Mergers, Acquisitions, Divestitures, Joint Ventures, IPO's
- Sale of a Company
- Purchase of a Business
- Corporate Divestiture
- Strategic Alliance of Companies

➢ Valuations, Fairness Opinions, Litigation Support
- Preparing Financial Valuation Studies
- Valuing Intangible Assets
- Rendering Fairness Opinions
- Providing Expert Witness Testimony

➢ Private Placements
- Debt
- Equity
- Project Finance

➢ Legal Consulting
- Document Drafting
- Taxation Analysis
- Deal Structure

HARTSFIELD CAPITAL

➢     Financial and Strategic Consulting
- Financial Engineering and Analysis
- Capital Structure
- Make/Buy/Build Analysis

➢     Executive Search Consulting

Complex transactions and even those that appear quite simple, require a broad spectrum of skills and disciplines, from strategic planning, market assessment, technology evaluation and people judgment, to financial analysis, deal structuring and negotiations, to financial and legal engineering.   Too often these different perspectives are not properly coordinated and balanced during the transaction process.   Success in acquisitions and divestitures today demands the effective integration of these skills.

## THE TRANSACTION PROCESS

I.     Planning

- Strategy Formulation
- Transaction Criteria
- Search Universe

II.     Analysis

- Candidate Screening
- Evaluation Analysis
- Target Selection

III.     Implementation

- Approach Strategy
- Negotiations and Closing

IV.     Post Transaction

- Integration

HARTSFIELD CAPITAL



# Acquisition Services

### Overview

HARTSFIELD CAPITAL works for clients on a confidentially retained basis to acquire businesses, products and technologies to meet specific strategic requirements in response to emerging opportunities.

We identify and develop prospective buyers and sellers, functioning as confidential intermediaries, to select and qualify unique and often unknown opportunities synergistic to the client's required objectives.

HARTSFIELD CAPITAL  has the credentials and contacts with executive decision makers of private and publicly held companies; the investment banking community; LBO specialists; and partnerships who own, control, or have financial interest in many diverse market segments.

### Client Review

Prior to starting our business development process, we establish the following profile:

➢ The client's near term strategy, real core capabilities and demonstrated competencies.
➢ Areas for growth, expansion or divestiture.
➢ Alternatives to an acquisition or divestiture (if appropriate) including technological transfers, licenses, product-line/asset purchases to turnkeying a start-up venture.
➢ Budgets.
➢ Time requirements.

### Establish Objectives

We will develop an agreed-to time phase acquisition strategy based on criteria which includes:

➢ Targeting product/market segments and value-added positions, which are particularly attractive (or threatening) to specific business areas.
➢ Competitive urgency.
➢ Affordability/materiality.
➢ Strategic and tactical objectives.

HARTSFIELD CAPITAL

> Potential impact on shareholder value.

Additionally, HARTSFIELD CAPITAL conducts comprehensive and penetrating industry characterizations and analyses for clients primarily interested in entering new businesses or obtaining independent verification of existing businesses that include:

> Industry size, scope, trends and direction.
> Primary, secondary and tertiary companies.
> Customer profiles.
> Threats (technology obsolescence, substitute products).

This type of review can be performed for one or any number of industries, market segments, products, etc., as required to address key strategic issues, confirms or redirects current planning or establish viable action plans.

**Kick-Off Meeting and Follow-Through**

We typically budget a series of two to three work sessions in the first month to cover all items outlined in the Client Review and Establish Objectives sections.

The decisions reached are then defined in detailed statements of work and acted upon. Activities are generally reported weekly by phone and written summary reports submitted the last working day of each month.

**Executing Transactions**

*Orientation*

> Prepare the Descriptive Memorandum that includes positioning the client in the best possible light by recasting financials, preparing strategic and tactical plans, developing appropriate market, product and competitor information, etc.
> Prepare all collateral materials, such as, letters of introduction, confidentiality agreements, etc.
> Aggressively market to all appropriate organizations, develop sincere expressions of interest, define and rank the merit of each initial offer.
> Assist or lead (depending on client preference) in negotiating and creatively structuring the transaction(s), especially as needed to close valuation gaps between the buyer and seller.

HARTSFIELD CAPITAL

### *Implementation*

For those areas ready for aggressive implementation we will identify, screen and profile target companies. Steps include:

➢ Develop a highly tailored communications strategy to best position the buyer in the mind of the target. This is followed by a letter of introduction and Buyer's Credential Profile (anonymous or open, depending upon the circumstances), which establishes a positive image in the seller's mind regarding the management strengths of the buyer and his ability to successfully conclude the transaction.

➢ Assist or lead in negotiating and creatively structuring the transaction(s), particularly as needed to close valuation gaps in the judgment of the seller.

### *Valuation*

If requested, we will provide fairness opinion and a valuation of the target company. Such valuation judgment is normally based upon, in part, a study of the company's financial and operating record; a comparison of its performance with other companies in its industry; relative market performance of the company's publicly traded securities (or appropriate proxies); ownership characteristics; analysis of the fair market value of certain important assets and backlog; and a study of the capitalization of the company. In addition, we temper and refine the valuation analysis based upon what we believe the target's worth to be to other competitors, as well as, via discussions with the client's operating and financial management.

### Project Management

Following the execution of this agreement, we will assist in organizing and coordinating the client's multi-disciplinary task team and the activities of any other experts/advisors that normally participate in the acquisition, due diligence and integration process. We are available to assist in the numerous technical details required to close a transaction. Subsequent steps may include: drafting the letter of intent; an asset purchase or merger agreement; helping to design employment and bonus agreements; or coordination of collateral approval materials. These tasks are often the most time-consuming parts of the transaction, requiring the anticipation and solution of inevitable issues that often derail an attractive project. We also provide the judgment and experience to constructively coordinate attorneys, accountants and other in-house or outside experts.

**Responsibilities**

In accordance with its established professional procedures, HARTSFIELD CAPITAL maintains strict confidentiality concerning the client's corporate development strategy and the target company being considered. We recognize that we have a fiduciary duty to the client and its affiliates and shall at all times perform our duties in accordance with the highest levels of skill and diligence common to those performing similar services. HARTSFIELD CAPITAL does not approach target companies on a client's behalf unless specifically authorized to do so by the client.

HARTSFIELD CAPITAL



# Divestiture Services

**HARTSFIELD CAPITAL's Steps For Selling A Business**

HARTSFIELD CAPITAL guides a potential seller from the initial decision to consider the sale of a business to the closing of the transaction. The five basic steps involved are:

I.      Establishing Client Goals

II.     Valuing the Business

III.    Preparing the Selling Memorandum

IV.     Screening for Potential Buyers

V.      Structuring, Negotiating and Closing

**Establishing Client Goals**

Deciding whether or not to sell a business can be one of the most difficult decisions a client will ever have to make. Objectivity is often clouded by emotions and personal desires as well as outside market factors. Engaging an independent professional such as HARTSFIELD CAPITAL can help a client to formalize their goals and assess the available alternatives.

Through meetings with members of the HARTSFIELD CAPITAL team, and other advisors you think appropriate, a clear understanding of the desires and needs of the shareholders and management will emerge. This understanding, coupled with a realistic assessment of the business, its requirements and prospects, will help determine the best course of action. If alternatives other than sale or merger appear to be more feasible, these, too, can be discussed and pursued.

These preliminary, very confidential discussions are the beginning of a close working relationship between the client and HARTSFIELD CAPITAL, an essential ingredient in a transaction of this magnitude and significance.

HARTSFIELD CAPITAL

## Valuing The Business

One of the major steps in selling a business is the determination of its real value. Proper valuation requires an extensive investigation of the business and an assessment of its future within the context of its industry, geography and the general economic climate.

The members of HARTSFIELD CAPITAL are well qualified for this task. Their backgrounds and disciplines include investment banking, security analysis, law, commercial banking and accounting.

HARTSFIELD CAPITAL professionals have years of expertise not only as independent appraisers of businesses, but also in the buying and selling of businesses both as principal and agent. HARTSFIELD CAPITAL's personnel have also provided expert witness testimony regarding valuation before various courts and at the Agent and Appeals Division levels of the Internal Revenue Service.

## Preparing The Selling Memorandum

Frequently, a potential buyer's initial introduction to the client's business is from written material. An essential part of the selling process, therefore, is the proper preparation of the Summary Fact Sheet and the Confidential Descriptive Memorandum.

HARTSFIELD CAPITAL works with the client and their advisors to prepare these documents to provide the prospective purchaser with information on the business. HARTSFIELD CAPITAL employs a Summary Fact Sheet concept to provide preliminary information about the business without necessarily revealing the client's name or any proprietary information. Once a confidentiality and nondisclosure agreement have been signed by an interested party, HARTSFIELD CAPITAL then releases a Confidential Descriptive Memorandum that includes a more detailed review of the business history, products and services, management, industry, financial status and future outlook.

HARTSFIELD CAPITAL understands that selling memoranda are confidential documents. Therefore, they are only given to screened, capable, and serious prospective buyers that have signed confidentiality agreements prior to their receipt.

Not only are properly prepared selling memorandums important in generating viable buyers, but also they are an indication of the importance of the business being sold as well as the professionalism and sincerity behind the project.

HARTSFIELD CAPITAL

## Screening For Potential Buyers

While an owner or management is well aware of its business' direct competitors, these firms are not usually the most suitable buyers. The identification and screening of potential synergistic, management and financial buyers require a wide range of resources.

HARTSFIELD CAPITAL is in regular contact with the members of the investment banking community, as well as, a wide variety of individual investors, venture capitalists, management groups, foreign and domestic, private and public companies.

HARTSFIELD CAPITAL maintains an active database of all publicly traded and privately held companies. This resource is further leveraged by HARTSFIELD CAPITAL's eighteen years of personal contacts in the merger, acquisition, divestiture and consulting industries.

HARTSFIELD CAPITAL's established relationships with prospective buyers assure the client's introduction to these entities at the appropriate level of decision-making. This helps insure both a rapid response and the protection of the client's confidentiality.

## Structuring, Negotiating and Closing

Structuring and negotiating are often the most complex and sensitive phases of the selling process. The buyer and seller frequently have diverse financial objectives, in addition to strong emotional involvement, HARTSFIELD CAPITAL professionals have the experience and diligence required to keep the negotiations progressing no matter how complex or heated they become.

Acting as an intermediary during often-sensitive negotiations, HARTSFIELD CAPITAL can devise a structure to maximize stakeholder benefits within the tax, accounting and legal constraints of both the buyer and the seller.

Once a verbal agreement has been reached, HARTSFIELD CAPITAL translates this into a written letter of intent. HARTSFIELD CAPITAL then continues to work with the lawyers and accountants to assure that the written definitive agreements and purchase contracts accurately reflect the terms of the verbal agreements and the written letter of intent, including such areas as, payment terms, management contracts, non-compete provisions and warranties. In addition, HARTSFIELD CAPITAL assumes the overall responsibility for seeing that all details of the closing, including the buyers due diligence, proceed on a timely basis as per a planned calendar of deadlines.

HARTSFIELD CAPITAL



# Acquisition & Divestiture Experience

## Major Domestic Transactions

| Company | Industry Segment | Type of Transaction | Activity |
|---|---|---|---|
| Atlanta Business Circulators, Inc. | Bulk Mailing Services | Disposition | Lead |
| Adamatic | Food Service Equipment | Disposition | Lead |
| Allen Bradley | Industrial Automation | Acquisition | Support |
| Alpha Products | Plastics | Disposition | Lead |
| AMP, Inc. | Connectors | Acquisition | Support |
| Arizona Valley National Bank | Banking | Disposition | Support |
| Aromatic Flavors& Fragrances | Industrial Organic Chemicals | Disposition | Lead |
| Augsbury | Real Estate | Liquidation | Lead |
| Benchmark | Financial Services | Disposition | Lead |
| Birmingham Packaging | Corrugated Boxing | Disposition | Lead |
| Bondware | Packaging | Disposition | Support |
| Bulldog Movers | Commercial & Residential Movers | Disposition | Lead |
| Cal Valley | Banking | Disposition | Support |
| Caldwell Spartin | Software | Disposition | Lead |
| California World Finance | Financial Services | Acquisition | Lead |
| Cappai Medical | Medical Supply | Disposition | Lead |
| Compushop | Computer Retail | Disposition | Lead |
| Danac | Property Development | Disposition | Lead |
| Dataforce | Software | Disposition | Lead |
| Dekalb Tire | Retail Auto Tires & Repair Centers | Disposition | Lead |
| Distribution Partners Limited | Lighting Products Distribution | Disposition | Lead |
| Doors & Building Components, Inc | Nonresidential Construction | Disposition | Lead |
| Draper | Industrial Looms | Disposition | Support |
| Dyneer Corporation | Mini-Conglomerate | Disposition | Support |
| Elliott | Power Equipment | Joint Venture | Support |
| Encompass Power Services | Engineering Services | Acquisition | Lead |
| Engineering Design Group | Engineering Services | Acquisition | Lead |
| FIS | Software | Disposition | Lead |
| Florida Gas | Oil Exploration and Transmissions | Acquisition | Support |
| Georgia Pacific Pump | Industrial Pumps | Disposition | Support |
| Global Technology | IT Consulting | Disposition | Support |
| Greyhound | Leasing | Acquisition | Support |
| Hall | Mail Room Systems | Acquisition | Lead |
| Hanscho | Graphic Arts | Acquisition | Lead |
| Hickory Springs Manufacturing Co. | Floor Carpet Underlayment | Disposition | Lead |
| Highland Corporation | Building Materials | Disposition | Lead |
| Hobart Brothers Company | Industrial Products | Disposition | Support |
| Hoover | Packaging | Acquisition | Lead |

HARTSFIELD CAPITAL

| Company | Industry Segment | Type of Transaction | Activity |
|---|---|---|---|
| Hoover Ball | Industrial | Disposition | Support |
| Hutchinson Automotive | Retail Automotive | Disposition | Lead |
| Illinois Tool Works | Bakery Equipment | Disposition | Lead |
| Image Networks | Promotional Products | Disposition | Lead |
| Industrial Transmission | Industrial Distributor | Disposition | Lead |
| Investors Mortgage | Financial Services | Acquisition | Lead |
| Irving Bank | Banking | Defense | Lead |
| Knowledge Systems | Software | License/Start-up | Lead |
| La Strada | Food Service | Disposition | Lead |
| Lighting Products | Lighting Distribution | Disposition | Lead |
| M. G. Thalhimer | Property Management | Disposition | Lead |
| Mark Escude Automotive | Retail Automotive | Disposition | Lead |
| Nanston Dental Group | Dental Group | Disposition | Lead |
| National Refrigeration Services | Commercial Refrigeration | Disposition | Lead |
| Nolan | Graphic Arts | Acquisition | Lead |
| Old Equity | Life Insurance | Disposition | Lead |
| Orbitron | Plastics | Acquisition | Lead |
| Packaging Distribution Systems | Contract Packaging | Disposition | Lead |
| Peerless Coatings | Industrial Coatings | Disposition | Lead |
| Presco Steel | Metal Fabrication | Disposition | Lead |
| Presco Steel Erectors | Commercial Construction | Disposition | Lead |
| Qwiz | Educational Software | Disposition | Lead |
| Richmond Company | Financial Services | Acquisition | Support |
| Rockwell Forgings | Metal Casting | Disposition | Support |
| Rockwell Power Tool Division | Consumer Products | Disposition | Lead |
| Rockwell Suspension Division | Heavy Vehicle | Disposition | Support |
| Saberliner | Executive Jets | Disposition | Support |
| Scripps Howard | Graphic Arts | Joint Venture | Lead |
| SMARTGroup | Advertising Media | Disposition | Lead |
| Sorbus | Computer Maintenance | Acquisition | Support |
| Southeastern Appliance Company | Wholesale Distribution | Disposition | Lead |
| Southwire Company Wood Products Div. | Wood Pallets | Disposition | Lead |
| Stanley Knight | Food Service Equipment | Disposition | Lead |
| Stone Mountain Group | Employee Leasing | Disposition | Lead |
| Sun Manufacturing | HVAC Systems | Disposition | Lead |
| TAFA Corporation | Capital Equipment | Disposition | Lead |
| Tanner's Chicken Rotisserie | Food Service | Disposition | Lead |
| Technology Concepts | Software | Acquisition | Lead |
| Tee Pack | Packaging | Disposition | Lead |
| Tidewater | Business Forms | Acquisition | Lead |
| Universal Data Consultants | Computer Hardware/Software Integrator | Disposition | Lead |
| Utah Valley National Bank | Banking | Disposition | Support |
| Walton Press | Commercial Printing | Disposition | Support |
| Western Wheel | Consumer Products | Disposition | Support |
| Wollard Equipment Company | Capital Equipment | Disposition | Lead |
| Zycom | Software | Joint Venture | Support |

HARTSFIELD CAPITAL

## Refrigeration Transactions (Domestic)

| Company | Type of Transaction | Activity |
|---------|---------------------|----------|
| Carter Service Company | Acquisition | Lead |
| Commercial Refrigeration | Acquisition | Lead |
| Crystal Refrigeration | Acquisition | Lead |
| Mabry & Haynes Construction | Acquisition | Lead |
| Nelson Refrigeration | Acquisition | Lead |
| Northwest Arkansas Refrigeration | Acquisition | Lead |
| Orlando Refrigeration | Acquisition | Lead |
| Orlando Fixturing and Construction | Acquisition | Lead |
| Refrigeration Engineering | Acquisition | Lead |
| Refrigeration Service & Design | Acquisition | Lead |
| Rogers Refrigeration | Acquisition | Lead |
| Sunbelt Equipment Sales | Acquisition | Lead |
| Tafco Refrigeration | Acquisition | Lead |

## Automotive Transactions (Domestic)

| Company | Type of Transaction | Activity |
|---|---|---|
| Buddy Hutchinson Toyota, Inc. | Disposition | Lead |
| Buddy Hutchinson Imports, Inc. | Disposition | Lead |
| Buddy Hutchinson Chevrolet, Inc. | Disposition | Lead |
| Mark Escude Toyota, Inc. | Disposition | Lead |
| Mark Escude Nissan, Inc. | Disposition | Lead |
| Mark Escude Motors, Inc. | Disposition | Lead |
| Mark Escude Mitsubishi | Disposition | Lead |
| Mark Escude Nissan North, Inc. | Disposition | Lead |
| Mark Escude Daewoo | Disposition | Lead |
| Regency Toyota, Inc. | Disposition | Lead |

## Consolidation/Roll-Ups (Domestic)

| Company | Industry Segment |
|---|---|
| IMS | Insurance Brokerage |
| Lawyers Title | Title Insurance |
| Nanston Dental Group | Dental |
| National Refrigeration Services | Refrigeration |
| Sunbelt Automotive | Automotive |
| Asbury Automotive Group | Automotive |

HARTSFIELD CAPITAL

## International Transactions (Other than Far East)

| Company | Industry Segment | Type of Transaction | Country |
|---------|------------------|---------------------|---------|
| BSI | Banking | Disposition | Switzerland |
| Braseixos | Packaging | Acquisition | Brazil |
| Canzone | Packaging | Acquisition | Nicaragua |
| Creusot-Loire | Graphic Arts | Acquisition | France |
| CSI | Avionics | Acquisition | Saudi Arabia |
| El Colombiano | Graphic Arts | License Agreement | Columbia |
| Envassess | Packaging | Joint Venture | Mexico |
| Fokker | Air Transport | License Agreement | Holland |
| Fornasa | Packaging | Acquisition | El Salvador |
| GMB | Graphic Arts | Acquisition | France |
| Hills/McKenna | Industrial Valves | Acquisition | Scotland |
| Itelcardano | Heavy Vehicle | Acquisition | Italy |
| Iveco/Fiat | Heavy Vehicle | Joint Venture | Italy |
| Lagoven | Shipping | Acquisition | Venezuela |
| M.A.N. | Graphic Arts | Joint Venture | W. Germany |
| M.A.N. | Heavy Vehicles | Joint Venture | W. Germany |
| Marconi Espanola | Telecommunications | License Agreement | Spain |
| Matarazzo | Packaging | Joint Venture | Brazil |
| Ogbogu | Shipping | Acquisition | Nigeria |
| Rimoldi | Sewing Machines | License Agreement | Spain |
| Rockwell/Collins | Marine Systems | Acquisition | Belgium |
| RPI | Automotive | Disposition | Canada |
| Schmalbach-Lubeca | Packaging | Acquisition | Germany |
| Scitex | Graphic Arts | License Agreement | Israel |
| Serck | Industrial Valves | Acquisition | England |
| Shellmar | Packaging | Joint Venture | Columbia |
| Shellmar | Packaging | Joint Venture | Brazil |
| Skapaneps | Shipping | Acquisition | Liberia |
| SLA | Packaging | Joint Venture | Austria |
| Societe Gererale | Financial Services | Joint Venture | France |
| Suheil | Automotive | Disposition | Iran |
| TPH | Graphic Arts | License Agreement | India |
| TPH | Graphic Arts | Joint Venture | India |
| Transcity | Banking | Acquisition | Australia |
| Tsakos | Shipping | Acquisition | Greece |

HARTSFIELD CAPITAL

## Far East Transactions

| Company | Industry Segment | Type of Transaction | Country |
|---|---|---|---|
| Daewoo Group | Graphic Arts | Sourcing Agreement | Korea |
| Honda Motor | Light Vehicle | License Agreement | Japan |
| Ikegai | Heavy Machining | Joint Venture | Japan |
| ISI | Financial Services | Disposition | Hong Kong |
| Komatsu | On Highway Vehicle | License Agreement | Japan |
| Komori Machine | Light Machining | License Agreement | Japan |
| MGD | Graphic Arts | License Agreement | Kuala Lumpur |
| Mitsubishi Heavy Industry | On Highway Vehicle | License Agreement | Japan |
| Remnim Factory | Graphic Arts | Joint Venture | China |
| Repco | Automotive | Acquisition | Singapore |
| Sampo | Electrical | Sourcing Agreement | Taiwan |
| Toyo Seikan | Packaging | Joint Venture | Japan |



## Financial Advisory Services

**Closely-Held Company Valuations**

- Sale Price Analysis
- Employee Stock Ownership Plans
- Minority Interest Purchase
- Buy-Sell Agreements
- Warrants and Options
- Convertible Securities

**Fairness Opinions**

- Acquisitions, Mergers and Divestitures
- "Going Private" Transactions
- Premiums for Control Positions
- Leverage Buyouts
- Stock Repurchases

**Tax Related Valuations**

- Estate, Gift and Income Tax
- Sale/Purchase Price Allocation
- Recapitalizations and Reorganizations
- Intangible Asset Valuation

**Litigation Support**

- Expert Witness Testimony
- Valuation Opinions
- Business Damages
- Bankruptcy Proceedings

**Financial Advisory Services**

- Merger/Acquisition Analysis
- Structuring Stock Repurchases
- Dividend Policy Analysis
- Build or Buy Analysis
- Project Finance Services

HARTSFIELD CAPITAL

**Compensation For Financial Advisory Services**

HARTSFIELD CAPITAL's compensation for valuation services is structured on a fixed fee basis. All fee arrangements are specifically designed to reflect the client's needs and are formally agreed to by all parties at the onset of an engagement.

In addition, engagement fees in the form of monthly retainers for financial advisory assignments, valuations or fairness opinions may be required.

HARTSFIELD CAPITAL invites potential clients to discuss their particular needs without incurring a fee for an initial meeting.



# Raising Capital

HARTSFIELD CAPITAL is dedicated to providing a broad range of financial advisory services to middle market companies. HARTSFIELD CAPITAL offers its services for raising capital in the private markets and advising on raising capital in the public markets. When retained, as either an agent or an advisor, HARTSFIELD CAPITAL:

- Determines an appropriate financing structure;
- Prepares a financing memorandum;
- Recommends an optimal timetable;
- Identifies prospective lenders;
- Markets the financing;
- Negotiates the terms and conditions;
- Coordinates the documentation; and
- Facilitates the closing.

Leverage buyouts and private placements of taxable and tax-exempt debt and equity securities are the areas in which HARTSFIELD CAPITAL is the most active. Other areas include corporate acquisitions, rights offerings and Employee Stock Ownership Plans. In recent years, HARTSFIELD CAPITAL has assisted its clients in transactions that have generally ranged in size from $5 million to $50 million. In each instance HARTSFIELD CAPITAL has arranged financing, which is competitively priced and properly structured to accommodate the client's requirements for future growth.

**Leverage Buyouts**

In a leveraged buyout, the acquirer, usually a management or investor group, uses the assets and cash flow of the acquired company to support and service the debt incurred in acquiring the company. An objective of the buyout group is to contribute the minimum amount of equity necessary to complete the transaction. HARTSFIELD CAPITAL aggressively seeks to meet this objective through expertise gained as agent for the financing of other highly leveraged transactions.

The key variables in a leveraged buyout are the value of the assets, the magnitude of the cash flow, on both a historical and projected basis, and the quality of the management. Weakness in any one of these areas does not necessarily preclude the possibility of financing a particular buyout. However, it does highlight the necessity of approaching potential lenders with a comprehensive financing memorandum, which emphasizes the client's strengths and includes plans for overcoming any perceived weaknesses. With input from the client HARTSFIELD CAPITAL tailors the financing memorandum to address questions that potential lenders ask in reviewing the transaction.

The potential lenders for a leveraged buyout include commercial banks, commercial financial companies, insurance companies, venture capital firms and leverage buyout funds. Some or all of them can provide financing in the form of senior debt (revolving credit and term loans), subordinated debt with and without warrants, and preferred and/or common stock. By maintaining contacts with a large number of potential lenders HARTSFIELD CAPITAL knows which ones will be comfortable with a particular industry or situation and therefore, offer the most attractive terms and conditions for financing the buyout.

HARTSFIELD CAPITAL



# Financial Consulting

**Project Finance**

Hartsfield also operates as a "Forfaiting Company" in the Global Trade & Project Finance Markets. Accordingly, the firm specializes in offering Forfaiting Services to corporate clients under Bank guarantee or aval in countries that meet the risk criteria.

Hartsfield uses its own funds and facilities arranged from International Banks and Financial Institutions. Hartsfield offers deferred payment terms by the discounting of trade documents under the guarantee or aval of internationally recognized Banks:

- Letters of Credit
- Letters of Guarantee
- Bills of Exchange
- Avaled Promissory Notes

Deferred Terms will depend on the individual transaction details and the Bank/Country Risk.

Structured Loans and Project Finance can be arranged and are dependant on particular transaction circumstances.

Major infrastructure or commercial projects can be funded by the arranging of Loans from major International Banks and Financial Institutions.

It is normal in these cases for the funding of the project to be supported by Treasury and/or Bank guarantees.

Funding and pricing of these transactions depends upon:

- Country Risk.
- Availability of Bank Guarantee.
- Bank Risk.
- Corporate Risk.
- Industrial Sector Risk.
- Use of Funds.
- Term of Funding.
- Currency used in the Funding.

Format and Documentation is dependent on specific terms and conditions of the particular Project.

HARTSFIELD CAPITAL

Securitized loans can be arranged where export revenues can be identified and are supported by contracts from international corporations. An example of this could be "blue chip" leases.

Corporate financial advisory services are intended to provide corporate clients with an organized approach to the solution of financially related problems and policies.

In this regard HARTSFIELD CAPITAL functions as "financial engineers", by preparing studies and developing solutions for a wide variety of corporate finance situations including:

- Preparing capital studies for board review and presentation to regulatory agencies;

- Advising on financial strategies to defend against hostile takeovers;

- Analyzing build or buy decisions for expanding a business;

- Reviewing and recommending cash and stock dividend policies;

- Structuring leverage buyouts for some or all shareholders;

- Valuing the break-up value of a company in preparation for a divestiture plan.

HARTSFIELD CAPITAL



# Valuation, Fairness Opinions & Litigation Support

HARTSFIELD CAPITAL has extensive experience in the preparation of independent valuations of business and corporate securities. Financial valuation studies are designed to meet the unique needs and characteristics of each valuation situation. No single formula, theory, or standard approach can be simply relied upon to meet the multitude of valuation issues that may arise. The valuation study is presented in a comprehensive report, which includes a description of the company, a financial analysis, an economic and industry overview, a description of the methodologies used and the conclusions reached.

HARTSFIELD CAPITAL has conducted numerous valuation studies for a broad range of purposes including:

- Sale Price Analysis
- Employee Stock Ownership Plans
- Merger, Acquisitions, and Divestitures
- Minority Interest Acquisitions
- Recapitalizations and Reorganizations
- Estate, Gift, and Income Tax Matters
- Matrimonial Joint Property Settlement Agreements
- Buy-Sell Agreements
- Stock Repurchases
- Valuing Warrants, Options, and Convertible Securities
- Bankruptcy Proceedings

In determining value, HARTSFIELD CAPITAL employs the three classic approaches to valuation -Ma rket Comparison, Income Capitalization, and Cost - to arrive at an independent and supportable conclusion of value. Factors considered, among others, include the nature and history of the business, economic and industry outlook, earnings history and forecast, dividend paying capacity, goodwill and intangible assets, prior stock sales and stock prices/profitability of comparative companies.

HARTSFIELD CAPITAL

## Valuing Intangible Assets

There are many different intangible assets, all of which require a specialized expertise in the valuation process. Intangible assets, which HARTSFIELD CAPITAL'S staff has experience in valuing, include: patents, trade names, trademarks, going concern value, goodwill, supply contracts, employment contracts, covenants not to compete, trade secrets, licensing and franchise agreements, customer lists, inventories, engineering drawings, assembled work force, computer software, and favorable financing.

Information and analysis developed in business enterprise valuations can contribute significantly to intangible asset valuations. For tax reporting purposes in a merger or acquisition, the intangible assets have to be "unbundled" from the business enterprise, separately identified and individually valued. A determination of the intangible asset's remaining economic useful life is also required.

While intangible assets are frequently valued as an integral part of the sale/purchase price allocations, the HARTSFIELD CAPITAL staff has also prepared valuations of intangible assets on a standalone basis. Intangible assets valued on a standalone basis frequently assume that the asset is acquired and used by a prudent investor independent of the current owner. This additional supporting analysis requires extensive professional research, documentation, and judgment.

## Rendering Fairness Opinions

Prior to the consummation of a merger or an acquisition, it may be necessary and prudent for the board of directors to have an independent investment firm provide a written opinion letter as to the fairness of the financial terms of the offer. Fairness opinions are presented to the board of directors and published with proxy materials where appropriate.

Fairness opinions may also be required for "going private" transactions, stock repurchases, recapitalizations and corporate restructurings. In some cases, a determination of financial fairness is legally required.

HARTSFIELD CAPITAL, in preparing a fairness opinion, performs a thorough review of the terms and structure of a proposed transaction and renders its opinion from a financial point of view. Among other factors considered, is the fairness of the price in relation to current and historical market prices, comparable transactions, going concern value and asset sale values. A third party opinion of financial fairness may be influential with a court in protecting directors and trustees against a lawsuit charging that they failed to exercise reasonable business judgment when they approved a business transaction.

HARTSFIELD CAPITAL

**Providing Expert Witness Testimony And Litigation Support**

HARTSFIELD CAPITAL professionals have presented expert witness testimony in a variety of valuation matters such as disputed values of securities and businesses with regard to estate, gift and income taxes, corporate recapitalizations and reorganizations, class action suits by stockholders, business damages and matrimonial division of assets.

HARTSFIELD CAPITAL also provides litigation support to clients and their legal counsel by: conducting an independent review of other firms' valuation reports; assisting in the preparation of interrogatories; consulting during depositions, pre-trial conferences, hearings, and cross-examinations; and structuring and negotiating settlements of valuation disputes.

HARTSFIELD CAPITAL thoroughly documents support for all conclusions contained in opinions, valuations and litigation support. If necessary, HARTSFIELD CAPITAL's professionals are prepared to appear as expert witnesses and present persuasive evidence. Such testimony has been presented before and on behalf of courts and commissions, including:

- Federal and State Courts
- Agent and Appeals Division levels of the IRS
- Bankruptcy Court
- Public Utility Commissions
- American Arbitration Association

HARTSFIELD CAPITAL

 **Management & Senior Staff**

**STEPHAN J. LOVETT**
**President**

Mr. Lovett is the President and he is responsible for HARTSFIELD CAPITAL'S financial advisory, investment banking and corporate development practice. He has over thirty years of diverse experience in domestic and international strategic, financial, marketing, corporate development and operational management. He has held the senior planning and development position at The Bank of New York/Irving Bank, Bell Atlantic, Rockwell International and The Continental Group.

Mr. Lovett has a unique capability to develop creative insights for alternative corporate portfolio and operating unit investments. He has completed over 200 major business development transactions; conducted business in 73 countries, and has profitably managed three operating companies and 16 venture startups. Additionally, he has a demonstrated ability to assist embryonic, middle market and large complex corporations in applying easy to implement financial engineering, marketing, and operating programs to immediately improve short term results while maintaining longer range investment strategy continuity.

Mr. Lovett graduated Phi Beta Kappa and received his JD/MBA Magna Cum Laude from Columbia University and is a former Naval Lieutenant.

HARTSFIELD CAPITAL

**RICHARD P. HORA**
**Managing Director**

Dick Hora is HARTSFIELD CAPITAL'S west coast-based managing director operating out of the San Diego area. Mr. Hora has a broad management background in aerospace, electronics, engineering as well as government programs and a number of commercial initiatives and manufacturing.

Prior to joining HARTSFIELD CAPITAL, Mr. Hora was the President and Chief Executive Officer of SPACEHAB, Inc. This is an $80M publicly held corporation that managed space programs for NASA.

Previous to that assignment, he was the Division Vice President of Energy Programs for General Dynamics and prior to that the Division Vice President of a major manufacturing division of General Dynamics. He worked his way through the General Dynamics Corporation as Business Manager in Fort Worth as well as Director of Finance for the Corporate Offices.

Mr. Hora's career actually began in manufacturing for Gould Manufacturing, which managed and manufactured automotive parts for a number of automotive companies.

Mr. Hora graduated from Yale University in 1972 with a concentration in engineering and applied sciences. He received his MBA in 1976 at Case Western Reserve University.


**WESLEY A. PIETRASIK**
**Managing Director – Equity Portfolio Management**

Mr. Pietrasik is a proven strategist to major Euro Financial Institutions. He has balanced US large & small cap portfolio management experience, as well as business development, analytical and leadership skills.

Over the course of his career, Mr. Pietrasik documented 72%, 130%, and 68% returns in 1997, 1998, and 1999 respectively, and developed a proprietary statistically based risk management trading/investment program yielding consistent above average results. Other accomplishments by Mr. Pietrasik include: Final stage development of internet based push analysis in institutional trading system; Prolific author, frequently Published in Frankfurter Handelsblatt; and Morning Call Research Published daily on PushAnalytics Website.

Mr. Pietrasik received his JD from John Marshall Law School, MSME from University of Utah, and BA in Physics from Loyola University.


HARTSFIELD CAPITAL

**BART SIEGEL**
**Managing Director – Investment Banking**

Mr. Siegel brings to HARTSFIELD CAPITAL his experience in technical and strategic business management as well as expertise in visioning, championing, developing, and positioning businesses to maximize value for investors and corporate management through commercialization or venturing within the corporate structure.

Prior to joining HARTSFIELD CAPITAL, Mr. Siegel was the President of Allen Enterprise. This company contracted with industries such as Alcoa Aluminum and Kasier Aluminum with a specialty in developing processes, automation, technology enhancement and organizational controls.

He was also the Chief Operations Officer for Oak Brook Management, which represented over 800 employees and $400M in gross revenues.

Mr. Siegel served in the U.S. Navy and graduated from Virginia Commonwealth University.


**JOHN H. BANZHAF**
**Executive Vice President – Investment Banking**

Mr. Banzhaf is an accomplished executive who brings broad operating experience to HARTSFIELD CAPITAL's corporate finance advisory assignments. Prior to becoming an Investment Banker, Mr. Banzhaf was a highly successful senior officer with regional retail chains as well as the owner and operator of a chain of stores specializing in women's apparel. As senior officer in charge of marketing and merchandising for the NYSE companies ShopKo Stores and Montgomery Ward, Mr. Banzhaf has created and led professional retailing organizations that achieved dominant shares in their markets. As the senior strategic planning officer, he initiated and implemented successful growth strategies in desperate markets. He has broad corporate experience in marketing, sales, operations and finance.

In addition to his duties as senior officer with HARTSFIELD CAPITAL Group, Mr. Banzhaf is President of Hartsfield Capital Securities, Inc., a NASD member broker-dealer, specializing in the private placement of securities of both public and private companies, as well as implementing the trading of public securities.

Mr. Banzhaf is a graduate of the School of Business Administration of The University of Michigan.


HARTSFIELD CAPITAL

## DELBERT D. REICHARDT
### Executive Vice President – Investment Banking

Mr. Reichardt has had extensive experience in the Investment Banking industry serving with Kidder, Peabody & Co., Incorporated in Boson and New York, and with Bank of America, NT & SA in its Southeast office in Atlanta. He has assisted clients from a wide range of industries with their funding needs and their merger and acquisition requirements. While with Kidder, Peabody, Mr. Reichardt was especially active with institutional funding of consumer and commercial finance and aviation companies.

Mr. Reichardt also served as Chief Financial Officer of GAC Corporation, a nationwide holding company based in Allentown, PA that was engaged in financial services including mortgage banking, consumer and commercial finance. He also served as Executive Vice President and Chief Administrative Officer of one of the earliest and largest REIT's, Great American Mortgage Investors, based in Atlanta. In addition to his duties with HARTSFIELD CAPITAL Group, Mr. Reichardt serves as Financial and Operations Principal of Hartsfield Capital Securities, Inc., a broker-dealer.

Mr. Reichardt has served on many Boards of Directors, and is past President of the Atlanta Chapter of Financial Executives Institute. A summary of his business career is listed in *Who's Who in Finance*. He is a graduate of Carroll College in Waukesha, WI where he received a BA degree, and he received an MBA degree with a major in finance from the Harvard Business School in Boston.

## DAVID S. COOPER
### Senior Vice President – Corporate Finance

Mr. Cooper is the Senior Vice President responsible for the corporate finance practice at HARTSFIELD CAPITAL as well as the functional excellence of the accounting, tax, and financial planning advice that the firm renders to its clients.

Prior to joining HARTSFIELD CAPITAL, Mr. Cooper practiced law in Atlanta, focusing on public and private securities transaction work, acquisitions, mergers, divestitures, franchise work, and general corporate work. Additionally, Mr. Cooper handled high technology matters and is actively involved in the Atlanta Venture Forum and the Business and Technology Alliance. He has extensive experience in capital structuring, Regulation "D" offerings, and initial public offerings.

Mr. Cooper is a certified public accountant and formerly practiced with Arthur Andersen & Co. He is a member of the Business Law Section of the American Bar Association, the Georgia Bar Association, the Georgia Society of Certified Public Accountants, and the American Association of Attorney-Certified Public Accountants, Inc. He received his JD/MBA and LLM Taxation from Emory University and his BA from Harvard University.

HARTSFIELD CAPITAL

**SHARON MARIE KNOX**
**Paralegal**

Ms. Knox is a senior paralegal professional responsible for managing the legal functions within HARTSFIELD CAPITAL.

Prior to joining HARTSFIELD CAPITAL, Ms. Knox performed paralegal duties with three leading law firms located in Atlanta.

Areas of expertise include:

I.      Corporate Law
II.     Securities/Blue Sky Law
III.    Real Estate/Environmental Law
IV.     Transactional/Mergers & Acquisitions
V.      Contracts

Ms. Knox earned her paralegal certification from the American Center for Technical Arts & Sciences/Main Line Paralegal Institute in Wayne, Pennsylvania and attended Golden Beacon College in Wilmington Delaware from 1983 - 1985. She has attended various seminars to meet Continuing Legal Education requirements. Ms. Knox is a member of the Georgia Association of Paralegals and is a Notary Public.


**NADIA SIMMON**
**Office Manager**

Ms. Simmon brings to the firm almost 20 years of Legal Administrative, Paralegal and office management experience. Responsibilities include, but not limited to, general client support duties, assisting the firm with general compliance issues and management of accounts payable and receivable. She oversees all business process activities as well as the day-to-day administrative functions.


Prior to joining Hartsfield Capital, Ms. Simmon performed legal assistant and paralegal duties with leading law firms in Florida and Connecticut. Areas of specialties are corporate law, commercial real estate, medical malpractice defense and litigation.


HARTSFIELD CAPITAL

**Contact Information:**

Hartsfield Capital Group, Inc.
3775 Mansell Road
Alpharetta, Georgia 30022
Telephone : (770) 408-9000
Facsimile   : (770) 408-9100
e-mail: stephan@hartsfieldcapital.com

HARTSFIELD CAPITAL

**Exhibit I**

**BrokerCheck Report**

**JOHN HARTRIDGE BANZHAF SR** ⟶ *Employment History is*

CRD# 2679579                                    *with Hartsfield p-4*

Report #31147-14822 generated on Thursday, December 06, 2007.

| **Section Title** | **Page(s)** |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| About this BrokerCheck Report | 5 |

FINRA



EXHIBIT
tabbles

**FINRA**

**Dear Investor:**

FINRA has generated the following BrokerCheck report for JOHN H. BANZHAF SR. The information contained within this report has been provided by a FINRA brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides include: regulatory actions, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



www.finra.org/brokercheck

**FINRA**

User Guidance

## JOHN H. BANZHAF SR

CRD# 2679679

# Report Summary for this Broker

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by either the broker, a previous employing brokerage firm, or a securities regulator on 07/24/2007.

## Currently employed by and registered with the following FINRA Firms:

**ARGOSY CAPITAL SECURITIES, INC.**
3775 MANSELL ROAD
ALPHARETTA, GA 30022
CRD# 44885
Registered with this firm since: 09/1998

## Broker Qualifications

### This broker is registered with:

- 1 Self-Regulatory Organization
- 1 U.S. state or territory

Is this broker currently suspended or inactive with any regulator? No.

### This broker has passed:

- 1 Principal/Supervisory Exam
- 1 General Industry/Product Exam
- 1 State Securities Law Exam

## Registration and Employment History

This broker was previously registered with the following FINRA firms:

**CENTENNIAL CAPITAL MANAGEMENT, INC.**
CRD# 38988
ATLANTA, GA
02/1997 - 12/1997

**BUCKHEAD FINANCIAL CORPORATION**
CRD# 18398
01/1996 - 03/1997

For additional registration and employment history details as reported by the broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this broker? No.

©2007 FINRA. All rights reserved.    Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR

1



User Guidance

www.finra.org/brokercheck

## Broker Qualifications

### Registrations

This section provides the SROs, states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective. This section also provides information on the physical location of each branch that the broker is associated with, for each listed employment.

**This individual is currently registered with 1 SRO and is licensed in 1 U.S. state or territory through his or her employer.**

### Employment 1 of 1

Firm Name:    **ARGOSY CAPITAL SECURITIES, INC.**

Main Office Address:  **3775 MANSELL ROAD**
**ALPHARETTA, GA 30022**

Firm CRD#:    **44885**

| SRO | Category | Status | Date |
|---|---|---|---|
| NASD | Corporate Securities Representative | APPROVED | 09/02/1998 |
| NASD | General Securities Principal | APPROVED | 09/02/1998 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| Georgia | Agent | APPROVED | 09/24/1998 |

### Branch Office Locations

**ARGOSY CAPITAL SECURITIES, INC.**
3775 MANSELL ROAD
ALPHARETTA, GA 30022

**ARGOSY CAPITAL SECURITIES, INC.**
702 VININGS ESTATES DRIVE
MABLETON, GA 30316

©2007 FINRA. All rights reserved.    Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR

## Broker Qualifications

### Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

**This individual has passed 1 principal/supervisory exam, 1 general industry/product exam, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Principal Examination | Series 24 | 05/24/1996 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Corporate Securities Limited Representative Examination | Series 62 | 07/11/1996 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 03/29/1996 |

Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by FINRA to brokers and other securities professionals can be found at http://www.finra.org/brokerqualifications/.

©2007 FINRA. All rights reserved.    Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR



# Registration and Employment History

## Previously Registered with the Following FINRA Firms

FINRA records show this broker previously held FINRA registrations with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 02/1997 - 12/1997 | CENTENNIAL CAPITAL MANAGEMENT, INC. | 38988 | ATLANTA, GA |
| 01/1996 - 03/1997 | BUCKHEAD FINANCIAL CORPORATION | 18398 | |

## Employment History

This section provides up to 10 years of a broker's employment history as reported by the individual broker, and includes all securities and non-securities related employment, full and part-time work, self-employment, military service, unemployment, and full-time education. Please note that this information is not updated after an individual ceases to be registered with a FINRA firm.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 02/1998 - Present | HARTSFIELD CAPITAL SECURITIES, INC. | ATLANTA, GA |
| 12/1997 - Present | HARTSFIELD CAPITAL GROUP INC. | ATLANTA, GA |
| 01/1997 - 12/1997 | CENTENNIAL CAPITAL MANAGEMENT, INC. | ATLANTA, GA |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

I AM THE PRESIDENT OF JOHN BANZHAF & ASSOCIATES, INC. AN "S" CORPORATION OWND BY MY WIFE AND I. IT WAS FOUNDED IN DECEMBER, 1995. IT RECEIVES ALL THE REVENUE PAID FOR MY SERVICES AT ARGOSY CAPITAL SECURITIES AND PAYS FOR ITEMS SUCH AS THE AUTOMOBILE I USE FOR BUSINESS, TELEPHONE, INSURANCES, SUPPLIES, ETC. MY WIFE, AS VICE PRESIDENT, MAINTAINS THE RECORDS, A PERIODIC DISTRIBUTION TO OUR PERSONAL ACCOUNT PROVIDES COMPENSATION.

BEGLEY, BANZHAF & REICHARDT, LLC, WAS FORMED IN DECEMBER, 2004, SOLELY AS A BANK ACCOUNT TO RECEIVE AND DISTRIBUTE FUNDS TO ITS PARTNERS FROM ANY POTENTIAL PROJECT. WITH SUCH A LIMITED FUNCTION, IT TAKES VIRTUALLY NO TIME IN ITS MANAGEMENT.

©2007 FINRA. All rights reserved.     Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR





# About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

## Who provides the information in BrokerCheck?

Information made available through FINRA BrokerCheck is derived from the Central Registration Depository (CRD®) as reported on the industry registration and licensing forms brokerage firms and brokers are required to complete.

The forms used by brokerage firms, Forms BD and BDW, are established by the Securities and Exchange Commission (SEC), and adopted by all state securities regulators and self-regulatory organizations (SROs). FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that collect broker information. Regulators provide information via Form U6, which is used primarily to report certain history about brokerage firms and brokers. These forms are approved by the SEC.

## How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (updates typically are required not later than 30 days after the broker/brokerage firm learns of an event). The report data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

## What information is NOT disclosed through BrokerCheck?

Information that has not been reported to the CRD system, or that is not required to be reported, is not disclosed through FINRA BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely, certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. NASD Interpretive Material 8310-2 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from the CRD system. Further information about expungement from the CRD system is available in NASD Notices to Members 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web Site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. The hotline is open Monday through Friday from 8 a.m. to 8 p.m., Eastern Time (ET).

For more information about the following, select the associated link:

- About BrokerCheck Reports: http://www.finra.org/brokercheck_reports
- Glossary: http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports: http://brokercheck.finra.org/faq
- Terms and Conditions: http://www.finra.org/terms.aspx

©2007 FINRA. All rights reserved.    Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR

©2007 FINRA. All rights reserved.     Report# 31147-14822 generated on Thursday, December 06, 2007 about JOHN H. BANZHAF SR

**Exhibit J**

Court File No. 05-CV-282639PDI

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

**MANSELL CAPITAL PARTNERS LLC**

Applicant

- and -

**WILLIAM B. KERR**

Respondent

**AFFIDAVIT OF THOMAS O. BEGLEY**
**(sworn March       , 2005)**

I, Thomas O. Begley, of the City of Alpharetta, in the State of Georgia, U.S.A., MAKE OATH AND SAY:

1.    I am a Vice President and a Director of the Applicant, Mansell Capital Partners LLC ("Mansell"), and as such have knowledge of the matters to which I hereinafter depose save where stated to be sworn on the information and belief.

2.    Judgment was granted in this matter against the respondent William B. Kerr by the Honourable Mr. Justice Todd Ducharme on February 23, 2005. A copy of the Judgment is attached as Exhibit "A". A copy of the Reasons for Judgment of the Honourable Mr. Justice Todd Ducharme, released March 3, 2005, is attached as Exhibit "B". By the terms of the Judgment, the respondent was ordered, among other things, to:

      (a)    return all funds that had been remitted by the applicant to the respondent, including the $6.5-million (US) remitted in October 2003 and which was found to be held by the respondent in trust for the applicant;

      (b)    provide the applicant with an accounting of the funds;

      (c)    advise the applicant, under oath, of the present whereabouts of the funds; and

      (d)    pay costs to the applicant in the amount of $4,500 inclusive of GST.

4938685 V1

3.    I am advised by Douglas Harrison, a partner with Stikeman Elliott LLP, the solicitors for the applicant, who has carriage of this matter, and do verily believe that he emailed a copy of the Judgment to the respondent's counsel, David Sloan, on February 23, 2005 at 4:18 p.m. A copy of Mr. Harrison's email to Mr. Sloan is attached as Exhibit "C".

4.    I spoke with the respondent on February 24, 2005 at which time he advised me that he could "absolutely pay" the funds to the applicant, but that he simply needed time to do so. He advised that he would pay the accumulated interest owing, which at that time was approximately $640,000 (US) by February 28, 2005 at 5:00 p.m., with the balance of the funds to be repaid by March 10, 2005. In addition, I am advised by Mr. Harrison and do verily believe that he and Mr. Sloan reached an agreement that day that Mr. Kerr would provide the information required from him pursuant to paragraph 5 of the Judgment by way of an examination to be held on March 3, 2005 at 2:00 p.m. These arrangements were confirmed by Mr. Harrison in a letter to Mr. Sloan dated February 28, 2005, a copy of which is attached as Exhibit "D", together with a copy of the Notice of Examination that was enclosed with the letter.

5.    On March 1, 2005, I received a call from Mr. Kerr at which time he advised that he would require more time to deliver the funds to the applicant. In addition, he advised that if we proceeded with his examination on March 3, 2005, there was a flight risk with respect to certain unnamed individuals who he suggested had control over the funds.

6.    I am advised by Mr. Harrison and do verily believe that at approximately 10:50 a.m. on March 3, 2005, he received a telephone call from Mr. Sloan who told him that Mr. Kerr would not be attending at the examination that day as he was ill at home. Mr. Sloan followed up the conversation with a letter that was faxed to Mr. Harrison, a copy of which is attached as Exhibit "E".

7.    Despite the advice that Mr. Kerr would not be attending, Mr. Harrison proceeded to attend at the Examiner's office and obtained a Certificate of Non-Attendance of Mr. Kerr, a copy of which is attached as Exhibit "F".

4938685 V1

8.     I am advised by Mr. Harrison and do verily believe that he forwarded a copy of the Certificate of Non-Attendance to Mr. Sloan by way of letter on March 4, 2005, further requesting Mr. Sloan to advise when he and Mr. Kerr could attend for examination the following week. A copy of Mr. Harrison's letter is attached as Exhibit "G".

9.     On March 8, 2005, I received a call from Mr. Kerr who said he expected to be able to remit the interest owing to the applicant the following morning. No funds were received by the applicant on March 9, 2005.

10.    I am advised by Mr. Harrison and do verily believe that he spoke with Mr. Sloan on March 10, 2005, at which time Mr. Sloan advised that Mr. Kerr was not available to attend for an examination that day or the following day. However, Mr. Kerr would instead deliver an affidavit to the applicant. Mr. Harrison confirmed this conversation in a letter to Mr. Sloan on March 11, 2005, a copy of which is attached as Exhibit "H". Mr. Harrison in his letter advised Mr. Sloan that if Mr. Kerr's affidavit and the payment of the costs had not been received by March 21, 2005, he would be seeking instructions to have Mr. Kerr cited in contempt for failure to comply with the terms of the Judgment.

11.    I am advised by Mr. Harrison and do verily believe that as of today's date he has not received an affidavit from Mr. Kerr, nor payment of the costs.

12.    On March 19, 2005, Mr. Kerr advised me that the past due interest to the applicant, totalling by then approximately $820,000 (US), would be received by the applicant on March 23, 2005.

13.    As of today's date, the applicant has still not received any funds from the respondent including payment of outstanding interest, which now totals approximately $960,000 (US), the funds ordered by the terms of the Judgment to be remitted to the applicant and the costs awarded. Further, Mr. Kerr has failed to provide the information about the funds that he was ordered to provided pursuant to the terms of paragraph 5 of the Judgment.

SWORN BEFORE ME at the City of
Alpharetta, Georgia, U.S.A., on March
    , 2005.

_____

THOMAS O. BEGLEY

_____

**Commissioner for Taking Affidavits**

4938685 V1

Court File No: 05-CV-282639PDI

MANSELL CAPITAL PARTNERS LLC    and    WILLIAM B. KERR
Applicant                                          Respondent

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

AFFIDAVIT OF THOMAS O. BEGLEY
(sworn March    , 2005)

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

**Douglas F. Harrison**  LSUC#: 29020J
Tel: (416) 869-5693
Fax: (416) 947-0866

Solicitors for the Applicant

493685 V1

**Exhibit K**

COURT FILE NO.: 05-CV-282639PD1
DATE: March 3, 2005

## SUPERIOR COURT OF JUSTICE — ONTARIO

RE:                MANSELL CAPITAL PARTNERS LLC

                                                                      Applicant

                          - and -

                   WILLIAM B. KERR

                                                                      Respondent

BEFORE:            T. Ducharme J.

COUNSEL:           Douglas F. Harrison for the Applicant

                   J. David Sloan for the Respondent

MOTION
HEARD:             February 23, 2005

## REASONS FOR JUDGMENT

[1]     This is an application brought under Rule 14.05(3)(b) of the *Rules of Civil Procedure* directing the respondent, a solicitor, to return to the applicant certain trust funds totalling at least $6.5-million (U.S.), to provide an accounting of the trust funds, to provide information concerning the whereabouts of the trust funds, and seeking a charging order against the respondent's assets in an amount equal to the trust funds. I released a judgment dated February 23, 2005 granting the applicant the relief sought. These are my Reasons for Judgment.

## THE FACTS

[2]     The applicant Mansell Capital Partners LLC ("Mansell") is a Georgia corporation with its head office in Alpharetta, Georgia. Mansell is an investment firm that places its clients' funds in various investment vehicles. The respondent William B. Kerr ("Kerr") is a member of the Law

- 2 -

Society of Upper Canada, practicing law in Oakville, Ontario as part of an association under the name Ryrie, Kerr, Davidson.

[3]     In early 2003, Mansell's broker-dealer, Hartsfield Capital Securities, Inc. ("Hartsfield"), also of Alpharetta, Georgia, had developed a relationship with Gordon Mascarenhas ("Mascarenhas"), a businessman in Oakville, Ontario.   Mascarenhas represented himself to be a financial consultant with close contacts in various international financial markets.   In a conversation in or about April 2003, Mascarenhas told Hartsfield that Kerr was able to pay a high rate of interest against funds held in Kerr's insured trust account and that Kerr had an opening for the placement of $650,000 (U.S.).  Mansell later learned that Mascarenhas was very close with Kerr and maintained an office in the office of Ryrie, Kerr, Davidson.

[4]     On or about April 17, 2003, Mansell entered into an agreement with Kerr to have funds from Mansell deposited in Kerr's insured trust account.  As part of the letter agreement, Kerr confirmed, among other things, that the funds he would hold in trust were not subject to any loss or foreclosure, were insured against any loss or foreclosure and that the capital would not be moved or transferred without written instructions from Mansell.  No funds were transferred to Kerr at that time.

[5]     On or about July 15, 2003, Del Reichardt ("Reichardt"), the Executive Vice-President of Hartsfield, wire transferred $100,000 (U.S.) to Kerr's trust account at the Royal Bank of Canada in Oakville, Ontario.  Kerr sent Reichardt a letter dated July 8, 2003, on the letterhead of Ryrie, Kerr, Davidson setting out the terms under which Reichardt's funds were placed in Kerr's trust account.  The letter specified that the funds would be held "in trust with this firm", not subject to any loss, and returned in 61 days, with payments of 5 per cent due and payable on the 31st and 61st days.  Kerr paid Reichardt interest on the $100,000 (U.S.) in accordance with their agreement and returned the $100,000 (U.S.) to Reichardt in or about January 2004. Reichardt later returned the $100,000 (U.S.) to Kerr's trust account.

[6]     On or about October 3, 2003, Mansell wire transferred $6,500,000 (U.S.), in two tranches, to Kerr's trust account.  The terms under which the funds were sent to Kerr were the same as those expressed in Kerr's letter of July 8, 2003 to Reichardt.  Mansell's understanding

- 3 -

that Kerr's insurance would protect the funds in his trust account was confirmed by a letter received from Kerr dated October 29, 2003, on the letterhead of Ryrie, Kerr, Davidson, advising that Kerr had increased his errors and omissions insurance coverage to $9,000,000 (Cdn.), excess of his existing $1,000,000 (Cdn.) worth of coverage.

[7]     In December 2003, Mansell made two separate requests that Kerr return $2,000,000 (U.S.) and $1,000,000 (U.S.) respectively from his trust account. In both cases, Kerr returned the requested funds to Mansell.

[8]     In a conversation in or about January 2004, Kerr advised Thomas O. Begley ("Begley"), Vice President of Mansell, that he would remit interest payments to Mansell of 5 per cent per month on the amount in his trust account, on the 10th day of each month. Mansell transferred an additional $2,000,000 (U.S.) to Kerr's trust account on or about February 23, 2004, and $1,050,000 (U.S.) in two instalments on or about July 13 and 23, 2004. All three transfers were made pursuant to the terms set out in Kerr's letter of July 8, 2003 to Reichardt.

[9]     After the two transfers in July 2004, Kerr agreed to pay Mansell interest in two monthly instalments -- $180,000 (U.S.) on the 10th and $140,000 (U.S.) on the 24th of each month -- and Mansell began receiving interest payments in October 2003. In recent months, the instalments have increasingly been paid late. The November 10, 2004 instalment was received by Mansell by way of two payments made on November 18 and 19, 2004; the November 24, 2004 instalment was received on December 3, 2004; the December 10, 2004 instalment was received on December 21, 2004, and the December 24, 2004 instalment was received on January 6, 2005. As of January 25, 2005 the interests payments due to Mansell from Kerr for January 10, 2005 and January 24, 2005 remained unpaid.

[10]     In July 2004, one of Mansell's clients requested a partial return of principal. Accordingly, on or about July 20, 2004, Mansell requested that Kerr return $1,500,000 (U.S.) from his trust account to Mansell. Kerr advised Begley that he now required 60 days' notice to release funds from his trust account. In fact, 60 days later, on September 20, 2004, the requested $1,500,000 (U.S.) was not received by Mansell.

- 4 -

[11]   On or about October 20, 2004, Begley received a fax from Kerr advising that he had experienced problems with his financial institution.  Some 90 days had passed since Mansell's unanswered request for the return of $1,500,000 (U.S.), and Mansell's client now asked that all of its principal, $3,250,000 (U.S.), be returned.  Begley, in turn, asked Kerr to return total capital of 3,500,000 (U.S.).  Kerr advised that arrangements were being made for the return of the sum of $3,500,000 (U.S.) to Mansell on or about November 1, 2004.

[12]   After the requested funds were not returned on November 1ˢᵗ, Begley had conversations with Kerr during the month of November and again reiterated Mansell's need for the return of the funds.  On or about November 24, 2004, Begley sent an e-mail to Kerr again requesting the return of the funds and expressing his grave concern for the security of the funds.  The e-mail also set out some of the consequences to Mansell if the default situation was not immediately cured and advised Kerr that Mansell would have no choice but to seek legal remedies against Kerr if necessary.

[13]   On or about December 2, 2004, Kerr told Begley that a minimum of $3,250,000 (U.S.) in principal plus all outstanding interest owing to one of Mansell's clients was in his trust account at the Royal Bank and would be transferred by wire to Mansell no later than the next day, December 3, 2004.  This conversation was noted in an e-mail sent to Kerr by John Banzhaf ("Banzhaf") of Mansell on or about December 2, 2004.  In addition, Banzhaf requested a letter from the institution holding the funds that would confirm the amount of principal funds on deposit in the trust account, and assuring Mansell of the timing of the wire transfer.  Kerr responded to Banzhaf by e-mail at or about 4:56 p.m. on December 2, 2004, advising that he had requested the bank letter and also indicating that the bank had said that there was $1,500,000 (U.S.) plus interest ready to be delivered, and that the balance would follow in a few days.

[14]   On Friday, December 3, 2004, Kerr told Begley that the requested funds would be sent on Monday, December 6, 2004.  No funds were received.

[15]   On December 9, 2004, Kerr advised Douglas Harrison ("Harrison"), a solicitor at Stikeman Elliott LLP in Toronto, the solicitors for Mansell, that the funds were held in trust, although Kerr was not sure that they were at the Royal Bank of Canada.  Kerr assured Harrison

- 5 -

that the funds were not at risk of loss, although they had not been released back to Kerr. Kerr said the funds had been pledged to support a transaction, but he did not say what that transaction was. Kerr said he would provide something in writing to prove the funds were safe, and hopefully the funds would be transmitted to Mansell that day or the next.

[16]   On December 10, 2004, at 5:35 p.m., Kerr advised Harrison by voicemail that he was not able to deal with matters that day for personal reasons, but that he would update Harrison on December 13, 2004, and hopefully provide the evidence requested and/or confirmation that the requested funds had gone to Mansell.

[17]   On December 13, 2004, Kerr advised Harrison that a letter demonstrating the funds were safe would be sent the following morning. That evening, Kerr advised Begley that the capital was intact and safe but had been pledged to a transaction.

[18]   At approximately 12:45 p.m. on December 14, 2004, Kerr advised Harrison that he had not been able to reach his contact at the bank to provide the appropriate documentation. Kerr said he would keep trying to do so and would keep Harrison posted.

[19]   On December 20, 2004, Kerr advised Begley that the requested funds were on their way. Later that day, the interest that had been due on December 10, 2004, was received in Mansell's account at Bank of America. However, the principal amount sought from and promised by Kerr was not received.

[20]   On January 3, 2005, Kerr informed Begley that the following day Mansell would receive the interest that was due December 24, 2004, plus $1,500,000 (U.S.). No such funds were received on January 4, 2005. On January 6, 2005, at approximately 4:00 p.m., Mansell received the interest payment due on December 24, 2004 from Kerr, but did not receive any of the $1,500,000 (U.S.) funds promised by Kerr.

[21]   On January 6, 2005, Harrison wrote to Kerr, demanding that the principal amount of $1,500,000 (U.S.), plus interest due, and proof that the balance of the Mansell funds were secure, be received by the end of business on January 11, 2005, failing which Mansell would seek legal

- 6 -

redress against him. As of January 20, 2005, Harrison had not received a response from Kerr to his letter of January 6, 2005.

[22]    On January 10, 2005, Begley received a call from Kerr, in which Kerr acknowledged receipt of Harrison's letter and informed Begley that he required until Monday, January 17, 2005, to pay the interest that was due on January 10, 2005, and to return the $1,500,000 (U.S.) that had been requested. As of January 13, 2005, Mansell has still not received the requested funds from Kerr nor any proof that the funds are secure.

[23]    On January 19, 2005, Mr. Kerr called Banzhaf and advised him that he had a letter of credit for $5 million (U.S.) and would be paying Mansell $1.5 million (U.S.) plus interest that day. No such payment was forthcoming.

[24]    This application was commenced on January 21, 2005 and was first before me on January 28, 2005. At this time, I was provided with an Affidavit of Mr. Kerr sworn January 27, 2005 in which he deposed, among other things:

> 5. Without any attempt to delay matters or to avoid the obvious, I can confirm to the Court that the money is fully protected and is fully available for return to the client. The money is not at risk.
>
> 6. In accordance with my instructions, I invested the money and at the present time it is in a bank institution, fully secure, as collateral for various transactions that are proceeding.
>
> 7. I confirm the money is not at risk, but unfortunately it has taken a lot longer for the money to be released in accordance with the request made by the client for the return of some of the funds last year. I had legitimately and honestly thought that the money was available when I made the statements to the client or to representatives of the client that the money would be coming at a certain time.
>
> 9. Over the last month, because of the request for the return of the funds, I have made great efforts to obtain the return of the monies by way of a collapsible Letter of Credit, when I was advised that the original investment of funds had to remain in place for the time being.
>
> 10. Specifically, the institution where the money is presently located and is presently safe has agreed to provide a $10 million Letter of Credit which I can draw on and obtain the return of the monies instead of the actual funds that have been placed. The

- 7 -

debtor for whom the funds have been held secure has agreed to do this at the debtor's expense.

It has taken a long time to make this arrangement, unfortunately, but it is now in place. It certainly took longer than I thought it would.

I have been advised by the bank institution and believe that the Letter of Credit will be available within the next 10 days and I can then draw on it within 48 hours thereafter.

My intention is to do so immediately and to thereby have the $10 million available for the return of the funds to the client, being the $6.5 million U.S., plus the various amounts for interest.

. . .

While I agree that I have been late in responding on a formal basis about the return of funds, I do not agree that this Application was warranted, nor do I agree that the client was ever entitled to suggest that I have done anything improper or untoward or in breach of my duties as a solicitor.

[25]    As Mr. Kerr had not informed either his counsel, Mr. Sloan, or Mansell where the funds were being held, I directed Mr. Sloan to contact Kerr and determine where the monies were. After speaking to Mr. Kerr, Mr. Sloan advised the court that the monies were being held in a bank in Spain. This news came as an unwelcome surprise to the applicant who had not been informed of, nor consented to, such a transfer. The matter was adjourned, on consent, to February 7, 2005 on the following terms:

> (1) that Mr. Kerr undertake as a Solicitor of this Court not to dispose of his assets, out of the ordinary course, until the return of this application;
>
> (2) that Mr. Kerr deliver an affidavit to the applicant's counsel confirming the information about the present whereabouts of the funds and as much of the information requested in paragraph 1(d) of the Notice of Application as possible, no later than 6 p.m. on February 1, 2005; and
>
> (3) that the respondent will deliver to the applicant's counsel a copy of the letter of credit referred to in the respondent's affidavit sworn January 27, 2005 forthwith upon receipt of same.

[26]    The parties appeared before me on February 7, 2005 and agreed that my order should be continued and the matter adjourned until February 23, 2005 in the hope that the letter of credit would be forthcoming and the parties could resolve their differences.

- 8 -

[27]    Unfortunately, the long promised letter of credit was not forthcoming and the parties appeared before me today. On behalf of Mansell, Begley provided an affidavit sworn January 25, 2005 in which he deposed that as of that date, Mansell had still not received the requested funds from Kerr nor any proof that the funds are secure. He also confirmed that Kerr has still not made the payment $1.5 million (U.S.) plus interest that he had indicated would be made on January 19, 2005.

[28]    The respondent filed an affidavit from a secretary at Mr. Sloan's firm dated February 23, 2005 in which she deposed as follows:

> 2. On February 16, 2005, our office received a fax from Mr. Kerr relating to the Stand By Letter of Credit. Attached hereto and marked as Exhibit "A" is a true copy of the letter received from Mr. Kerr which is written on the letter head (sic) of a company in Beijing, China.

> 3. I am advised by Mr. Sloan and verily believe that this is a letter from the party who was arranging the Stand By Letters of Credit and confirms its issuance.

> 4. Mr. Sloan advises me and I verily believe that he has been told by Mr. Kerr that the funding of the Letter of Credit will be proceeded with but there has been a problem in getting the original Letters of Credit that cannot be explained at this time. Mr. Sloan advises that he was told this by Mr. Kerr and believes the same.

> 5. Mr. Sloan advises that he was simply told by Mr. Kerr that it will be any day that the Letters of Credit will be received and that the return of the monies can be funded at that point. I verily believe this information from Mr. Sloan.

[29]    Exhibit "A" was a letter dated February 16, 2005, on the letterhead of Jinjun Nide (Luohe) Co. Ltd. ("Jinjun") a company with an address in Beijing written to Mr. Kerr. This letter reads as follows:

Re: Standby Letters of Credit

We represent and warrant to you that we have made arrangement for the delivery to you of two (2) Standby Letters of Credit for 10 million euros with a one-year term, each to be issued by the Caixanova Bank of Spain.

- 9 -

The delivery has been delayed due to technical matters with the bank; however they are now resolved. The instructions to Caixanova Bank by us are irrevocable and the Bank is instructed to issue the Standby Letters of Credit to William B. Kerr c/o Royal Bank of Canada.

There was no evidence before me as to why Jinjun was involved in this matter. Nor was any explanation offered for Mr. Kerr's assertion that he could not explain "at this time" the delay in getting the letters of credit.

## CAN THIS MATTER PROCEED AS AN APPLICATION UNDER RULE 14.05(3)(b)?

[30]    Mr. Sloan raises a preliminary jurisdictional objection. He submits that Rule 14.05(3)(b) is directed at estates or more formal trust arrangements and points out that there appears to be no precedents where an application under this rule has been entertained with respect to monies contained in a solicitor's trust account. He does however concede that Kerr has a fiduciary obligation with respect to Mansell and that the monies have been deposited in a trust account. It is not clear to me whether Mr. Sloan's position is that Kerr is not a trustee or, more narrowly, that while Kerr is a trustee, he is not the type of trustee that Rule 14.05(3)(b) is intended to deal with. Therefore, I will deal with both issues.

### (A) Is there a Trust and is Kerr a Trustee?

[31]    As Professor Oosterhoff has aptly observed:

It is an unenviable task to define the trust. In order to be complete the definition would have to be so comprehensive as to be unintelligible and, therefore, useless; whereas a short definition might express the principal elements of the trust and, thus, be clear but fail to speak of the institution's many and different facets.[1]

However, Professor Oosterhoff does cite with approval two definitions of trust. The first, advanced by Underhill is as follows:

A trust is an equitable obligation, binding a person (who is called a trustee) to deal with property over which he has control (which is called the trust property), for

---

[1] A.H. Oosterhoff et al, ed., *Oosterhoff on Trusts: Text, Commentary and Materials*, 6th ed. (Scarborough: Carswell Thomson, 2004) at 13.

- 10 -

the benefit of persons (who are called the beneficiaries or *cestuis que trust*), of whom he may himself be one and any one of whom may enforce the obligation. Any act or neglect on part of the trustee which is not authorized or excused by the terms of the trust instrument, or by law, is called a breach of trust.[2]

The second definition of trust is that advanced by Lewin:

[a trust is] the duty or aggregate accumulation of obligations that rest upon a person described as a trustee. The responsibilities are in relation to property held by him, or under his control. That property he will be compelled by a court in its equitable jurisdiction to administer in the manner lawfully prescribed by the trust instrument, or where there be no specific provision written or oral, or to the extent that such provision is invalid or lacking, in accordance with equitable principles. As a consequences the administration will be in such a manner that the consequential benefits and advantages accrue, not to the trustee, but to the person called *cestuis que trust*, or beneficiaries, if there be any;[3]

Thus, Professor Oosterhoff states that:

The trust is, therefore, a fiduciary relationship imposing certain obligations on the person who holds title to the property. The relationship is fiduciary because, while the trustees have substantial control over the trust property, they are bound to act in strict confidentiality, with honesty and candour, and entirely in the interests of the *cestuis que trust*.

[32]    In his affidavit sworn on January 27, 2005, Mr. Kerr made his position about the existence of a trust quite clear. In paragraph 3 he deposed as follows:

I do not agree that it is proper to classify the documents as a Trust Agreement. I was retained as a solicitor to perform certain functions and in my view I was acting only as a solicitor, albeit with appropriate fiduciary duties to my client, at all material times.

[33]    In considering the question of whether or not there is a trust and whether Kerr is a trustee, the first relevant consideration is the documents involved. The letter agreement written on the letterhead of the law firm, Ryrie, Kerr, Davidson, and signed by both Kerr and Mansell reads, in relevant part, as follows:

The undersigned will act to protect the capital over which he may be given authority to sign and/or endorse and shall only move or transfer such capital on the

---

[2] Underhill and Hayton, *Law Relating to Trusts and Trustees*. 15th ed. by David J. Hayton (London: Butterworths & Co. (Publishers) Ltd., 1995) at 3.
[3] W.J. Mowbray, ed., *Lewin on Trusts*. 17th ed. (London: Sweet & Maxwell Ltd., 2004) at 4.

- 11 -

written instructions of Mansell and in accordance with the instructions set out and attached.

. . .

You have advised that <u>funds will deposited (sic) in trust</u>. I will treat the provisions of our instructions as set out in Schedule A as disbursement instructions and will not deviate from the same in either form or substance without prior written unanimous approval of Mansell.

. . .

More specifically:

1)      That there shall be no deviations from the instructions as set out in Schedule A without the unanimous consent of the parties;

2)      That the value of the subject Mansell account, <u>placed in my trust</u>, shall never be less than the initial investment, unless the initial investment is returned to the Class B shareholder.  Said value shall be in cash or lendable AA rated securities;

(emphasis added)

[34]    There is also the letter from Kerr to Reichart dated July 8, 2003 on the letterhead of the law firm, Ryrie, Kerr, Davidson, which set out the terms for the initial deposit of $100,000 (U.S.) to Kerr's trust account on July 15, 2003 as well as the terms for the deposit of $6,500,000 (U.S.) to Kerr's trust account on October 3, 2003.  This letter reads, in relevant part, as follows:

Dear Sir:

Pursuant to instructions from you regarding the placement of funds <u>held by me in trust</u>, it is agreed as follows:

1.      The funds will be held in trust by the undersigned; and

2.      The <u>funds in trust</u> shall at all times be lien free, unencumbered and not subject to any loss whatsoever; and

3. The funds shall be placed in the said account for a period of sixty (60) days and returned to your order on the sixty first (61st) day.

Within forty-eight hours of my receipt of funds in <u>my trust account</u> . . .

. . .

- 12 -

As I am holding the funds in trust and I will act for Del Reichardt pursuant to your instructions and pursuant to the aforementioned conditions.
(emphasis added)

[35]     In my view, these documents clearly evidence the creation of a trust. First, the repeated reference to "trust" highlighted in the above passages, indicates the nature of the transaction. Second, the substance of the agreement clearly creates a trust in that it binds the trustee, Kerr, to deal with the property over which he has control (the deposited monies) for the benefit of the beneficiary, Mansell.

[36]     An even clearer indication of the creation of a trust and Kerr's status as a trustee is the fact that the monies have been deposited in his solicitor's trust account. This is significant as the Law Society of Upper Canada, the regulator of the legal profession in Ontario, regulates transactions from such accounts. By-law 19 of the Law Society of Upper Canada[4] provides, in part, as follows:

## TRUST ACCOUNT TRANSACTIONS

### Money received in trust for client

2. (1) Subject to section 3, every member who receives money in trust for a client shall immediately pay the money into an account at a chartered bank, provincial savings office, credit union or a league to which the Credit Unions and Caisses Populaires Act, 1994 applies or registered trust corporation, to be kept in the name of the member, or in the name of the firm of members of which the member is a partner or by which the member is employed, and designated as a trust account.

### Interpretation

(2) For the purposes of subsection (1), a member receives money in trust for a client if the member receives from a person,

(a) money that belongs in whole or in part to a client;

(b) money that is to be held on behalf of a client;

---

[4] Section 62(0.1) ¶ 5 of the *Law Society Act*, R.S.O. 1990, c. L.8 provides that Convocation may make by-laws governing the handling of money and other property by members and student members. Section 62(2) of the same Act provides that such by-laws are to be interpreted as if they form part of the Act.

- 13 -

(c) money that is to be held on a client's direction or order;

**Withdrawal of money from trust account**

4. (1) A member may withdraw from a trust account only the following money:

1. Money properly required for payment to a client or to a person on behalf of a client

2. Money required to reimburse the member for money properly expended on behalf of a client or for expenses properly incurred on behalf of a client;

3. Money properly required for or toward payment of fees for services performed by the member for which a billing has been delivered.

4. Money that is directly transferred into another trust account and held on behalf of a client.

5. Money that under this By-Law should not have been paid into a trust account but was through inadvertence paid into a trust account.
(emphasis added)

[37]   In addition to the duties set out in By-law 19, the Law Society's Rules of Professional Conduct address preservation of clients' property. In particular, Rule 2.07 states in part,

2.07(1) A lawyer shall care for a client's property as a careful and prudent owner would when dealing with like property and shall observe all relevant rules and law about the preservation of a client's property entrusted to a lawyer.

(2) A lawyer shall promptly notify the client of the receipt of any money or other property of the client, unless satisfied that the client is aware that they have come into a lawyer's custody.

(3) A lawyer shall clearly label and identify the client's property and place it in safekeeping distinguishable from the lawyer's own property.

(4) A lawyer shall maintain such records as necessary to identify a client's property that is in the lawyer's custody.

(5) A lawyer shall account promptly for a client's property that is in the lawyer's custody and upon request shall deliver it to the order of the client.

[38]   Thus, even if Kerr were correct that the documents referred to above do not constitute a Trust Agreement, it is obvious, given the clear language of section 2(2) of By-law 19, highlighted above, that Kerr is holding the monies in trust for his client Mansell. The other

- 14 -

obligations imposed by the By-law and the Rules of Professional Conduct make it even clearer that a trust exists and Kerr is the trustee while the client, Mansell, is the beneficiary.

### (B)  Can an Application under Rule 14.05(3)(b) be brought with respect to this type of "Trustee" and this type of "Trust"?

[39]    Having determined that Kerr is a trustee and that a trust exists, I will address Mr. Sloan's submission that Rule 14.05(3)(b) is not meant to deal with disputes involving solicitors' trust accounts.  Rule 14.05(3)(b) provides as follows:

> 14.05(3) A proceeding may be brought by application where these rules authorize the commencement of a proceeding by application or where the relief claimed is,
> 
> . . .
> 
> (b) an order directing executors, administrators or trustees to do or abstain from doing any particular act in respect of an estate or trust for which they are responsible;

[40]    Mr. Sloan has no authority to support this submission and was unable to identify any principled reason as to why I should interpret the rule in the narrow way he suggests.  Certainly, the plain language of the rule applies to this situation as Kerr is a trustee and the applicant is seeking relief with respect to a trust for which he is responsible.  This more narrow interpretation is also contrary to Rule 1.04(1) which provides that the rules "shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits."  The fact that neither party has found a case where an application was brought under this rule with respect to monies in a solicitor's trust account is of no assistance.  Indeed, this might well be explained by the fact that clients might choose to deal with disputes by involving the Law Society rather than by commencing litigation.  In any event, academic commentators have expressly recognized that a trust can arise "where a solicitor receives money on behalf of a client".[5]  Thus, I find that this application is properly brought under Rule 14.05(3)(b).

### (C)  Can this Application be brought under Rule 14.05(3)(h)?

[41]    In the alternative, Mr. Harrison submits that, if this application cannot properly be brought under Rule 14.05(3)(b), I should exercise my jurisdiction and hear it under Rule

- 15 -

14.05(3)(h).   Mr. Sloan objects to this on the basis that Rule 14.05(3)(h) was not specifically pleaded in the Notice of Application.  However, Mr. Sloan fairly concedes that there are no material facts in dispute.  While Rule 14.05(3)(h) was not expressly pleaded in the Notice of Application, it did include the usual basket pleading, "such further and other grounds as counsel may advise and this Honourable Court may accept."  Moreover, I would think that any time counsel wishes to raise a jurisdictional objection to an application relating to the scope of Rule 14.05(3) they would be alive to the possibility that the moving party might seek to rely on the broad provisions of Rule 14.05(3)(h).  Therefore in the circumstances of this case, if I am wrong about the propriety of proceeding under Rule 14.05(3)(b), I would hear the matter under Rule 14.05(3)(h) in any event.

**THE RELIEF SOUGHT**

[42]   Mr. Harrison requests a variety of orders.  Mr. Sloan takes no position with respect to the terms of the proposed order.

[43]   For the reasons outlined in paragraphs 31 to 38, *supra*, I am prepared to make an order declaring that the funds remitted by the applicant to the respondent's trust account are held in trust by the respondent.

[44]   Mr. Harrison also requests that I make an order directing the respondent to return forthwith the funds to the applicant in full.  In this regard, I would note that on the uncontradicted evidence before me, Mr. Kerr has undertaken to make full or partial payment to Mansell in statements made on December 2, 3, 13, 20, 2004 and January 3, 10 and 19, 2005.  No such payments have been made.  Similarly, on January 27, 2005 Mr. Kerr deposed that the letters of credit would be in place for him to draw upon within 12 days.  Then on February 23, 2005, the best he can do is say that there has been a problem getting the letters of credit which he cannot explain but the letters of credit will be received "any day".  Not only has Mr. Kerr not returned the monies originally requested on July 20, 2004 and then October 20, 2004, but he has failed to provide information about the location and status of the funds and any adequate assurance that they are safe.  On this basis, the applicant is fully justified in being concerned about the

---

[5] H.A.J. Ford et al, *Principles of the Law of Trusts* Supp No. 9 (Sydney: Lawbook Co., 2004) at 3-4

- 16 -

whereabouts and security of these monies. Therefore I will order that the respondent return forthwith all monies owing to the applicant. For the same reason I will also grant the charging order requested by Mr. Harrison.

[45]    Mr. Harrison also requests that I order the respondent to provide, under oath, particulars of the whereabouts of the funds as well as an accounting of the funds to the applicant. In considering this request I note that a trustee has a duty to give to the beneficiary of a trust, on demand, any and all information with respect to the trust fund. In particular, a beneficiary is *prima facie*, in the absence of special circumstances, entitled to production and inspection of all trust documents in the possession of a trustee. A beneficiary is also entitled to be given any necessary authority to verify the information given and to ascertain that the trust property is free from any encumbrances. The beneficiary's rights to inspect trust documents are founded upon the trustee's fiduciary duty to keep the beneficiary informed and to render accounts. Consequently I think such an order is appropriate.

[46]    Finally Mr. Harrison requests that I order a tracing of the funds and declare a constructive trust to the benefit of the applicant over any accounts into which the funds have been deposited by the respondent or over any assets into which the funds can be traced. Such orders are common restitutionary orders where defaulting fiduciaries are required to account to their beneficiaries to ensure that they cannot profit from their gains. A tracing order will permit the applicant to ascertain what has happened to its property, identify the persons who have handled or received its property and justify its claim that the property can be regarded as belonging to the plaintiff. The declaration of a constructive trust will assist in the recovery of such property. Given Mr. Kerr's failure to provide adequate information about the location or appropriate assurances about the security of the funds, both of these orders are fully justified in this case.

## COSTS

[47]    I disagree with Mr. Kerr's assertion in his affidavit of January 27, 2005 that this Application was not warranted. The facts summarized in paragraph 44, *supra*, make it abundantly clear that the applicant was fully justified in bringing this application. Thus the

- 17 -

applicant is entitled to its costs which are payable forthwith and fixed in the amount of $4,500 inclusive of GST.

T. Ducharme J.

**Released:**   March 3, 2005

COURT FILE NO.: 05-CV-282639PD1
DATE:  March 3, 2005

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

## MANSWELL CAPITAL PARTNERS LLC

**Applicant**

- and -

## WILLIAM B. KERR

_____

## REASONS FOR JUDGMENT

_____

**T. Ducharme J.**

**Released:** March 3, 2005

**Exhibit L**



Hartsfield Capital Group
3775 Mansell Road
Alpharetta, Georgia 30022

770-408-9000
770-408-9100 fax

*FILE*
*Hartsfield*

## HARTSFIELD CAPITAL

August 31, 2005

Mrs. Wendy Yap
Dover Limited
56 Andrew Road
Singapore 299968

Dear Mrs. Yap:

SUBJECT: ACCOUNT STATEMENT

This is to advise and to confirm that Mansell Capital Partners, LLC, Atlanta Georgia, is holding in your account, funds in the amount of $3,250,000 as of today, August 31, 2005.

Very truly yours,

Thomas Begler
V.P. Business Development

**Exhibit M**

## UNANIMOUS RESOLUTION OF THE SHAREHOLDERS, DIRECTORS AND OFFICERS OF MANSELL CAPITAL PARTNERS, LLC

A special meeting of the shareholders, directors and officers of Mansell Capital Partners, LLC, ("Company") was held on July 14, 2003. The following were present representing all of the shareholders, directors and officers of the Company.

Stephan J. Lovett, President
Thomas O. Begley, Secretary

IT WAS RESOLVED THAT Mr. Gordon Mascarenhas, a Canadian citizen with Passport Number JS983498 shall be appointed as "Advisor and Administrator" to assist with specific transactions wherein the company shall exchange it's investment funds, currently on deposit with the clearing firm of Hartsfield Capital Securities, Inc. in Atlanta, Georgia, for legally issued, marginable bank instruments from any bank with rated securities of AA or better by S&P and Aa/P1 by Moody's; and

IT WAS FURTHER RESOLVED THAT, Mr. Mascarenhas shall only act in a legal manner that *does not* place the Company or its assets at any risk of loss or foreclosure; and

IT WAS FURTHERE RESOLVED THAT, Mr. Mascarenhas is hereby authorized to execute the acquisition of commercial documents consistent with the criteria described in the aforementioned resolutions. Mr. Mascarenhas's execution of the acquisition of such securities shall be performed with notification to and pre-approval of a designated representative of Mansell Capital Partners, LLC: and

IT WAS FURTHER RESOLVED THAT the Company's securities dealer (Hartsfield Capital Securities, Inc.) shall be instructed by the Company to issue by standard international banking practices, a bank-to-bank communication via swift containing payment for said instruments; and

IT WAS FURTHER RESOLVED THAT the bank instrument to be purchased by the Company shall be cash-backed, irrevocable and unconditional as to payment at maturity with a one year term, and shall be payable by the issuing bank without recourse, protest, notification, and free of any deductions, withholdings, fees, taxes or charges levied by any party including any political entity in the jurisdiction of issuance of the instrument. The instrument shall be a global issue suitable for acquisition by a U.S. or Canadian citizen; and

IT WAS FURTHER RESOLVED THAT Mr. Mascarenhas shall be authorized to issue such relevant instructions to our securities dealer (Hartsfield Capital Securities, Inc.) who will act immediately on our behalf and upon our confirmation.

There being no further business, the meeting was declared closed.

This Resolution is Agreed, Signed and Sealed on this 14th day of July, 2003.

_____
Stephan J. Lovett, President

Certified by the Corporate Secretary:

_____
Thomas O. Begley, Secretary

80

**Exhibit N**

January 12, 2003

Mansell Capital Partners, LLC
3775 Mansell Road
Alpharetta, GA 30022

Gentlemen:

This is to confirm the arrangement wherein Mansell Capital Partners provided a check in the amount of $34,449.77 to K&K Holdings, LLC on behalf of Hartsfield Capital Group. Hartsfield has indicated that the amount, with no interest added, will be repaid within ten days.

Sincerely,

Stephan J. Lovett
President



**Exhibit O**

## BOARD OF DIRECTORS' RESOLUTION

## FOR AUTHORIZATION FOR BANK ACCOUNT SIGNITURE

## FOR

## MANSELL CAPITAL PARTNERS, LLC

### A Georgia Limited Liability Company

We, the undersigned, representing all or a majority of Directors of MANSELL CAPITAL PARTNERS, LLC,

having met and discussed the business herein set forth, have unanimously:

RESOLVED, that Ms. Wendy Yap, President of Dover Financial be and hereby is authorized to be the

signatory on a bank account in the name of MANSELL CAPITAL PARTNERS, LLC with Mays Davis Group and its

depository bank, PNC for the deposit of funds belonging to the LLC, such funds to be withdrawn only by check or wire

transfer from the LLC and signed by Ms. Wendy Yap, Messer's Stephan Lovett and Alain Assemi of the LLC.

DATED this June 30, 2003

Stephan Lovett, Managing Director

Alain Assemi, Director

**Exhibit P**

JUN-27-2003 15:49    HARTSFIELD CAPITAL    770 408 9100    F#511 P.003/005
770 408 9100    F#441 P.001/003

## HARTSFIELD CAPITAL SECURITIES, INC.
3775 Mansell Road ~ Alpharetta, GA 30022
770-408-6390 ~ Fax 770-408-9100
Member NASD and SIPC

March 13, 2003

Mr. David G Serena
Chief Operating Officer
May Davis Group, Inc.
Via Facsimile: 212-871-9651

Dear Mr. Serena:

Enclosed is the statement of Project Finance Custodial Responsibilities under which Hartsfield Capital Securities, Inc. ("HCS") will conduct its business with May Davis Group, Inc. ("MDG") It defines the parameters of the contemplated transaction. It is HCS's intent to initiate the buy and sell transaction only when the circumstances outlined in the statement of Project Finance Custodial Responsibilities are met. Deviation from the stated requirements will not be attempted without joint concurrence.

We ask that you review the enclosed document to ensure that MDG finds the stated parameters to be acceptable and once provided to MDG shall govern the account. Should that be the case, please acknowledge the receipt of this letter and its attachment in the space provided. Thank you.

Sincerely

John H. Banzhaf
President

Accepted for May Davis Group, Inc.

David G. Serena

3/14/03
Date



**Exhibit Q**

Page 1

IN THE U.S. DISTRICT COURT

SOUTHERN DISTRICT OF NEW JERSEY COUNTY

CA NO.:08-CV-1337LTS

DOVER, LTD.,

               Plaintiff,

-VS-

ALAIN ASSEMI, HARTSFIELD CAPITAL GROUP, STEPHAN J. LOVETT,

DELBERT D. REICHARDT, DELBERT D. REICHARDT, MANSELL CAPITAL

PARTNERS, LLC, THOMAS O. BEGLEY, THOMAS O. BEGLEY &

ASSOCIATES, T.J. MORROW, and T.J. MORROW, P.C.,

               Defendant.

-----------------------------------------/

DEPOSITION OF DELBERT D. REICHARDT

Thursday, July 31st, 2008

3:50 PM - 5:30 pm

181 Peachtree Street

Atlanta, GA

Reported by:

Catherine Jarman Rouzer, CVR-CCR

State of Georgia

Esquire Deposition Services

Atlanta Office Job #427626/204574

404-872-7890

**Delbert D. Reichardt**

Page 6

1          PROCEEDINGS
2 (Whereupon,
3          DELBERT D. REICHARDT,
4 having been first duly sworn, was examined and testified as
5 follows.)
6          EXAMINATION
7 BY MR. MULLANEY:
8     Q   Good afternoon, Mr. Reichardt. I'm Tom Mullaney,
9 attorney for Plaintiff, Dover Limited. I note for the
10 record that you were here for Mr. Banzhaf's deposition, so
11 you know how it goes, and you won't be -- can't say you
12 were sandbagged.
13          Those exhibits at your left elbow are you're
14 going to find in reverse order there, I think. So the
15 first exhibit I refer to will be on the bottom of the pile.
16 Do you want to turn them upside down? Exactly.
17     A   This is part of that?
18     Q   No. Is that Exhibit One you have in your hand?
19     A   It says P-2.
20          MR. KOLBER: No, it's the one before that.
21          Yeah, just like that.
22 BY MR. MULLANEY:
23     Q   Have you ever seen what's been previously marked
24 as Plaintiff's One before?
25     A   I don't remember that I've seen this.

Page 7

1     Q   Okay. Did you know that Mansell was -- strike
2 that.
3          Did you know that Mansell had paid the rent for
4 Hartsfield Capital Group on one occasion?
5     A   Yes. Mr. Banzhaf told me when it was happening.
6     Q   Okay. What was your role in Mansell, if any?
7     A   It really -- didn't really amount to a lot. Mr.
8 Banzhaf actually carried out all the activities that we
9 discussed today, writing of checks and so on, but he would
10 talk to me from time to time and keep me kind of up to date
11 if there were any issues going on. I may have signed a
12 check or two. I -- but I don't recall specifically.
13     Q   Did you have check signing authority?
14     A   Yes.
15     Q   Did anyone besides you and Mr. Banzhaf have check
16 signing authority?
17     A   Not to my knowledge.
18     Q   Did you have access to the checkbook of Mansell?
19     A   I'd have to ask Mr. Banzhaf. He kept it in his
20 desk.
21     Q   Okay. Was it locked in his desk?
22     A   I don't think so.
23     Q   Did Mr. Banzhaf keep it in his office?
24     A   Yes.
25     Q   Did he lock his office?

Page 8

1     A   No.
2     Q   Were you an investor in Mansell Capital Partners?
3     A   No.
4     Q   Did you -- were you an investor in the Kerr
5 Trust?
6     A   Yes.
7     Q   And how did you place your investment with the
8 Kerr Trust?
9     A   In the one case, I wrote a check and gave it to
10 John to send to Kerr. In the second case, I had a wire
11 transfer done from my account directly to Kerr.
12     Q   Okay. In the case of the check was it written to
13 Mansell?
14     A   No. I'm sure it wasn't.
15     Q   Then why did you give it to John?
16     A   That's a good question.
17     Q   Thank you.
18     A   Let me correct. Let me restate. And I -- while
19 my memory is fuzzy, I probably sent the check directly to
20 Kerr. I had his address in Oakville, Ontario, so I
21 probably did.
22     Q   And the wire was directly to Kerr?
23     A   Yes.
24     Q   Were you ever paid any money by Kerr? I take
25 that back. Were you ever paid any money by the Kerr Trust?

Page 9

1     A   Yes, interest.
2     Q   How much did you put into the Kerr Trust?
3     A   Two hundred thousand dollars.
4     Q   How much were you ever paid?
5     A   I think the aggregate was around eighty thousand
6 or ninety thousand dollars of interest.
7     Q   Do you know what it was? Do you know if it was
8 interest or principal or?
9     A   I do now.
10     Q   Well, now what do you know it to be?
11     A   It was return of principal -- return of capital.
12          MR. KOLBER: We don't know what it was. We
13          know what it was characterized.
14 BY MR. MULLANEY:
15     Q   There is a -- What's the basis of your belief
16 that you were having your capital or your principal
17 returned? What's the basis of your belief of -- that you
18 were -- the capital was returned to you by the Kerr Trust?
19     A   My knowledge of this was based upon testimony
20 made by Bill Kerr in an affidavit made before a court in
21 Toronto. May I also do one more thing? I need to correct
22 the record.
23     Q   Sure.
24     A   As I'm -- as I'm thinking, I recall my check. It
25 did go through John for the first hundred thousand, and it

3 (Pages 6 to 9)

# Delbert D. Reichardt

Page 10

1 seemed to me that he transferred it. John would have to
2 testify to whom I wrote out the check.
3    Q   Okay.
4    A   Because I can't remember, but that's where it
5 went. It seemed to me on his records, didn't it show
6 moving a hundred thousand dollars?
7    Q   It probably does, but I just can't remember.
8 It's in there somewhere
9    A   It's in there.
10    Q   But if you remember, you remember. If you don't,
11 you don't.
12    A   I remember.
13    Q   Did, if you recall, did John tell you why you
14 were to give Mansell a check to be sent to the Kerr Trust?
15    A   No, he didn't.
16    Q   Who told you, if anybody, to give John a check to
17 send to the Kerr Trust?
18    A   I just understood that was the system.
19    Q   How did you get that understanding?
20    A   Watching the process.
21    Q   When did you make your first investment -- make
22 your first payment to the Kerr Trust?
23    A   I believe it was in the fall of 2003. It was
24 summer, but it was sometime in the second half of the year.
25    Q   Was it your understanding that interest payments

Page 11

1 from the Kerr Trust were sent first to Mansell before you
2 made your first investment?
3    A   No, it wasn't. What I had before I initiated the
4 investment, I got a letter from William Kerr, in which he
5 outlined the terms and conditions of the investment.
6    Q   Okay.
7    A   That's why it would have been my expectation that
8 the interest would be coming direct as opposed to Mansell.
9 But it didn't surprise me, because I saw the system
10 working.
11    Q   Well -- right. From your -- and your observation
12 of the system working was your observation of John,
13 correct?
14    A   Yes.
15    Q   And through water cooler talk or whatever, you
16 had an understanding that Mansell was distributing monies
17 for the Kerr Trust?
18    A   My understanding was that Mansell Capital, MCP,
19 LLC, was simply a vehicle through which monies passed, and
20 so my money had passed through there to get to Kerr, and
21 Kerr's return of interest to us would come through Mansell
22 Capital Partners. I understood that.
23    Q   And you didn't have an understanding of why
24 Mansell had to exist as that kind of vehicle?
25    A   I think it was a convenience as a vehicle.

Page 12

1    Q   And at the time you became what you thought -- at
2 the time you paid money in to the Kerr Trust through
3 Mansell, you also had the authority to distribute money to
4 yourself. You were from Mansell. You had check writing
5 authority, is that correct?
6    A   That would be correct.
7    Q   Did that -- I should probably know the answer to
8 this, but I didn't look you up on FINRA. Do you have a
9 securities license also?
10    A   Yes, sir.
11    Q   What series is it that you have?
12    A   I have the 7, 62, and 28.
13    Q   Okay.
14    A   Oh, and 55. FINOP. Do you know what a --
15    Q   I don't. I'm guessing it's an options, some sort
16 of option?
17    A   No, no, it's --
18    Q   Financial operations?
19    A   Financial operations officer. It was on the --
20 when we last filed the focus reports and so on. John can't
21 do that. I can.
22    Q   When did you get your last payment from Kerr,
23 slash, Mansell?
24    A   It probably would coincide with the dates that
25 Mr. Banzhaf mentioned earlier, that it went into --

Page 13

1 somewhere in 2005.
2    Q   Would your wire to Kerr show up in the Bank of
3 America -- in the Mansell Bank of America account?
4    A   The wire of the hundred thousand was certainly in
5 his records. Now, I may be confused on this. I saw the
6 record, but it may have been the bank records, Bank of
7 America records, but it might also have been Mansell
8 records.
9    Q   Were you paid any money by Mansell for any
10 administrative services?
11    A   Yes.
12    Q   How much were you paid for your administrative
13 services?
14    A   I think I received approximately the same amount
15 that Mr. Banzhaf received, which was over that period of
16 months was around eighty thousand dollars.
17    Q   Did you receive that before or after you made
18 your first investment in the Kerr Trust, or both?
19    A   No, that -- it would certainly have been after --
20 after I received -- after I made my investments, because I
21 made my investments in 2003, I think both of them.
22    Q   Were you -- and the payments you -- How much in
23 total were you paid by Mansell, roughly, if you remember?
24    A   I think that's the number I just gave you.
25    Q   Eighty thousand?

4 (Pages 10 to 13)

# Delbert D. Reichardt

Page 18

1 receipts if someone went through there, and I still do
2 today. You know, if I receive payments from Argosy, I put
3 it in my -- and run it through there first.
4    Q    Okay. And there's probably a tax advantage to
5 that?
6    A    Yeah. It is not really a broker/dealer. It
7 simply has that name.
8    Q    Oh.
9    A    It's one that I rescued from a heap of a -- of a
10 company that went dormant, and received the authority to
11 those assets of that company.
12    Q    Okay.
13    A    And I found that particular name, it had been set
14 up to be an active company and never was, and so I went to
15 the -- this is a lot of information you don't need.
16    Q    Probably.
17        MR. KOLBER: Don't need it, don't bother.
18        THE WITNESS: I did it through the State of
19        Georgia.
20        MR. MULLANEY: Your dog's the one that's
21        chewing up the cabinetry.
22 BY MR. MULLANEY:
23    Q    What services did you provide to Mansell in
24 exchange for the eighty thousand dollars you received?
25    A    Primarily giving my support to John.

Page 19

1    Q    Would you say you spent less time on --
2    A    Considerably less time.
3    Q    Okay.
4    A    My time was mostly being available to him, if he
5 needed my help, but it was the company's work.
6    Q    Did Mr. Begley, to your knowledge, did Mr. Begley
7 approve of the arrangement of you being paid for services
8 to Mansell?
9    A    I have no knowledge of that.
10    Q    Okay. To your knowledge, did Mr. Lovett approve
11 of the arrangement --
12    A    I have no knowledge of that.
13    Q    Do you know if anyone else in the world knew that
14 you were being paid for your services to Mansell?
15    A    I have no knowledge of that either.
16    Q    I'm going to just show you a document that's been
17 previously marked as an exhibit. I forget which one. If
18 you wouldn't mind --
19        MR. KOLBER: Or I can do it.
20 BY MR. MULLANEY:
21    Q    You want to be the file manager?
22        MR. KOLBER: There it is. It's Exhibit
23        Plaintiff's Three.
24 BY MR. MULLANEY:
25    Q    Plaintiff's Three. If you don't mind pulling

Page 20

1 Plaintiff's Three out of the stack and Mr. Reichardt taking
2 a quick look? Have you ever seen Plaintiff's Three before?
3    A    Yes, I have reason to believe that I did see
4 this.
5    Q    Okay. Before the initiation of this litigation
6 have you seen this document?
7    A    Yes. Mr. Lovett was very proud of what he had
8 created here, and so he distributed copies.
9    Q    And you were a distributee?
10    A    Apparently.
11    Q    Well, you think you remember getting this?
12    A    Yes, yes.
13    Q    Do you remember roughly when you might have
14 received a copy of this?
15    A    I really don't.
16    Q    Did you have any objections to the contents of
17 Plaintiff's Exhibit Three?
18    A    Yeah. There -- for one thing, the manner in
19 which he -- and I haven't really looked at this carefully
20 now, but he would always misrepresent the broker/dealer and
21 say that he had a broker/dealer, you know, included under
22 Hartsfield Capital, which we objected to, as John and I
23 would object to that, because we weren't his broker/dealer,
24 and we didn't work for him. But he liked to represent to
25 the world that everything in here belonged to him and the

Page 21

1 people belonged to him, worked for him. So those were the
2 objections.
3    Q    Okay. Did you ever put those objections in
4 writing?
5    A    I am thinking that on one occasion we did. John
6 and I working in concert did, but I can testify that John
7 and I together went to his office several times to express
8 our concerns for the misrepresentations in his document.
9    Q    Now, were you aware that this document was
10 available on the Internet?
11    A    I was not.
12    Q    Do you know if Mr. Lovett ever took actions to
13 correct this document?
14    A    Yes.
15    Q    Do you know when he did it?
16    A    More recently.
17    Q    Do you have a copy of the corrected document
18 available to you?
19    A    I believe we do.
20    Q    If it's not terribly inconvenient, bring it
21 tomorrow. You don't have to. You're under no obligation
22 to. Mr. Kolber will tell you, but I would be pleased to
23 see it. I'm going to ask for it.
24    A    You had never seen it?
25    Q    Never seen it.

6 (Pages 18 to 21)

# Delbert D. Reichardt

Page 26

1 Argosy number?
2    A    No, we don't.
3    Q    That's --
4    A    Our lease provided for backup services.
5    Q    Is the same true for the facsimile?
6    A    That's correct.
7    Q    Does Argosy have its own facsimile number?
8    A    No.
9    Q    Argosy's facsimile number is 770-408-9100?
10   A    That's correct.
11   Q    And it was in 2003?
12   A    Probably was.
13   Q    And do you recall a time when Hartsfield Capital
14 Securities and Hartsfield Capital Group had separate fax
15 numbers?
16   A    No.
17   Q    What is your email address today?
18   A    My email address is del@hartsfieldcapital.com.
19   Q    Even today?
20   A    Even today. But we have changed it on -- for
21 public purposes. We are using argosycapitalsecurities.net.
22 Is that correct, John?
23        MR. BANZHAF:  Argosycapital.net.
24        THE WITNESS:  Just capital.net, for public
25        purposes, but personally, I still receive

Page 27

1        del@hartsfieldcapital.com.
2 BY MR. MULLANEY:
3    Q    When did Argosy set up its own email account.net?
4    A    Last year.
5    Q    Last year 2007? Before then could you or Mr.
6 Banzhaf, to your knowledge, your business email was only
7 hartsfieldcapital.com?
8    A    To the best of my knowledge it was.
9    Q    Did Hartsfield Capital Group pay you any money
10 individually in 2003?
11   A    2003, I don't think so.  I don't remember.
12   Q    2004?
13   A    I don't remember.
14   Q    2005?
15   A    I'm pretty confident they didn't, no.
16   Q    You had testified earlier that your employment in
17 Hartsfield Capital Group ended in 1998, correct?
18   A    Yes.
19   Q    Do you have any reason to think you received any
20 compensation from Hartsfield Capital Group after 1998?
21   A    I have no reason to believe that.
22   Q    All right. Did Hartsfield Capital Securities pay
23 --
24   A    You triggered something.  I personally
25 participated in assisting Hartsfield Capital Group make a

Page 28

1 sale of a company, which was -- at that time, it was its
2 business, and this was a Hoffer Company, and because of our
3 assistance in working with Hoffer, and I would have to
4 characterize it as -- as John and my -- because he was
5 included on a more personal basis.  It wasn't really the
6 broker/dealer doing it.  It was us personally.  We knew Mr.
7 Hoffer, and so we, to that extent, assisted and helped in
8 the sale of his company.  And so when Hartsfield Capital
9 Group got a payment, a piece of that, not much, was paid to
10 the broker/dealer.
11   Q    Was paid to the broker/dealer?
12   A    We have to -- we have to run all our money
13 receipts through the broker/dealer.  That's under the
14 securities laws.
15   Q    Okay.  Do you remember what year that was?
16   A    2005 or six.
17        MR. BANZHAF:  Oh, prior to that I would
18        think.
19        THE WITNESS:  You think it was even earlier?
20        MR. BANZHAF:  Yeah.
21        THE WITNESS:  It didn't seem that long ago.
22        It might have been.
23 BY MR. MULLANEY:
24   Q    Do you remember how much it was?
25   A    What we got?  And it was something like maybe ten

Page 29

1 thousand dollars.  But the fee was like ninety that was
2 brought in.  I did most of the selling.
3    Q    Were there any other events like that?
4    A    No, that's just one that I recall where we didn't
5 work closely with their firm.  Otherwise, it's been pretty
6 much of a -- a Chinese wall.
7    Q    Okay.  Hartsfield Capital Securities hasn't paid
8 Stephan Lovett any money?
9    A    I mean other than as a landlord.  You know, I
10 mean I mean, I don't consider a landlord as being very
11 close.
12   Q    We say firewall today by the way.
13        MR. KOLBER:  That's what he said.  Didn't he
14        say that?
15        MR. MULLANEY:  Chinese wall.
16        MR. KOLBER:  Oh, okay.  All right.
17        THE WITNESS:  Fire wall.
18        MR. MULLANEY:  Fire wall.
19        THE WITNESS:  I stand corrected.
20 BY MR. MULLANEY:
21   Q    Yes.  Did Hartsfield Capital Securities ever have
22 any reason to pay Stephan Lovett any money?
23   A    When you say pay, we advanced him some money.
24   Q    For what?
25   A    He had a need, and he came and made a -- a plea

8 (Pages 26 to 29)

**Delbert D. Reichardt**

Page 30

1 for -- for some help, and I reasoned that we could make an
2 advanced payment on our rent, which that's what I did.
3    Q   Okay. How much was it?
4    A   Oh, it might have been twenty-five, thirty
5 thousand dollars, something like that.
6    Q   Did he -- When was this?
7    A   Oh, I think -- I'm thinking this happened twice,
8 and the last one was just a couple of years ago. It could
9 have been like 2005.
10        MR. BANZHAF: Me, I don't know.
11 BY MR. MULLANEY:
12    Q   And it was Securities -- Hartsfield Capital
13 Securities that lent Mr. Lovett this money?
14    A   Yes, which is something you have to be very
15 careful on being a securities company. But since the
16 securities company paid rent, I just advanced rent to him,
17 rent money.
18    Q   Was it to him personally, or was it to Group?
19    A   I think it was to Group. I'm almost positive it
20 was to Group.
21    Q   Okay. And it was for --
22    A   Because Group and Lovett are synonymous.
23    Q   Why do you say that?
24    A   I don't think there are any other partners.
25    Q   What does Tom Begley do?

Page 31

1    A   Well, he may have a title. I don't think he
2 works for Lovett.
3        MR. KOLBER: Only talk to what you know.
4 BY MR. MULLANEY:
5    Q   Do you see Tom Begley every day at work?
6    A   No.
7    Q   Do you know where Tom Begley keeps an office
8 today?
9    A   Yes.
10    Q   Where?
11    A   Next to mine, but he's not there every day.
12    Q   Okay. You anticipated my next question. How
13 often do you see Mr. Begley?
14    A   At most, once a week.
15    Q   Do you know what he does?
16    A   Not really.
17    Q   And Mr. Lovett's need for this rent advance was a
18 personal one?
19    A   No, I think it was his company. He had an
20 obligation to meet and needed the money, you know, like
21 right now.
22    Q   But that obligation was not to the landlord at
23 the time?
24    A   His landlord or mine?
25    Q   His landlord?

Page 32

1    A   I don't know. It wasn't important that I know.
2    Q   You said that he came to you and made a --
3    A   Plea.
4    Q   -- impassioned plea?
5    A   Well, because I think he was under pressure.
6    Q   Right. Did he tell you who was pressuring him?
7    A   No.
8    Q   And he didn't tell you what the obligation was
9 for?
10    A   No.
11        MR. KOLBER: I don't think any of this is
12 relevant.
13        MR. MULLANEY: I disagree, but we can move
14 on.
15        (Whereupon, Plaintiff's Exhibit Number
16 Twelve was marked for identification purposes.)
17 BY MR. MULLANEY:
18    Q   Let's go to your affidavit. I think I know the
19 answer. Do you recall signing this affidavit, Mr.
20 Reichardt?
21    A   Yes, I do.
22    Q   Let's turn to paragraph five. You probably
23 heard, you may not remember Mr. Banzhaf's answers to the
24 clients of to which Hartsfield Capital Securities may have
25 or did provide services. Do you have anything to add to

Page 33

1 Mr. Banzhaf's testimony on that point?
2    A   Yes.
3    Q   What?
4    A   It is not my memory that John McDonald or the
5 McDonald Company was a Lovett client. I was introduced to
6 John McDonald by a colleague in the broker world.
7        MR. BANZHAF: Correct.
8 BY MR. MULLANEY:
9    Q   Okay.
10    A   And he -- and he took me by the hand to meet him
11 at his office. That is at the John McDonald office. And
12 he's a well-known realtor here in Atlanta in the warehouse
13 area. Builds to suit, you know, warehouses.
14    Q   Oh, okay, I see. I thought you meant his office
15 was in the warehouse area. Do you have anything to add to
16 Mr. Banzhaf's testimony about why Argosy or Hartsfield
17 Capital Securities registered and deregistered in the state
18 of New York?
19    A   No, I thought he covered it thoroughly.
20    Q   Okay. Let's go to paragraph thirteen.
21    A   Of my affidavit?
22    Q   Yeah. The word security, unless my eye -- my
23 eyes are going, but I think that's misspelled. What
24 percentage of Argosy's -- what percentage of Argosy's
25 trades are executed on the New York Stock Exchange,

9 (Pages 30 to 33)